# United States Court of Appeals
# for the Federal Circuit

CRFD RESEARCH, INC.,

Appellant,

v.

DISH NETWORK CORPORATION, DISH DBS CORPORATION, DISH NETWORK L.L.C., ECHOSTAR CORPORATION, and ECHOSTAR TECHNOLOGIES L.L.C.,

Appellees.

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2015-00627

## JOINT APPENDIX

Tarek N. Fahmi

ASCENDA LAW GROUP, PC
333 W San Carlos St.
Suite 200
San Jose, CA 95110

(866) 877-4883
tarek.fahmi@ascendalaw.com

*Attorney for Appellant*

Eliot D. Williams
G. Hopkins Guy III

BAKER BOTTS L.L.P.
1001 Page Mill Road
Building One, Suite 200
Palo Alto, CA 94304

(650) 739-7511
eliot.williams@bakerbotts.com

*Attorneys for Appellee*

# TABLE OF CONTENTS

Final Written Decision of PTAB IPR2015-00627 ..................................................... 1

Certified List IPR2015-00627 ...................................................................................... 36

US Patent 7,191,233 .................................................................................................... 40

Excerpts from DISH Netowrk Petition ..................................................................... 52

Patent Owner Preliminary Response ....................................................................... 132

Decision - Institution of Inter Partes Review ....................................................... 164

Excerpt from Scheduling Order ............................................................................... 190

CRFD Patent Owner Response ................................................................................. 208

DISH Network Reply .................................................................................................. 262

Excerpt from Transcript of Oral Hearing .............................................................. 349

Bates et al., US Patent 6,963,901 ........................................................................... 759

Chan et al.,
"Next Generation Wireles Data Services: Architecture and Experience" ................ 774

Phan San Jose................................................................................................................. 1323

Phan Helsinki ............................................................................................................... 1337

Excerpts from Deposition of Prasant Mohapatra ................................................ 1707

Excerpts from Declaration of Prasant Mohapatra ............................................... 1809

Excerpts from Deposition of W. Leo Hoarty........................................................ 1907

CERTIFICATE OF SERVICE................................................................................. A-1

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

DISH NETWORK CORPORATION, DISH DBS CORPORATION,
DISH NETWORK L.L.C., ECHOSTAR CORPORATION, and
ECHOSTAR TECHNOLOGIES L.L.C.,
Petitioner,

v.

CRFD RESEARCH, INC.,
Patent Owner.
_____

Case IPR2015-00627
Patent 7,191,233 B2
_____

Before JUSTIN T. ARBES, THOMAS L. GIANNETTI, and
CHARLES J. BOUDREAU, *Administrative Patent Judges.*

ARBES, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

# I. BACKGROUND

Petitioners DISH Network Corporation, DISH DBS Corporation, DISH Network L.L.C., EchoStar Corporation, and EchoStar Technologies L.L.C. (collectively, "Petitioner") filed a Petition (Paper 1, "Pet.") seeking *inter partes* review of claims 1, 4, 23, and 25 of U.S. Patent No. 7,191,233 B2 (Ex. 1001, "the '233 patent") pursuant to 35 U.S.C. §§ 311–319. On June 3, 2015, we instituted an *inter partes* review of claims 1, 4, 23, and 25 on four grounds of unpatentability (Paper 9, "Dec. on Inst."). Patent Owner CRFD Research, Inc. filed a Patent Owner Response (Paper 14, "PO Resp."), and Petitioner filed a Reply (Paper 16, "Reply"). An oral hearing was held on January 19, 2016, and a transcript of the hearing is included in the record (Paper 23, "Tr.").

We have jurisdiction under 35 U.S.C. § 6(c). This final written decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 1, 4, 23, and 25 are unpatentable.

## A. The '233 Patent[1]

The '233 patent describes a system and method for "user-directed transfer of an on-going software-based session from one device to another

---

[1] The '233 patent also is the subject of Cases IPR2015-00055 and IPR2015-00259, in which *inter partes* reviews were instituted, and was the subject of Case IPR2015-00157, in which the request for *inter partes* review was denied. On April 22, 2016, we issued a final written decision in Case IPR2015-00055 determining that claims 1, 4–6, and 8–11 of the '233 patent had been shown to be unpatentable.

device." Ex. 1001, col. 1, ll. 8–11. A user may have a number of communication-enabled devices (e.g., cellular telephone, wireless personal digital assistant (PDA), laptop computer, desktop computer) through which the user conducts software application sessions. *Id*. at col. 1, ll. 15–52. The user may conduct a session on one device and then decide to switch to another device. *Id*. at col. 1, ll. 53–59. For example, the user may want to switch from a stationary device to a mobile device, or to switch to a device with a different graphical user interface. *Id*. According to the '233 patent, conventional systems that required the user to "discontinue the current session on the first device and reinitiate a new session on the second device" could entail inconveniences such as the history of the original session being lost or time delays involved in logging off and reinitiating. *Id*. at col. 1, ll. 59–66.

Figure 1 of the '233 patent is reproduced below.



*Fig. 1*

3

Figure 1 depicts wireless clients 120 (e.g., a cellular telephone or PDA) and wired clients 125 (e.g., a desktop or laptop computer) of a user that connect over various networks to application services network 105. *Id.* at col. 4, ll. 4–11, 30–33, col. 5, ll. 3–6. Wireless clients 120 and wired clients 125 execute client programs that support session services for the respective devices, and are "configured to have a preferred mode of interaction, i.e., modality," such as a graphical user interface for transferring sessions between devices. *Id.* at col. 4, ll. 33–50. Application services network 105 provides session-based services (e.g., instant messaging, database querying), and application server 140 provides applications for those services (e.g., instant messaging application, database querying application), to wireless clients 120 and wired clients 125. *Id.* at col. 5, ll. 21–30.

The '233 patent describes the method of session transfer as follows: (1) a "redirect or transfer command" is sent from a first device (wireless client 120 or wired client 125); (2) session server 145 begins intercepting messages destined for the first device; (3) the first device transmits a "transaction or session history" to session server 145; (4) session server 145 retrieves the previously stored "device profile" of the second device to which the session is to be redirected, "convert[s] the stored messages [of the session history] into a data format" and/or modality compatible with the second device, and converts the "state" of the session to a state compatible with the second device; and (5) when the user activates the second device, session server 145 "pushes the converted session to the redirected device over the network 100 as a normal session with the converted transaction log." *Id.* at col. 7, l. 46–col. 8, l. 58, Figs. 3A–3B.

APPX004

*B. Illustrative Claim*

Claim 1 of the '233 patent recites:

1. A method for redirecting an on-going, software based session comprising:

conducting a session with a first device;

specifying a second device;

discontinuing said session on said first device; and

transmitting a session history of said first device from said first device to a session transfer module after said session is discontinued on said first device; and

resuming said session on said second device with said session history.

*C. Prior Art*

The pending grounds of unpatentability in the instant *inter partes* review are based on the following prior art:

U.S. Patent No. 6,963,901 B1, filed July 24, 2000, issued Nov. 8, 2005 (Ex. 1004, "Bates");

Mun Choon Chan & Thomas Y. C. Woo, *Next-Generation Wireless Data Services: Architecture and Experience*, IEEE PERS. COMM., Feb. 1999, 20 (Ex. 1005, "Chan");

Thomas Phan et al., *A New TWIST on Mobile Computing: Two-Way Interactive Session Transfer*, PROC. SECOND IEEE WORKSHOP ON INTERNET APPLICATIONS (WIAPP 2001) (Ex. 1019, "Phan San Jose"); and

Thomas Phan et al., *Handoff of Application Sessions Across Time and Space*, IEEE INT'L CONF. ON COMM. (ICC 2001) (Ex. 1020, "Phan Helsinki").[2]

---

[2] Petitioner refers to Phan San Jose as "Phan WIAPP," and refers to Phan Helsinki as "Phan ICC." Because the two references were discussed

APPX005

*D. Pending Grounds of Unpatentability*

The instant *inter partes* review involves the following grounds of unpatentability:

| Reference(s) | Basis | Claim(s) |
|---|---|---|
| Phan Helsinki | 35 U.S.C. § 102(a) | 1, 4, 23, and 25 |
| Phan Helsinki and Phan San Jose | 35 U.S.C. § 103(a) | 4 and 25 |
| Bates | 35 U.S.C. § 102(e) | 1 and 23 |
| Bates and Chan | 35 U.S.C. § 103(a) | 1, 4, 23, and 25 |

## II. ANALYSIS

*A. Claim Interpretation*

The Board interprets claims using the "broadest reasonable construction in light of the specification of the patent in which [they] appear[]." 37 C.F.R. § 42.100(b); *see In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1278–79 (Fed. Cir. 2015), *cert. granted sub nom. Cuozzo*

---

previously in Case IPR2015-00055, we use the same nomenclature as the earlier proceeding for consistency. The copies of Phan San Jose and Phan Helsinki submitted by Petitioner include Library of Congress date stamps of August 28, 2001, and July 31, 2001, respectively. Petitioner argues that the references were publicly available "at least as early as" August 18, 2001 (presumably August 28, 2001), and July 31, 2001, respectively. Pet. 3. Patent Owner does not dispute Petitioner's contentions. Based on the record presented, we are persuaded that Phan San Jose and Phan Helsinki are prior art printed publications under 35 U.S.C. § 102(a). *See Kyocera Wireless Corp. v. ITC*, 545 F.3d 1340, 1350–51 (Fed. Cir. 2008). Also, when citing Phan San Jose and Phan Helsinki, we refer to the page numbers added by Petitioner in the bottom-right corner of each page. *See* 37 C.F.R. § 42.63(d)(2).

*Speed Techs. LLC v. Lee*, 136 S. Ct. 890 (mem.) (2016).  Under this standard, we interpret claim terms using "the broadest reasonable meaning of the words in their ordinary usage as they would be understood by one of ordinary skill in the art, taking into account whatever enlightenment by way of definitions or otherwise that may be afforded by the written description contained in the applicant's specification." *In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997).  We presume that claim terms have their ordinary and customary meaning. *See Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1062 (Fed. Cir. 2016) ("Under a broadest reasonable interpretation, words of the claim must be given their plain meaning, unless such meaning is inconsistent with the specification and prosecution history."); *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning is the meaning that the term would have to a person of ordinary skill in the art in question." (internal quotation marks omitted)).  A patentee, however, may rebut this presumption by acting as his or her own lexicographer, providing a definition of the term in the specification with "reasonable clarity, deliberateness, and precision." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

### *1. Previously Interpreted Terms*

In the Decisions on Institution in Cases IPR2015-00055, IPR2015-00157, IPR2015-00259, and IPR2015-00627, we interpreted various claim terms of the '233 patent as follows:

| Claim Term | Interpretation |
|---|---|
| "modality" | a preferred mode of interaction |

| Claim Term | Interpretation |
|---|---|
| "device profile" | information pertaining to the operation of a device, such as the data format or modality of the device |
| "in response to . . . activation of said second device" | in response to the second device being made active, such as by a user logging on to the second device |
| "session" | a series of information transactions between communicating devices during a particular time period |
| "discontinuing" | terminating or otherwise stopping, with the ability to be resumed |
| "discontinued" | terminated or otherwise stopped, with the ability to be resumed |
| "session transfer module" | computer hardware and/or software that participates in the transfer of a session |

*See* Dec. on Inst. 6–9; *Hulu, LLC v. CRFD Research, Inc.*, Case IPR2015-00259, slip op. at 6–9 (PTAB June 3, 2015) (Paper 8); *Unified Patents Inc. v. CRFD Research, Inc.*, Case IPR2015-00157, slip op. at 6–9 (PTAB Apr. 30, 2015) (Paper 8); *Iron Dome LLC v. CRFD Research, Inc.*, Case IPR2015-00055, slip op. at 6–10 (PTAB Apr. 27, 2015) (Paper 10). The parties do not dispute these interpretations in their Patent Owner Response and Reply. We do not perceive any reason or evidence that compels any deviation from these interpretations. Accordingly, we adopt our previous analysis for purposes of this Decision. We also interpret one other limitation.

### 2. Ordering of the "Specifying" Step[3]

Although the parties do not address specifically how "specifying a second device" in claims 1 and 23 should be interpreted, the parties disagree as to whether the step must occur in a specific order with respect to the step of "discontinuing said session on said first device." Patent Owner argues in its Response that Phan Helsinki, in describing the "pull mode" that is further explained in Phan San Jose, fails to disclose the "specifying" step because the user merely clicks "Suspend" to discontinue the session and then chooses a particular device on which to resume the session at a later time. PO Resp. 16–31. At the hearing, Patent Owner argued that the "specifying" step must occur before the "discontinuing" step, and that it must be the user or the first device that performs the specifying, citing as support an embodiment described in the Specification of the '233 patent. Tr. 21:1–23:18. Petitioner disagreed, arguing that nothing in the claim language itself requires the "specifying" step to occur before the "discontinuing" step. Reply 4–5; Tr. 18:1–22. We agree with Petitioner.

To determine whether the steps of a method claim that do not otherwise recite an order must nonetheless be performed in a particular order, we first "look to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003). "If not, we next look to the rest of the specification to determine whether it 'directly or

---

[3] In the final written decision in Case IPR2015-00055, we interpreted claim 1 not to require that the "specifying" step take place before the "discontinuing" step. *Iron Dome LLC v. CRFD Research, Inc.*, Case IPR2015-00055, slip op. at 8–10 (PTAB Apr. 22, 2016) (Paper 30). Our analysis herein is similar to that in Case IPR2015-00055.

APPX009

implicitly requires such a narrow construction.'"  *Id.* at 1370 (citation and emphasis omitted); *see also Mformation Techs., Inc. v. Research In Motion Ltd.*, 764 F.3d 1392, 1398–99 (Fed. Cir. 2014) ("a claim 'requires an ordering of steps when the claim language, as a matter of logic or grammar, requires that the steps be performed in the order written, or the specification directly or implicitly requires' an order of steps" (citation omitted)).

Claims 1 and 23 require certain steps to be performed before others. For example, the "transmitting" step must take place "*after* said session is discontinued on said first device" (emphasis added).  Likewise, "conducting a session with a first device" logically must take place before "discontinuing said session on said first device."  There is nothing in the language of the claims, however, expressly requiring "specifying a second device" to take place before "discontinuing said session on said first device" or requiring such an order as a matter of logic or grammar.  *See Altiris*, 318 F.3d at 1370–71 (concluding that the claim at issue required "several of the steps" to take place in order, but not the particular step argued by the plaintiff).  The "discontinuing" step, as well as the subsequent "transmitting" step, do not even refer to the second device.

Thus, we look to the Specification to determine whether it expressly or implicitly requires a particular order.  The Specification discloses that "[t]he client software of the wireless/wired client devices, 120 and 125 may be . . . configured to provide a selection of devices that a transferring session may be redirected thereto," and "[t]he selection of the redirected device may . . . be forwarded from the user of a wireless/wired client device, 120 and 125 to the session server [145]."  Ex. 1001, col. 4, ll. 53–61.  Also, as shown in Figures 3A and 3B, session server 145 receives a "redirect or transfer

command" from the first client device (step 305) before it begins intercepting messages destined for the first client device (step 310) and "access[es] the device profile of the selected second client (or redirected) device" (step 320). *Id.* at col. 7, l. 49–col. 8, l. 13. These portions of the Specification, however, describe only "exemplary" embodiments of the invention. *Id.* at col. 4, ll. 4–6, col. 7, ll. 46–49. They do not show, expressly or implicitly, that the "specifying" step of the claims must occur before the "discontinuing" step. Moreover, the Specification indicates the opposite, stating that "although the method of the present invention has been described by examples, the steps of the method may be performed in a different order than illustrated or simultaneously." *Id.* at col. 9, ll. 22–25.

Applying the broadest reasonable interpretation of the claims in light of the Specification, we do not interpret claims 1 and 23 to require that the "specifying" step take place before the "discontinuing" step.

### *B. Grounds Based on Phan Helsinki and Phan San Jose*

Petitioner argues that claims 1, 4, 23, and 25 are anticipated by Phan Helsinki under 35 U.S.C. § 102(a), and that claims 4 and 25 are unpatentable over Phan Helsinki and Phan San Jose under 35 U.S.C. § 103(a), relying on the supporting testimony of W. Leo Hoarty. Pet. 40–56 (citing Ex. 1018).[4] We have reviewed the Petition, Patent Owner Response, and Reply, as well

---

[4] In numerous paragraphs of his Declaration, Mr. Hoarty repeats the testimony of Mark Claypool, Ph.D., from Case IPR2015-00259, states that he agrees with Dr. Claypool's analysis and conclusions, and adopts them "as [his] own." *See, e.g.*, Ex. 1018 ¶¶ 43, 52, 55–64. Petitioner filed a copy of Dr. Claypool's declaration from Case IPR2015-00259 in this proceeding as Exhibit 1003.

APPX011

as the evidence discussed in each of those papers, and are persuaded, by a preponderance of the evidence, that claims 1, 4, 23, and 25 are anticipated by Phan Helsinki, and that claims 4 and 25 are unpatentable over Phan Helsinki and Phan San Jose.

### *1. Phan Helsinki*

Phan Helsinki describes a research project called the "Interactive Mobile Application Support for Heterogeneous Clients (iMASH)," which allows medical practitioners at a hospital to use different types of devices (e.g., desktop computers, PDAs) and "experience uninterrupted and seamless data access across multiple devices by performing application session handoff." Ex. 1020, 7 (emphasis omitted). The system provides for session handoff by placing a set of middleware servers between the client devices and the application server, storing state data on the middleware servers for the user's session on a first device (e.g., user preferences, URL history), and transferring the data to the second device upon session handoff. *Id*. at 8–10. Figure 1 of Phan Helsinki is reproduced below.



Figure 1 depicts wired and wireless client devices, a "distributed set of middleware servers" that is "the source for all services for clients," and an application server. *Id.* at 8. A client device "contacts only the local middleware server for all services," and the middleware server "takes responsibility for getting the data from the right [application] servers, and makes necessary conversion to fit the clients' needs." *Id.* at 9. Figure 2 of Phan Helsinki is reproduced below.



Figure 2 depicts functionality provided by the middleware server, such as user authentication and profiling, data caching, and presentation conversion (i.e., converting data for the particular client device requesting it). *Id.* "When a user moves an on-going application session from one device to another, middleware servers act as a 'home' for the application state (including active connections, cached data, etc.) to facilitate migration between devices." *Id.*

Phan Helsinki also describes the "Middleware-Aware Remote Code" (MARC) on the client device that facilitates "session saving and

restoration," and the process by which a session is transferred using MARC and a web browser. *Id*. at 9–10. Specifically, Phan Helsinki describes the following steps:

>   1. The user starts the client application and provides it with a unique user id.

>   2. The MARC within the application discovers and contacts the middleware server using Jini and begins a new session using the user id. The last saved state, if it exists, is retrieved from the middleware server. This step uses Java [Remote Method Invocation (RMI)] to acquire the most recently saved bookmarks, history, and user preferences, all of which are stored on and transported from the middleware as serialised Java Objects.

>   3. The returned data from the middleware is received by the MARC and then incorporated into the client before the user's current interactive application session begins. Within Mozilla, the data is deserialised by the MARC and then read into Mozilla's bookmark, history, and user preference dataspace. . . .

>   4. As the user changes the current session state, the state is updated at the middleware server at the appropriate times. For example, whenever Mozilla flushes the bookmarks to disk, our MARC will also transmit this data to the middleware via RMI.

>   5. When the user exits the session, the client updates the state at the middleware. Because Mozilla flushes all data upon exiting, our MARC likewise updates data on the middleware.

*Id.* at 10.

### 2. *Phan San Jose*

Phan San Jose pertains to the same iMASH research project as Phan Helsinki, and explains how the system allows physicians and staff at a hospital to use different types of devices (e.g., desktop and laptop

computers, display tablets) and "seamlessly move an application's session from one machine to another machine" using the hospital's "network as a conduit." Ex. 1019, 5.

Phan San Jose describes how the system could be used with a "Teaching File" Java applet that displays medical images and associated information, and allows users to create and modify instructional "teaching files." *Id*. at 10. In the Teaching File implementation, when a user requests a teaching file, the application server (AS) sends the image file (stored in the system's proprietary picture archiving and communication system (PACS) image format) to the middleware server (MWS). *Id*. at 10–11. The MWS then "performs the image assembly on behalf of the client, including the conversion of the proprietary PACS image to [a] Java Image and the manipulation of that image according to the teaching file state description." *Id*. at 11. Phan San Jose describes two ways of performing the session handoff. *Id*. In the "pull" mode, "the user selects a 'Suspend' operation, his session shall be saved back to the MWS, allowing the application to terminate, and at a later time the session can be reinstantiated by the Teaching File application running on the target machine." *Id*. In the "push" mode, "the user can select the hostname of the target from a list." *Id.* "When the handoff occurs, the MWS will contact a daemon running on the target machine to immediately launch the Teaching File applet and automatically retrieve the session state . . . [and the] applet on the first client terminates when the state is fully reinstantiated on the second client." *Id*.

APPX015

Figure 5 of Phan San Jose is reproduced below.



Figure 5 depicts the user interface of the Teaching File applet. *Id.* at 10. In the dropdown menu labeled "Target," the user is able to choose "Suspend" (corresponding to the "pull" mode) or one of three hostnames to which the session may be transferred (corresponding to the "push" mode). *Id.* at 10–11.

### *3. Anticipation Ground (Claims 1, 4, 23, and 25)*

Petitioner has presented sufficient evidence showing that Phan Helsinki discloses every limitation of claims 1, 4, 23, and 25. For example, as to claim 1, Petitioner explains how a user conducts a session with a "first device" (e.g., an office desktop computer), then discontinues the session on the "first device" by suspending the session, causing the user's session history (e.g., bookmark list, history file, user preferences) to be transmitted

16

from the computer to a "session transfer module" (i.e., the middleware server), and chooses to reinstantiate the session on a "second device" (e.g., a PDA) using the previously saved session history. Pet. 40–48 (citing Ex. 1020, 8–10, Ex. 1018 ¶¶ 84, 85, 87–90).

Patent Owner makes two arguments. First, Patent Owner argues that "[t]o better understand Phan Helsinki, it is useful to first examine the teachings of Phan San Jose," and Phan San Jose's description of the "push" mode does not disclose "transmitting a session history of said first device from said first device to a session transfer module *after* said session is discontinued on said first device," as recited in claim 1. PO Resp. 17–19 (emphasis added). Patent Owner cites as support testimony from Prasant Mohapatra, Ph.D., which largely repeats Patent Owner's arguments in its Response. *See id.* (citing Ex. 2001 ¶¶ 27, 31). We do not see the relevance of Phan San Jose to Petitioner's asserted anticipation ground, however, because the ground is based on Phan Helsinki alone. *See Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1255–56 (Fed. Cir. 1989) ("Anticipation requires that every limitation of the claim in issue be disclosed, either expressly or under principles of inherency, in a single prior art reference."). The parties agree that Phan Helsinki and Phan San Jose both describe a "pull" mode, which is different from the "push" mode that also is disclosed in Phan San Jose. *See* PO Resp. 12, 17, 22–23, 29; Ex. 2004, 67:23–68:5 (Petitioner's declarant, Mr. Hoarty, testifying that he "believe[s] that the skilled person would perceive steps 1 through 3 [in Phan Helsinki] to be a pull mechanism as defined by Phan San Jose"). Patent Owner agreed at the hearing that Phan Helsinki, in describing the "pull" mode, discloses the "transmitting" step of claim 1. Tr. 24:6–15. Based on

the record presented during trial, we are persuaded that Phan Helsinki discloses the "transmitting" step recited in claim 1.

Second, Patent Owner argues that Phan Helsinki (as further explained by Phan San Jose) does not disclose "specifying a second device." PO Resp. 8–12, 16–24 (citing Ex. 2001 ¶¶ 32–35). Patent Owner contends that in the "pull" mode described in the references, the user selects a "Suspend" operation without specifying a device on which to resume the session. *Id.* at 19–24. Selecting "Suspend" causes the session history to be sent to the middleware server, then, *later*, if the "user wishes to resume a session [on a different device], the session state is 'pulled' from the [middleware server]." *Id.* According to Patent Owner, there is no disclosure in the references of the second device on which the session will be resumed being "specified." *Id.* We disagree.

As an initial matter, although we agree that Phan Helsinki and Phan San Jose pertain generally to the same system, Petitioner's anticipation ground is based on Phan Helsinki alone. Thus, we evaluate only whether Phan Helsinki discloses, expressly or inherently, the limitations of claim 1.

To the extent Patent Owner's argument is that Phan Helsinki does not specify a second device because the user does not identify a second device before choosing to suspend the session on the first device, we are not persuaded. As explained above, we do not agree with Patent Owner that the claim requires the "specifying" step to take place before the "discontinuing" step. *See supra* Section II.A.2. In other words, there is nothing preventing the specification of the second device from occurring after the user chooses to suspend the session on the first device, discontinuing the session and causing the session history to be transmitted to the middleware server. The

specification of the second device may take place at a later time, such as when the user chooses to resume the session on a different device.

To the extent Patent Owner's argument is that Phan Helsinki does not specify a second device at all, we also are not persuaded. Petitioner contends that the second device is specified when the user "logs on to or starts a new device to continue the session." *See* Pet. 43–45; Reply 2–5. The system described in Phan Helsinki "enable[s] a user to experience uninterrupted and seamless data access across multiple devices by performing application session handoff," i.e., from one client device (e.g., desktop computer) to another (e.g., PDA). Ex. 1020, 7–9 (emphasis omitted). "When a user changes devices or spawns a new branch of a session to a new device, the middleware server authenticates the user on the new device." *Id.* at 9. Specifically, "[w]hen the user exits the session [on a first client device], the client updates the state at the middleware." *Id.* at 10. Later, the user chooses a second client device on which to resume the session, "[t]he user starts the client application [on the second client device] and provides it with a unique user id," the second client device retrieves the session state from the middleware server, and the session continues. *Id.*

Petitioner's contention that the second device in Phan Helsinki is specified when the user takes action on the second device to resume the session (e.g., logging on or starting the new device) is persuasive. *See* Pet. 43–45; Reply 2–5. Claim 1 is broadly worded. It does not specify who or what does the specifying, or to whom or what the second device is specified. *See* Tr. 22:14–19 (acknowledging that "the claim language does not state explicitly who does the specifying"). The claim only requires that the second device be specified. Phan Helsinki discloses that the user

chooses a device on which he or she wants to resume the session and takes action on that device to do so, which causes the client application on the second device to communicate with the middleware server to retrieve the session state. We are persuaded that this constitutes "specifying" the second device. Indeed, Patent Owner's declarant, Dr. Mohapatra, acknowledged that in the "pull" mode of Phan Helsinki and Phan San Jose, the "[s]econd device is specified at some point in time." Ex. 1027, 67:19–24. Dr. Mohapatra appears to disagree that Phan Helsinki discloses the "specifying" step only to the extent that "specifying" the second device must occur before "discontinuation" of the session on the first device. *Id.* at 42:9–17. As explained above, however, we do not agree with Patent Owner that the claim requires such ordering. *See supra* Section II.A.2.

Patent Owner argued at the hearing that at the time of resuming the session on the second device, the middleware server only knows the identity of the user (via the user logging on and providing a unique user ID to the second device), but identifying a user is not the same as specifying a device. Tr. 21:10–14. Patent Owner further argued that the middleware server may not know the address (e.g., IP address) to which to send the session state because the device may be behind a firewall. *Id.* at 23:8–18.

Patent Owner's arguments are not persuasive. First, as explained above, we do not see anything in the claim that would prohibit the user from specifying a second device by taking action on that particular device (as opposed to a different device) to resume the session. Second, even if the second device had to be specified to the middleware server, the middleware server in Phan Helsinki must receive enough information from the second device to be able to distinguish the chosen second device from other

APPX020

potential devices, even if only by virtue of the second device's association with a user account; otherwise, the middleware server would not be able to transmit the session history to the second device. *See* PO Resp. 22 (acknowledging that the client devices involved in the session communicate with the middleware server); Ex. 1020, 8–10 (describing how the middleware server is able to communicate with both the first client device and the second client device); Ex. 1027, 41:11–42:2 (Dr. Mohapatra acknowledging that "to resume at that second device, the MARC server would need to know the IP address of the second device in order to send the session information from the MARC server to the second device," and "the MARC server would learn the IP address of the second device when the second device contacted the MARC server to request a resumption of the session"); Tr. 23:18–24:5 (characterizing Dr. Mohapatra's testimony as "a recognition that at some point the middleware server knows what the second device is"). Petitioner has provided sufficient evidence that Phan Helsinki discloses "specifying a second device," as recited in claim 1.

As to the remaining claims, claim 23 recites similar limitations to claim 1. Claim 4 recites "accessing a device profile of said second device" and "restructuring said session data[5] to conform with said device profile of said second device," and claim 25 recites similar limitations. Petitioner cites

---

[5] Claim 1 refers to a "session history" rather than "session data." Based on how the terms are used in the claims, and how "session history" is used in the Specification, we conclude that a person of ordinary skill in the art would understand the terms to refer to the same thing. *See, e.g.*, claims 1 ("resuming said session on said second device with said session history"), 4 ("restructuring said session data to conform with said device profile of said second device"), 8 ("reformatting said session history of said session to conform with said device profile of said second device").

Phan Helsinki's disclosure of "[d]evice profiling" functionality in the middleware server and Phan Helsinki's disclosure of "[p]resentation conversion" where "[m]iddleware servers fetch data based on user requests . . . and perform conversion as needed." *See* Ex. 1020, 9; Pet. 48–51 (citing Ex. 1018 ¶ 92). Patent Owner disputes only the "specifying" step of claims 1 and 23, and we are not persuaded for the reasons explained above. *See* PO Resp. 16–24. Based on the record presented during trial, Petitioner has presented sufficient evidence showing that Phan Helsinki discloses every limitation of claims 4, 23, and 25.

Based on all of the evidence of record, we determine that Petitioner has shown, by a preponderance of the evidence, that claims 1, 4, 23, and 25 are anticipated by Phan Helsinki under 35 U.S.C. § 102(a).

### 4. Level of Ordinary Skill in the Art

> Section 103(a) forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103(a)). Petitioner argues that a person of ordinary skill in the art would have had "either (1) a Bachelor of Science in Computer Science, Computer Engineering, Electrical Engineering, or an equivalent field as well as at least 2 years of academic or industry experience in the software field or (2) at least four years of industry experience in the field of the '233 Patent," citing the testimony of Mr. Hoarty. Pet. 20 (citing Ex. 1018 ¶¶ 48–50). Dr. Mohapatra similarly testifies that a person of ordinary skill in the art

22

would have had "a Bachelor of Science degree in computer science or computer engineering with approximately 2 years of practical work experience or post-graduate research in a field such as computer networking and/or distributed systems." Ex. 2001 ¶ 11. Based on our review of the '233 patent, the types of problems and solutions described in the '233 patent and cited prior art, and the testimony of the parties' declarants, we conclude that a person of ordinary skill in the art would have had a bachelor's degree in computer science or computer engineering (or its equivalent), and at least two years of experience with computer networking, distributed systems, or similar fields. *See, e.g.*, Ex. 1001, col. 1, ll. 5–67 (disclosing that "[t]he invention generally relates to session management in a distributed computer network," and describing issues in the prior art when a user has "several communication-enabled devices" and wants to switch between them). We apply this level of ordinary skill in the art for purposes of this Decision.

### *5. Obviousness Ground (Claims 4 and 25)*

Petitioner has presented sufficient evidence that the combination of Phan Helsinki and Phan San Jose teaches all of the limitations of claims 4 and 25, and that a person of ordinary skill in the art would have considered their teachings regarding the same research project together and combined their teachings. *See* Pet. 51–56. For example, with respect to claim 4, which recites "accessing a device profile of said second device" and "restructuring said session data to conform with said device profile of said second device," Petitioner cites Phan San Jose's disclosure of content adaptation of data based on a device profile for a particular client device. *See id.*; Ex. 1019, 7–9 ("[O]ur system is designed to allow for the filtration, or content

adaptation, of data sent from the MWS to the various clients. We can specify the client's characteristics in a device profile that will be made available to the MWS."). Petitioner contends that a person of ordinary skill in the art would have combined the teachings of Phan Helsinki and Phan San Jose because together they describe the same system, they are directed to the same problem, and a person of ordinary skill in the art would have understood that including content adaptation, as described in Phan San Jose, would have been an improvement to the disclosed system. *See* Pet. 51–56 (citing Ex. 1018 ¶¶ 93–97, 102–103). Claim 25 recites a similar limitation to claim 4.

Patent Owner argues that both references fail to teach or render obvious the step of "specifying a second device" in claim 1, and that a person of ordinary skill in the art would not have combined the ordering of steps from the "push" mode in Phan San Jose with the "pull" mode disclosure of Phan Helsinki. PO Resp. 24–31. As explained above, we are persuaded that Phan Helsinki alone discloses "specifying a second device," which need not occur before the "discontinuing" step. *See supra* Sections II.A.2, II.B.3. Patent Owner's argument as to the challenged claims depending from claims 1 and 23, therefore, is not persuasive.

Based on all of the evidence of record, we determine that Petitioner has shown, by a preponderance of the evidence, that claims 4 and 25 are unpatentable over Phan Helsinki and Phan San Jose under 35 U.S.C. § 103(a).

*C. Grounds Based on Bates and Chan*

Petitioner argues that claims 1 and 23 are anticipated by Bates under 35 U.S.C. § 102(e), and that claims 1, 4, 23, and 25 are unpatentable over Bates and Chan under 35 U.S.C. § 103(a). Pet. 24–40. We have reviewed the Petition, Patent Owner Response, and Reply, as well as the evidence discussed in each of those papers, and are not persuaded, by a preponderance of the evidence, that the challenged claims are unpatentable based on either of the asserted grounds.

*1. Bates*

Bates describes a method of "sharing . . . browser information between at least two browser applications." Ex. 1004, col. 1, ll. 63–66. A user may operate one browser program (e.g., Netscape Navigator) on a first client computer, and then choose to use a different browser program (e.g., Internet Explorer) on a second client computer. *Id*. at col. 4, ll. 41–47. The first client computer stores "browser information" and transmits the information to the second client computer for use with the second browser program. *Id*. at col. 4, ll. 49–61. Bates describes the browser information as "information generated during a browsing session, i.e., a period of time when the browser 240 is executing on a client computer 106 and a network connection exists between the client 106 and the network 104 allowing a user to traverse network addresses corresponding to the servers 108." *Id*. at col. 4, ll. 61–67. For example, browser information may include a history of websites visited during a browsing session, bookmarks, cookies, and browser configurations. *Id*. at col. 4, l. 67–col. 5, l. 6.

APPX025

Bates discloses various data input windows that allow the user to input parameters for the transfer. *Id*. at col. 5, l. 47–col. 8, l. 54. The user may enter "an e-mail address for a computer (e.g., a remote client computer 106) to which the browser information" will be sent. *Id*. at col. 5, ll. 51–56, Fig. 3. Bates discloses an exemplary embodiment where browser information is transmitted via email, but states that "any method or system (e.g., file transfer protocol (FTP))" may be used. *Id*. at col. 3, ll. 21–26. The user also may choose what browser information to share with the second client computer and when. *Id*. at col. 5, l. 64–col. 8, l. 54, Figs. 4, 5. Figure 5 of Bates is reproduced below.



*Fig. 5*

Figure 5 depicts a data input window that allows a user to "select when browser information will be transmitted to a remote client computer 106," such as upon user request, at shutdown, or when the first client computer is idle ("e.g., when the computer 106 enters a standby or hibernation mode"). *Id*. at col. 7, l. 53–col. 8, l. 5. The first client computer transmits the browser information (e.g., in an email message) to the second client computer

APPX026

whenever such a "share event" occurs, and the second client computer uses the information to configure its browser program. *Id.* at col. 8, l. 55–col. 10, l. 55, Figs. 7, 8.

### *2. Anticipation Ground (Claims 1 and 23)*

Independent claims 1 and 23 recite transmitting the session history of a first device from the first device to a session transfer module "after said session is discontinued on said first device." Petitioner contends that Bates discloses transmitting the session history (i.e., browser information, such as website history, bookmarks, and browser configurations) after session discontinuation, citing Bates's disclosure of "terminat[ing] the browsing session" and three "share events" shown in Figure 5: "upon user request," "at shutdown," and "at idle period." Pet. 26–31. Specifically, Petitioner argues that

> Figure 5 of Bates discloses that a user may choose when to send the browser information (i.e., the session history), including "upon user request," "at shutdown" or "at idle period" . . . . These time periods include time periods after discontinuation of the session on the first computer. "At shutdown" on the first computer, the session is "discontinued" because it would be stopped, but could be resumed. A session entering an "idle period" on the first computer would also be "discontinued" because it would be stopped, but could be resumed. Finally, the "upon user request" option of Bates allows for browser information transmission at any number of user-selected times, including after the session is discontinued on the first device.

*Id.* at 31 (citations and emphasis omitted). Petitioner cites the testimony of Dr. Claypool and Mr. Hoarty in support. *Id.* (citing Ex. 1003 ¶ 122, Ex. 1018 ¶¶ 63–64).

Patent Owner responds that Petitioner's assertions as to when the three share events occur with respect to discontinuation of the session on the first client computer do not demonstrate that Bates discloses transmitting the session history "after said session is discontinued on said first device," relying on the testimony of Dr. Mohapatra. PO Resp. 31–41 (citing Ex. 2001 ¶¶ 51–55). According to Patent Owner, transmission does not necessarily occur after discontinuation of the session in Bates, and it is equally likely that transmission occurs during a session or concurrently with the session being discontinued. *Id.* at 36–38. Patent Owner also points out that Bates describes the sequence of events in Figure 7, including the transmission of browser information (step 720), as occurring "during a browsing session"—not *after* a session is discontinued on the first client computer. *Id*. at 31–36 (citing Ex. 1004, col. 8, ll. 55–57).

Having reviewed all of the parties' arguments and supporting evidence, we conclude that Petitioner has not shown, by a preponderance of the evidence, that Bates expressly or inherently discloses transmitting the session history "after said session is discontinued on said first device." *See Corning*, 868 F.2d at 1255–56 (Fed. Cir. 1989) ("Anticipation requires that every limitation of the claim in issue be disclosed, either expressly or under principles of inherency, in a single prior art reference.").

We begin by noting that there is nothing in Bates explicitly disclosing when the alleged "session" ends. Bates, however, does disclose what occurs *during* a "session." The term "session" in the claims means a series of information transactions between communicating devices during a particular time period. *See supra* Section II.A.1. Bates uses the slightly different term "browsing session," which it defines as the "period of time when the

28

browser 240 is executing on a client computer 106 and a network connection exists between the client 106 and the network 104 allowing a user to traverse network addresses corresponding to the servers 108." Ex. 1004, col. 4, ll. 61–67. Thus, the "browsing session" in Bates is the period of time when the browser program is "executing" on the client computer and the client computer has an open connection to the network servers with which it is communicating. During this time, the client computer in Bates generates browser information in response to user input (e.g., by creating a history of websites visited by the user). *See id.* at Abstract ("A first browser executing on a first computer generates browser information in response to user input."), col. 9, ll. 17–46 (describing the generation and storage of browser information in buffer 242), col. 2, ll. 2–10 (reciting "generating the user-configured browser information during execution of a first network browser on a first computer in response to user-input commands"), claim 1 (same). Accordingly, the alleged "session" in Bates (i.e., the series of information transactions between communicating devices) occurs during the time period of what Bates refers to as the "browsing session."[6]

---

[6] We do not agree with Petitioner that the term "browsing session" in Bates is "broader" than "session" in the claims. *See* Reply 11. The terms are directed to different concepts ("browsing session" referring to a period of time and "session" referring to a series of information transactions), and it cannot be said that one is "broader" than the other. Rather, a "session" occurs during the "browsing session" period of time. Nor do we agree with Petitioner that "Bates's 'browsing session' . . . spans the time when there is a network connection between the client and servers," so "Bates's 'browsing session' may therefore span several claimed 'sessions.'" *See id.* Bates discloses that the "browsing session" is the period of time when a connection exists *and* the browser program is executing. Ex. 1004, col. 4, ll. 61–67. Petitioner's argument ignores the latter.

Figure 7 of Bates depicts the steps performed by the client computer "during a browsing session," *id.* at col. 8, ll. 55–57, and is reproduced below.



*Fig. 7*

As shown in Figure 7, the client computer begins processing an event at step 704, determines whether the event is a share event (e.g., "upon user request," "at shutdown," or "at idle period") at step 710, and transmits the browser information at step 720. *Id.* at col. 8, l. 55–col. 9, l. 37. Thus, we agree with Patent Owner and Dr. Mohapatra that transmission of the session history in Bates occurs *during* the session, not *after* the session is discontinued as required by the claims. *See* PO Resp. 31–36; Ex. 2001 ¶¶ 50–51.

Petitioner also argues that the following disclosure in Bates discloses the required session discontinuation:

> [C]onsider a user reading messages posted on a bulletin board, inputting data into a web page or performing some other task during a browsing session. Prior to completing the task, the user may be required to terminate a browsing session. In such an event, the necessary browser information may be collected and transmitted to a remote computer containing another browser program.

Ex. 1004, col. 10, ll. 58–65; *see* Pet. 26–27. We are not persuaded that this portion of Bates implies a sequential order for the last two sentences (i.e., that the browsing session is terminated before transmission of the browser information). The fact that "the user may be required to terminate a browsing session" before completing a task does not mean necessarily that the browsing session actually is terminated at that time. To the contrary, as discussed above, Bates's description of Figure 7 indicates that transmission of browser information occurs "during a browsing session." *See* Ex. 1004, col. 8, l. 55–col. 9, l. 37.

Petitioner further points to the three share events themselves ("upon user request," "at shutdown," and "at idle period") and argues that when they occur, transmission of the session history necessarily would be after discontinuation of the session. Pet. 31–32; Reply 9–10. Mr. Hoarty's corresponding testimony (agreeing with Dr. Claypool's testimony) largely repeats Petitioner's arguments in the Petition. *See* Ex. 1018 ¶¶ 63–64. We are not persuaded. Petitioner does not explain sufficiently or point to sufficient supporting evidence showing that transmission *must* occur after discontinuing the session in any of the three cited share events in Bates, as would be required for a finding of inherency. *See MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999) (explaining that inherency requires that "the prior art necessarily functions in accordance

with, or includes, the claimed limitations"). In particular, Petitioner points to two portions of Dr. Mohapatra's cross-examination testimony regarding the idle period and shutdown procedures in Bates. Reply 9–10 (citing Ex. 1027, 89:3–14, 93:13–24). As explained above, however, Petitioner does not account for the actual disclosure of Bates indicating that a "session" would occur during the "browsing session" time period, which includes transmission of the session history. *See* Ex. 1004, col. 8, l. 55–col. 9, l. 37. Further, the second question posed to Dr. Mohapatra asked what he would "expect" would happen in Bates, not what *necessarily* would happen, and so is not directly probative on the issue of inherency. *See* Ex. 1027, 93:13–24. Finally, Patent Owner explains in its Response why, for each of the three share events cited by Petitioner, it is at least equally likely that transmission occurs *before* discontinuing the session. PO Resp. 36–41. For example, Dr. Mohapatra testifies that

> a transmission that occurs "immediately upon user request" is not necessarily concurrent with a transmission after a session is discontinued. User requests may occur at any time, and are especially likely to occur during a browsing session as a user comes across interesting information or performs actions that the user wishes to preserve as browsing history or other session events. Therefore, it is equally, if not more, likely that such a user request will be made (and a corresponding transmission of session state effected) while the user is engaged in a current session.

Ex. 2001 ¶ 52. We find Dr. Mohapatra's testimony on these points persuasive and supported by the disclosure of Bates. *See id.* ¶¶ 50–55.

Based on all of the evidence of record, we are not persuaded that Bates discloses, either expressly or inherently, transmitting the session history "after said session is discontinued on said first device," as recited in

32

claims 1 and 23.  Accordingly, we determine that Petitioner has not shown, by a preponderance of the evidence, that claims 1 and 23 are anticipated by Bates under 35 U.S.C. § 102(e).

### 3. Obviousness Ground (Claims 1, 4, 23, and 25)

Independent claims 1 and 23 each recite the transmission of a session history of a first device from the first device to a session transfer module "after said session is discontinued on said first device."  Claim 4 depends from claim 1, and claim 25 depends from claim 23.  In its asserted obviousness ground, Petitioner relies solely on Bates as allegedly teaching this limitation.  *See* Pet. 26–31, 33–40.  We are not persuaded for the reasons explained above.  *See supra* Section II.C.2.  Petitioner relies on Chan only for a teaching of a "session transfer module" and the limitations of the dependent claims, and does not argue that the transmission limitation is taught or suggested by the combined teachings of Bates and Chan.  *See* Pet. 33–40.  Accordingly, based on all of the evidence of record, we determine that Petitioner has not shown, by a preponderance of the evidence, that claims 1, 4, 23, and 25 are unpatentable over Bates and Chan under 35 U.S.C. § 103(a).

### III. ORDER

Petitioner has demonstrated, by a preponderance of the evidence, that claims 1, 4, 23, and 25 are anticipated by Phan Helsinki under 35 U.S.C. § 102(a) and that claims 4 and 25 are unpatentable over Phan Helsinki and Phan San Jose under 35 U.S.C. § 103(a).  Petitioner has not demonstrated, by a preponderance of the evidence, that claims 1 and 23 are anticipated by

APPX033

Bates under 35 U.S.C. § 102(e) or that claims 1, 4, 23, and 25 are unpatentable over Bates and Chan under 35 U.S.C. § 103(a).

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 4, 23, and 25 of the '233 patent have been shown to be unpatentable.

This is a final decision. Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

APPX034

PETITIONER:

Eliot D. Williams
G. Hopkins Guy, III
BAKER BOTTS L.L.P.
eliot.williams@bakerbotts.com
hop.guy@bakerbotts.com


PATENT OWNER:

Tarek N. Fahmi
Holly J. Atkinson
ASCENDA LAW GROUP, PC
tarek.fahmi@ascendalaw.com
holly.atkinson@ascendalaw.com

APPX035

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

**CRFD RESEARCH, INC.,**
**Patent Owner/Appellant**

**v.**                                        **Appeal No. 16-2298**

**DISH NETWORK CORPORATION, DISH DBS CORPORATION,**
**DISH NETWORK L.L.C., ECHOSTAR CORPORATION, and**
**ECHOSTAR TECHNOLOGIES L.L.C.,**
**Petitioners/Appellee**

**Proceeding No:  IPR2015-00627**

## NOTICE FORWARDING CERTIFIED LIST

A Notice of Appeal to the United States Court of Appeals for the Federal

Circuit was timely filed on July 5, 2016, in the United States Patent and Trademark

Office in connection with the above-identified *Inter Partes Review* (IPR)

proceeding.  Pursuant to 35 U.S.C. § 143 and Federal Circuit Rule 17(b)(1), a

Certified List is this day being forwarded to the Federal Circuit.

August 15, 2016                    Respectfully submitted,

                                   Deputy Under Secretary of Commerce for
                                   Intellectual Property and Director of the
                                   U.S. Patent and Trademark Office

By: _____
                                   Carrie M. Johnson
                                   Paralegal Specialist
                                   Mail Stop 8, P.O. Box 1450
                                   Alexandria, Virginia 22313-1450
                                   571-272-9035

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the

foregoing has been served on Appellant and Appellee this 15th day of August,

2016, as follows:

### *For Appellant/Patent Owner***:**

Tarek N. Fahmi
Holly J. Atkinson
ASCENDA LAW GROUP, PC
tarek.fahmi@ascendalaw.com
holly.atkinson@ascendalaw.com

### *For Appellee/Petitioner***:**

Eliot D. Williams
G. Hopkins Guy, III
BAKER BOTTS L.L.P.
eliot.williams@bakerbotts.com
hop.guy@bakerbotts.com

Carrie M. Johnson
Paralegal Specialist
U.S. Patent & Trademark Office

2

Form PTO 55 (12-80)

# U.S. DEPARTMENT OF COMMERCE
## United States Patent and Trademark Office

August 15, 2016

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes* Review proceeding identified below:

**DISH NETWORK CORPORATION, DISH DBS CORPORATION, DISH NETWORK L.L.C., ECHOSTAR CORPORATION, and ECHOSTAR TECHNOLOGIES L.L.C.,**
**Petitioner**

**v.**

**CRFD RESEARCH, INC.,**
**Patent Owner**

**Case:  IPR2015-00627**
**Patent No. 7,191,233 B2**

By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

*Certifying Officer*

File History for IPR2015-00627

| Date | Document |
|---|---|
| 1/26/2015 | Petition for *Inter Partes* Review |
| 1/26/2015 | Petitioner's Power of Attorney |
| 1/27/2015 | Patent Owner's Power of Attorney |
| 1/27/2015 | Patent Owner's Mandatory Notices |
| 2/17/2015 | Notice of Filing Date Accorded to Petition |
| 3/1/2015 | Patent Owner's Updated Mandatory Notices |
| 3/31/2015 | Patent Owner's Preliminary Response |
| 6/3/2015 | Decision - Institution of *Inter Partes* Review |
| 6/3/2015 | Scheduling Order |
| 6/4/2015 | Patent Owner's Updated Mandatory Notices |
| 6/26/2015 | Patent Owner's Notice of Deposition |
| 6/30/2015 | Conduct of the Proceedings § 42.5 |
| 8/17/2015 | Patent Owner's Response to Petition |
| 10/14/2015 | Petitioner's Notice of Deposition |
| 11/2/2015 | Petitioners' Reply to Response |
| 11/13/2015 | Patent Owner's request for oral hearing |
| 12/11/2015 | Petitioners' Request for Oral Hearing |
| 12/22/2015 | Order - Trial Hearing |
| 1/14/2016 | Patent Owner's Updated Exhibit List |
| 1/14/2016 | Petitioner's Demonstrative Exhibits |
| 1/15/2016 | Petitioners' Updated Exhibit List |
| 2/18/2016 | Oral Hearing Transcript |
| 6/1/2016 | Final Written Decision |



US007191233B2

(12) **United States Patent**  (10) **Patent No.:** US 7,191,233 B2
Miller  (45) **Date of Patent:** Mar. 13, 2007

(54) **SYSTEM FOR AUTOMATED, MID-SESSION, USER-DIRECTED, DEVICE-TO-DEVICE SESSION TRANSFER SYSTEM**

(75) Inventor: **Michael J. Miller**, Germantown, MD (US)

(73) Assignee: **TeleCommunication Systems, Inc.**, Annapolis, MD (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 701 days.

(21) Appl. No.: **09/953,408**

(22) Filed: **Sep. 17, 2001**

(65) **Prior Publication Data**

US 2003/0055977 A1    Mar. 20, 2003

(51) **Int. Cl.**
*G06F 15/173*    (2006.01)
*G06F 15/16*    (2006.01)
(52) **U.S. Cl.** ...................................... **709/227**; 709/223
(58) **Field of Classification Search** ................ 709/204, 709/227, 228, 229, 230, 238, 223; 455/405, 455/509
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,826,613 B1 *  11/2004  Wang et al.  ................. 709/227
2001/0036835 A1 *  11/2001  Leedom, Jr.  ................ 455/509
2002/0059425 A1 *  5/2002  Belfiore et al.  ............. 709/226
2002/0065064 A1 *  5/2002  Griffith et al.  .............. 455/405
2002/0143971 A1 *  10/2002  Govindarajan et al.  ..... 709/230

OTHER PUBLICATIONS

Pinto, Alexandre S., "TINA—based Environment for Mobile Multimedia Services," 1999, Telecommunications Information Networking Architecture Conference Proceedings, 1999. IEEE, Piscataway, NJ, Apr. 12, 1999, pp. 54-65.*

* cited by examiner

*Primary Examiner*—Paul H. Kang
(74) *Attorney, Agent, or Firm*—William H. Bollman

(57)    **ABSTRACT**

A session transfer module of a session server provides the capability to a user to direct a transfer of an on-going session from one device to another device while maintaining the session. The session transfer module is invoked by a user in a way consistent with the user interface of the client application, including by a graphical user command, a command line prompt, or a voice command. The client provides a selection of possible devices that may receive the redirected session. The session transfer module receives the selected device with the session redirect command over a communication network. The communication network may be wired (e.g., public switched telephone network ("PSTN"), Internet, etc.,) a wireless network (e.g., digital telephone network, pager network, etc.,) or a combination of the wired and wireless networks. The session transfer module may be configured to discontinue the session with the current device and to block any subsequent messages of the transferring session from reaching the device. The session transfer module may be further configured to access a device profile from a device profile database to convert the blocked messages into a format compatible to the format and/or modality of the redirected device. The session transfer module may be further configured to push the session to the redirected device in response to an activation (e.g., log-on) of the redirected device by the user. Alternatively, the session transfer module may be further configured to push the session back to the device in response to a time-out in the activation of the redirected device.

**43 Claims, 4 Drawing Sheets**

300

RECEIVE REDIRECT COMMAND ⟍305

INTERCEPT ANY MESSAGES FOR DEVICE ⟍310

RECEIVE SESSION HISTORY ⟍315

ACCESS REDIRECT DEVICE PROFILE ⟍320

CONVERT STATE OF SESSION FOR REDIRECTED DEVICE ⟍325

SET ACTIVATION TIMER ⟍330

Ⓐ



*Fig. 1*



*Fig. 2*



300

Fig. 3

| 3A |
| 3B |

Fig. 3A



*Fig. 3B*

DISH, Ex. 1001 - Page 5 of 12

# SYSTEM FOR AUTOMATED, MID-SESSION, USER-DIRECTED, DEVICE-TO-DEVICE SESSION TRANSFER SYSTEM

## TECHNICAL FIELD

The invention generally relates to session management in a distributed computer network. More particularly, the invention relates to a user-directed transfer of an on-going software-based session from one device to another device.

## DESCRIPTION OF THE RELATED ART

In today's information intensive society, it is not uncommon for a user to have several communication-enabled devices (e.g., a cellular phone, a pager, a wireless personal digital assistant). A typical user may have a desktop computer system to perform information transactions (or sessions) such as sending/receiving electronic mail ("e-mail"), browsing the Internet for information and communicating via instant messaging. However, the size and weight of a typical desktop computer system are among several features that prevent users from taking a desktop computer system while the users are mobile. Moreover, the typical communication conduits that provide session services to desktop computer systems are normally tied to stationary interfaces.

As a result, many users have turned to a variety of untethered and lighter weight devices to perform these information transactions while the user is mobile. Laptop computers with wireless modems are an example, as are enhanced text pagers, wireless handheld devices, personal digital assistants (PDA), and wireless mobile phones with integrated displays. The wireless handheld may have a small screen with a reduced keyboard coupled in a compact form factor. The form factor is typically small enough to allow the wireless handheld to be carried around conveniently on a user. Wireless handhelds typically have the capability to perform similar information transactions that a user would expect from his/her desktop computer in a format compatible with the reduced screen size.

Along with wireless handhelds, personal digital assistants ("PDAs") and Wireless Application Protocol ("WAP") telephones have also been configured to perform similar information transactions but formatted to conform to the limitations of the respective graphical interfaces, as well as other limitations, of each type of device. With the wide variety of devices, a user may have many options in which to conduct a software application session. In fact, many users often have multiple communication-enabled devices.

However, a user may be conducting a session on a first device and wish to switch to a second device. This decision may be based on a variety of factors such as proximity to the second device, mobility of the second device, safety concerns, a preference for a particular type of graphical user interface, modality of interaction with the user interface, or other additional capabilities of the second device, etc. In conventional systems, the user would have to discontinue the current session on the first device and reinitiate a new session on the second device. Although reinitiating a new session on a second device is an adequate solution, a user may be facing the loss of a session history of the session, a time delay related to the logging off and reinitiating, or other similar inconveniences. Accordingly, the conventional technique of switching devices may not be entirely satisfactory.

## SUMMARY OF THE INVENTION

In accordance with the principles of the present invention, a method for redirecting an on-going, software-based session is disclosed. The method includes conducting a session with a first device and specifying a second device. The method further includes discontinuing the session on the first device and resuming the session on the second device. In addition to transferring from device to device, the data might need to be changed, either in format, for instance from HTML to WML, or in modality, for instance from voice to text or text to voice.

One aspect of the present invention provides for a system for transferring a session. The system includes a network, a first device, a second device, and a session server. The session server is configured to provide a session service between the first device and the session server over the network. The session server is further configured to transfer a session from the first device to the second device in response to a redirect command from the first device.

Another aspect of the present invention provides for a computer readable storage medium on which is embedded one or more computer programs. The one or more computer programs are implementing a method for redirecting a session. The one or more computer programs includes a set of instructions for conducting a session with a first device and specifying a second device. The set of instructions further include discontinuing the session on the first device and resuming the session on the second device.

Additional aspects and novel features of the invention will be set forth in part in the description which follows and in part will become apparent to those skilled in the art upon examination of the following or may be learned by practice of the invention.

## DESCRIPTION OF DRAWINGS

Features and aspects of the present invention will become apparent to those skilled in the art from the following description with reference to the drawings, in which:

FIG. **1** illustrates a computer network in which an exemplary embodiment of a session transfer module may be implemented;

FIG. **2** illustrates a software architecture of an exemplary embodiment of the session transfer module according to the principles of the present invention; and

FIG. **3** is a key to FIGS. **3A**–**3B**, which together illustrate an exemplary flow diagram of the session transfer module according to the principles of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

For simplicity and illustrative purposes, the principles of the present invention are described by referring mainly to an exemplary embodiment thereof. Although an embodiment of the invention may be practiced in an instant messaging environment or a Web browsing environment, one of ordinary skill in the art will readily recognize that the same principles are equally applicable to, and can be implemented in, any session-oriented environments, and that any such variation does not depart from the true spirit and scope of the present invention. Moreover, in the following detailed description, references are made to the accompanying drawings, which illustrate specific embodiments in which the present invention may be practiced. Electrical, mechanical, logical and structural changes may be made to the embodi-

DISH, Ex. 1001 - Page 6 of 12

ments without departing from the spirit and scope of the present invention. The following detailed description is, therefore, not to be taken in a limiting sense and the scope of the present invention is defined by the appended claims and their equivalents.

In accordance with the principles of the present invention, a session transfer module of a session server provides the capability to initiate a transfer of an on-going session from a first device to a second device while maintaining the session and its context. The session transfer module may be invoked by a client software application executing on the first device in a way consistent with the modality of the user interface, including by a graphical user command selection, a voice command, or a command line prompt. The client of the first device may be configured to provide a selection of possible devices that may receive the redirected session. The session transfer module may be further configured to receive the identification of the selected second device (or redirected device) with the session redirect command over a communication network. The communication network may be a wired (e.g., public switched telephone network ("PSTN"), Internet, etc.,) a wireless network (e.g., digital telephone network, pager network, etc.,) or a combination of the wired and wireless networks.

The session transfer module may be further configured to discontinue the session with the first device and to block any subsequent messages of the transferring session from reaching the first device. The session transfer module may be further configured to access a device profile from a device profile database to convert the blocked messages as well as the messages comprising the prior message history (or session history) into a format compatible with the redirected device, where the format may include parameters such as data format, modality, etc. The session transfer module may be further configured to push the session to the redirected device either asynchronously or in response to an activation (e.g., log-on) of the redirected device by the user. Additionally, the session transfer module may be further configured to push the session back to the first device in response to a time-out in the activation of the redirected device.

In another aspect of the present invention, the session transfer module may be configured to accept a session history of a first device during the redirection process. The first device may be provided with the capability of transmitting the session history of the session to the session transfer module. The session transfer module may be configured to direct a data handler module to reformat the session history to conform to the data format and/or modality compatible according to the redirected device profile in response to the receipt of the session history. Subsequently, the session transfer module may be further configured to transmit the reformatted session history to the redirected device. Thus, a user may be provided with a complete history of the session at the redirected device.

Alternatively, the session transfer module may access a session history of the session maintained by a session handler module. The session handler module may be configured to provide the session management tasks between a device and the session server, which may include maintaining a session history of the session. The session transfer module may be further configured to direct a data handler module to reformat the session history to conform to the data format and/or modality compatible according to the redirected device profile. Subsequently, the session transfer module may be further configured to transmit the reformat-

ted session history to the redirected device. Thus, a user may be provided with a complete history of the session at the redirected device.

FIG. 1 illustrates a communication network 100 where an exemplary embodiment may be practiced in accordance with the principles of the present invention. In particular, the communication network 100 includes an application services network 105, one or more protocol gateways that may be wireless-based 110 or wire-based (e.g., an Internet Protocol ("IP") protocol gateway 115), and wireless and wired clients, 120 and 125, respectively.

The wireless and wired protocol gateways, 110 and 115, may be configured to interface with the application services network 105 via a network 112. The network 112 may be configured to provide a communication channel between the application services network 105 and the protocol gateways, 110 and 115. The network 112 may be implemented by a local area network, a token ring network, a wide area network, the Internet or some combination thereof.

The wireless protocol gateway 110 may be further configured to interface with the wireless clients 120 via a wireless network 130. The wireless network 130 may be configured to provide wireless communication protocol support for the wireless clients 125. The wireless network 130 may be configured to support wireless network protocols such as Cellular Digital Packet Data, Mobitex, IEEE 801.11b, Wireless Application Protocol, Global System for Mobiles, and other similar protocols.

The wireless clients 120 may be implemented on a text-pager, a personal digital assistant, a wireless mobile telephone with or without integrated displays and other similar devices. Each of the wireless clients 120, as well as the wired clients 125, may be configured to execute a client program which may be implemented as a software program, utility and/or subroutine to interface with the application services network 105. The client may be configured to provide the software (e.g., utilities, application specific software, etc.,) to support the session services designated for each type of wireless/wired client devices, 120 and 125. Moreover, a client may be configured to have a preferred mode of interaction, i.e., modality. For instance, a client may be configured to provide a graphical manner, e.g., a graphical user interface, to redirect or transfer command for transferring a current session of client to another device without discontinuing the session. Alternatively, a client may be configured to provide a command line prompt for a user to input the redirect command into the client. Alternatively, a client may be configured to provide a voice command to input the redirect command into the client. It is to be understood that this invention is not limited to these modes of user interaction with the client application.

The client software of the wireless/wired client devices, 120 and 125 may be further configured to provide a selection of devices that a transferring session may be redirected thereto. The selection may be provided in a graphical method (e.g., a dialog box, a menu selection, etc.) according to the constraints of each device. The selection of the redirected device may also be forwarded from the user of a wireless/wired client device, 120 and 125 to the session server 140.

Similarly, the wired protocol gateways 115 may be configured to interface with the wired clients 120 via a wired network 135. The wired network 135 may be configured to provide wired communication protocol support for the wired clients 125. The wired network 135 may be configured to support protocols such as Transmission Control Protocol/

DISH, Ex. 1001 - Page 7 of 12

Internet Protocol, X.25, IEEE 802.5, IEEE 802.3, Asynchronous Transfer Mode, and other network protocols.

The wired clients **125** may be implemented as a laptop computer with a telephone modem, a desktop computer with a telephone modem, server/client, and other similar computing platforms. Each of the wired clients **125** may be configured to execute a client implemented by a software program, utility and/or subroutine to interface with the wired network **135** and, subsequently, the application services network **105**. Accordingly, messages from wireless clients **120** and/or wired clients **125** are transmitted to their protocol gateways, **110** and **115**, respectively, over their respective networks, **110** and **115**, respectively. The protocol gateways, **110** and **115**, may be configured to encapsulate the transmitted messages to the network protocol of the application services network **105**. Similarly, as messages are transmitted from the application services network **105** to the clients, **120** and **125**, the protocol gateways, **110** and **115**, reformat the transmitted messages into the respective network protocol of the clients, **120** and **125**.

The application services network **105** may be configured to provide a variety of services to the wireless and wired clients, **120** and **125**, respectively. These services may include session-based services such instant messaging, database querying, and other similar services. The supporting applications of these session based-services may be provided by an application server **140**. The application server **140** may be configured to provide an application such as instant messaging application, a web application, a database querying application, and other similar applications. The application server **140** may be implemented by any number of commercially available servers or high performance computers. Because the specific type of session to be used in the present invention will vary according to individual needs, the present invention is not limited to any specific type of session and may thus utilize any type of session that may be provided to a user which may reasonably accomplish the goals of the present invention.

The application server **140** may be further configured to interface with the components of the application services network **105**, which may include a session server **145**, a plurality of message routers **150**, a plurality of databases **155**, and a data handler module **160**.

The session server **145** may be configured to provide session-based services to the users of the wireless and wired clients, **120** and **125**. A session-based service may be an instant messaging service, messaging service, a database query, a Web browsing session, and the like. Additionally, although FIG. **1** depicts a single session server **145**, it is to be understood that the present invention is not limited to one session server, but rather, the present invention may include any reasonable number of session servers, clustered or otherwise configured to interoperate. Accordingly, the single session server depicted in FIG. **1** is for illustrative purposes only and thus is not meant to limit the present invention in any respect.

The session server **145** is further configured to interface with the message routers **150**. The message routers **150** may be configured to authenticate the messages of the session between wireless/wired clients, **120** and **125**, and the session server **145**. The message routers **150** may be further configured to route the messages of the session between the session server **145** and to the appropriate protocol gateway, **110**, **115**, of the communication network **100** depending on the network used by the wireless/wired clients, **120** and **125**. Additionally, the message routers **150** may be further configured to transfer messages to and from the application

server **140** directly. Thus, for example, wired client **125** may communicate with a wireless client **120**.

The session server **145** may be configured to access the databases **155** to retrieve information to support the type of session services provided to each user and to ascertain the validity of each user. The databases **155** may be implemented in a variety of ways. However, as is readily apparent to those of ordinary skill in the art, the differences among the variety of implementations have no effect on the scope and spirit of the present invention. Additionally, the databases **155** may be configured to provide device profile information to the device manager **215** and/or user preference data to the application server **140**.

The session server **145** may be further configured to interface with the data handler module **160**. The data handler module **160** may be configured to provide data transformation services for the session server **145**

Although FIG. **1** illustrates an example of the logical configuration of the various components of the of the application services network **105**, it should be noted that the various components may be physically linked in a variety of methods such as a local area network, a bus architecture, and other similar networking architecture. Accordingly, the configuration of the application services network **105** depicted in FIG. **1** is for illustrative purposes only and thus is not meant to limit the present invention in any respect.

FIG. **2** illustrates a block diagram of the software architecture of an exemplary embodiment of the session transfer module included in the session server **145** shown in FIG. **1**. In particular, the session server **145** includes a session manager **205**, a session handler **210**, a device manager **215**, and a session transfer module **220**.

The session manager **205** of the session server **105** may be configured to provide the management function for the session server **105** for the users. The management functions may include determining the type of services available to a user, the number of sessions, load-balancing of the sessions, registration of new users, etc.

As part of the session server **145**, the session handler module **210** is configured to manage an individual session for each of the wireless/wired clients **120**, **125**. The session handler module **210** may provide at least authentication of the messages transmitted and message acknowledgement during a session.

Also part of the session server **145**, the device manager **215** is configured to provide device profiles to the session handler module **210**. A user may be registered to access the session server **145** through multiple devices. When a user logs into the session server **145**, the session handler module **210** is notified by a log-on message of the type of client device is being utilized by the user. The session handler module **210** then retrieves the device profile from the device manager **215**. The retrieved device profile is then used by the session handler module **210** to transfer information in a data-format and/or modality compatible with the client device. The device manager **215** may be further configured to access database **155** to retrieve the device profile. The device profile may be stored on a single disk of the database **155** or may be stored across multiple disks of the database **155**.

The retrieved device profile is also utilized by the data handler module **160** (shown in FIG. **1**). The data handler module **160** may be configured to provide data transformation services to the session manager **205**. The session transfer module **220** may be configured to provide the capability of transferring a session from one client device of

DISH, Ex. 1001 - Page 8 of 12

a user to another client device of the user. The session transfer module **220** may be invoked in a way consistent with the client user interface, including by using a graphical command, a command line prompt, or a voice command. The "Redirect" or "Transfer Session" command may be configured to provide a redirected device of the user to accept the transferred session. The session transfer module **220** may be further configured to discontinue or suspend the session with the transferring device and to block any subsequent messages of the transferring session from reaching the transferring device.

The session transfer module **220** of the session server **145** is further configured to access a device profile from the device manager **215** to facilitate the conversion of the blocked messages into a format compatible with the redirected device. The session transfer module **220** is further configured to push the transferring session to the redirected device in response to an activation (e.g., log-on) of the redirected device by the user. Additionally, the session transfer module is further configured to push an alert to the redirected device to notify the user that the session is waiting and that the user can access it by activating the session on the redirected device. Moreover, the session transfer module is further configured to push the session back to the device in response to a time-out in the activation of the redirected device.

The session transfer module **220** may be configured to optionally accept a transaction (or session) history of the transferring device during the redirection process. The device may be provided with the capability of transmitting the session history of the device to the session transfer module **220**. The session transfer module **220** may be configured to reformat the session history to conform to the data format and/or modality compatible according to the redirected device profile in response to the receipt of the session history. Subsequently, the session transfer module **220** may be further configured to transmit the reformatted session history to the redirected device. Thus, a user may be provided with a complete history of the session at the redirected device. Alternatively, the session transfer module **220** may be configured to transmit a portion of the session history that is compatible with the memory requirements of the redirected device. This particular feature may be a user preference setting and/or a network administrative setting.

FIGS. **3A**–**3B**, together, illustrate an exemplary flow diagram **300** of the session transfer module **225** of the session server **140** shown in FIG. **2** in accordance with the principles of the present invention. In particular, referring to FIG. **3A**, the session transfer module **225** is invoked when the session server **145** receives a redirect or transfer command from a wireless/wired client **120,125**, in step **305**.

In step **310**, the session transfer module **220** is configured to intercept any messages destined for the first client device. Additionally, the session transfer module **220** may be configured to block any messages for the first client device. The intercepted messages or blocked messages may be stored temporarily in a memory in the session server **145** allocated by the session transfer module **220**. Any messages queued for transfer from the first client device are subsequently released by the session transfer module **220**.

In step **315**, the session transfer module **220** may be configured to receive a transaction or session history from the transferring device. The session history may be stored temporarily in a memory space allocated by the session transfer module **220** in the session server **105**. Alternatively, the session handler **210** or application server **140** may be

configured to maintain a session history of the session for the transferring device, which may be accessed by the session transfer module **220**.

In step **320**, the session transfer module **220** may be configured to access the device profile of the selected second client (or redirected) from the device manager **215**. The retrieved device profile is utilized by the session transfer module **220** to direct the data handler module **160** to reformat or convert the stored messages into a data format compatible and/or modality (e.g., WML for WAP devices, HDML, for pre-WAP telephones, HTML for desktop browsers, VoiceXML for voice browsers, etc.) with the redirected device.

In step **325**, the state of the session is converted to a state compatible with the redirected device by the session transfer module **220** according to the device profile. For example, the redirected device may have a different user preference settings, data preferences, modality, and/or command library.

In step **330**, the session transfer module **220** sets an activation timer. The activation timer is configured to provide a time limit for the user to log on to the redirected device. The length of the activation timer may be preset by a service provider or the amount of time may be set by the user. Additionally, the session transfer module **220** may be further configured to transmit a notification (or alert) message to the redirected device to inform that a current on-going session is awaiting to be resumed.

Referring to FIG. **3B**, in step **335**, the session transfer module **220** determines whether the user has activated the redirected device. If the session transfer module **220** detects the activation of the redirected device, in step **340**, the session transfer module **220** pushes the converted session to the redirected device over the network **100** as a normal session with the converted transaction log. Subsequently, the session transfer module **220** returns to an idle state, in step **345**.

Otherwise, in step **350**, the session transfer module **220** determines whether the activation time has expired. If the activation timer has not expired, the session transfer module **225** returns to step **335**. Otherwise, the session transfer module **220** returns the converted state of the session to the original state of the session, in step **355**.

In step **360**, the session transfer module **220** sets a second activation timer. The second activation timer is configured to provide a time limit for the user to activate (or log on) to the original device.

In step **365**, the session transfer module **220** determines whether the user has activated the original device. If the user has activated the original device, the session transfer module **220** pushes the session back to the original device, in step **370**. Otherwise, the session transfer module **220** determines whether the second activation timer has expired, in step **375**.

If the second activation timer has not expired, the session transfer module **220** returns to step **365**. Otherwise, if the second activation timer has expired, the session transfer module **220** is configured to end the session, in step **380** and return to an idle state in step **345**.

Certain embodiments of the present invention may be performed as a computer program. The computer program may exist in a variety of forms both active and inactive. For example, the computer program can exist as software program(s) comprised of program instructions in source code, object code, executable code or other formats; firmware program(s); or hardware description language (HDL) files. Any of the above can be embodied on a computer readable medium, which include storage devices and signals, in

DISH, Ex. 1001 - Page 9 of 12

9 10

compressed or uncompressed form. Exemplary computer readable storage devices include conventional computer system RAM (random access memory), ROM (read-only memory), EPROM (erasable, programmable ROM), EEPROM (electrically erasable, programmable ROM), and magnetic or optical disks or tapes. Exemplary computer readable signals, whether modulated using a carrier or not, are signals that a computer system hosting or running the present invention can be configured to access, including signals downloaded through the Internet or other networks. Concrete examples of the foregoing include distribution of executable software program(s) of the computer program on a CD ROM or via Internet download. In a sense, the Internet itself, as an abstract entity, is a computer readable medium. The same is true of computer networks in general.

While the invention has been described with reference to the exemplary embodiments thereof, those skilled in the art will be able to make various modifications to the described embodiments of the invention without departing from the true spirit and scope of the invention. The terms and descriptions used herein are set forth by way of illustration only and are not meant as limitations. In particular, although the method of the present invention has been described by examples, the steps of the method may be performed in a different order than illustrated or simultaneously. Those skilled in the art will recognize that these and other variations are possible within the spirit and scope of the invention as defined in the following claims and their equivalents.

What is claimed is:

**1**. A method for redirecting an on-going, software based session comprising:

conducting a session with a first device;

specifying a second device;

discontinuing said session on said first device; and

transmitting a session history of said first device from said first device to a session transfer module after said session is discontinued on said first device; and

resuming said session on said second device with said session history.

**2**. The method according to claim **1**, further comprising:

pushing said session to said second device in response to said discontinuing; and

resuming said session in response to an activation of said second device.

**3**. The method according to claim **1**, further comprising:

pushing a notification to said second device in response to said discontinuing.

**4**. The method according to claim **1**, further comprising:

accessing a device profile of said second device; and

restructuring said session data to conform with said device profile of said second device.

**5**. The method according to claim **4**, wherein:

said restructured session data conforms to a data format of said second device.

**6**. The method according to claim **4**, wherein:

said restructured session data conforms to a modality of said second device.

**7**. The method according to claim **4**, further comprising:

blocking messages of said session originally intended for said first device;

storing said messages of said session originally intended for said first device;

reformatting said messages of said session to conform with said device profile of said second device; and

transmitting reformatted messages in response to said activation of said second device.

**8**. The method according to claim **1**, further comprising:

reformatting said session history of said session to conform with said device profile of said second device; and

transmitting reformatted session history of said session in response to said activation of said second device.

**9**. The method according to claim **1**, further comprising:

accessing said session history of said session;

reformatting said session history of said session to conform to said device profile of said second device; and

transmitting reformatted session history of said session in response to said activation of said second device.

**10**. The method according to claim **9**, wherein:

said formatted session history conforms to a data format of said second device.

**11**. The method according to claim **9**, wherein:

said formatted session history conforms to a modality of said second device.

**12**. A method for redirecting an on-going, software based session comprising:

conducting a session with a first device;

specifying a second device;

discontinuing said session on said first device;

resuming said session on said second device;

pushing said session to said first device in response to one of a non-activation and a timeout in said activation of said second device; and

resuming said session on said first device in response to a reactivation of said first device.

**13**. A system for transferring a session, comprising:

a network;

a session transfer module;

a first device to transmit a session history of said first device to said session transfer module after said session is discontinued on said first device;

a second device to receive said session history; and

a session server providing a session service between said first device and said session server over said network, wherein said session server is configured to transfer a session from said first device to said second device in response to a redirect command from said first device.

**14**. The system for transferring a session according to claim **13**, wherein:

said session server is configured to push said session to said second device in response to an activation of said second device.

**15**. The system for transferring a session according to claim **13**, further comprising:

a device database configured to store a profile for each device registered to a user, wherein said session server is configured to access a second device profile from said device database and to restructure said session to conform with said second device profile.

**16**. The system for transferring a session according to claim **13**, wherein:

said session server is configured to block messages of said session intended for said first device and to store said messages of said session.

**17**. The system for transferring a session according to claim **13**, further comprising:

a data handler server configured to reformat said messages of said session to conform with said second device profile and to transmit reformatted messages of said session in response to said activation of said second device.

DISH, Ex. 1001 - Page 10 of 12

**18**. The system for transferring a session according to claim **17**, wherein:

said session server is configured to receive said session history of said session from said device and to reformat said session history of said session to conform with said second device profile.

**19**. The system for transferring a session according to claim **17**, wherein:

said session server is configured to transmit reformatted session history of said session in response to an activation of said second device.

**20**. The system for transferring a session according to claim **17**, further comprising:

a session handler module configured to maintain said session history of said session, wherein said session server is configured to access said session history from said session handler module and to reformat said session history of said session to conform with said second device profile.

**21**. A system for transferring a session, comprising:

a network;

a first device;

a second device; and

a session server providing a session service between said first device and said session server over said network, wherein said session server is configured to transfer a session from said first device to said second device in response to a redirect command from said first device;

wherein said session server is configured to push said session to said second device in response to an activation of said second device; and

wherein said session server is configured to push said session to said first device in response to one of a non-activation and a timeout in said activation of said second device.

**22**. The system for transferring a session according to claim **21**, wherein:

said session server is configured to resume said session on said second device in response to an activation of said second device.

**23**. A computer readable storage medium on which is embedded one or more computer programs, said one or more computer programs implementing a method for redirecting a session, said one or more computer programs comprising a set of instructions for:

conducting a session with a first device;

specifying a second device;

discontinuing said session on said first device; and

transmitting a session history of said first device from said first device to a session transfer module after said session is discontinued on said first device;

resuming said session on said second device with said session history.

**24**. The computer readable storage medium according to claim **23**, said one or more computer programs further comprising a set of instructions for:

pushing said session to said second device in response to said discontinuing; and

resuming said session in response to an activation of said second device.

**25**. The computer readable storage medium according to claim **23**, said one or more computer programs further comprising a set of instructions for:

accessing a device profile of said second device; and

restructuring said session to conform with said device profile of said second device.

**26**. The computer readable storage medium according to claim **25**, said one or more computer programs further comprising a set of instructions for:

blocking messages of said session intended for said first device;

storing said messages of said session; reformatting said messages of said session to conform to said device profile of said second device; and

transmitting said messages of said session in response to said activation of said second device.

**27**. The computer readable storage medium according to claim **26**, wherein:

said reformatted messages conform to a data format of said second device.

**28**. The computer readable storage medium according to claim **26**, wherein:

said reformatted messages conform to a modality of said second device.

**29**. The computer readable storage medium according to claim **25**, said one or more computer programs further comprising a set of instructions for:

reformatting said session history of said session to conform to said device profile of said second device; and

transmitting reformatted session history of said session in response to an activation of said second device.

**30**. The computer readable storage medium according to claim **29**, wherein:

said reformatted session history conforms to a data format of said second device.

**31**. The computer readable storage medium according to claim **29**, wherein:

said reformatted session history conforms to a modality of said second device.

**32**. A computer readable storage medium on which is embedded one or more computer programs, said one or more computer programs implementing a method for transferring a session, said one or more computer programs comprising a set of instructions for:

conducting a session with a first device;

specifying a second device;

discontinuing said session on said first device; and

resuming said session on said second device;

pushing said session to said first device in response to one of a non-activation or a timeout in the activation of said second device; and

resuming said session on said first device in response a reactivation of said first device.

**33**. The computer readable storage medium according to claim **32**, said one or more computer programs further comprising a set of instructions for:

reformatting said session history of said session to conform with said device profile of said second device; and

transmitting reformatted session history of said session in response to an activation of said second device.

**34**. A system for transferring a session, comprising:

a plurality of networks;

a session transfer module;

a first device to transmit a session history of said first device to said session transfer module after said session is discontinued on said first device;

a second device to receive said session history; and

a session server providing a session service between said first device and said session server over said plurality of networks, wherein said session server is configured to transfer a session from said first device to said second device in response to a redirect command from said first device.

DISH, Ex. 1001 - Page 11 of 12

13

**35**. The system for transferring a session according to claim **34**, wherein:

said session server is configured to push said session to said second device in response to an activation of said second device.

**36**. The system for transferring a session according to claim **34**, further comprising:

a device database configured to store a profile for each device registered to a user, wherein said session server is configured to access a second device profile from said device database and to restructure said session to conform with said second device profile.

**37**. The system for transferring a session according to claim **34**, wherein:

said session server is configured to block messages of said session intended for said first device and to store said messages of said session.

**38**. The system for transferring a session according to claim **34**, further comprising:

a data handler server configured to reformat said messages of said session to conform with said second device profile and to transmit reformatted messages of said session in response to said activation of said second device.

**39**. The system for transferring a session according to claim **38**, wherein:

said session server is configured to receive said session history of said session from said device and to reformat said session history of said session to conform with said second device profile.

**40**. The system for transferring a session according to claim **38**, wherein:

said session server is configured to transmit reformatted session history of said session in response to an activation of said second device.

14

**41**. The system for transferring a session according to claim **38**, further comprising:

a session handler module configured to maintain said session history of said session, wherein said session server is configured to access said session history from said session handler module and to reformat said session history of said session to conform with said second device profile.

**42**. A system for transferring a session, comprising:

a plurality of networks;

a first device;

a second device; and

a session server providing a session service between said first device and said session server over said plurality of networks, wherein said session server is configured to transfer a session from said first device to said second device in response to a redirect command from said first device;

wherein said session server is configured to push said session to said second device in response to an activation of said second device; and

wherein said session server is configured to push said session to said first device in response to one of a non-activation and a timeout in said activation of said second device.

**43**. The system for transferring a session according to claim **42**, wherein:

said session server is configured to resume session on said second device in response to an activation of said second device.

* * * * *

DISH, Ex. 1001 - Page 12 of 12

## UNITED STATES PATENT AND TRADEMARK OFFICE
## BEFORE THE PATENT TRIAL AND APPEAL BOARD

| | | | |
|---|---|---|---|
| In Re: | U.S. Patent 7,191,233 | : | Attorney Docket No. 081841.0106 |
| Inventor: | Michael J. Miller | : | |
| Filed: | September 17, 2001 | : | |
| Claimed Priority: | September 17, 2001 | : | |
| Issued: | March 13, 2007 | : | IPR No. Unassigned |
| Assignee: | CRFD Research, Inc. | : | |
| Title: | System for Automated, Mid-Session, User-Directed, Device-to-Device Session Transfer System | | |

Mail Stop PATENT BOARD
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, Virginia 22313-1450

*Submitted Electronically via the Patent Review Processing System*

## PETITION FOR *INTER PARTES* REVIEW OF CLAIMS 1, 4, 23 AND 25 OF U.S. PATENT NO. 7,191,233 UNDER 35 U.S.C. §§ 311-319 AND 37 C.F.R. §§ 42.100 *ET SEQ.*

Exhibit 1005 - Chan, Mun Choon et al., "Next-Generation Wireless Data Services:  Architecture and Experience," IEEE Personal Communications, Feb. 1999, pp. 20-33 ("Chan"). Chain is available as prior art under 35 U.S.C. § 102(b) because it was publicly available at least as early as Feb. 1999.

Exhibit 1020 -  Thomas Phan et al., "Handoff of Application Sessions Across Time and Space" in volume 5 of the IEEE International Conference on Communications (ICC 2001). Institute of Electrical & Electronic Engineers 2001. Selected pages: Table of Contents, pp. 1367-72 ("Phan ICC"). Phan ICC is available as prior art under 35 U.S.C. § 102(a) because it was publicly available at least as early as July 31, 2001.

Exhibit 1019 - Thomas Phan *et al*., "A New TWIST on Mobile Computing: Two-Way Interactive Session Transfer" in the Proceedings of the Second IEEE Workshop on Internet Applications (WIAPP 2001). IEEE Computer Society 2000. Selected pages: Table of Contents, pp. 2-11 ("Phan WIAPP"). Phan WIAPP is available as prior art under 35 U.S.C. § 102(a) because it was publicly available at least as early as August 18, 2001.

### B.    *Grounds For Challenge*
Petitioner requests cancellation of the claims on the following grounds:

1.    Claims 1 and 23 are anticipated by Bates.

2.    Claims 1, 4, 23 and 25 are obvious over Bates in view of *Chan*.

3.    Claims 1, 4, 23 and 25 are anticipated by *Phan ICC*.

4.      Claims 4 and 25 are obvious over *Phan ICC* in view of *Phan WIAPP*.

## III.   OVERVIEW OF THE '233 PATENT

### A.      *Summary of the Claimed Subject Matter*

The '233 Patent is directed to a system and method for "session management in a distributed computer network."   Ex. 1001 at 3:10-21. More particularly, "the invention relates to a user-directed transfer of an on-going software-based session from one device to another device." *Id*. at 1:8-11.   The alleged invention can supposedly be utilized in "any session-oriented environments."  *Id*. at 2:54-63. The main objective of the alleged invention is to allow a user of a computing apparatus to engage in an activity on that apparatus (such as browsing the Internet or instant messaging on a desktop) and then transfer information about the computing session to a second computing apparatus (such as a laptop), so that the user can pick up the session where he or she left off. In order to effect this transfer, the '233 patent discloses a "session history," which moves from the first device to the second device via a "session transfer module."

The '233 patent operates over a conventional client-server infrastructure that was well known in the art at the time the application that led to the '233 patent was filed.   Ex. 1003, ¶ 25.   Figure 1 of the '233 patent below depicts an illustrative communication network 100 that has several components, including wireless and wired "client" devices 120 and 125, respectively, and a session server 145.

| '233 Claim 1 | *Phan ICC* |
|---|---|
| | √ A set of application servers connected to a high bandwidth wired network. These machines are typically legacy servers that are not well suited to support multiple mobile clients.<br><br>√ A collection of wired client devices that includes office workstations, clinic stations, imaging equipment, etc.<br><br>√ High bandwidth wireless access within the hospital, augmented by one or more lower bandwidth wide area wireless systems, supporting a number of heterogeneous mobile client devices that can vary from laptop to graphical tablet to PDA. …<br><br>√ A set of strategically deployed, dedicated middleware servers.<br><br>The key to the iMASH architecture is the distributed set of middleware servers, which when viewed at the application level, interconnect all applications and clients. Requests from clients are explicitly addressed to nearby middleware servers; these middleware servers are the source for all services for clients, simplifying service discovery, as well as the sole client for application servers….Middleware takes responsibility for getting the data from the right servers, and makes necessary conversion to fit the clients' needs. …<br><br>As shown in Figure 2, middleware servers provide the following functionality:<br>    …<br><br>√ *Presentation conversion*. Middleware servers fetch data based on user requests (or pre-fetch data based on prediction of user's near-future need) and perform conversion as needed.<br><br>…<br><br>√ *Session handoff*. When a user moves an on-going application session from one device to another, |

| '233 Claim 1 | *Phan ICC* |
|---|---|
| | middleware servers act as a "home" for the application state (including active connections, cached data, etc.) to facilitate migration between devices. <br><br> … <br><br> √ User re-authentication. When a user changes devices or spawns a new branch of a session to a new device, the middleware server authenticates the user on the new device. <br><br> In this paper we focus on the issue of session data transfer while conserving the rest for future work…. <br><br> **3.3 Software Architecture** <br> …Inserting the middleware servers simply forces all communication through the middleware servers with no out-of-band data sent directly between application server and client. Therefore, to the servers, the middleware layer must appear to be a client system, and likewise, the middleware layer must appear to be an application server to the clients." <br><br> *See, e.g., Phan ICC*, Ex. 1020, § 4: <br> "Our case study involves Mozilla [9], an open-source web browser based on Netscape Communicator 5.0 that is available from the Free Software Community with the support of Netscape/AOL. We have been working on Mozilla R15 on Windows NT 4.0 SP5. The end result of our implementation is a seamless web-browsing session experienced by the user even after he or she has moved from one machine to another. When the user wishes to migrate to another platform, the browser's session state is accordingly moved as well…From this nascent experience withMozilla, we can: …(2) establish baseline performance metrics and upper-bounds on session state transfer times…" <br><br> *See, e.g., Phan ICC*, Ex. 1020, Fig. 2: |

| '233 Claim 1 | *Phan ICC* |
|---|---|
| | <br>Figure 2: Middleware architecture |

Phan discloses a method for session transfer and "Software Architecture" running on clients' computers and servers (i.e., a computer readable medium) for the purpose of effecting an application session transfer (i.e., a software-based session). Ex. 1020, §§ 3-4; Ex. 1018, ¶ 84.

| '233 Claim 1 | *Phan ICC* |
|---|---|
| 1[a] conducting a session with a first device;<br><br>1[b] specifying a second device | *See, e.g., Phan ICC*, Ex. 1020, § 3 (excerpted *supra* at element 1[p]):<br><br>*See, e.g., Phan ICC*, Ex. 1020, §§ 4.1:<br>"**4.1 Implementation Issues**<br>The MARC and middleware processes can be implemented using a variety of possibilities. Ideally, a good-performance, off-the-shelf software package that provides service lookup and distributed communication would be leveraged. A number of options, such as LDAP [16], Jini [15], and RFC-2165 [14] implementations, can provide service lookup. Likewise, CORBA, Java Remote Method Invocation (RMI), and several message-passing libraries are available for |

| '233 Claim 1 | *Phan ICC* |
|---|---|
| | implementing distributed transactions. |
| | . . . |
| | For Mozilla, we consider a session state to be the bookmark list, the history file, the user preferences, and the cache of web pages. In fact, this state can be used by any number of heterogeneous web browsers so long as they are outfitted with our MARC. A session transfer in our implementation involves the following sequence. |
| | 1. The user starts the client application and provides it with a unique user id. |
| | 2. The MARC within the application discovers and contacts the middleware server using Jini and begins a new session using the user id. The last saved state, if it exists, is retrieved from the middleware server. This step uses Java RMI to acquire the most recently saved bookmarks, history, and user preferences, all of which are stored on and transported from the middleware as serialised Java Objects. |
| | 3. The returned data from the middleware is received by the MARC and then incorporated into the client before the user's current interactive application session begins. Within Mozilla, the data is deserialised by the MARC and then read into Mozilla's bookmark, history, and user preference dataspace. Web pages are retrieved on-demand from the middleware server using a standard proxy protocol communicating with a middleware component executing the Squid [11] webpage proxy cache. |
| | 4. As the user changes the current session state, the state is updated at the middleware server at the appropriate times. For example, whenever Mozilla flushes the bookmarks to disk, our MARC will also transmit this data to the middleware via RMI. |
| | 5. When the user exits the session, the client updates the state at the middleware. Because Mozilla flushes all data upon exiting, our MARC likewise updates data on the middleware." |

As to the "first device" of this element, *Phan ICC* discloses running an "on-going application session" (i.e., *a session*) on a variety of devices such as "an office desktop, a PDA, a laptop, and a home desktop (i.e., *a first device*).

*Phan ICC* also discloses a "second device" (such as a different laptop, desktop or PDA) that is identified or specified when a user logs on to or starts a new device to continue the session. *Phan ICC*, Ex. 1020, §§ 4.1; Ex. 1018, ¶ 85. For example, Phan ICC discloses that "[w]hen a user changes devices or spawns a new branch of a session to a new device, the middleware server authenticates the user on the new device." *Id*.

| '233 Claim 1 | *Phan ICC* |
|---|---|
| 1[c] discontinuing said session on said first device, | *See, e.g., Phan ICC*, Ex. 1020, § 4.1 (excerpted *supra* at elements 1[a] and 1[b]):<br><br>*See, e.g., Phan ICC*, Ex. 1020, Abstract (bold in original): "Personal computing on mobile platforms such as laptops and personal digital assistants, rather than in a traditional desktop environment, is becoming increasingly more common. In this paper we address the issue of application session transfer for uninterrupted data access across this diverse range of platforms. …We have developed a tiered architecture that includes a middleware server layer positioned between existing application servers and multiple clients to make session transfer transparent to the user. Any client application executing our Middleware-Aware Remote Code library can save and restore its session by interacting with a middleware server. As a proof of concept, we have implemented the transfer of bookmarks, history, web cache, and user preferences with the Mozilla open source web browser. From this effort we have established baseline performance metrics and have found that the overhead is within reasonable bounds of just a few seconds of latency." |

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT AND TRIAL APPEAL BOARD

DISH NETWORK L.L.C., ECHOSTAR CORPORATION
& ECHOSTAR TECHNOLOGIES L.L.C.,

Petitioner

v.

CRFD RESEARCH, INC.,

Patent Owner

Case IPR2015-00627

Patent 7,191,233 B2

PATENT OWNER'S PRELIMINARY RESPONSE TO
PETITION FOR *INTER PARTES* REVIEW OF
U.S. PATENT NO. 7,191,233
UNDER 35 USC §§ 311-319 AND 37 CFR § 42.100 ET SEQ.

APPX132

## Table of Contents

1. Introduction ........................................................................ 1

2. Overview of U.S. Patent 7,191,233. ................................... 1

3. Argument ............................................................................ 4

    A. The Petition Fails to Establish that *Bates* Anticipates
    Claim 1. ............................................................................ 4

    B. The Petition Fails to Establish that *Bates* Anticipates
    Claim 23. .......................................................................... 13

    C. The Petition Fails to Establish that Claims 1, 4, 23, and
    25 are Obvious in View of *Bates* When Considered in
    Combination with *Chan*. .................................................. 14

    D.    The Petition Fails to Establish that Any of Claims 1,
    4, 23, and 25 are Anticipated by *Phan ICC*. ................... 16

    E.    The Petition Fails to Establish that Claims 4 and 25 are
    Obvious in View of *Phan ICC* and Phan *WIAPP*. ........... 25

4. Conclusion ........................................................................ 27

# Table of Authorities

## CASES

*Advanced Display Sys., Inc. v. Kent State Univ.*,
212 F.3d 1272 (Fed. Cir. 2000) ................................................................ 10

*CFMT, Inc. v. Yieldup Intern. Corp.*,
349 F.3d 1333 (Fed. Cir. 2003) ................................................................ 15

*Hartness Int'l. Inc. v. Simplimatic Engineering Co.*,
819 F.2d 1100 (Fed. Cir. 1987) .......................................................... 15, 27

*In re Rijckaert*,
9 F.3d 1531 (Fed. Cir. 1993) .................................................................... 11

*In re Robertson*,
169 F.3d 743 (Fed. Cir. 1999) .................................................................. 11

*In re Wilson*,
424 F.2d 1382 (CCPA 1970) .................................................................... 26

*Kinetic Technologies, Inc. v. Skyworks Solutions, Inc.*,
IPR2014-00530 (P.T.A.B. Sept. 29, 2014) ............................................... 18

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
545 F.3d 1359 (Fed. Cir. 2008) ....................................................... passim

*Richardson v. Suzuki Motor Co.*,
868 F.2d 1226 (Fed. Cir. 1989) ................................................................ 11

*Schering Corp. v. Geneva Pharm.*,
339 F.3d 1373 (Fed. Cir. 2003) .................................................................. 7

*Scripps Clinic & Research Found. v. Genentech, Inc.*,
927 F.2d 1565 (Fed. Cir. 1991) .................................................................. 8

*Zenith Elecs. Corp. v. PDI Commc'ns Sys., Inc.*,
522 F.3d 1348 (Fed. Cir. 2008) .................................................................. 7

*Zetec, Inc. v. Westinghouse Electric Company, LLC,*
    IPR2014-00384 (P.T.A.B. July 23, 2014) .............................................. 17

**STATUTES**

35 U.S.C. § 112 (d) ................................................................................ 25

35 U.S.C. § 314 ............................................................................... 12, 25

35 U.S.C. § 316 (e) ............................................................................ 4, 16

**REGULATIONS**

37 C.F.R. § 42.108(c) ............................................................................. 1

37 C.F.R. § 42.65(a) ............................................................................. 18

**OTHER AUTHORITIES**

MPEP § 2112 ........................................................................................ 11

## 1. Introduction

Pursuant to 37 C.F.R. § 42.107(a) Patent Owner, CRFD Research, Inc., submits the following preliminary response to the Petition, setting forth reasons why no *inter partes* review should be instituted under 35 U.S.C. § 314.

The Board should not institute *inter partes* review because Petitioner has failed to demonstrate a reasonable likelihood that at least one of the claims challenged in the petition is unpatentable.[1]

## 2. Overview of U.S. Patent 7,191,233.

U.S. Patent 7,191,233 (the "'233 Patent") (Ex. 1001) describes methods and systems for transferring information transactions (or "sessions") between different communication-enabled devices, such as smart phones, personal digital assistants, and desktop computer systems.[2] The session transfer occurs so as to maintain the session and its context.[3] Furthermore, differences in device-

---

[1] 37 C.F.R. § 42.108(c).

[2] *Ex. 1001* at 1:18-22; 2:3-12; 3:6-6-10.

[3] *Id.* at 3:8-10.

specific data formats and modalities are accounted for.[4] "Thus, a user may be provided with a complete history of the session at the [receiving] device."[5]

Transferring sessions between devices provides a user with flexibility and convenience. For example, a user that is conducting a session using one device may wish to switch to another device because of its proximity or mobility, or because the other device offers a more suitable interface or other features for conducting the session.[6] Rather than having to discontinue a current session on a current device and then initiate a new session on the other device—a process that, while adequate, may involve the loss of a current session history—the solution presented in the '233 Patent allows for the current session to be redirected to a specified second device.[7]

Claim 1 of the '233 Patent recites,

1. A method for redirecting an on-going, software based session comprising:
conducting a session with a first device;
specifying a second device;

---

[4] *Id.* at 2:8-12; 3:48-52.

[5] *Id.* at 3:55-56.

[6] *Id.* at 1:53-59.

[7] *Id.* at 1:59-66; 2:3-6.

discontinuing said session on said first device; and

transmitting a session history of said first device from said first device to a session transfer module after said session is discontinued on said first device; and

resuming said session on said second device with said session history.[8]

Notice that the claim requires transmitting the session history of the first device *after that session is discontinued* on the first device.[9] A similar requirement exists in independent claim 23.[10] As demonstrated below, the cited references fail to teach or suggest such a feature.

---

[8] *Id.* at 9:30-39.

[9] *Id.* at 9:35-37.

[10] *Id.* at 11:50-52.

## 3. Argument

### A.    The Petition Fails to Establish that *Bates* Anticipates Claim 1.

Petitioner alleges that claim 1 is anticipated under 35 U.S.C. § 102(e) by

U.S. Patent 6,963,901 to

Bates et al. ("*Bates*") (Ex.

1004).[11] However, as

demonstrated below, *Bates*

fails to teach "transmitting a

session history of said first

device from said first device to

a session transfer module *after*

*said session is discontinued on*

*said first device*," as recited in

claim 1. Hence, no *inter partes*

review should be instituted.[12]



Fig. 7

---

[11] Petition at 24 *et seq*.

[12] 35 U.S.C. § 316 (e) ("In an inter partes review instituted under this chapter,

the petitioner shall have the burden of proving a proposition of unpatentability

by a preponderance of the evidence.").

*Bates* describes "a method, apparatus and article of manufacture configured to support sharing of browser information between at least two browser applications."[13] More particularly, *Bates* is concerned with a process for transferring (e.g., by email) browser information between two computers during a browsing session.[14] *Bates* describes this process with reference to FIG. 7, reproduced above.

According to *Bates*, this illustrated procedure shows the operation of a local computer "***during a browsing session***."[15] At the outset (706) a determination is made as to whether or not the local computer is configured to share browser information with a remote computer.[16] If not, the local computer proceeds according to its normal processing (708). If, on the other hand, the local computer is configured to share browser information, then (710) events are examined to determine whether or not they constitute a "'share event,' i.e., an event adapted to initiate transmission of the browser information from the

---

[13] *Ex. 1004* at 1:63-66.

[14] *Id.* at 8:55 et seq.

[15] *Id.* at 8:55-57 (emphasis added).

[16] *Id.* at 8:59-66.

local client computer to the remote client computer."[17]

   *Bates* describes the various "share events" in connection with a user interface shown in FIG. 5. Five such events are noted: upon user request (i.e., the browser information is transmitted immediately in response to a user-request), at shutdown (the



*Fig. 5*

browser information is transmitted when the client computer is shutdown), at an idle period (the browser information is transmitted when the client computer is idle, e.g., when it enters a standby or hibernation mode), periodically (the browser information is transmitted at periodic time intervals), and upon a predetermined action (the browser information is transmitted upon the occurrence of an action performed by the user, which action is not solely directed to sending the browser information).[18]

   If the event recognized at step 710 in FIG. 7 is a "share event," then (720-724) the local computer will transmit the browser information stored in a

---

[17] *Id.* at 8:66 – 9:7.

[18] *Id.* at 7:56 – 8:23.

buffer (if any).[19] Otherwise (712-718), the local computer accumulates browser information in the buffer and either sends it (if the local computer is configured to do so in response to the event) or waits until such time as a share event is recognized.[20]

A patent claim is "invalid for anticipation [only] if a single prior art reference discloses each and every limitation" of the claim.[21] Each element, and the "arrangement or combination" of those elements, must be present in the prior art reference.[22] Accordingly, "there must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention."[23] *Bates* fails to meet these demands.

---

[19] *Id.* at 9:38-49.

[20] *Id.* at 9:10-37.

[21] *Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003); see also *Zenith Elecs. Corp. v. PDI Commc'ns Sys., Inc.*, 522 F.3d 1348, 1363 (Fed. Cir. 2008).

[22] *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008).

[23] *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991).

Claim 1 requires that the first device transmit the session history *after* the session is discontinued:

> transmitting a session history of said first device from said first device to a session transfer module after said session is discontinued on said first device.[24]

*Bates*, however, describes transferring browser information:

- immediately upon user request,

- when the client computer is shutdown,

- when the client computer is idle,

- periodically, and

- upon the occurrence of a predetermined action not solely directed to sending the browser information.[25]

Importantly, none of these events corresponds to a time *after said session is discontinued on said first device*.

*Bates* describes the process of transferring browser information with respect FIG. 7, which is identified as a process that occurs "during a browsing

---

[24] *Ex. 1001* at 9:35-37.

[25] *Ex. 1004* at 7:56 – 8:23.

session."[26] It is axiomatic that steps in a process that takes place *during* a browsing session cannot be said to occur *after* that session is discontinued. Even if one reads out the explicit teaching of the FIG. 7 process taking place during the browsing session, never does *Bates* indicate that any of the described instances for transferring the browser information occur after the session is first discontinued and nor need they necessarily be so.

For example, a transmission that occurs "immediately upon user request" is not synonymous with a transmission after a session is discontinued. It is equally, if not more, likely that the user request is made (and the transmission effected) while the user is engaged in a session. Likewise, transmissions that occur when a computer is shutdown or idle may perhaps be coincident with a session being discontinued, but there is no requirement (and nothing in *Bates* to suggest) that they must be after a session is discontinued. Certainly, periodic transmissions of browser information need not occur after a session is discontinued, nor do transmissions that occur upon the manifestation of an unidentified predetermined action and nothing in *Bates* indicates anything to the contrary.

Petitioner hypothesizes that certain of the transmission times described

---

[26] *Id.* at 8:55-57.

by *Bates could* be after a session has been discontinued,[27] but fail to show that *Bates* necessarily requires this condition.[28] Transmission of browser information "at shutdown" may be coincident with discontinuing a session (as defined by Petitioner), but it need not necessarily be afterwards. The same is true if the computer is in an idle condition. Finally, as admitted by Petitioners, because *Bates* does not put any time restriction on when the user can request that the browser information be transferred "upon user request," *Bates* allows for browser information transmission "at any number of user-selected times,"[29] and there is no teaching or suggestion that it ***must*** be after a session is

---

[27] Petition at 31.

[28] *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) (The key to anticipation is that, within "the four corners of a single, prior art document … every element of the claimed invention [must be described], either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation.").

[29] Petition at 31.

discontinued.[30]

If anything, Petitioner seems to be relying upon some notion of inherency in interpreting the disclosure provided by *Bates*. Certainly there is no explicit teaching of transmitting browser information after a session is discontinued and Petitioner's use of terms such as "could be" indicate that even Petitioner believes more than one possible interpretation of the teachings exist. Inherency, however, is an unavailing argument in such circumstances. To establish such inherency, Petitioner would have to provide rationale or evidence tending to show same[31] and the fact that a certain result or characteristic **may** occur or be present in the prior art is **not** sufficient to establish the inherency of that result or characteristic.[32] That is, inherency "may not be established by probabilities or possibilities [and] the mere fact that a certain thing **may** result from a given set of circumstances is not sufficient."[33]

---

[30] *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1236 (Fed. Cir. 1989) ("The ***identical*** invention must be shown in as complete detail as is contained in the patent claim.") (emphasis added) (citations omitted).

[31] MPEP § 2112.

[32] *In re Rijckaert*, 9 F.3d 1531, 1534 (Fed. Cir. 1993).

[33] *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) (emphasis added).

Petitioner's own argument admits the possibility of alternate times for the transmission of the browser information in *Bates* and inasmuch as the reference itself describes the transmissions in the context of FIG. 7 as being "during a browsing session"[34] it is equally likely, if not more so, that Petitioner's characterization of the events is wrong. Stated differently, a procedure in which browser information is transmitted "during a browsing session," as *Bates* itself labels the events in question, is manifestly different from one in which a session history is transmitted *after* that session is discontinued, as recited in claim 1, and so *Bates* cannot anticipate claim 1.[35]

For at least the foregoing reasons, Petitioner cannot demonstrate a reasonable likelihood that the challenged claim is unpatentable,[36] hence, no *inter partes* review should be instituted on this proposed ground.

---

[34] *Ex. 1004* at 8:55-57.

[35] *Net MoneyIN*, 545 F.3d at 1371 (no anticipation where a prior art reference fails to teach every element, and the "arrangement or combination" of those elements, of a claim).

[36] See 35 U.S.C. § 314 (an *inter partes* review may not be instituted where the petition fails to show a reasonable likelihood that petitioner would prevail as to at least one challenged claim).

**B.      The Petition Fails to Establish that *Bates* Anticipates Claim 23.**

Petitioner alleges that claim 23 is anticipated under 35 U.S.C. § 102(e) by *Bates*.[37] In doing so, Petitioner presents the same arguments as with respect to claim 1.[38] In particular, Petitioner argues that *Bates* teaches "transmitting a session history of said first device from said first device to a session transfer module after said session is discontinued on said first device," as recited in claim 23.[39]

Above it was demonstrated that *Bates* fails to teach this feature of the claims. Indeed, Petitioner's own argument demonstrates the deficiency of the reference in this regard. *Bates* itself describes transmissions of browser information "during a browsing session,"[40] hence, *Bates* cannot anticipate claim 23.[41] Accordingly, Petitioners cannot demonstrate a reasonable likelihood that

---

[37] Petition at 32 *et seq.*

[38] *Id.* at 32-33 (as to all elements of claim 23, Petitioner merely refers back to claim charts and discussion presented for claim 1).

[39] *Id.* at 33.

[40] *Ex. 1004* at 8:55-57.

[41] *Net MoneyIN*, 545 F.3d at 1371.

the claim 23 is unpatentable, and so no *inter partes* review should be instituted on this proposed ground.

## C. The Petition Fails to Establish that Claims 1, 4, 23, and 25 are Obvious in View of *Bates* When Considered in Combination with *Chan*.

In alleging the unpatentability of claims 1, 4, 23, and 25 under 35 U.S.C. § 103 in view of the combined teachings of *Bates* and Chan, Mun Choon et al., "Next-Generation Wireless Data Services: Architecture and Experience," IEEE Personal Communications, Feb. 1999, pp. 20-33 ("*Chan*") (Ex. 1005), Petitioner cites *Chan* for teachings concerning "a session transfer module."[42] Nothing in *Chan* is alleged to teach or suggest "transmitting a session history of said first device from said first device to a session transfer module after said session is discontinued on said first device," and so combining the teachings of *Chan* with those of *Bates* offers nothing more in this regard than *Bates* alone. Accordingly, inasmuch as *Bates* does not teach or suggest transmitting a session history of said first device from said first device to a session transfer module after said session is discontinued on said first device,[43]

---

[42] Petition at 33.

[43] *Supra*, §§ 3A-3B.

the combination of *Bates* and *Chan* must likewise fail to suggest this feature of the challenged claims.[44] Thus, claims 1 and 23 remain patentable over the combined teachings of *Bates* and *Chan.*

Claim 4 depends from claim 1, and claim 25 depends from claim 23. Each dependent claim includes the limitations of its respective parent claim(s), hence, claims 4 and 25 are patentable over the combined teachings of *Bates* and *Chan* for at least the same reasons as claims 1 and 23 are so patentable.[45] Consequently, no *inter partes* review should be instituted on this proposed ground.

---

[44] *CFMT, Inc. v. Yieldup Intern. Corp.*, 349 F.3d 1333, 1342 (Fed. Cir. 2003) ("[O]bviousness requires a suggestion of all limitations in a claim.") *citing In re Royka*, 490 F.2d at 985.

[45] *Hartness Int'l. Inc. v. Simplimatic Engineering Co.*, 819 F.2d 1100, 1108 (Fed. Cir. 1987) (a claim that depends from a nonobvious independent claim is nonobvious because it contains all of the limitations of that independent claim plus a further limitation).

### D. The Petition Fails to Establish that Any of Claims 1, 4, 23, and 25 are Anticipated by *Phan ICC*.

Petitioner alleges that claims 1, 4, 23, and 25 are anticipated under 35 U.S.C. § 102(a) by *Phan ICC* (Ex. 1020).[46] However, Petitioner's analysis deficient; hence, no *inter partes* review should be instituted.[47]

With respect to the second element of claim 1 ("specifying a second device") Petitioner makes no convincing showing that *Phan ICC* teaches this feature and instead alleges, "*Phan ICC* also discloses a 'second device . . . that is identified or specified when a user logs on to or starts a new device to continue the session.'"[48] Petitioner's analysis ignores the actual limitation of the claim at issue. Nowhere does Petitioner make any effort to explain how logging on to or starting a new device "specif[ies] a second device" as required by the claim. Rather, all that is taught by the cited reference is that a user may begin a new

---

[46] Petition at 40 *et seq.*

[47] 35 U.S.C. § 316 (e) ("In an inter partes review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence.").

[48] Petition at 45.

session at a new device.[49] It is Petitioner's burden to identify where each and every element of a challenged claim is found in the prior art.[50] Petitioner has failed to meet this burden because nowhere does the Petition explain how the cited reference teaches "*specifying* a second device." Therefore, no *inter partes* review should be instituted on this ground.

In addition, with respect to the fourth element of claim 1 ("transmitting a session history of said first device from said first device to a session transfer module *after said session is discontinued on said first device*"), Petitioner failed to convincingly address the requirement that the session history be transmitted *after* the session is discontinued on the first device. Petitioner alleges that *Phan ICC* teaches, "When the user exits the session, the client updates the

---

[49] *Ex. 1020* at 1370, rt. col.

[50] *Zetec, Inc. v. Westinghouse Electric Company, LLC*, IPR2014-00384, Paper 10 at 6 (P.T.A.B. July 23, 2014) citing 37 C.F.R. §§ 42.22(a)(2), 42.104(b)(4), (5) ('a petition must include "[a] full statement of the reasons for the relief requested, including a detailed explanation of the significance of the evidence" and "where each element of [each challenged] claim is found in the prior art patents or printed publications relied upon [and] the relevance of the evidence to the challenge raised.'").

middleware."[51] At best, this indicates that a device transmits session information *concurrently* with exiting the session, not ***after the session is discontinued***, as required by claim 1. Petitioner makes no attempt to explain how a discussion of transmitting session information *concurrently* with exiting the session, teaches transmitting a session history ***after the session is discontinued***, and Mr. Hoarty's declaration adds nothing to Petitioner's analysis in this regard because it merely repeats the allegations set forth in the petition verbatim.[52] As such, the declaration testimony is entitled to little or no weight.[53]

Petitioner notes that the *Phan WIAPP* publication (Ex. 1019) reports on the same iMASH project that is described by *Phan ICC*.[54] Accordingly, *Phan WIAPP* provides additional insight into why *Phan ICC* fails to teach transmitting a session history of said first device from said first device to a session transfer module ***after said session is discontinued on said first device***.

*Phan WIAPP* explains the TWIST process used in iMASH with

---

[51] Petition at 47 (citing *Ex. 1020* at § 4.1).

[52] Compare Petition at 47 with *Ex. 1018* at ¶ 88.

[53] 37 C.F.R. § 42.65(a); and see *Kinetic Technologies, Inc. v. Skyworks Solutions, Inc.*, IPR2014-00530, Paper 8 at p. 13 (P.T.A.B. Sept. 29, 2014).

[54] Petition at 16.

reference to Figure 4 (reproduced below).[55]



In this diagram, **o** represents the original data object, $f_1$ is a filtering mechanism applied in respect of client $C_1$ to produce data object $f_1(o)$, and $g_1$ is a user modification performed on the data object a client $C_1$ to produce data object $g_1f_1(o)$.[56] As explained by *Phan WIAPP*,

---

[55] *Ex. 1019* at 8, rt. col. (citations to Ex. 1019 are to the exhibit page numbers).

[56] *Id.* at 8, left col.

As the session begins, (1) the AS returns data object o to the MWS, which is immediately cached. (2) The MWS filters to suit the limitations of $C_1$ by applying the filter function $f_1$ to o; client $C_1$ thus receives $f_1(o)$ from the MWS. (3) The user at $C_1$ proceeds to modify the data by applying an operation $g_1$ to the object, resulting in $g_1 f_1(o)$.[57]

With respect to a "session handoff" procedure from client $C_1$ to a second client, $C_2$:

Because this is a two-way interactive transfer, the result of the operation $g_1$ at $C_1$ must be made visible to $C_2$ when the session is reinstantiated. The modified form of the data must thus be made available at the MWS so that it can be sent to $C_2$. We note for now that (4) upon handoff, only $g_1$ is sent back to the MWS.[58]

Thus, as shown in the illustration, the "handoff" consists of client $C_1$ transmitting $g_1$ to the MWS and, thereafter, the MWS computing $g_1 f_1(o)$ and transferring $g_1 f_1(o)$ (appropriately filtered by $f_2$) to client $C_2$.[59] This is substantially different from what is recited in claim 1.

---

[57] *Id.*

[58] *Id.*

[59] *Id.*

Claim 1 requires that the *same* session history that is transmitted from the first device to the session transfer model be used by the second device to resume the session:

> transmitting *a session history* of said first device from said first device to a session transfer module after said session is discontinued on said first device; and
>
> resuming said session on said second device *with said session history*.[60]

*Phan WIAPP* shows, quite conclusively, that this is not how the iMASH system operates. If one considers what is transmitted from client C1 (which according to Petitioner is the "first device")[61] to the MWS (which Petitioner equates to the session transfer module),[62] *Phan WIAPP* states, "only $g_1$ is sent back to the MWS."[63] However, client $C_2$ (which Petitioner alleges is the "second device" in claim 1)[64] does *not* resume the session with "only $g_1$." Instead, it is $f_2 g_1 f_1(o)$ that

---

[60] *Ex. 1001* at 9:35-39 (emphasis added).

[61] See, e.g., Petition at 17.

[62] *Id.*

[63] *Ex. 1019* at 8, left col.

[64] Petition at 10-11.

is transmitted to $C_2$, and that is what C2 uses to resume the session.[65]

Even accounting for situations in which data manipulations $f_2$ are not needed, it would remain the case that what is transmitted from client $C_1$ to the MWS is different than what the MWS provides to $C_2$ to continue a session.[66] In short, in iMASH the second device does not resume a session with *the* session history that was transmitted from the first device to the session transfer module, but instead operates using some other data object that was constructed by the MWS.[67] Thus, because *Phan ICC* describes the same system as *Phan*

---

[65] *Id.*

[66] *Ex. 1019* at 8, rt. col. – 9, left col. (explaining that only a subset of the actual data object is ever transmitted from client $C_1$ because the MWS always performs the necessary data reconstruction before transferring a data object to $C_2$).

[67] *Id.*; and see *id.* at 8 rt. col. ("When the user performs a handoff, only the annotation change, encoded as XML, is sent back to the MWS instead of the entire teaching file . . . .").

*WIAPP, Phan ICC* cannot anticipate claim 1.[68]

In addition, *Phan WIAPP,* and therefore *Phan ICC,* fails to teach "transmitting a session history of said first device from said first device to a session transfer module *after* said session is discontinued on said first device,"[69] as recited by claim 1. According to *Phan WIAPP,* "The applet on the first client terminates when the state is fully reinstantiated on the second client."[70] In other words, in iMASH it is only after the second client has resumed the session that the applet on the first client discontinues its session. Of course, before the second client initiates its session, it must receive information from the MWS.[71] Before the information is sent from the MWS, the first client provides the MWS with $g_1$.[72] Therefore, it follows that in iMASH the first client does *not* transmit a session history to a session transfer module after the session is

---

[68] *Net MoneyIN*, 545 F.3d at 1371 (no anticipation where a prior art reference fails to teach every element, and the "arrangement or combination" of those elements, of a claim).

[69] *Ex. 1001* at 9:35-37.

[70] *Ex. 1019* at 11, rt. col.

[71] *Id.* at 8, left col. and Fig. 4

[72] *Id.*

discontinued on the first device, but instead transmits some representation of its operations on a data object to the MWS and then waits until a session is fully reinstantiated on the second client before terminating its session.[73] This procedure is manifestly different from that recited in claim 1, hence, *Phan ICC,* which describes the same system as *Phan WIAPP*, cannot anticipate claim 1.[74]

In alleging that claim 23 is anticipated by *Phan ICC,* Petitioner merely repeats all of the arguments raised with respect to claim 1.[75] In particular, Petitioner alleges that *Phan ICC* teaches "transmitting a session history of said first device from said first device to a session transfer module after said session is discontinued on said first device."[76] Above it was demonstrated that this is not the case, hence, claim 23 is not anticipated by *Phan ICC.*

Claim 4 depends from claim 1, and claim 25 depends from claim 23. Each dependent claim includes the limitations of its respective parent claim(s), hence, claims 4 and 25 not anticipated by *Phan ICC* for at least the same reasons as claims 1 and 23. Consequently, no *inter partes* review should be

---

[73] *Id.* at 50.

[74] *Net MoneyIN*, 545 F.3d at 1371.

[75] Petition at 49 *et seq.*

[76] *Id.* at 33.

instituted on this proposed ground.

### E. The Petition Fails to Establish that Claims 4 and 25 are Obvious in View of *Phan ICC* and Phan *WIAPP*.

The patentability of claims 4 and 25 is challenged under 35 U.S.C. § 103(a) in view of the combined teachings of *Phan ICC* and *Phan WIAPP*.[77] This proposed ground of institution should not be granted, however, because Petitioner has failed to demonstrate any reasonable likelihood of prevailing with respect to any challenged claim.[78]

Claim 4 depends from claim 1 and claim 25 depends from claim 23. A dependent claim necessarily includes all of the limitations of the claim from which it depends.[79] Accordingly, claim 4 includes all of the limitations of claim 1 and claim 25 includes all of the limitations of claim 23.

Above it was shown that neither *Phan ICC* or *Phan WIAPP* teach or suggest transmitting a session history of said first device from said first device to a session transfer module *after said session is discontinued on said first device*, as

---

[77] Petition at 51 *et seq*.

[78] 35 U.S.C. § 314.

[79] 35 U.S.C. § 112 (d).

required by claims 1 and 23. In fact, not only are the references individually

deficient in this regard, the combination of Phan ICC and Phan WIAPP

actually indicate that, "The applet on the first client terminates when the state

is fully reinstantiated on the second client."[80] That is, it is only *after* the second

client has received information from the MWS[81] and *resumed* the session that

the applet on the first client discontinues its session. Necessarily then, in any

combination of *Phan ICC* and *Phan WIAPP* a first device would *not* transmit a

session history to a session transfer module *after* the session is discontinued on

the first device, but instead would transmit some representation of its

operations on a data object to the MWS and then wait until a session is fully

reinstantiated on the second device before terminating its session.[82]

It necessarily follows that because the combined teachings of the

references do not suggest all of the limitations of claims 1 or 23, claims 1 and

23 cannot be obvious in view of the conmbination of these references.[83]

Likewise, claim 4, which depends from claim 1, and claim 25, which depends

---

[80] *Ex. 1019* at 11, rt. col.

[81] *Id*. at 8, left col. and Fig. 4

[82] *Id*. at 11, rt. col.

[83] *In re Wilson*, 424 F.2d 1382, 1385 (CCPA 1970).

from claim 23, are patentable over *Phan ICC* and *Phan WIAPP*.[84]

## 4. Conclusion

For at least the foregoing reasons, the Board should not institute *inter partes* review of the '233 Patent on any of the grounds proposed by Petitioner.

Respectfully submitted,

Date: <u>March 31, 2015</u>     by:    <u>*/Tarek N. Fahmi/*</u>
                                            Tarek N. Fahmi, Reg. No. 41,402

ASCENDA LAW GROUP, PC
333 W San Carlos St., Suite 200
San Jose, CA 95110
1 866 877 4883
Email: tarek.fahmi@ascendalaw.com

---

[84] *Hartness Int'l,* 819 F.2d at1108 (dependent claims are nonobvious under section 103 if the independent claims from which they depend are nonobvious).

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing

PATENT OWNER'S PRELIMINARY RESPONSE

was served on March 31, 2015, by filing this document though the Patent

Review Processing System as well as delivering a copy via email directed to the

attorneys of record for the Petitioner at the following address:

Eliot D. Williams
G. Hopkins Guy, III
Baker Botts L.L.P.
1001 Page Mill Rd.
Palo Alto, CA 94304-1007

eliot.williams@bakerbotts.com

hop.guy@bakerbotts.com

The parties have agreed to email service in this proceeding.

Date: March 31, 2015          by:    /Tarek N. Fahmi/
                                     Tarek N. Fahmi, Reg. No. 41,402

ASCENDA LAW GROUP, PC
333 W San Carlos St., Suite 200
San Jose, CA 95110
1 866 877 4883
Email: patents@ascendalaw.com

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

DISH NETWORK CORPORATION, DISH DBS CORPORATION,
DISH NETWORK L.L.C., ECHOSTAR CORPORATION, and
ECHOSTAR TECHNOLOGIES L.L.C.,
Petitioner,

v.

CRFD RESEARCH, INC.,
Patent Owner.
_____

Case IPR2015-00627
Patent 7,191,233 B2
_____

Before JUSTIN T. ARBES, THOMAS L. GIANNETTI, and
CHARLES J. BOUDREAU, *Administrative Patent Judges.*

ARBES, *Administrative Patent Judge.*

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

Petitioners DISH Network Corporation, DISH DBS Corporation, DISH Network L.L.C., EchoStar Corporation, and EchoStar Technologies L.L.C. (collectively, "Petitioner") filed a Petition (Paper 1, "Pet.") to institute an *inter partes* review of claims 1, 4, 23, and 25 of U.S. Patent No. 7,191,233 B2 (Ex. 1001, "the '233 patent") pursuant to 35 U.S.C. §§ 311–19. Patent Owner CRFD Research, Inc. filed a Preliminary Response (Paper 8, "Prelim. Resp."). We have jurisdiction under 35 U.S.C. § 314. Pursuant to 35 U.S.C. § 314(a), the Director may not authorize an *inter partes* review unless the information in the petition and preliminary response "shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." For the reasons that follow, we have decided to institute an *inter partes* review as to claims 1, 4, 23, and 25 of the '233 patent on certain grounds of unpatentability.

# I. BACKGROUND

## *A. The '233 Patent*[1]

The '233 patent describes a system and method for "user-directed transfer of an on-going software-based session from one device to another device." Ex. 1001, col. 1, ll. 8–11. A user may have a number of communication-enabled devices (e.g., cellular telephone, wireless personal digital assistant (PDA), laptop computer, desktop computer) through which the user conducts software application sessions. *Id*. at col. 1, ll. 15–52. The user may conduct a session on one device and then decide to switch to

---

[1] The '233 patent also is the subject of Cases IPR2015-00055, IPR2015-00157, and IPR2015-00259.

another device.  *Id*. at col. 1, ll. 53–59.  For example, the user may want to switch from a stationary device to a mobile device, or switch to a device with a different graphical user interface.  *Id*.  According to the '233 patent, conventional systems that required the user to "discontinue the current session on the first device and reinitiate a new session on the second device" were inadequate due to the history of the original session being lost and the time delay in logging off and reinitiating.  *Id*. at col. 1, ll. 59–66.

Figure 1 of the '233 patent is reproduced below.



*Fig. 1*

Figure 1 depicts wireless clients 120 (e.g., a cellular telephone or PDA) and wired clients 125 (e.g., a desktop or laptop computer) of a user that connect over various networks to application services network 105.  *Id*. at col. 4,

ll. 4–11, 30–33, col. 5, ll. 3–6. Wireless clients 120 and wired clients 125 execute client programs that support session services for the respective devices, and are "configured to have a preferred mode of interaction, i.e., modality," such as a graphical user interface for transferring sessions between devices. *Id.* at col. 4, ll. 33–50. Application services network 105 provides session-based services (e.g., instant messaging, database querying), and application server 140 provides applications for those services (e.g., instant messaging application, database querying application), to wireless clients 120 and wired clients 125. *Id.* at col. 5, ll. 21–30.

The '233 patent describes the method of session transfer as follows: (1) a "redirect or transfer command" is sent from a first device (wireless client 120 or wired client 125); (2) session server 145 begins intercepting messages destined for the first device; (3) the first device transmits a "transaction or session history" to session server 145; (4) session server 145 retrieves the previously stored "device profile" of the second device to which the session is to be redirected, "convert[s] the messages [of the session history] into a data format" and/or modality compatible with the second device, and converts the "state" of the session to a state compatible with the second device; and (5) when the user activates the second device, session server 145 "pushes the converted session to the redirected device over the network 100 as a normal session with the converted transaction log." *Id.* at col. 7, l. 46–col. 8, l. 58.

*B. Illustrative Claim*

Claim 1 of the '233 patent recites:

1. A method for redirecting an on-going, software based session comprising:

conducting a session with a first device;

specifying a second device;

discontinuing said session on said first device; and

transmitting a session history of said first device from said first device to a session transfer module after said session is discontinued on said first device; and

resuming said session on said second device with said session history.

*C. The Prior Art*

Petitioner relies on the following prior art:

U.S. Patent No. 6,963,901 B1, filed July 24, 2000, issued Nov. 8, 2005 (Ex. 1004, "Bates");

Mun Choon Chan & Thomas Y. C. Woo, *Next-Generation Wireless Data Services: Architecture and Experience*, IEEE PERSONAL COMMS., Feb. 1999, at 20 (Ex. 1005, "Chan");

Thomas Phan *et al.*, *A New TWIST on Mobile Computing: Two-Way Interactive Session Transfer*, PROCEEDINGS OF THE SECOND IEEE WORKSHOP ON INTERNET APPLICATIONS (WIAPP 2001) (Ex. 1019, "Phan San Jose"); and

Thomas Phan *et al.*, *Handoff of Application Sessions Across Time and Space*, IEEE INTERNATIONAL CONFERENCE ON COMMUNICATIONS (ICC 2001) (Ex. 1020, "Phan Helsinki").[2]

---

[2] When citing Chan, Phan San Jose, and Phan Helsinki, we refer to the page numbers at the lower right corner of each page. *See* 37 C.F.R. § 42.63(d)(2). Also, Petitioner refers to Phan San Jose as "Phan WIAPP," and refers to Phan Helsinki as "Phan ICC." Because the two references were discussed

*D. The Asserted Grounds*

Petitioner challenges claims 1, 4, 23, and 25 of the '233 patent on the following grounds:

| Reference(s) | Basis | Claims Challenged |
|---|---|---|
| Bates | 35 U.S.C. § 102(e) | 1 and 23 |
| Bates and Chan | 35 U.S.C. § 103(a) | 1, 4, 23, and 25 |
| Phan Helsinki | 35 U.S.C. § 102(a) | 1, 4, 23, and 25 |
| Phan Helsinki and Phan San Jose | 35 U.S.C. § 103(a) | 4 and 25 |

*E. Claim Interpretation*

The Board interprets claims using the "broadest reasonable construction in light of the specification of the patent in which [they] appear[]." 37 C.F.R. § 42.100(b); *see* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012); *In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271, 1278–82 (Fed. Cir. 2015). Under this standard, we interpret claim terms using "the broadest reasonable meaning of the words in their ordinary usage as they would be understood by one of ordinary skill in the art, taking into account whatever enlightenment by way of definitions or otherwise that may be afforded by the written description contained in the applicant's specification." *In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997). We presume that claim terms have their ordinary and customary meaning. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir.

---

previously in Case IPR2015-00055, we use the same nomenclature as the earlier proceeding for consistency.

2007) ("The ordinary and customary meaning is the meaning that the term would have to a person of ordinary skill in the art in question.") (internal quotation marks omitted). However, a patentee may rebut this presumption by acting as his own lexicographer, providing a definition of the term in the specification with "reasonable clarity, deliberateness, and precision." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

The '233 patent also is challenged in Case IPR2015-00055, and was challenged in Case IPR2015-00157. For the reasons stated in the Decisions on Institution in those proceedings, we interpret four claim terms as follows:

| Claim Term | Interpretation |
|---|---|
| "modality" | a preferred mode of interaction |
| "device profile" | information pertaining to the operation of a device, such as the data format or modality of the device |
| "in response to . . . activation of said second device" | in response to the second device being made active, such as by a user logging on to the second device |
| "session" | a series of information transactions between communicating devices during a particular time period |

*See Unified Patents Inc. v. CRFD Research, Inc.*, Case IPR2015-00157, slip op. at 6–9 (PTAB Apr. 30, 2015) (Paper 8); *Iron Dome LLC v. CRFD Research, Inc.*, Case IPR2015-00055, slip op. at 6–10 (PTAB Apr. 27, 2015) (Paper 10). We also interpret the terms "discontinuing," "discontinued," and "session transfer module."

*1. "Discontinuing" and "Discontinued" (Claims 1 and 23)*

Petitioner argues that the term "discontinuing" should be interpreted to mean "terminating or otherwise stopping, with the ability to be resumed," citing as support portions of the '233 patent Specification indicating that a session takes place on one device and then is transferred and "resum[ed]" on another device. Pet. 22 (citing Ex. 1001, col. 1, ll. 9–11, col. 2, ll. 3–8). Patent Owner does not dispute Petitioner's proposed interpretation in its Preliminary Response.

Based on the current record, we agree that Petitioner's proposed interpretation is the broadest reasonable interpretation in light of the Specification. As stated above, we interpret "session" to mean a series of information transactions between communicating devices during a particular time period. A "session" must be capable of being "conduct[ed]" with and "discontinu[ed]" on the first device (claim 1), and also "push[ed]" to and "resum[ed]" on the second device (claim 2). *See also* Ex. 1001, col. 7, ll. 7–11 ("session transfer module 220 may be further configured to discontinue or suspend the session with the transferring device and to block any subsequent messages of the transferring session from reaching the transferring device"), 53–61. We interpret "discontinuing" to mean terminating or otherwise stopping, with the ability to be resumed, and interpret "discontinued" to mean terminated or otherwise stopped, with the ability to be resumed.

*2. "Session Transfer Module" (Claims 1 and 23)*

Petitioner argues that the term "session transfer module" should be interpreted to mean "hardware and/or software that participates in the

transfer of the session." Pet. 23. Petitioner points out that the Specification discloses a session transfer module that "may be configured" to perform various functions in connection with transferring a session from one device to another. *Id.* (citing Ex. 1001, col. 3, l. 6–col. 4, l. 3). Patent Owner does not dispute Petitioner's proposed interpretation in its Preliminary Response.

The only function attributed to the "session transfer module" in the challenged claims is receiving the session history from the first device. Petitioner is correct, though, that the Specification describes other session transfer-related functions for which session transfer module 220 may be configured. For example, session transfer module 220 may be "configured to intercept any messages destined for the first client device . . . [and] block any messages for the first client device," convert "the state of the session . . . to a state compatible with the redirected device," and "transmit a notification (or alert) message to the redirected device to inform that a current on-going session is awaiting to be resumed." Ex. 1001, col. 7, l. 53–col. 8, l. 28, Figs. 3A, 3B. The Specification further discloses embodiments that are "software program(s) comprised of program instructions in source code, object code, executable code or other formats; firmware program(s); or hardware description language (HDL) files." *Id.* at col. 8, ll. 59–65. On this record, applying the broadest reasonable interpretation of the claims in light of the Specification, we interpret "session transfer module" to mean computer hardware and/or software that participates in the transfer of a session.

## II. DISCUSSION

### A. Anticipation Ground Based on Bates

Petitioner contends that claims 1 and 23 are anticipated by Bates under 35 U.S.C. § 102(e). Pet. 24–33. We are persuaded that Petitioner has established a reasonable likelihood of prevailing on its asserted ground for the reasons explained below.

### 1. Bates

Bates describes a method of "sharing . . . browser information between at least two browser applications." Ex. 1004, col. 1, ll. 63–66. A user may operate one browser program (e.g., Netscape Navigator) on a first client computer, and then choose to use a different browser program (e.g., Internet Explorer) on a second client computer. *Id*. at col. 4, ll. 41–47. The first client computer stores "browser information" and transmits the information to the second client computer for use with the second browser program. *Id*. at col. 4, ll. 49–61. Bates describes the browser information as "information generated during a browsing session, i.e., a period of time when the browser 240 is executing on a client computer 106 and a network connection exists between the client 106 and the network 104 allowing a user to traverse network addresses corresponding to the servers 108." *Id*. at col. 4, ll. 61–67. For example, browser information may include a history of websites visited during a browsing session, bookmarks, cookies, and browser configurations. *Id*. at col. 4, l. 67–col., 5, l. 6.

Bates discloses various data input windows that allow the user to input parameters for the transfer. *Id*. at col. 5, l. 47–col. 8, l. 54. The user may enter "an e-mail address for a computer (e.g., a remote client computer

106) to which the browser information" will be sent. *Id*. at col. 5, ll. 51–56,
Fig. 3. Bates discloses an exemplary embodiment where browser
information is transmitted via email, but states that "any method or system
(e.g., file transfer protocol (FTP))" may be used. *Id*. at col. 3, ll. 21–26. The
user also may choose what browser information to share with the second
client computer and when. *Id*. at col. 5, l. 64–col. 8, l. 54, Figs. 4, 5. Figure
5 of Bates is reproduced below.



*Fig. 5*

Figure 5 depicts a data input window that allows a user to "select when
browser information will be transmitted to a remote client computer," such
as upon user request, at shutdown, or when the first client computer is idle
("e.g., when the computer 106 enters a standby or hibernation mode"). *Id*. at
col. 7, l. 53–col. 8, l. 5. The first client computer transmits the browser
information (e.g., in an email message) to the second client computer
whenever such a "share event" occurs, and the second client computer uses
the information to configure its browser program. *Id*. at col. 8, l. 55–col 10,
l. 55, Figs. 7, 8.

## 2. Analysis

Petitioner explains in its Petition how Bates discloses each of the limitations of claims 1 and 23, and relies on the Declaration of W. Leo Hoarty in support of its arguments. Pet. 24–33 (citing Ex. 1018 ¶¶ 46–47, 55–64, 67–68, 78–79).[3] For example, with respect to claim 1, Petitioner explains how a user conducts a session with a "first device" (i.e., the first client computer), then discontinues the session on the "first device" so that it can be resumed on a "second device" (i.e., the second client computer) using the same browser information (e.g., website history, bookmarks). *Id*. at 24–32. Regarding the "session transfer module" recited in claim 1, Petitioner identifies network servers $108_{1-n}$ and email server 102 in Bates, "the software running the [transmission] protocols" (e.g., Simple Mail Transfer Protocol (SMTP), FTP), "or the combination of the two" because they constitute hardware and/or software that "participates" in the transfer of a session. *Id*. at 29–30. Upon review of the Petition, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing.

Patent Owner argues that Bates does not disclose transmitting a session history from a first device "after said session is discontinued on said first device," as recited in claims 1 and 23. Prelim. Resp. 4–14. With respect to the "discontinuing" and "transmitting" steps recited in the challenged claims, Petitioner cites Bates's disclosure of "terminat[ing] the

---

[3] In numerous paragraphs of his Declaration, Mr. Hoarty repeats the testimony of Mark Claypool, Ph.D., in Case IPR2015-00259, and states that he agrees with Dr. Claypool's analysis and conclusions, and adopts them "as [his] own." *See, e.g.*, Ex. 1018 ¶¶ 43, 52, 55–64. Petitioner filed a copy of Dr. Claypool's declaration in Case IPR2015-00259 in this proceeding as Exhibit 1003.

browsing session" and three "share events" shown in Figure 5: "upon user request," "at shutdown," and "at idle period." *Id.* at 26–32 (citing Ex. 1004, col. 10, l. 58–col. 11, l. 1). Specifically, Petitioner argues:

> These time periods include time periods *after* discontinuation of the session on the first computer. "At shutdown" on the first computer, the session is "discontinued" because it would be stopped, but could be resumed. A session entering an "idle period" on the first computer would also be "discontinued" because it would be stopped, but could be resumed. Finally, the "upon user request" option of Bates allows for browser information transmission at any number of user-selected times, including after the session is discontinued on the first device.

*Id.* at 31 (citations omitted).

Patent Owner argues that Petitioner's assertions as to when any of the events could occur with respect to discontinuation of the session on the first client computer are insufficient to demonstrate that Bates discloses the "transmitting" step, either expressly or inherently. Prelim. Resp. 4–14. According to Patent Owner, transmission of browser information at shutdown or at an idle period "may perhaps be coincident with a session being discontinued," but does not necessarily take place after a session is discontinued. *Id.* at 9–10. Patent Owner also points out that Bates describes Figure 7 as depicting the sequence of events that occurs "during a browsing session." *Id.* at 4–7 (citing Ex. 1004, col. 8, ll. 55–57). Therefore, because Figure 7 includes determining whether an event is a triggering "share event" (step 710) and transmitting browser information (step 720), the transmission in Bates must occur *during* a session, not *after* a session is discontinued on the first client computer. *Id.*

In its Preliminary Response, however, Patent Owner does not address other statements in Bates that are cited by Petitioner for the session discontinuation, and that specifically describe the "termination" of a session:

> [T]wo or more browser programs may share attributes, settings and other browser information. Such a system can facilitate use of browsers to navigate network environments. For example, consider a user reading messages posted on a bulletin board, inputting data into a web page or performing some other task during a browsing session. *Prior to completing the task, the user may be required to terminate a browsing session. In such an event, the necessary browser information may be collected and transmitted to a remote computer containing another browser program. The browser information is then used to reconfigure the browser program of the remote computer and restore the user to where he or she left off during the terminated browsing session.* . . . In effect, the present invention preserves the current status of a browsing session to be resumed at another location.

Ex. 1004, col. 10, l. 55–col. 11, l. 8 (emphases added); *see* Pet. 26–27. Thus, in at least one embodiment in Bates, the user is required to terminate the browsing session and, "[i]n such an event," browser information is collected and transmitted from the first client computer. Also, it is unclear what Patent Owner means by transmission at shutdown or idle being "coincident" with a session being discontinued in Bates, or how the events could occur "coincident" with each other. *See* Prelim. Resp. 9–10. Based on the record currently before us, we are persuaded that the above disclosure of Bates pertaining to session termination, along with Bates's description of various triggering events in which a user may be required to terminate a browsing session (e.g., at shutdown), are sufficient to demonstrate a reasonable likelihood that Bates discloses the "transmitting" step of the challenged claims.

Based on the current record, and our interpretations of "discontinuing," "discontinued," and "session transfer module," *see supra* Section I.E.1–2, Petitioner has demonstrated a reasonable likelihood of prevailing on its assertion that claims 1 and 23 are anticipated by Bates.

### B. Obviousness Ground Based on Bates and Chan

Petitioner contends that claims 1, 4, 23, and 25 are unpatentable over Bates and Chan under 35 U.S.C. § 103(a), relying on the supporting testimony of Mr. Hoarty. Pet. 33–40 (citing Ex. 1018 ¶¶ 65–66, 69–72, 74–76, 78–79, 81–82). We are persuaded that Petitioner has established a reasonable likelihood of prevailing on the asserted ground for the reasons explained below.

### 1. Chan

Chan describes a client-server architecture that allows "an application session to persist across network and device handoffs." Ex. 1005, 4. Figure 4 of Chan is reproduced below.



■ **Figure 4.** *Server architecture.*

Figure 4 depicts server components that facilitate the transfer of a session from one client device to another. The "service module" manages session "states that are persistent per user, per application, or per session." *Id.* at 6–7. "For example, in Web browsing persistent application states such as bookmarks, history, and cookies should be preserved when the user migrates to different devices." *Id.* at 7. The server stores a "device profile" for client devices, and includes an "adaptation layer" that performs "[d]evice- or media-specific processing such as transcoding." *Id.* at 6–7. The "dispatch module" determines "what kind of adaptation to perform," the "service module" adapts the state information for the destination client device, and a "state management module carries out the application transfer functions," such as packaging and transferring the state information to the destination client device. *Id.*

*2. Analysis*

Petitioner relies on Bates for the majority of the limitations of claims 1, 4, 23, and 25, and relies on Chan as teaching certain limitations. Pet. 33–40. For example, Petitioner cites Chan's service module and state management module as a "session transfer module," as recited in independent claims 1 and 23, and argues that Chan "restructur[es] . . . session data"[4] to conform with a device profile of a second device, as recited

---

[4] Claim 1 refers to a "session history" rather than "session data." Based on how the terms are used in the claims, and how "session history" is used in the Specification, we conclude that a person of ordinary skill in the art would understand the terms to refer to the same thing. *See, e.g.*, claims 1 ("resuming said session on said second device with said session history"), 4 ("restructuring said session data to conform with said device profile of said

in claim 4. *Id*. at 33–38. Patent Owner repeats its argument that Bates does not teach transmitting a session history "after said session is discontinued on said first device," as recited in independent claims 1 and 23, which we disagree with for the reasons set forth above. *See* Prelim. Resp. 14–15; *supra* Section II.A.2. On this record, Petitioner has made a sufficient showing that all limitations of the challenged claims are taught by Bates and Chan.

Regarding the combination of the two references, Petitioner explains that Bates focuses on client-side functionality and recognizes the need to reformat session data when a session is transferred from one device to another device that uses a different browser. Pet. 38–39 (citing Ex. 1004, col. 11, ll. 22–49). According to Petitioner, a person of ordinary skill in the art would have had reason to combine the teachings of Bates with prior art like Chan that discloses "server-side implementation of session transfer between computers and that describe[s] reformatting session data to aid session transfer amongst heterogeneous devices," and the result of such a combination would have been predictable to an ordinarily skilled artisan. *Id*. (citing Ex. 1018 ¶¶ 69–72). Based on the current record, we are persuaded that Petitioner's analysis regarding the proposed combination is sufficient to show "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417–18 (2007) (quotation omitted).

---

second device"), 8 ("reformatting said session history of said session to conform with said device profile of said second device"). The parties, however, are encouraged to address the scope and treatment of claim 4 in their papers during trial.

Based on the current record, Petitioner has demonstrated a reasonable likelihood of prevailing on its assertion that claims 1, 4, 23, and 25 are unpatentable over Bates and Chan.

### C. Grounds Based on Phan Helsinki and Phan San Jose

Petitioner contends that claims 1, 4, 23, and 25 are anticipated by Phan Helsinki under 35 U.S.C. § 102(a), and that claims 4 and 25 are unpatentable over Phan Helsinki and Phan San Jose under 35 U.S.C. § 103(a). Pet. 40–56. We are persuaded that Petitioner has established a reasonable likelihood of prevailing on its asserted grounds for the reasons explained below.

### 1. Phan San Jose

Phan San Jose describes a research project called the "Interactive Mobile Application Support for Heterogeneous Client (iMASH)," which allows physicians and staff at a hospital to use different types of devices (e.g., desktop and laptop computers, display tablets) and "seamlessly move an application's session from one machine to another machine" using the hospital's "network as a conduit." Ex. 1019, 5. The system provides for "Two-Way Interactive Session Transfer (TWIST)" by placing a set of middleware servers between the client devices and the application server, storing state data on the middleware servers for the user's session on a first device (e.g., textual annotations, user preferences, URL history), and transferring the data to the second device upon session handoff. *Id*. at 6–7.

Phan San Jose describes how the system could be used with a "Teaching File" Java applet that displays medical images and associated

information, and allows users to create and modify instructional "teaching files." *Id.* at 10. In the Teaching File implementation, when a user requests a teaching file, the application server (AS) sends the image file (stored in the system's proprietary image format called "PACS") to the middleware server (MWS). *Id.* at 10–11. The MWS then "performs the image assembly on behalf of the client, including the conversion of the proprietary PACS image to [a] Java Image and the manipulation of that image according to the teaching file state description." *Id.* at 11. Phan San Jose describes two ways of performing the session handoff. *Id.* In the "pull" mode, the "session shall be saved back to the MWS, allowing the application to terminate, and at a later time the session can be reinstantiated by the Teaching File application running on the target machine." *Id.* In the "push" mode, "the user can select the hostname of the target from a list. When the handoff occurs, the MWS will contact a daemon running on the target machine to immediately launch the Teaching File applet and automatically retrieve the session state . . . [and the] applet on the first client terminates when the state is fully reinstantiated on the second client." *Id.*

### 2. Phan Helsinki

Phan Helsinki pertains to the same iMASH research project as Phan San Jose, and describes the architecture and operation of the system in additional detail. Ex. 1020, 7. For example, Phan Helsinki explains that the "[m]iddleware servers fetch data based on user requests (or pre-fetch data based on prediction of [a] user's near-future need) and perform conversion as needed," and "[w]hen a user moves an on-going application session from one device to another, middleware servers act as a 'home' for the application

state (including active connections, cached data, etc.) to facilitate migration between devices." *Id*. at 9. Phan Helsinki also describes the "Middleware-Aware Remote Code" (MARC) on the client device that facilitates "session saving and restoration," and the process by which a session is transferred using MARC and a web browser. *Id*. at 9–10.

### 3. *Anticipation by Phan Helsinki*
*(Claims 1, 4, 23, and 25)*

Petitioner explains in its Petition how Phan Helsinki discloses each of the limitations of claims 1, 4, 23, and 25. Pet. 40–51. For example, with respect to claim 1, Petitioner explains how a user conducts a session with a "first device" (e.g., an office desktop computer), then discontinues the session on the "first device" upon deciding to suspend the session and reinstantiate it on a "second device" (e.g., a PDA), such that the user's session history (e.g., bookmark list, history file, user preferences) is available for use on the "second device." *Id*. at 40–48 (citing Ex. 1020, 8–11). Regarding the "session transfer module" recited in claim 1, Petitioner identifies Phan Helsinki's middleware server. *Id*. at 47. Regarding the limitations of claim 4 pertaining to a "device profile" of a second device, Petitioner cites Figure 2 of Phan Helsinki, which discloses "User & Device Profiling" functionality in the middleware architecture, and the reference's disclosure of performing "conversion as needed." *Id*. at 48–49 (citing Ex. 1020, 8–9). Upon review of the Petition, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing.

Patent Owner makes three arguments. First, Patent Owner argues that Petitioner fails to explain how Phan Helsinki discloses "specifying a second

device," as recited in claims 1 and 23. Prelim. Resp. 16–17. Petitioner contends that in Phan Helsinki, a second device is "specified when a user logs on to or starts a new device to continue the session." Pet. 43–45. As support, Petitioner cites Phan Helsinki's statement that "[w]hen a user changes devices or spawns a new branch of a session to a new device, the middleware server authenticates the user on the new device." Ex. 1020, 9; *see* Pet. 45. Petitioner has shown sufficiently that a "second device" to which the session is to be transferred is specified in Phan Helsinki.

Second, Patent Owner argues that Phan Helsinki does not disclose transmitting a session history from a first device "after said session is discontinued on said first device," as recited in claims 1 and 23. Prelim. Resp. 17–25. With respect to the "discontinuing" and "transmitting" steps recited in the challenged claims, Petitioner cites Phan Helsinki's description of the sequence of events during a session transfer, which includes the following: "When the user *exits the session*, the client updates the state at the middleware. Because Mozilla flushes all data upon *exiting*, our MARC likewise updates data on the middleware." Ex. 1020, 10 (emphasis added); *see* Pet. 45–47. Patent Owner argues that this portion of Phan Helsinki at most "indicates that a device transmits session information *concurrently* with exiting the session, not *after the session is discontinued*," as required by claim 1." Prelim. Resp. 17–18. The cited language, however, states that it is the user who chooses to exit a session, and when that occurs, the client device will transmit state information to the middleware server. Also, it is unclear what Patent Owner means by transmission happening "concurrently" with a session being discontinued in Phan Helsinki, or how the events could occur "concurrently" with each other. *See id.* We are persuaded that

Petitioner's analysis is sufficient to demonstrate a reasonable likelihood of prevailing based on the current record.

Third, Patent Owner argues that Phan San Jose, which describes the same research project as Phan Helsinki, "provides additional insight into why" Phan Helsinki fails to disclose the steps of claims 1 and 23, including transmitting a session history from a first device "after said session is discontinued on said first device" and "resuming said session on said second device with said session history." Prelim. Resp. 18–24. Specifically, Patent Owner contends that (1) Phan San Jose does not disclose the "transmitting" step, and (2) the data sent from the first device in Phan San Jose is not the same data that are used to resume the session. *Id.* We do not see the relevance of Phan San Jose to Petitioner's asserted anticipation ground, however, because the ground is based on Phan Helsinki alone. *See Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1255-56 (Fed. Cir. 1989) ("Anticipation requires that every limitation of the claim in issue be disclosed, either expressly or under principles of inherency, in a single prior art reference."). Regardless, though, based on the current record, we disagree with Patent Owner's arguments regarding Phan San Jose.[5]

Based on the current record, Petitioner has demonstrated a reasonable likelihood of prevailing on its assertion that claims 1, 4, 23, and 25 are anticipated by Phan Helsinki.

---

[5] In Case IPR2015-00055, we instituted an *inter partes* review of claim 1 as anticipated by Phan San Jose, and claims 4–6 and 8–11 as unpatentable over Phan San Jose and Phan Helsinki. *See Iron Dome LLC v. CRFD Research, Inc.*, Case IPR2015-00055, slip op. at 22 (PTAB Apr. 27, 2015) (Paper 10). Patent Owner's arguments regarding Phan San Jose are similar to those it raised in its preliminary response in Case IPR2015-00055. *Compare* Case IPR2015-00055, Paper 8, 6–14, *with* Prelim. Resp. 18–24.

### 4. Obviousness Over Phan Helsinki and Phan San Jose
### (Claims 4 and 25)

In its asserted obviousness ground, Petitioner relies on Phan Helsinki for the limitations of parent independent claims 1 and 23, and relies on Phan San Jose as teaching the limitations of dependent claims 4 and 25, citing Phan San Jose's description of filtration or content adaptation. Pet. 51–56. Patent Owner repeats its argument that Phan Helsinki and Phan San Jose do not teach transmitting a session history "after said session is discontinued on said first device," as recited in independent claims 1 and 23, which we disagree with for the reasons set forth above. *See* Prelim. Resp. 25–27; *supra* Section II.C.3. Upon review of the Petition, we are persuaded on this record that Petitioner has made a sufficient showing that all limitations of the challenged claims are taught by the references, and that a person of ordinary skill in the art would have had reason to combine their teachings. *See* Pet. 51–56 (citing Ex. 1018 ¶¶ 93–97, 102–03).

Based on the current record, Petitioner has demonstrated a reasonable likelihood of prevailing on its assertion that claims 4 and 25 are unpatentable over Phan Helsinki and Phan San Jose.

### D. Conclusion

We conclude that Petitioner has demonstrated a reasonable likelihood of prevailing with respect to at least one claim of the '233 patent challenged in the Petition. The Board, however, has not made a final determination under 35 U.S.C. § 318(a) with respect to the patentability of the challenged claims.

*E. Designation of Counsel*

The parties are reminded that they must designate "a lead counsel and a back-up counsel who can conduct business on behalf of the lead counsel." 37 C.F.R. § 42.10(a). Back-up counsel must be a registered practitioner or recognized *pro hac vice* upon a showing of good cause. 37 C.F.R. § 42.10(c); *see Unified Patents, Inc. v. Parallel Iron, LLC*, Case IPR2013-00639 (PTAB Oct. 15, 2013) (Paper 7). Patent Owner designated a lead counsel, but not a back-up counsel. Paper 7, 2. Patent Owner shall designate a back-up counsel within ten business days of this Decision.

## III. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that an *inter partes* review is instituted as to claims 1, 4, 23, and 25 of the '233 patent;

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(a), *inter partes* review of the '233 patent is hereby instituted commencing on the entry date of this Decision, and pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial;

FURTHER ORDERED that the trial is limited to the following grounds of unpatentability, and no other grounds set forth in the Petition as to claims 1, 4, 23, and 25 of the '233 patent are authorized:

Claims 1 and 23 under 35 U.S.C. § 102(e) as anticipated by Bates;

Claims 1, 4, 23, and 25 under 35 U.S.C. § 103(a) as unpatentable over Bates and Chan;

Claims 1, 4, 23, and 25 under 35 U.S.C. § 102(a) as anticipated by Phan Helsinki; and

Claims 4 and 25 under 35 U.S.C. § 103(a) as unpatentable over Phan Helsinki and Phan San Jose; and

FURTHER ORDERED that, within ten business days of this Decision, Patent Owner shall file updated mandatory notice information designating both a lead counsel and a back-up counsel, pursuant to 37 C.F.R. § 42.8(b)(3).

PETITIONER:

Eliot D. Williams
G. Hopkins Guy, III
BAKER BOTTS L.L.P.
eliot.williams@bakerbotts.com
hop.guy@bakerbotts.com


PATENT OWNER:

Tarek N. Fahmi
ASCENDA LAW GROUP, PC
tarek.fahmi@ascendalaw.com

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

DISH NETWORK CORPORATION, DISH DBS CORPORATION,
DISH NETWORK L.L.C., ECHOSTAR CORPORATION, and
ECHOSTAR TECHNOLOGIES L.L.C.,
Petitioner,

v.

CRFD RESEARCH, INC.,
Patent Owner.

_____

Case IPR2015-00627
Patent 7,191,233 B2

_____

Before JUSTIN T. ARBES, THOMAS L. GIANNETTI, and
CHARLES J. BOUDREAU, *Administrative Patent Judges.*

ARBES, *Administrative Patent Judge.*

SCHEDULING ORDER

substantive paper is permitted after the reply.  *See* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,768 (Aug. 14, 2012).  The observation must be a concise statement of the relevance of precisely identified testimony to a precisely identified argument or portion of an exhibit.  Each observation should not exceed a single, short paragraph.  The opposing party may respond to the observation.  Any response must be equally concise and specific.

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

—————

BEFORE THE PATENT AND TRIAL APPEAL BOARD

—————

DISH NETWORK L.L.C., ECHOSTAR CORPORATION

& ECHOSTAR TECHNOLOGIES L.L.C.

Petitioner

v.

CRFD RESEARCH, INC.

Patent Owner

—————

Case IPR2015-00627

Patent 7,191,233 B2

—————

**PATENT OWNER'S RESPONSE TO
PETITION FOR *INTER PARTES* REVIEW OF
U.S. PATENT NO. 7,191,233
UNDER 35 USC §§ 311-319 AND 37 CFR § 42.100 ET SEQ.**

**Table of Contents**

1. Introduction ...................................................................................1

2. Overview of U.S. Patent 7,191,233. .........................................2

3. Overview of Phan San Jose ......................................................5

4. Overview of Phan Helsinki. ....................................................10

5. Overview of Bates ...................................................................12

6. Overview of Chan. ..................................................................15

7. Argument .................................................................................16

    A. Phan Helsinki Does Not Anticipate Any of the Challenged Claims. ...................................................................................16

    B. Claims 4 and 25 are Patentable Over Phan Helsinki and Phan San Jose. ...............................................................................24

    C. Bates Does Not Anticipate Any of the Challenged Claims. ..........31

    D. Claims 1, 4, 23, and 25 are Patentable Over *Bates* When Considered in Combination with *Chan*. ............................................41

8. Conclusion ..............................................................................44

# Table of Authorities

**CASES**

*Advanced Display Sys., Inc. v. Kent State Univ.*,
   212 F.3d 1272 (Fed. Cir. 2000) ................................................................38

*CFMT, Inc. v. Yieldup Intern. Corp.*,
   349 F.3d 1333 (Fed. Cir. 2003) .......................................................29, 42

*Graham v. John Deere Co.*,
   383 U.S. 1 (1966) .................................................................................25

*Hartness Int'l, Inc. v. Simplimatic Eng'g Co.*,
   819 F.2d 1100 (Fed. Cir. 1987) .......................................................31, 44

*Heart Failure Technologies, LLC v. Cardiokinetix, Inc.*,
   IPR2013-00183 (P.T.A.B. July 31, 2013) ...............................................27

*In re Oelrich*,
   666 F.2d 578 (CCPA 1981)....................................................................40

*In re Rijckaert*,
   9 F.3d 1531 (Fed. Cir. 1993) ................................................................40

*In re Robertson*,
   169 F.3d 743 (Fed. Cir. 1999) ..............................................................40

*In re Wilson*,
   424 F.2d 1382 (CCPA 1970)...................................................................31

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007) ............................................................................26

*Mintz v. Dietz & Watson, Inc.*,
   679 F.3d 1372 (Fed. Cir. 2012) .............................................................26

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
   545 F.3d 1359 (Fed. Cir. 2008) ..................................................22, 35, 41

*Proctor & Gamble Co. v. Teva Pharm. USA, Inc.*,
   566 F.3d 989 (Fed. Cir. 2009) ....................................................................26

*Richardson v. Suzuki Motor Co.*,
   868 F.2d 1226 (Fed. Cir. 1989) ................................................................39

*Schering Corp. v. Geneva Pharm.*,
   339 F.3d 1373 (Fed. Cir. 2003) ....................................................22, 32, 35

*Scripps Clinic & Research Found. v. Genentech, Inc.*,
   927 F.2d 1565 (Fed. Cir. 1991) ................................................................23

*Zenith Elecs. Corp. v. PDI Commc'ns Sys., Inc.*,
   522 F.3d 1348 (Fed. Cir. 2008) ................................................................35

**STATUTES**

35 U.S.C. § 112 (d) ........................................................................................24

**Exhibit List**

2001    Declaration of Prasant Mohapatra

2002    CV of Prasant Mohapatra

2003    *Iron Dome LLC v. CRFD Research, Inc.*, IPR2015-00055, Decision – Institution of *Inter Partes* Review, Paper 10 (P.T.A.B. Apr. 27, 2015).

2004    Deposition of William Leo Hoarty, Aug. 7, 2015.

**1. Introduction**

Trial was instituted as to claims 1, 4, 23, and 25 of U.S. Patent 7,191,233 (the "'233 Patent") (*Ex. 1001*) to consider whether:

(a) Claims 1 and 23 are patentable under 35 U.S.C. § 102(e) over *Bates*;

(b) Claims 1, 4, 23, and 25 are patentable under 35 U.S.C. § 103(a) over *Bates* and *Chan*;

(c) Claims 1, 4, 23, and 25 are patentable under 35 U.S.C. § 102(a) over *Phan Helsinki*; and

(d) Claims 4 and 25 are patentable under 35 U.S.C. § 103(a) over *Phan Helsinki* and *Phan San Jose*? [1]

---

[1] Decision – Institution of *Inter Partes* Review, Paper 9 at 24-25. "*Phan Helsinki*" is Thomas Phan et al., "Handoff of Application Sessions Across Time and Space," IEEE International Conference on Communications (ICC 2001) (*Ex. 1020*), and "*Phan San Jose*" is Thomas Phan et al., "A New TWIST on Mobile Computing: Two-Way Interactive Session Transfer," Proceedings of the Second IEEE Workshop on Internet Applications (WIAPP 2001) (*Ex. 1019*).

The Board should resolve all of these issues in favor of Patent Owner because none of the cited references, whether considered alone or in the proposed combinations, teach or suggest the subject matter recited in the challenged claims.

## 2. Overview of U.S. Patent 7,191,233.

The '233 Patent describes methods and systems for transferring information transactions (or "sessions") between different communication-enabled devices, such as smart phones, personal digital assistants, and desktop computer systems.[2] The session transfer occurs so as to maintain the session and its context.[3] Furthermore, differences in device-specific data formats and modalities are accounted for.[4] "Thus, a user may be provided with a complete history of the session at the [receiving] device."[5]

Transferring sessions between devices provides a user with flexibility and convenience. For example, a user that is conducting a session using one

---

[2] *Ex. 1001* at 1:18-22; 2:3-12; 3:6-6-10.

[3] *Id.* at 3:8-10.

[4] *Id.* at 2:8-12; 3:48-52.

[5] *Id.* at 3:55-56.

device may wish to switch to another device because of its proximity or mobility, or because the other device offers a more suitable interface or other features for conducting the session.[6] Rather than having to discontinue a current session on a current device and then initiate a new session on the other device—a process that, while adequate, may involve the loss of a current session history—the solution presented in the '233 Patent allows for the current session to be redirected to a specified second device.[7]

Claims 1 and 23 of the '233 Patent are independent claims and recite:

> 1. A method for redirecting an on-going, software based session comprising:
>
> conducting a session with a first device;
>
> specifying a second device;
>
> discontinuing said session on said first device; and
>
> transmitting a session history of said first device from said first device to a session transfer module after said session is discontinued on said first device; and
>
> resuming said session on said second device with said session history.[8]

---

[6] *Id.* at 1:53-59.

[7] *Id.* at 1:59-66; 2:3-6.

[8] *Id.* at 9:30-39.

23. A computer readable storage medium on which is embedded one or more computer programs, said one or more computer programs implementing a method for redirecting a session, said one or more computer programs comprising a set of instructions for:

conducting a session with a first device;

specifying a second device;

discontinuing said session on said first device; and

transmitting a session history of said first device from said first device to a session transfer module after said session is discontinued on said first device;

resuming said session on said second device with said session history.[9]

Notice that each of claims 1 and 23 requires transmitting the session history of the first device **after that session is discontinued** on the first device.[10] Furthermore, the method requires **specifying a second device**. This second device is the device on which the session is resumed with the session history transmitted from the first device. As demonstrated below, none of the cited references, nor their combination, teach or suggest such features.

---

[9] *Id*. at 11:41-53.

[10] *Id*. at 9:35-37; 11:49-51.

### 3. Overview of Phan San Jose.

*Phan San Jose* describes "TWIST," a two-way interactive session transfer behavior for communications between clients and services.[11] This TWIST process is summarized in Figure 4 of the reference, reproduced below.[12]



In this diagram, **o** represents the original data object, $f_1$ is a filtering mechanism applied in respect of client $C_1$ to produce data object $f_1(o)$, and

---

[11] *Ex. 1019* at 5, Abstract.

[12] *Ex. 1019* at 8, rt. col.

$g_1$ is a user modification performed on the data object a client $C_1$ to produce data object $g_1f_1(o)$.[13] As explained by *Phan San Jose*,

> As the session begins, (1) the AS returns data object o to the MWS, which is immediately cached. (2) The MWS filters to suit the limitations of $C_1$ by applying the filter function $f_1$ to o; client $C_1$ thus receives $f_1(o)$ from the MWS. (3) The user at $C_1$ proceeds to modify the data by applying an operation $g_1$ to the object, resulting in $g_1f_1(o)$.[14]

*Phan San Jose* then goes on to explain the "session handoff" procedure from client $C_1$ to a second client, $C_2$.

> Because this is a two-way interactive transfer, the result of the operation $g_1$ at $C_1$ must be made visible to $C_2$ when the session is reinstantiated. The modified form of the data must thus be made available at the MWS so that it can be sent to $C_2$. We note for now that (4) upon handoff, only $g_1$ is sent back to the MWS.[15]

Thus, as shown in the illustration, the "handoff" consists of client $C_1$

---

[13] *Id.* at 8, left col.

[14] *Id.* MWS is a middleware server—"the most important hardware portion of [the] iMASH architecture . . . places between the AS [application server] and the clients." *Id.* at 6, right col.

[15] *Id.* at 8, left col.

transmitting $g_1$ to the MWS and, thereafter, the middleware server ("MWS") computing $g_1 f_1(o)$ and transferring $g_1 f_1(o)$ (appropriately filtered by $f_2$) to client $C_2$.[16]

*Phan San Jose* describes two ways of performing the session handoff: In the "pull" mode, the user "suspends" a current session, which is saved back to the MWS, allowing the application to terminate. Later, the session can be reinstantiated on a Teaching File applet on another device. In the "push" mode, "the user can select the hostname of the target from a list. When the handoff occurs, the MWS will contact a daemon running on the target machine to immediately launch the Teaching File applet and automatically retrieve the session state . . . [and the] applet on the first client terminates when the state is fully reinstantiated on the second client."[17] In a companion case involving the '233 Patent, the Board determined that the "push mode" of *Phan San Jose* does not meet the limitations of claim 1 of the '233 Patent,[18] but left open consideration of the "pull" mode vis-à-vis claim 1 based on the then-current record.[19]

---

[16] *Id.*

[17] *Id.* at 11, right col.

[18] *Ex. 2003* at 14.

[19] *Id.*

*Phan San Jose* highlights important distinctions between the two described modes of operation by contrasting the two directly with one another:

> Although the performance enhancement is a significant factor, our primary goal was implementing the handoff capability with the TWIST. When the user wishes to perform a session handoff, he must first decide how the handoff shall be conducted with respect to the recipient. If the user selects a "Suspend" operation, his session shall be saved back to the MWS, allowing the application to terminate, and at a later time the session can be reinstantiated by the Teaching File application running on the target machine. ***This approach is clearly a "pull" mechanism*** in that the target explicitly retrieves the session state from the MWS. Alternatively, at the first client, the user can select the hostname of the target from a list. When the handoff occurs, the MWS will contact a daemon running on the target machine to immediately launch the Teaching File applet and automatically retrieve the session state. ***We consider this a "push" mechanism.*** The applet on the first client terminates when the state is fully reinstantiated on the second client. In our first implementation, we provided static hostnames of the target clients that were running an iMASH session instantiation daemon, but we plan to have leverage a dynamic resource discovery mechanism using a

technology such as Jini[17].[20]

Thus, according to *Phan San Jose*, the "pull" mode involves the user selecting a "Suspend" operation at the first client device, which results in the user's session being saved to the MWS. Conversely, in the "push" mode, the user actively selects a target device for the handoff by specifying a hostname.

This distinction is illustrated graphically in Figure 5 of *Phan San Jose*, reproduced below, which shows the user interface for the Teaching File application. As can be seen in the upper part of the diagram, when a "Handoff" is selected, the user is presented a dropdown menu for specifying a "Target." According to *Phan San Jose*, if "Suspend" is selected, the user's "session shall be saved back to the MWS, allowing the application to terminate."[21] Otherwise, if a "hostname of the target [is selected] from [the] list[, w]hen the handoff occurs, the MWS will contact a daemon running on the target machine to immediately launch the Teaching File applet and automatically retrieve the session state."[22]

---

[20] *Ex. 1019* at 11, rt. col. (emphasis added).

[21] *Id.*

[22] *Id.*



**Figure 5**: The Teaching File applet with handoff capability.

## 4. Overview of Phan Helsinki.

*Phan Helsinki* pertains to the same system discussed in *Phan San Jose*,[23] and provides some further description of the architecture and

---

[23] *Ex. 2004* at 57:18 – 59:1.

operation of the system.[24] For example, *Phan Helsinki* explains that the system employs "middleware servers strategically placed between the application servers and the clients."[25] Thus, the middleware servers, rather than the original application servers, become the data sources for the various clients and also support session handoffs.[26] In this latter capacity, "[w]hen a user moves an on-going application session from one device to another, middleware servers act as a 'home' for the application state (including active connections, cached data, etc.) to facilitate migration between devices."[27]

*Phan Helsinki* also describes the "Middleware-Aware Remote Code" (MARC) on the client device that facilitates "session saving and restoration," and the process by which a session is transferred using the MARC and a web browser.[28] According to *Phan Helsinki*, a session transfer involves a user starting a client application and providing a user ID; and the MARC within the application contacting the middleware server and

---

[24] *Ex. 1020* at 7.

[25] *Id*.

[26] *Id*.

[27] *Id*. at 9.

[28] *Id*. at 9–10.

beginning a new session using the user ID.[29] If a previous session state

exists, it is retrieved from the middleware server by the MARC and

incorporated into the client before the user's current session begins.[30] As the

user changes the session state, the state is updated at the middleware server

as appropriate, with a final state being updated when the user exits the

session.[31] A person of ordinary skill in the art would understand this to be a

"pull" mechanism, as described by *Phan San Jose*.[32]

### 5. Overview of Bates.

U.S. Patent 6,963,901 to Bates et al. ("*Bates*") (Ex. 1004) describes "a

method, apparatus and article of manufacture configured to support sharing

of browser information between at least two browser applications."[33] More

particularly, *Bates* is concerned with a process for transferring (e.g., by

email) browser information between two computers during a browsing

---

[29] *Id.* at 10.

[30] *Id.*

[31] *Id.*; see also *Ex. 2004* at 64:16 – 68:5.

[32] *Ex. 2004* at 67:23 – 68:5.

[33] *Ex. 1004* at 1:63-66.

session.[34] *Bates* describes this process with reference to FIG. 7, reproduced below.

According to *Bates*, this illustrated procedure shows the operation of a



*Fig. 7*

local computer "***during a browsing session***."[35] At the outset (706) a determination is made as to whether or not the local computer is configured to share browser information with a remote computer.[36] If not, the local computer proceeds according to its normal processing (708). If, on the other hand, the local computer is configured to share browser information, then (710) events are examined to determine whether or not they constitute a "'share event,' i.e., an event adapted to initiate transmission of the browser

---

[34] *Id*. at 8:55 et seq.

[35] *Id*. at 8:55-57 (emphasis added); *Ex. 2004* at 10:20 – 11:13.

[36] *Ex. 1004* at 8:59-66; *Ex. 2004* at 13:17 – 14:9.

information from the local client computer to the remote client computer."[37]

*Bates* describes the various "share events" in connection with a user interface shown in FIG. 5. Five such events are noted: upon user request (i.e., the browser information is transmitted immediately in response to a user-request), at shutdown (the browser information is transmitted when the client computer is shutdown), at an idle period (the browser information is transmitted when the client computer is idle, e.g., when it enters a standby or hibernation mode), periodically (the browser information is transmitted at periodic time intervals), and upon a predetermined action (the browser information is transmitted upon the occurrence of an action performed by the user, which action is not solely directed to sending the browser information).[38]



*Fig. 5*

---

[37] *Ex. 1004* at 8:66 – 9:7; *Ex. 2004* at 14:10-19.

[38] *Ex. 1004* at 7:56 – 8:23; *Ex. 2004* at 15:12 – 16:18 ("I believe we could start with column 7 of the specification and find, on line 53, that the window

If the event recognized at step 710 in FIG. 7 is a "share event," then

(at 720-724) the local computer will transmit the browser information stored

in a buffer (if any).[39] Otherwise (712-718), the local computer accumulates

browser information in the buffer and either sends it (if the local computer is

configured to do so in response to the event) or waits until such time as a

share event is recognized.[40]


## 6. Overview of Chan.

Chan, Mun Choon et al., "Next-Generation Wireless Data Services:

Architecture and Experience," IEEE Personal Communications, Feb. 1999,

pp. 20-33 ("*Chan*") (Ex. 1005) describes a particular "vision" of service

offerings for a wireless data network.[41] In connection with this description,

*Chan* indicates that transfers of application sessions can take place and that

---

500 defines what -- defines a share event -- or what causes a share event to

occur . . . .).

[39] *Ex. 1004* at 9:38-49; *Ex. 2004* at 20:6 – 21:13; 22:3-13.

[40] *Ex. 1004* at 9:10-37; *Ex. 2004* at 28:19 – 29:6; 32:9 – 35:3.

[41] *Ex. 1005* at 22, left col.

such transfers can be provided in either of two ways: pull and push.[42] "In a pull model, the destination device initiates the transfer; in a push model, the source device initiates the transfer."[43] According to *Chan*, when application state is transferred the following steps occur: the source and destination device exchange a handshake, the state information to be transferred is packaged and transferred, the destination device restarts the application using the transferred session state, and the source device is then shut down.[44]

## 7. Argument

### A. Phan Helsinki Does Not Anticipate Any of the Challenged Claims.

Petitioner alleges that independent claims 1 and 23, as well as their respective dependent claims 4 and 25, are each anticipated under 35 U.S.C.

---

[42] *Id*. at 23, left col.

[43] *Id*.

[44] *Id*. at 25; *Ex. 2004* at 48:22 – 49:19 (acknowledging that this section of *Chan* describes an application transfer).

§ 102(a) by *Phan Helsinki*.[45] This contention lacks merit. As demonstrated below, *Phan Helsinki* describes a "pull mode" of operation.[46] *Phan San Jose,* which relates to the same system described in *Phan Helsinki*,[47] explains the "pull mode" in detail and specifies that it entails the user selecting a "Suspend" operation after which the user's session is saved to a middleware server.[48] Importantly, at no time in the "pull mode" is a second device, to which the transmission history of the first device is transmitted, **specified**, as required by independent claims 1 and 23. Hence, none of the challenged clams are anticipated by *Phan Helsinki*.

To better understand *Phan Helsinki*, it is useful to first examine the teachings of *Phan San Jose*, which, as indicated above, pertains to the same iMASH research project as *Phan Helsinki*.[49] *Phan San Jose* describes two modes of operation: a push mode and a pull mode.[50] The same panel members of the Board adjudicating this proceeding have previously

---

[45] Petition at 40 *et seq*.

[46] *Ex. 1020* at 10; *Ex. 2004* at 64:16 – 68:5.

[47] *Ex. 2003* at 19; *Ex. 2004* at 58:20 – 59:1.

[48] *Ex. 1019* at 11; *Ex. 2001* at ¶¶ 25, 27.

[49] *Ex. 2003* at 19; *Ex. 2004* at 58:20 – 59:1.

[50] *Ex. 1019* at 11; *Ex. 2001* at ¶¶ 25, 27.

determined that *Phan San Jose's* push mode does not meet the requirements of claim 1.[51] This was a correct determination.

Claim 1 requires, *inter alia*, "transmitting a session history of said first device from said first device to a session transfer module **after said session is discontinued on said first device.**"[52] Claim 23 includes the same requirements.[53] *Phan San Jose's* push mode fails to meet these requirements.[54] According to the reference, "The applet on the first client terminates **when the state is fully reinstantiated on the second client**."[55] In other words, in the push mode of the TWIST process it is only **after** the second client has **resumed** the session that the applet on the first client discontinues its session. Of course, before the second client initiates its session, it must receive information from the MWS.[56] Before the information is sent from the MWS, the first client provides the MWS with

---

[51] *Ex. 2003* at 11, 14.

[52] *Ex. 1001* at 9:35-37.

[53] *Id*. at 11:50-52.

[54] *Ex. 2001* at ¶¶ 27, 31.

[55] *Ex. 1019* at 11, rt. col. (emphasis added).

[56] *Id*. at 8, left col. and Fig. 4.

that information.[57] Therefore, it follows that in the push mode of the TWIST, the first client does ***not*** transmit a session history to a session transfer module ***after*** the session is discontinued on the first device, but instead transmits some representation of its operations on a data object to the MWS and then ***waits*** until a session is fully reinstantiated on the second client before terminating its session.[58] This procedure is manifestly different from that recited in claim 1.

Similarly, *Phan San Jose's* "pull" mode fails to meet the requirements of claims 1 and 23. More specifically, *Phan San Jose's* "pull" mode does not include "***specifying a second device***," as required by these claims.[59]

As discussed above, when describing the "pull" mode, *Phan San Jose* states:

> When the user wishes to perform a session handoff, he must first decide how the handoff shall be conducted with respect to the recipient. If the user selects a "Suspend" operation, his session shall be saved back to the MWS, allowing the application to terminate, and at a later time the session can be reinstantiated by the

---

[57] *Id.*

[58] *Id.* at 11, rt. col.; *Ex. 2001* at ¶ 31.

[59] *Ex. 1001* at 9:33; 11:48 (emphasis added); *Ex. 2001* at ¶¶ 27, 32.

Teaching File application running on the target machine. ***This approach is clearly a "pull" mechanism*** in that the target explicitly retrieves the session state from the MWS.[60]

Thus, the "pull" mode involves the user selecting a "Suspend" operation at



**Figure 5**: The Teaching File applet with handoff capability.

the first client device.[61] This operation can be envisioned from the illustration provided as Fig. 5 of *Phan San Jose*. In the upper part of the user interface screen, when a "Handoff" is selected, the user is presented a dropdown menu for specifying a "Target." The option for "Suspend" corresponds to the pull mode.[62] When "Suspend" is selected, the user's "session shall be saved back to the MWS, allowing the

---

[60] *Ex. 1019* at 11, rt. col. (emphasis added).

[61] *Ex. 2004* at 56:3 – 57:13.

[62] *Id*.; *Ex. 1019* at 11, rt. col.

application to terminate."[63]

Consequently, rather than teaching "specifying a second device" on which a session is to be resumed, in the "pull" mode, at most, an ***unspecified*** second device is taught for continuation of a session. That is, in the "pull" mode, the session is saved to the MWS (responsive to user selection of the "Suspend" option); later, if a user wishes to resume a session, the session state is "pulled" from the MWS.[64] Notably, however, nowhere is it disclosed or taught that one of the devices on which the session will be resumed is "specified" in this process. Instead, the "target explicitly retrieves the session state from the MWS."[65]

With the above understanding, we now turn to the teachings of *Phan Helsinki*. As explained above, *Phan Helsinki* pertains to the same system discussed in *Phan San Jose*.[66] According to *Phan Helsinki*, "[w]hen a user moves an on-going application session from one device to another, middleware servers act as a 'home' for the application state (including active

---

[63] *Ex. 1019* at 11, rt. col.; *Ex. 2001* at ¶¶ 32; *Ex. 2004* at 56:3 – 57:13.

[64] *Ex. 1019* at 11, rt. col.

[65] *Id*.

[66] *Ex. 1020* at 7; *Ex. 2001* at ¶¶ 26, 33; *Ex. 2004* at 57:18 – 59:1.

connections, cached data, etc.) to facilitate migration between devices."[67] Further, a session transfer involves the MARC within a client application contacting the middleware server and beginning a new session.[68] If a previous session state exists, it is retrieved from the middleware server by the MARC and incorporated into the client before the user's current session begins.[69] Thus, *Phan Helsinki* describes what was contemplated in *Phan San Jose* as the "pull" mode in which "the target explicitly retrieves the session state from the MWS."[70]

A patent claim is "invalid for anticipation [only] if a single prior art reference discloses each and every limitation" of the claim.[71] Each element, and the "arrangement or combination" of those elements, must be present in the prior art reference.[72] Accordingly, "there must be no difference between

---

[67] *Ex. 1020* at 9.

[68] *Id*. at 10; *Ex. 2004* at 60:15 – 63:9.

[69] *Ex. 1020* at 10.

[70] *Ex. 2001* at ¶ 33; *Ex. 1019* at 11, rt. col. (emphasis added); *Ex. 2004* at 64:16 – 68:5.

[71] *Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).

[72] *See Net MoneyIN, Inc. v. VeriSign, Inc*., 545 F.3d 1359, 1371 (Fed. Cir. 2008).

the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention."[73]

As demonstrated above, *Phan Helsinki* describes, and *Phan San Jose* explains in greater detail, a "pull" mode. In the "pull" mode, no second device on which a session will be resumed is ***specified***, as required by the claims. Instead, the "pull" mode involves the user selecting a "Suspend" operation at the first client device, rather than specifying a target device.[74] When "Suspend" is selected, the user's "session shall be saved back to the MWS, allowing the application to terminate."[75] Later, a second device may obtain the session state from the MWS and begin its session.[76]

Thus, there are manifest differences between *Phan Helsinki* and the invention recited in independent claims 1 and 23. Accordingly, *Phan Helsinki* cannot anticipate either of claims 1 or 23.[77] Claims 4 and 25

---

[73] *Scripps Clinic & Research Found. v. Genentech, Inc*., 927 F.2d 1565, 1576 (Fed. Cir. 1991).

[74] *Ex. 2004* at 56:3 – 57:13.

[75] *Ex. 1019* at 11, rt. col.; *Ex. 2001* at ¶¶ 33, 35; *Ex. 2004* at 56:3 – 57:13.

[76] *Ex. 1020* at 10; *Ex. 2004* at 60:15 – 63:9.

[77] *Ex. 2001* at ¶¶ 34-35; *Scripps Clinic & Research Found*., 927 F.2d at 1576.

depend, respectively, from claims 1 and 23 and, therefore, include all of the limitations of their respective parent claims.[78] Accordingly, claims 4 and 25 are each patentable over *Phan Helsinki* for at least the same reasons as claims 1 and 23, respectively.[79]

### B. Claims 4 and 25 are Patentable Over Phan Helsinki and Phan San Jose.

Petitioner contends that claims 4 and 25 are further unpatentable as being obvious in view of the combined teachings of *Phan Helsinki* and *Phan San Jose*.[80] As demonstrated above, however, this is not so. Indeed, because claims 4 and 25 each include all of the limitations of claims 1 and 23, respectively, these claims are patentable over *Phan Helsinki* and *Phan San Jose* for at least the reasons specified above.

As explained above, *Phan Helsinki* pertains to the same system discussed in *Phan San Jose*.[81] According to *Phan Helsinki*, "[w]hen a user moves an on-going application session from one device to another,

---

[78] 35 U.S.C. § 112 (d).

[79] *Ex. 2001* at ¶ 36.

[80] Pet. at 51.

[81] *Ex. 1020* at 7; *Ex. 2001* at ¶ 38.

middleware servers act as a 'home' for the application state (including active connections, cached data, etc.) to facilitate migration between devices."[82] Further, a session transfer involves the MARC within a client application contacting the middleware server and beginning a new session.[83] If a previous session state exists, it is retrieved from the middleware server by the MARC and incorporated into the client before the user's current session begins.[84] Thus, *Phan Helsinki* describes what was contemplated in *Phan San Jose* as the "pull" mode,[85] in which "the target explicitly retrieves the session state from the MWS."[86]

Obviousness is a question of law based upon factual findings. The fact-finder is required to: 1) determine the scope and content of the prior art; 2) ascertain the differences between the prior art and the claims at issue; and 3) resolve the level of ordinary skill in the pertinent art.[87] Furthermore, a party seeking to invalidate a patent claim as obvious must demonstrate that a

---

[82] *Ex. 1020* at 9; *Ex. 2004* at 62:11-16.

[83] *Ex. 1020* at 10.

[84] *Id*.; Ex. 2004 at 62:17 – 63:9.

[85] *Ex. 2004* at 67:23 – 68:5; *Ex. 2001* at ¶ 38.

[86] *Ex. 1019* at 11, rt. col.

[87] *Graham v. John Deere Co*., 383 U.S. 1 (1966).

"skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so."[88] This determination is one that must be made at the time the invention was made.[89] This temporal requirement prevents the "forbidden use of hindsight."[90] Mere conclusory statements cannot sustain rejections for obviousness[91] and "Petitioner[s] must show some *reason* why a person of

---

[88] See *Proctor & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 995 (Fed. Cir. 2009) ("To decide whether risedronate was obvious in light of the prior art, a court must determine whether, **at the time of invention**, a person having ordinary skill in the art would have had 'reason to attempt to make the composition' known as risedronate and 'a reasonable expectation of success in doing so.'") (emphasis added).

[89] *Id.*

[90] See *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012) ("Indeed, where the invention is less technologically complex, the need for *Graham* findings can be important to ward against falling into the forbidden use of hindsight.").

[91] *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) ("[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements;

ordinary skill in the art would have thought to combine *particular* available elements of knowledge, as evidenced by the prior art, to reach the claimed invention."[92]

Here, the the scope and content of the prior art as represented by the cited references is readily determined.[93] *Phan Helsinki* pertains to the same system discussed in *Phan San Jose*,[94] and describes what was contemplated in *Phan San Jose* as the "pull" mode.[95] *Phan San Jose* explains that in the "pull" mode the user selects a "Suspend" operation at the first client device. When "Suspend" is selected, the user's "session shall be saved back to the MWS, allowing the application to terminate."[96] However, rather than specifying a target device on which a session is to be resumed (as in the

---

instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness").

[92] *Heart Failure Technologies, LLC v. Cardiokinetix, Inc.*, IPR2013-00183, Paper 12 at p. 9 (P.T.A.B. July 31, 2013) (citing *KSR*, 550 U.S. at 418) (emphasis in original).

[93] *Ex. 2001* at ¶ 40.

[94] *Id.* at ¶ 38; *Ex. 1020* at 7; *Ex. 2004* at 57:18 – 59:1.

[95] *Ex. 2001* at ¶¶ 38, 40; *Ex. 2004* at 67:23 – 68:5.

[96] *Ex. 1019* at 11, rt. col.

"push" mode), in the pull mode ***no teaching is made of specifying a target device***. Instead, the session is simply saved to the MWS. Later, if a user wishes to resume the session, the session state is "pulled" from the MWS as explained in *Phan Helsinki*.[97]

Each of the challenged claims 4 and 25 (by virtue of their dependency on claims 1 and 23) require "***specifying a second device***."[98] The combination of *Phan Helsinki* and *Phan San Jose*, however, suggest a "pull" mode in which ***no target device specification is taught***, and a session is "Suspend[ed]" and saved to the MWS.[99] The combination of the references therefore does not suggest what is recited in the claims.[100]

---

[97] *Ex. 1020* at 9-10; *Ex. 2004* at 61:11 – 66:14.

[98] *Ex. 1001* at 9:33; 11:48 (emphasis added).

[99] *See, e.g.*, *Ex. 1020* at 10 ("When the user exits the session, the client updates the state at the middleware."); and *Ex. 1019* at 11, rt. col. ("If the user selects a "Suspend" operation, his session shall be saved back to the MWS, allowing the application to terminate, and at a later time the session can be reinstantiated by the Teaching File application running on the target machine. This approach is clearly a "pull" mechanism in that the target explicitly retrieves the session state from the MWS.); *Ex. 2001* at ¶¶ 40-41.

[100] *Ex. 2001* at ¶ 41.

With respect to the "specifying a second device" element of claim 1, Petitioner argues that *Phan Helsinki* teaches or suggests this feature and in the process described at § 4.1 "Implementation Issues.'"[101] However, petitioner's own declarant has testified that what is described in this portion of the reference is the "pull" mode,[102] and, as explained above, in the "pull" mode there is no "specifying a second device" as required by the claims. Accordingly, the challenged claims are not obvious in view of the combination of *Phan Helsinki* and *Phan San Jose*.[103]

Finally, Petitioner cannot rely on the *Phan San Jose* teachings concerning a "push" mode and somehow incorporate those teachings with aspects of the "pull" mode in an attempt to meet the requirements of the claims. First, for a "push" mode *Phan San Jose* specifies that the session

---

[101] Pet. at 43-45.

[102] *Ex. 2004* at 63:12 – 68:5 ("I believe that the skilled person would perceive steps 1 through 3 to be a pull mechanism as defined by Phan San Jose.")

[103] *CFMT, Inc. v. Yieldup Intern. Corp.*, 349 F.3d 1333, 1342 (Fed. Cir. 2003) ("[O]bviousness requires a suggestion of all limitations in a claim."); Ex. 2001 at ¶ 41.

history is transmitted ***before*** the session is discontinued on the first device.[104] This is an important feature of the push mode and not one that would be overlooked or abandoned.[105] Thus, any combination of *Phan San Jose* and *Phan Helsinki* that rely on the "push" mode would require that the session history is transmitted ***before*** the session is discontinued on the first device, which is also contrary to the requirements of the claims.[106] Second, there are no compelling reasons for a person of ordinary skill in the art to implement a "pull" mode in which a second device is specified. Because the "pull" mode involves suspension of a session (rather than transfer of an ongoing session), no second device is required at the time the session is suspended.[107]

Thus, because the two references of concern describe the very same system, the result of the combination of those references is readily apparent and suggests the system that is the subject of the references and not one in which some aspects of the described "push" mode and other aspects of the described "pull" mode are combined in a fashion that is nowhere contemplated in those references and instead is only discussed in the subject

---

[104] *Ex. 1001* at 9:35-37; *Ex. 2004* at 52:5 – 55:24.

[105] *Ex. 2001* at ¶¶ 42-43.

[106] *Id*.

[107] *Id*. at ¶ 44.

'233 Patent. Indeed, Petitioner has made no allegations or showing that such a result would be suggested and none would be.[108]

It necessarily follows that because the combined teachings of the references do not suggest all of the limitations of claims 1 and 23, and there has been no evidence, or even argument, cited that would suggest modifications of the teachings of the references to meet the limitations of claims 1 and 23, claims 1 and 23 are patentable over these references.[109] For the same reasons, claims 4 and 25, which depend from claims 1 and 23, respectively, are patentable over *Phan Helsinki* and *Phan San Jose*.[110]

### C. Bates Does Not Anticipate Any of the Challenged Claims.

Petitioner alleges that claims 1 and 23 are anticipated under 35 U.S.C. § 102(e) by *Bates*.[111] However, as demonstrated below, *Bates* fails to teach

---

[108] *Ex. 2001* at ¶¶ 42-45.

[109] *In re Wilson*, 424 F.2d 1382, 1385 (CCPA 1970); *Ex. 2001* at ¶ 39.

[110] *Hartness Int'l, Inc. v. Simplimatic Eng'g Co.,* 819 F.2d 1100, 1108 (Fed. Cir. 1987) (dependent claims are nonobvious under section 103 if the independent claims from which they depend are nonobvious).

[111] Pet. at 24 *et seq*.

"transmitting a session history of said first device from said first device to a session transfer module *after said session is discontinued on said first device*," as recited in claims 1 and 23. Hence, claims 1 and 23 are not anticipated by *Bates*.[112]

As discussed above, *Bates* describes a process for transferring browser information between two computers *during a browsing session*.[113] According to that process, a first determination (at 706) is made as to whether or not the local computer is configured to share browser information with a remote computer.[114] If so then (at 710) events are examined to determine whether or not they constitute a ""share event," i.e., an event adapted to initiate transmission of the browser information from the local client computer to the



Fig. 7


---

[112] *Schering Corp.*, 339 F.3d at 1377.

[113] *Ex. 1004* at 8:55 et seq.

[114] *Id.* at 8:59-66.

remote client computer."[115]

*Bates* describes five such share events, or conditions which cause share events to occur, in particular with reference to Fig. 5:[116]

- upon user request (i.e., the browser information is transmitted immediately in response to a user-request),[117]

- at shutdown (the browser information is transmitted when the program is terminated),[118]



*Fig. 5*

- at an idle period (the browser information is transmitted when the client computer is idle, e.g., when it enters a standby or

---

[115] *Id*. at 8:66 – 9:7; *Ex. 2004* at 14:12-19.

[116] *Ex. 1004* at 7:56 – 8:23; *Ex. 2004* at 16:11 – 17:9; 24:22-24 ("I believe that Figure 5 is evaluated in step 710 in Figure 7 and determines when the browser information is transmitted.").

[117] *Ex. 2004* at 18:7-14.

[118] *Id*. at 25:10-14.

hibernation mode),[119]

- periodically (the browser information is transmitted at specific time intervals),[120] and

- upon a predetermined action (the browser information is transmitted upon the occurrence of an action performed by the user, which action is user-definable).[121]

If the event recognized at step 710 in FIG. 7 is a "share event," then (720-724) the local computer will transmit the browser information stored in a buffer (if any).[122] Otherwise (712-718), the local computer accumulates browser information in the buffer and either sends it (if the local computer is configured to do so in response to the event) or waits until such time as a share event is recognized.[123]

---

[119] *Id*. at 25:16 – 26:21.

[120] *Id*. at 26:22 – 27:10.

[121] *Id*. at 27:11 – 28:12.

[122] *Ex. 1004* at 9:38-49; *Ex. 2004* at 20:6 – 21:13; 22:3-13.

[123] *Ex. 1004* at 9:10-37; *Ex. 2004* at 28:19 – 29:6; 32:9 – 35:3.

As noted above, anticipation requires that a reference disclose "each and every limitation" of the challenged claim,[124] and the same "arrangement or combination" of those limitations.[125] *Bates* fails to meet these demands.

Claims 1 and 23 each require that the first device transmit the session history *after* the session is discontinued:

> transmitting a session history of said first device from said first device to a session transfer module after said session is discontinued on said first device.[126]

*Bates*, however, only describes transferring browser information "***during a browsing session***."[127] This is not surprising because *Bates* is concerned with ***preserving*** that current browsing session.[128]

In order to achieve the goal of preserving the current browsing session, *Bates* allows a user to designate when the transfer of the browser information will take place:

---

[124] *Schering Corp.*, 339 F.3d at 1377; see also *Zenith Elecs. Corp. v. PDI Commc'ns Sys., Inc.*, 522 F.3d 1348, 1363 (Fed. Cir. 2008).

[125] *Net MoneyIN, Inc.*, 545 F.3d at 1371.

[126] *Ex. 1001* at 9:35-37; 11:50-52.

[127] *Ex. 1004* at 8:55-57.

[128] *Id.* at 10:51-56, 11:9-12; *Ex. 2004* at 43:19 – 46:23.

- immediately upon user request,

- when the client application is shutdown,

- when the client computer is idle,

- periodically, and

- upon the occurrence of a predetermined action.[129]

Importantly, none of these events corresponds to a time ***after said session is discontinued on said first device***.

It is axiomatic that steps in a process that takes place ***during a browsing session*** does not occur ***after*** that session is discontinued.[130] Even if one reads out the explicit teaching of the FIG. 7 process taking place during the browsing session, never does *Bates* indicate that any of the described instances for transferring the browser information occur ***after*** the session is discontinued and nor need they necessarily be so.[131]

---

[129] *Ex. 1004* at 7:56 – 8:23; *Ex. 2004* at 16:22 – 17:2 ("The skilled person would read the specification, again, column 7, line 53: The window 500 of Figure 5 includes a plurality of checkboxes, 502a through e, which allows the user to select when browsing information will be transmitted to a remote computer 106.").

[130] *Ex. 2001* at ¶ 51.

[131] *Id*.

For example, a transmission that occurs "immediately upon user request" is not necessarily concurrent with a transmission after a session is discontinued. It is equally, if not more, likely that the user request is made (and the transmission effected) while the user is engaged in a session.[132]

Likewise, transmissions that occur when an application is being shutdown need not necessarily be concurrent with a transmission after a session is discontinued. It is equally likely that the transmission is made as part of the shutdown process – i.e., concurrently with the session being terminated.[133]

Similarly, transmissions that occur when a computer is idle do not necessarily occur after a session is discontinued. Idle periods can, and often do, occur during a Web browsing session and so transmissions that occur as a result of such an idle period would take place during a session, not after it is discontinued.[134] It is important to recognize that there is no requirement (and nothing in *Bates* to suggest) that such transmissions ***must*** be after a session is discontinued.

Certainly, periodic transmissions of browser information need not

---

[132] *Id*. at ¶ 52.

[133] *Id*. at ¶ 53.

[134] *Id*. at ¶ 54.

necessarily occur after a session is discontinued,[135] nor do transmissions that occur upon the manifestation of an unidentified predetermined action and nothing in *Bates* indicates anything to the contrary.[136]

Petitioner hypothesizes that certain of the transmission times described by *Bates* **could** be after a session has been discontinued,[137] but fail to show that *Bates* **necessarily** requires this condition.[138] Transmission of browser information "at shutdown" may be concurrent with discontinuing a session (as defined by Petitioner), but it ***need not necessarily*** be afterwards. As noted by Dr. Mohapatra, it would be equally likely to effect such transmission during the session, as explicitly taught by *Bates* in Fig. 7, before discontinuing the session as part of the shutdown of the

---

[135] *Id*. at ¶ 55.

[136] *Id*.

[137] Pet. at 31.

[138] *See Advanced Display Sys., Inc. v. Kent State Univ*., 212 F.3d 1272, 1282 (Fed. Cir. 2000) (The key to anticipation is that, within "the four corners of a single, prior art document … every element of the claimed invention [must be described], either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation.").

application.[139]  The same is true if the computer is in an idle condition.[140]

Finally, as admitted by Petitioners, because *Bates* does not put any time

restriction on when the user can request that the browser information be

transferred "upon user request," *Bates* allows for browser information

transmission "at any number of user-selected times,"[141] and there is no

teaching or suggestion that it ***must*** be after a session is discontinued.[142] In

fact, because *Bates* is concerned with ***preserving*** a current browsing

session,[143] it is more likely that transmissions of browser information will

always occur ***during*** the current browser session (i.e., before discontinuing a

session on a current device) than after the session is discontinued so that the

sending computer can repeat the transmission of the session state if the

transfer is not successful.[144]

---

[139] *Ex. 2001* at ¶ 53.

[140] *Id*. at ¶ 54.

[141] Pet. at 31.

[142] *See Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1236 (Fed. Cir.

1989) (No anticipation where the ***identical*** invention is not shown in as

complete detail as is contained in the patent claim.)

[143] *Ex. 1001* at 10:51-56, 11:6-8; *Ex. 2004* at 43:19 – 46:23.

[144] *See, e.g.*, *Ex. 2001* at ¶ 42.

Insofar as Petitioner relies upon some notion of inherency in interpreting the disclosure provided by *Bates* (for certainly there is no explicit teaching of transmitting browser information after a session is discontinued and Petitioner's use of terms such as "could be" indicate that even Petitioner believes more than one possible interpretation of the teachings exist), Petitioner's proofs fall far short of what is required to show anticipation of the challenged claims. To establish such inherency, Petitioner would have to provide rationale or evidence tending to show same[145] and the fact that a certain result or characteristic ***may*** occur or be present in the prior art is ***not*** sufficient to establish the inherency of that result or characteristic.[146] That is, inherency "may not be established by probabilities or possibilities [and] the mere fact that a certain thing ***may*** result from a given set of circumstances is not sufficient."[147]

Petitioner's own argument admits the possibility that the transmission of the browser information in *Bates* occurs at times other than after discontinuing a session, and inasmuch as the reference itself describes the transmissions in the context of FIG. 7 as being "during a browsing

---

[145] *In re Oelrich*, 666 F.2d 578, 581-82 (CCPA 1981).

[146] *In re Rijckaert*, 9 F.3d 1531, 1534 (Fed. Cir. 1993).

[147] *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) (emphasis added).

session"[148] it is equally likely, if not more so, that Petitioner's characterization of the events is wrong. Stated differently, a procedure in which browser information is transmitted "during a browsing session," as *Bates* itself labels the events in question, is manifestly different from one in which a session history is transmitted *after* that session is discontinued,[149] as recited in claims 1 and 23, and so *Bates* cannot anticipate either of claims 1 or 23.[150]

### D. Claims 1, 4, 23, and 25 are Patentable Over *Bates* When Considered in Combination with *Chan*.

In alleging the unpatentability of claims 1, 4, 23, and 25 under 35 U.S.C. § 103 in view of the combined teachings of *Bates* and Chan, Mun Choon et al., "Next-Generation Wireless Data Services: Architecture and Experience," IEEE Personal Communications, Feb. 1999, pp. 20-33 ("*Chan*") (Ex. 1005), Petitioner cites *Chan* for teachings concerning "a

---

[148] *Ex. 1004* at 8:55-57.

[149] *Ex. 2001* at ¶ 46.

[150] *Net MoneyIN*, 545 F.3d at 1371 (no anticipation where a prior art reference fails to teach every element, and the "arrangement or combination" of those elements, of a claim).

session transfer module."[151] Nothing in *Chan* is alleged to teach or suggest "transmitting a session history of said first device from said first device to a session transfer module after said session is discontinued on said first device," and so combining the teachings of *Chan* with those of *Bates* offers nothing more in this regard than *Bates* alone. Accordingly, inasmuch as *Bates* does not teach or suggest transmitting a session history of said first device from said first device to a session transfer module after said session is discontinued on said first device,[152] the combination of *Bates* and *Chan* must likewise fail to suggest this feature of the challenged claims.[153] Thus, claims 1 and 23 remain patentable over the combined teachings of *Bates* and *Chan*.

Moreover, Petitioner's declarant admits that *Chan* describes a session transfer process in which application state is transferred from a source device to a destination device, the destination device then restarts an application using the transferred session state, and, only after these steps have been completed, does the source device then shut down.[154] In other

---

[151] Pet. at 33.

[152] *Supra*, § 7C.

[153] *CFMT, Inc.*, 349 F.3d at 1342.

[154] *Ex. 2004* at 48:22 – 49:19 (acknowledging *Chan's* describing an application transfer); *and see Ex. 1005* at 25.

words, according to *Chan*, the source device discontinues the session only after the transfer of the session state to the second device has been completed. This is consistent with Dr. Mohapatra's testimony that it is more likely that transmissions of browser information will occur ***during*** a current browser session (i.e., before discontinuing a session on a current device) than after the session is discontinued so that the sending computer can repeat the transmission of the session state if the transfer is not successful.[155]

Accordingly, a person of ordinary skill in the art considering the combined teachings of *Bates* (which specifies transmissions of browser information ***during*** a browser session) and *Chan* (which describes a source device discontinuing a session after a transfer of session state to a second device has been completed) would follow the teachings of these references and ***not*** adopt a process in which a session history of a first device is transmitted from said first device to a session transfer module ***after*** said session is discontinued on said first device, as recited in claims 1 and 23.[156] These are further reasons why claims 1 and 23 are patentable over the combined teachings of *Bates* and *Chan*.

Claim 4 depends from claim 1, and claim 25 depends from claim 23.

---

[155] *Ex. 2001* at ¶ 42.

[156] *Id.* at ¶¶ 57-58.

Each dependent claim includes the limitations of its respective parent claim(s), hence, claims 4 and 25 are patentable over the combined teachings of *Bates* and *Chan* for at least the same reasons as claims 1 and 23 are so patentable.[157]


**8. Conclusion**

For at least the foregoing reasons,

(a) Claims 1 and 23 are patentable under 35 U.S.C. § 102(e) over *Bates*;

(b) Claims 1, 4, 23, and 25 are patentable under 35 U.S.C. § 103(a) over *Bates* and *Chan*;

(c) Claims 1, 4, 23, and 25 are patentable under 35 U.S.C. § 102(a) over *Phan Helsinki*; and

(d) Claims 4 and 25 are patentable under 35 U.S.C. § 103(a) over *Phan Helsinki* and *Phan San Jose*.

---

[157] *Hartness Int'l. Inc. v. Simplimatic Engineering Co.*, 819 F.2d 1100, 1108 (Fed. Cir. 1987) (a claim that depends from a nonobvious independent claim is nonobvious because it contains all of the limitations of that independent claim plus a further limitation).

Accordingly, judgment should be entered in favor of the Patent Owner.

Respectfully submitted,

Date: <u>August 17, 2015</u>     by:     <u>*/Tarek N. Fahmi/*</u>
Tarek N. Fahmi, Reg. No. 41,402

ASCENDA LAW GROUP, PC
333 W. San Carlos St.
Suite 200
San Jose, CA 95110
1 866 877 4883
Email: tarek.fahmi@ascendalaw.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing

PATENT OWNER'S RESPONSE

and its supporting exhibits were served on August 17, 2015, by filing this

document though the Patent Review Processing System as well as delivering

a copy via email directed to the attorneys of record for the Petitioner at the

following address:

Eliot D. Williams
G. Hopkins Guy, III
Brad Bowling
Baker Botts L.L.P.
1001 Page Mill Rd.
Palo Alto, CA 94304-1007

eliot.williams@bakerbotts.com

hop.guy@bakerbotts.com

brad.bowling@bakerbotts.com

The parties have agreed to email service in this proceeding.


Date: August 17, 2015          by:     */Tarek N. Fahmi/*
                                       Tarek N. Fahmi, Reg. No. 41,402

ASCENDA LAW GROUP, PC
333 W. San Carlos St.,  Suite 200
San Jose, CA 95110
1 866 877 4883
Email: patents@ascendalaw.com

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

_____

DISH NETWORK CORPORATION, DISH DBS CORPORATION, DISH
NETWORK L.L.C., ECHOSTAR CORPORATION, AND ECHOSTAR
TECHNOLOGIES L.L.C.
Petitioner

v.

CRFD RESEARCH, INC.
Patent Owner

_____

Case IPR2015-00627
U.S. Patent No. 7,191,233 B2

_____

**<u>PETITIONERS' REPLY TO PATENT OWNER'S RESPONSE</u>**

# TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ....................................................................1

II.  ARGUMENT ..............................................................................................2

  A.  PHAN HELSINKI ANTICIPATES CLAIMS 1, 4, 23, AND 25 --
      GROUND 3 ...........................................................................................2

    1.  Phan Helsinki Specifies a Second Device ................................................2

    2.  Phan Helsinki Specifies a Second Device After The First Session is
        Discontinued ........................................................................................5

  B.  BATES ANTICIPATES CLAIMS 1 AND 23 -- GROUND 1 ...................7

    1.  Bates Discloses Transmission of a Session History After the Session is
        Discontinued on the First Device ........................................................7

  C.  PATENT OWNER POINTS TO NO ADDITIONAL ELEMENT IN
      THE DEPENDENT CLAIMS -- GROUNDS 2, 3, AND 4 ......................11

  D.  CONCLUSION .....................................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Akamai Techs. v. Cable & Wireless Internet Servs.*,
    344 F.3d 1186 (Fed. Cir. 2003) ..............................................................9

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
    256 F. 3d. 1363 (Fed. Cir. 2001) .........................................................4, 5

**LIST OF EXHIBITS**

| 1001 | U.S. Patent No. 7,191,233 by Michael J. Miller entitled "System for Automated, Mid-Session, User-Directed, Device-to-Device Session Transfer System" (the "'233 Patent"). |
|------|------|
| 1002 | File History for U.S. Patent No. 7,191,233. |
| 1003 | Declaration of Mark Claypool, Ph.D. (Exh. 1003 in Case No. IPR 2015-00259). |
| 1004 | U.S. Patent No. 6,963,901, Bates, et al., "Cooperative Browsers Using Browser Information Contained in an e-mail Message for Re-configuring," ("Bates") filed July 24, 2000 and issued November 8, 2005. |
| 1005 | Mun Choon Chan *et al.*, "Next-Generation Wireless Data Services: Architecture and Experience," IEEE Personal Communications, Feb. 1999, pp. 20-33 ("Chan"). |
| 1006 | Bo Zuo, "Mobile ID Protocol: A Badge-Activated Application Level Handoff of a Multimedia Streaming to Support User Mobility," Master's Thesis, Univ. of Ill. at Urbana-Champaign, Aug. 2000 ("Zou"). |
| 1007 | Monet Research Group Publications, http://cairo.cs.uiuc.edu/papers.html, Feb. 4, 2001. |
| 1008 | Excerpts from Merriam-Webster's Collegiate Dictionary, 10th Ed., 2000. |
| 1009 | Excerpts from Microsoft Computer Dictionary, 4th Ed., 1999. |
| 1010 | U.S. Pat. App. Pub. No. 2002/0059425 to Belfiore, et al. |
| 1011 | RFC 959, File Transfer Protocol, Oct. 1985. |
| 1012 | RFC 821, Simple Mail Transfer Protocol, Aug. 1982. |
| 1013 | RFC 2821, Simple Mail Transfer Protocol, Apr. 2001. |
| 1014 | RFC 918, Post Office Protocol, Version 1, Oct. 1984. |
| 1015 | RFC 937, Post Office Protocol, Version 2, Feb. 1985. |
| 1016 | RFC 1939, Post Office Protocol, Version 3, May 1996. |

| 1017 | Milojicic, Dejan *et al.,* "Process Migration," <u>ACM Computing Surveys,</u> Vol. 32, No. 3, Sept. 2000, pp. 241-299. |
|------|------|
| 1018 | Declaration of W. Leo Hoarty. |
| 1019 | Thomas Phan et al., "A New TWIST on Mobile Computing: Two-Way Interactive Session Transfer" in the Proceedings of the Second IEEE Workshop on Internet Applications (WIAPP 2001). IEEE Computer Society 2000. Selected pages: Table of Contents, pp. 2-11 ("Phan WIAPP"). |
| 1020 | Thomas Phan et al., "Handoff of Application Sessions Across Time and Space" in volume 5 of the IEEE International Conference on Communications (ICC 2001). Institute of Electrical & Electronic Engineers 2001. Selected pages: Table of Contents, pp. 1367-72 ("Phan ICC"). |
| 1021 | Rajive Bagrodia, Mario Gerla, Songwu Lu, Richard Meyer, Daniel J. Valentino, and Lixia Zhang, "Challenges: Supporting Nomadic Healers," which was publically available at least by August 31, 2000 at https://web.archive.org/web/20000831051046/http://pcl.cs.ucla.edu/projects/imash/rm-mobicomm00.html, as captured and archived by the WayBack Machine at https://web.archive.org/web/20000831051046/http://pcl.cs.ucla.edu/projects/imash/rm-mobicomm00.html) ("Bagrodia"). |
| 1022 | Complaint, *Dragon Intellectual Property, LLC v. DISH Network Corporation et al.*, No. 14-CV-064 (DED) |
| 1023 | Affidavit of Service of Complaint on DISH Network Corporation and DISH Network L.L.C. |
| 1024 | Declaration of John Day. |
| 1025 | CRFD's Initial Claim Chart - Infringement Contentions for U.S. Patent No. 7,191,233. |
| 1026 | Telecommunications Information Networking Architecture Consortium, Service Architecture, Version 5.0, June 16, 1997. |
| 1027 | October 26, 2015 Deposition of Dr. Prasant Mohapatra Transcript |

Petitioners DISH Network Corporation, DISH DBS Corporation, DISH

Network L.L.C. (collectively, "DISH"), EchoStar Corporation, and EchoStar

Technologies L.L.C. (collectively, "EchoStar") (DISH and EchoStar collectively

"Petitioner") respectfully submit this reply to Patent Owner's Response regarding

the unpatentability of claims 1, 4, 23, and 25 of the '233 Patent (the "challenged

claims").

## I.  PRELIMINARY STATEMENT

Under the Board's construction of the terms "session," "discontinuing," and

"discontinued," the challenged claims are unpatentable.  Patent Owner does not

challenge those constructions.  Instead, Patent Owner attempts to ignore them and

to read new limitations into the claims that do not exist.  Patent Owner also

disregards the teachings of the prior art that Petitioner relies upon-- instead arguing

that the challenged claims are not disclosed by other prior art disclosures that

Petitioner does not reply upon.

For example, as to anticipation of the challenged claims by Phan *Helsinki*,

Patent Owner ignores the actual ground, and instead argues that the claims are not

anticipated by a different reference -- Phan *San Jose*.  Paper 14 (PO Resp.) at 17-

22.  The Board has already recognized that Patent Owner's arguments to this effect

are irrelevant.  Paper 9 (Inst. Dec.) at 22 ("We do not see the relevance of Phan

San Jose to Petitioner's asserted anticipation ground . . . based on Phan Helsinki

alone."). Even if Patent Owner's argument about a different prior art reference were somehow relevant, it fails on the merits as well. In particular, Patent Owner's argument that Phan *San Jose* fails to disclose "specifying a second device" (*id.* at 17) was contradicted by its own expert's admission on cross-examination. Ex. 1027 at 67:19-24.

With respect to the ground based on Bates, Patent Owner solely contests the "transmitting a session history of said first device . . . *after* said session is discontinued on said first device" step of claim 1 (and corresponding element of claim 23). Under the Board's construction of "session" and "discontinuing," Bates discloses this limitation in at least two different configurations: (1) the configuration where session history is shared at shutdown; and (2) the configuration when session history is shared after the computer has been idle.

## II. ARGUMENT

### A. PHAN HELSINKI ANTICIPATES CLAIMS 1, 4, 23, AND 25 -- GROUND 3

#### 1. Phan Helsinki Specifies a Second Device

The Board instituted this Trial on several grounds, including Petitioner's Ground 3, which asserted that all of the challenged claims are anticipated by Phan *Helsinki*. Paper 9 at 20-22, 25. Rather than address that central Ground, Petitioner attacks a straw man. In particular, Patent Owner challenges the disclosure of Phan *San Jose*, then argues that because Phan San Jose and Phan Helsinki pertain to the

same "research project" (Paper 14 at 17), Phan Helsinki must suffer from the same defects. *Id.* at 23-24. The Board has previously noted the fallacy in Patent Owner's arguments. Paper 9 (Inst. Dec.) at 22 ("We do not see the relevance of Phan San Jose to Petitioner's asserted anticipation ground…").

As to the actual merits of the Ground 3, Patent Owner has little to say. Its argument appears to be that Phan Helsinki fails to disclose "specifying a second device" as recited in claims 1 and 23. *Cf.* Paper 14 (PO Resp.) at 21, 23 ("In the 'pull mode' [of Phan Helsinki and Phan San Jose], no second device on which a session will be resumed is ***specified***, as required by the claims.") (emphasis in original). But Patent Owner simply ignores the portions of Phan Helsinki that separately disclose this element. As explained in the Petition, Phan Helsinki discloses a second device that is specified when a user logs on or continues its session on a new device. Paper 1 at 43-45. As Phan Helsinki explains: "When a user changes devices or spawns a new branch of a session to a new device, the middleware server authenticates the user on the new device." Ex. 1020 § 3.2. The new device receives the session data "from the middleware" (*id.* at § 4.1), which permits the "seamless access to data from any device on a variety of networks" (*id.* at § 3.1).

Patent Owner provides no argument as to how this specific embodiment is insufficient to show that the second device is "specified." Moreover, its own

expert admitted that the second device is specified in the "pull" embodiments of

both Phan Helsinki and Phan San Jose:

> Q.  Okay.  Do you agree, though, that in the
> Phan model -- the Phan pull model that the second
> device is specified?
>
>           . . .
>
>           THE WITNESS:  Second device is specified at
> some point in time, yes, in the pull model.

Ex. 1027, 67:19-24.  Dr. Mohapatra acknowledged that the second device would

identify itself by at least the device's unique IP address, when it makes a request to

the MWS to resume the session.  *Id.* at 41:3-42:2.  Accordingly, even Patent

Owner's own expert admits that the second device is specified in the Phan Helsinki

"pull" model.

While not raised in its opposition, Patent Owner's argument appears to be

based on the flawed premise that the claimed "specifying" step must take place

before the "discontinuing said session on said first device" step.  Ex. 1027, 42:13-

42:25.  This argument, however, runs afoul of well-established Federal Circuit law

that "[u]nless the steps of a method actually recite an order, the steps are not

ordinarily construed to require one." *Interactive Gift Express, Inc. v. Compuserve

Inc.*, 256 F. 3d. 1363, 1342 (Fed. Cir. 2001).  As an initial matter, Patent Owner

has not asked the Board for claim construction that would require that the

"specifying" step take place before the "discontinuing" step.  Nor would such a

construction be proper because there is nothing in the claim itself or in the specification that would require such an ordering between these two steps. *See, id.* Certainly, the broadest reasonable interpretation of the claims does not require such an order.

Accordingly, Phan Helsinki anticipates all the challenged claims.

### 2. Phan Helsinki Specifies a Second Device After The First Session is Discontinued

In addressing Ground 3 (which, as noted, is limited to Phan *Helsinki*), Patent Owner argues that Phan *San Jose's* "*push*" mode of operation does not meet the claim limitation of "transmitting a session history of said first device . . . after said session is discontinued on said first device." *Id*. at 18-19. But the Petition relied upon Phan *Helsinki's* "*pull*" implementation, which meets this limitation because, "*[w]hen the user exits the session*, the client updates the state at the middleware. Because Mozilla flushes all data *upon exiting*, our MARC [Middleware-Aware Remote Code] likewise updates data to the middleware." Petition at 47; Ex. 1020, § 4.1 (emphasis supplied); Ex. 1018; ¶ 88. Patent Owner's Response fails to address this mapping to the Phan Helsinki reference.

Any argument from Patent Owner's Preliminary response that Phan Helsinki's "pull" system does not meet the claimed "transmitting a session history of said first device . . . *after* said session is discontinued on said first device" has been abandoned because it was not included in the Response. *See* 37 CFR

42.120(a) ("A patent owner may file a response to the petition addressing any ground for unpatentability not already denied."); 37 CFR 42.23(a) ("Oppositions and replies must comply with the content requirements for motions."); 42.22(a)(2) ("Each … motion … must include . . . [a] full statement of the reasons for the relief requested, including a detailed explanation of the significance of the evidence including material facts, and the governing law, rules, and precedent.")

Even if this abandoned argument were considered, it fails on the merits. The Board held that a "session" is "a series of information transactions between communication devices during a particular time period." Paper 9 at 7. During the session, the user conducts a session by retrieving web pages using the Mozilla browser. Petition at 44-45; Ex. 1020, § 4.1; Ex. 1027, 40:3-10. The user's interactions with the servers providing web pages are within the Board's construction of the claimed "session."

When the user closes the Mozilla web browser, the "series of information transactions between communication devices during a particular time period" is ended. Thereafter, "[w]hen the user exits the session, the client updates the state at the middleware. Because Mozilla flushes all data upon exiting, our MARC [Middleware-Aware Remote Code] likewise updates data to the middleware." Petition at 47; Ex. 1020, § 4.1; Ex. 1018, ¶ 88. The update of the Mozilla flushed data to the MARC server meets the broadest reasonable interpretation of the

claimed "transmitting a session history of said first device . . . after said session is discontinued on said first device," under the Board's (proper) construction of "session."

## B.    BATES ANTICIPATES CLAIMS 1 AND 23 -- GROUND 1

Patent Owner does not dispute that Bates discloses "transmitting a session history of said first device from said first device to a session transfer module" as recited by Claims 1 and 23.  Patent Owner also does not dispute that the cited references disclose "a first device to transmit a session history of said first device to said session transfer module" as recited by Claims 13 and 34.  Instead, Patent Owner argues that the cited references do not teach or suggest the transmission of the session history *after said session is discontinued on said first device*.

### 1.    Bates Discloses Transmission of a Session History After the Session is Discontinued on the First Device

Bates discloses a system for transferring a browser session from one computer to another computer.  *See, e.g.,* Ex. 1004, 3:4-7, 9:24-30, 10:51-11:8.  Figure 4 of Bates discloses an interface for a user to select the types of browser session history to be transmitted.  *See*, Ex. 1004, 5:64-67.  Bates identifies examples of browser session history that may be transmitted, including bookmarks, input data, cache, links taken, and favorites.  *See, e.g.,* Bates Figure 4, 6:6-7:43.

During operation of the system disclosed in Bates, the browser session history that is selected to be transmitted to a second computer is first stored in a

buffer. *See* Ex. 1004 at 5:7-13; Ex. 1027, 84:21-85:9, 87:14-88:5, 90:13-19. As shown in Figure 2, the buffer is separate from the browser. Also separate from the browser is email software, which transmits the browser session history to another computer. Ex. 1004 at Figure 2; *see also*, Ex. 1004 at 3:21-26, 5:16-19, 5:52-56.

Figure 5 of Bates shows a user interface that allows a user to select when the browser session history will be transmitted.



*Fig. 5*

Patent Owner discusses several of these "sending preferences" in its Response and concludes that none of them requires that the session history *must* be transmitted after the session is discontinued on the first device. Paper 14 at 36. According to Patent Owner, it follows that Bates does not disclose transmission of the session history after the session has been terminated on the first device.

In order to be an invalidating reference, Bates need not teach or suggest that a session history can *only* be transferred *after* the session is discontinued on the first device.  All Bates needs to disclose is that at least one option for the timing of the transfer of the session history is *after* the session is discontinued on the first device.  *See Akamai Techs. v. Cable & Wireless Internet Servs.*, 344 F.3d 1186, 1192-1193 (Fed. Cir. 2003) (anticipation established when "one skilled in the art would reasonably understand or infer from the prior art reference's teaching that every claim [limitation] was disclosed in that single reference.") (citation omitted).

Patent Owner tacitly admits that Bates discloses several points in time when a session history can be transferred, including after the session has been discontinued.  In discussing the "AT SHUTDOWN" sending preference, Patent Owner admits, "transmissions that occur when an application or computer is being shut down *need not necessarily* be concurrent with a transmission after a session is discontinued.  It is equally likely that the transition is made as part of the shutdown process." Paper 14 at 37.  Patent Owner's reading however, is contrary the Board's interpretations of "session" and "discontinuing."

"Session" has been construed as "a series of information transactions between communicating devices during a particular period of time" and "discontinuing" as "terminating or otherwise stopping, with the ability to be resume."   Paper 9 at 7-8.  Bates's disclosure of transferring the session history

"AT SHUTDOWN" necessarily results in transmission of the browser session history after the session is discontinued, under the Board's construction of "session" and "discontinued." This condition corresponds to shutting down the computer that was used for browsing. Ex. 1004, 7:53-55. When the condition is met, the browser used to conduct any session will flush its cache to disk before the program initiates the sharing of session information by email. Ex. 1027, 93:13-24. Because the user has chosen to shut down the computer, the sharing necessarily takes place after the session is discontinued.

Bates's disclosure of transferring the session history "AT IDLE PERIOD" also results in transmission of the browser session history after the session is discontinued, under the Board's construction of those terms. As Bates discloses, under this condition, "browser information is transmitted when the client computer 106 is idle, e.g., when the computer 106 enters a standby or hibernation mode." Ex. 1004, 8:1-5. As Dr. Mohapatra confirmed, the idle period would be a time period of an hour or half an hour without user interaction. Ex. 1027, 89:3-14. During such a time period, any sessions the user was engaged in would have necessarily been torn down based on idle time expiring. Ex. 1027, 89:3-14. Therefore, the share event for transferring the session history "AT IDLE PERIOD," necessarily would be after any sessions were discontinued.

Patent Owner alleges that Bates is directed to preserving a current browsing session and, therefore, by implication, is not for sharing a discontinued session. Paper 14 at 39. But this argument is based on a misunderstanding of how Bates uses the term "browsing session," which is broader than the Board's definition of "session." Bates states that "[i]n one embodiment, browser information includes information generated during a *browsing session, i.e., a period of time when the browser 240 is executing on a client computer 106 and a network connection exists between the client 106 and the network 104 allowing a user to traverse network addresses corresponding to the servers 108*." Ex. 1004, 4:61-68 (emphasis added). Bates's "browsing session" therefore spans the time when there is a network connection between the client and servers. By contrast, the Board's construction of "session" only includes the time when there is communication between client and servers. Bates's "browsing session" may therefore span several claimed "sessions." There no inconsistency between Bates's preservation of "browsing history" with the transmission of session history after the "session" is "discontinued," under the Board's construction of those terms.

### C. PATENT OWNER POINTS TO NO ADDITIONAL ELEMENT IN THE DEPENDENT CLAIMS -- GROUNDS 2, 3, AND 4

With respect to claims 3 and 25, the Patent Owner does not allege that the references fail to disclose any of the limitations introduced in the dependent claims. Paper 14 at 28, 41-43.

**D.   CONCLUSION**

As set forth above and in the petition, claims 1, 4, 23, and 25 are

unpatentable.

Respectfully submitted,
BAKER BOTTS L.L.P.

November 2, 2015                    / Eliot D. Williams /
Eliot D. Williams (Reg. No. 50,822)
G. Hopkins Guy III (Reg. No. 35,866)
*Attorneys for Petitioners*

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. 42.6(e)(1), the parties have agreed to accept service by electronic means.  I hereby certify that on November 2, 2015, I caused a copy of the foregoing PETITIONERS' REPLY TO PATENT OWNER'S RESPONSE and EXHIBIT 1027 to be served via electronic mail to the following addresses:

Tarek N. Fahmi, Esq.  tarek.fahmi@ascendalaw.com

Holly J. Atkinson, Esq.  holly.atkinson@ascendalaw.com

Ascenda Law Group, PC  patents@ascendalaw.com


_____November 2, 2015_____ /Eliot D. Williams/_____
Date         Eliot D. Williams (Reg. No. 50,822)
            G. Hopkins Guy III (Reg. No. 35,866)
            1001 Page Mill Road, Bld. 1, Suite 200
            Palo Alto, California 94304-1007
            650.739.7510

            Attorneys for Petitioner

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

DISH NETWORK CORPORATION, DISH DBS
CORPORATION, DISH NETWORK, LLC, ECHOSTAR
CORPORATION, and ECHOSTAR TECHNOLOGIES, LLC,
Petitioner,

v.

CRFD RESEARCH, INC.,
Patent Owner.
_____

Case IPR2015-00627
Patent 7,191,233 B2
_____

Held: January 19, 2016
_____

BEFORE:  JUSTIN T. ARBES, THOMAS L. GIANNETTI, and
CHARLES J. BOUDREAU, Administrative Patent Judges.

The above-entitled matter came on for hearing on Tuesday,
January 19, 2016, commencing at 2:36 p.m., at the U.S. Patent
and Trademark Office, 600 Dulany Street, Alexandria, Virginia.

1        JUDGE BOUDREAU:  Mr. Guy, if I could interrupt

2  you for a second, if you were in the room during the Iron Dome

3  presentation earlier today, Mr. Fahmi said that the user in Phan

4  Helsinki -- that it's the user in Phan Helsinki, rather than the

5  second device, that is specified when the session is resumed.

6  Could you point us to any evidence in Phan Helsinki that a

7  second device is specified as opposed to just the user.

8        MR. GUY:  Let's go to slide 5.  The second device a

9  number of times in Phan Helsinki talks about what the user is

10  doing with this additional device.  So in page 9 of Phan Helsinki

11  they say when a user moves an ongoing application session from

12  one device to another, middleware server acts as the home for the

13  application including active connections, cache data, et cetera, to

14  facilitate migration between devices.  Elsewhere on page 10, the

15  end result or our implementation is a seamless web browsing

16  session experienced by the user even after he or she has moved

17  from one machine to another.  When the user wishes to migrate to

18  another platform, the browser session state is accordingly moved

19  as well.  And then there's the statement with respect to

20  reauthentication.  So that's our support in the Phan reference to

21  that.

22        I would also point out there's a Figure 2 on the

23  middleware architecture.  There is a central block that is entitled

15

1    User and Device Profiling.  And here the information is also

2    stored with respect to all the devices that are capable of

3    switching.

4           I want to make sure I answered your question, though.

5    This is our support for what is in Phan regarding the interaction

6    of a user and those devices, but I still believe that what is going

7    on here is the devices are being specified according to the claim

8    language.

9           All right.  Moving on, let me go to slide 7.  So one of

10   the points is, and I think it's already been admitted and should be

11   resolved, that the first argument is whether a second device has

12   been specified.  Their expert admits that, yes, a second device has

13   been specified.

14          The question is a matter of when.  And here in a second

15   portion of their testimony of their expert, patent owner's expert

16   admitted the second device identifies itself by IP address when

17   the session resumed.  Question: Similarly, to resume at that

18   second device, the MARC server would need to know the IP

19   address of the second device in order to send the session

20   information from the MARC server to the second device?

21          Question [sic]: Yes.

16

1      There was discussion both earlier today with Iron Dome

2 and now from the current petitioner about what happens in Phan

3 and in particular Phan Helsinki in terms of obtaining the stayed

4 information from the middleware server.  Well, Phan Helsinki

5 addresses this very question within the text.  And I would invite

6 your attention to page 1370.  It's page 10 of the exhibit.  And it's

7 also summarized for you on our demonstrative slide 6.  In the

8 right-hand column on page 1370, Phan Helsinki explains the

9 steps involved with the session of the transfer.

10      Step number 1, the user starts the client application and

11 provides it with a unique user ID.  Notice, it's a unique user ID.

12 And this comports with what you heard earlier about the

13 middleware server authenticating the user.  So rather than a

14 device being specified, it's a user being specified.

15      In Step 2 we are told in the second sentence that the last

16 saved state, if it exists, is retrieved from the middleware server.

17 In Step 3 that information is incorporated into the claim before

18 the user's current session begins.  In Step 4, as the user changes

19 the session state, that state is updated at the middleware server at

20 appropriate times.  And Step 5 when the user exits the session,

21 the client updates the state at the middleware server.  So this is

22 the process described by Phan Helsinki.  And we see that the

21

1 process does not include specifying the second device as required

2 by the claims. So Phan Helsinki does not anticipate the claims.

3      JUDGE GIANNETTI: I thought that petitioner's

4 argument was that eventually this translates into an IP address.

5 Isn't that enough specification of a device?

6      MR. FAHMI: No, Your Honor, it's not. They are

7 postulating a scenario where the second device essentially

8 specifies itself. And that's really at odds with what's described in

9 the specification of the patent. The specification of the patent

10 when it provides examples of how specifying is done indicates

11 that it's done by the first device or more specifically the user of

12 the first device during a session. This occurs at both column 3 at

13 lines 15 through 22 --

14      JUDGE ARBES: Counsel, that's not in the claim

15 language. The claim language does not specify who does the

16 specifying.

17      MR. FAHMI: I agree the claim language does not state

18 explicitly who does the specifying, Your Honor, but you don't

19 read claims in isolation. You read them in the context of the

20 specification. Even under a broadest reasonable interpretation,

21 we know this from In Re Suitco Surfaces. The Federal Circuit

22 has indicated that one cannot divorce the claim from the

23 specification.

22

1      JUDGE ARBES:  As I understand it, your interpretation

2  of that step, then, specifying a second device means that it either

3  has to be the user or the first device that does the specifying.

4  That's how you interpret that claim language?

5      MR. FAHMI:  Yes.  That's what's described in the

6  specification, Your Honor, yes.  So since that does not happen in

7  Phan Helsinki, Phan Helsinki does not anticipate the claims.

8      JUDGE ARBES:  Counsel, can you respond to the

9  petitioner's argument regarding your expert's statement at page 67

10  of the deposition that the second device is specified at some point

11  in time in the pull model?

12      MR. FAHMI:  I think what he's saying there is at some

13  point in time there is this address information, yes.  Now, in the

14  pull model, I think as petitioner has indicated, that address

15  information may -- in the absence of a firewall as we discussed

16  this morning, that address information is going to be needed by

17  the middleware server.  But as I have mentioned, the specification

18  of the second device by itself doesn't meet the claim limitation.

19      JUDGE ARBES:  Let's say for the moment that we do

20  not believe there's any ordering in the claim for the specifying

21  step, that that can occur at the beginning or at the end.  Doesn't

22  that admission seem to be that that limitation is taught by Phan,

23  then?

23

1          MR. FAHMI:  I don't think it's admitting that the

2     limitation is taught, Your Honor.  I think it's merely a recognition

3     that at some point the middleware server knows what the second

4     device is.  I don't think it was a question about whether the claim

5     limitation is met.

6          JUDGE GIANNETTI:  Is it correct that you are not

7     challenging the transmitting step?

8          MR. FAHMI:  That's true, Your Honor.  We think that

9     what Phan Helsinki is describing is the pull model.  And when

10    you read Phan Helsinki in the context of Phan San Jose especially

11    which goes into detail about the pull model, the session is exited

12    and then the information is provided to the middleware server.

13    So, yeah.  And I think actually I just read that when I recited the

14    steps explained by Phan Helsinki.  So I think that's a fair reading

15    of the reference.

16         I would, though, like to note a couple of things about

17    the combination of Phan San Jose and Phan Helsinki.  As we

18    know from this morning, Phan San Jose makes explicit reference

19    to Phan Helsinki.  So it's not a question of whether they can be

20    combined.  It's continuation of the same work.  But there's no

21    indication that one would pick and choose elements of the push

22    model and somehow use them in the pull model to allow for the

23    specification of the second device.  That is the argument that we

24

1          MR. GUY:  I'm sorry, the claim session has ended.

2          JUDGE ARBES:  At step 704, even though how Bates

3   uses the term session, it has not been terminated.  We are talking

4   about apple and oranges.

5          MR. GUY:  Yes.  Well, they are close.  One provides

6   the anticipatory basis for invalidating the claim, but they do use

7   slightly different language.  They use the term "browsing

8   session."  And that is included -- this ancillary amount of

9   flowcharting here is used.

10         Obviously something has got to happen after you

11  terminate the claim session that you send the information.  It just

12  can't totally shut down.  It's the session that shuts down.  Not the

13  entire computer and so forth.

14         JUDGE ARBES:  So your argument is it's contingent on

15  us finding a difference between how the claim uses session and

16  how Bates uses the term "browsing session"?

17         MR. GUY:  I don't think there's any doubt about that.

18  Your decision construed the term differently than browsing

19  session is explicitly defined in Bates.

20         JUDGE ARBES:  It's broader than how session is used

21  in the claims?

22         MR. GUY:  Yeah, that's correct.  And I'll be blunt with

23  you, it took me a little understanding to understand how it's

34

1   broader. Clearly it's broader in the sense that the session, if you

2   will, the claim session has a limitation as to when it ends and the

3   broader browser session of Bates continues on for a little bit.

4   And that little bit is not a whole lot. It's boxes 706, 710, 724 and

5   then you get to 720.

6         I have no further comments, Your Honor. We conclude

7   oral argument for DISH.

8         JUDGE ARBES: I want to thank all the parties and the

9   case is submitted.

10        (Whereupon, the proceedings at 3:33 p.m., were

11   concluded.)

APPX383



US006963901B1

(12) **United States Patent**       (10) Patent No.:     **US 6,963,901 B1**
Bates et al.                         (45) Date of Patent:      **Nov. 8, 2005**

(54) **COOPERATIVE BROWSERS USING BROWSER INFORMATION CONTAINED IN AN E-MAIL MESSAGE FOR RE-CONFIGURING**

(75) Inventors: **Cary Lee Bates**, Rochester, MN (US); **Paul Reuben Day**, Rochester, MN (US); **John Matthew Santosuosso**, Rochester, MN (US)

(73) Assignee: **International Business Machines Corporation**, Armonk, NY (US)

( * ) Notice:  Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 892 days.

(21) Appl. No.: **09/624,884**

(22) Filed: **Jul. 24, 2000**

(51) Int. Cl.$^7$ ............................................. **G06F 15/16**
(52) U.S. Cl. ...................... **709/206**; 709/221; 709/248
(58) Field of Search ................................. 705/204, 218, 705/221, 248; 709/204–206, 218, 220–222, 709/248, 245–246

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,944,791 A | * | 8/1999 | Scherpbier .................. 709/218 |
| 6,144,991 A | * | 11/2000 | England ...................... 709/205 |
| 6,192,398 B1 | * | 2/2001 | Hunt .......................... 709/213 |
| 6,393,462 B1 | * | 5/2002 | Mullen-Schultz ........... 709/206 |
| 6,401,077 B1 | * | 6/2002 | Godden et al. .............. 705/26 |

| | | | |
|---|---|---|---|
| 6,434,222 B1 | * | 8/2002 | Shaffer et al. ........... 379/88.13 |
| 6,476,827 B1 | * | 11/2002 | Porter ........................ 345/738 |
| 6,477,550 B1 | * | 11/2002 | Balasubramaniam et al. .... 715/513 |
| 6,487,195 B1 | * | 11/2002 | Choung et al. ............. 370/352 |
| 6,557,028 B2 | * | 4/2003 | Cragun ...................... 709/205 |
| 6,571,245 B2 | * | 5/2003 | Huang et al. ................. 707/10 |
| 6,668,273 B1 | * | 12/2003 | Rust ........................... 709/204 |
| 2001/0029527 A1 | * | 10/2001 | Goshen ...................... 709/218 |

OTHER PUBLICATIONS

Jacobs et al., "Filling HTML Forms Simultaneously: CoWeb—Architecture and Functionality", Fifth International World Wide Web Conference, May 1996, Paris, Fance.*

* cited by examiner

*Primary Examiner*—Saleh Najjar
*Assistant Examiner*—Oanh L. Duong
(74) *Attorney, Agent, or Firm*—Moser, Patterson & Sheridan, LLP

(57)       **ABSTRACT**

The present invention provides a method, apparatus and article of manufacture configured to support sharing of browser information between at least two browser applications. A first browser executing on a first computer generates browser information in response to user input. The browser information is selectively routed to a second computer containing a second browser. The browser information is then used to reconfigure the second browser.

29 Claims, 6 Drawing Sheets





*Fig. 1*

APPX760

DISH, Ex. 1004 - Page 2 of 15



*Fig. 2*

DISH, Ex. 1004 - Page 3 of 15

300 ⌐

| E-MAIL ADDRESS OF COOPERATIVE BROWSER(S) | _ ▢ ✕ |
|---|---|

302 ⌐ [                                    ]

[ ⟹ ] ⌐ 304

**Fig. 3**

400 ⌐

| WHAT TO SHARE | _ ▢ ✕ |
|---|---|

$402_a$ — ☐   •   ALL BROWSER INFO
$402_b$ — ☐   •   INPUT DATA
$402_c$ — ☐   •   CACHE
$402_d$ — ☐   •   LINKS TAKEN
$402_e$ — ☐   •   KEYSTROKES
$402_f$ — ☐   •   HISTORY LIST
$402_g$ — ☐   •   CUSTOMIZABLE PREFERENCES OF BROWSER
$402_h$ — ☐   •   BOOKMARKS
      $402_i$ — ☐   •   ALL
      $402_j$ — ☐   •   NEW ONES
$402_k$ — ☐   •   FAVORITES

404 — [ ⟸ ]   [ ⟹ ] — 406

**Fig. 4**

500

| SENDING PREFERENCES | _ ▢ ✕ |

- 502a — ▢   • UPON USER REQUEST
- 502b — ▢   • AT SHUTDOWN
- 502c — ▢   • AT IDLE PERIOD
- 502d — ▢   • PERIODIC
  - ▭ — 504
- 502e — ▢   • AT ACTION
  - 506a — ▢   • ACTION 1
  - 506b — ▢   • ACTION 2
  - 506c — ▢   • ACTION 3

508 — ⬅   ➡ — 510

*Fig. 5*

600

| RECEIVING PREFERENCES | _ ▢ ✕ |

- 602a — ▢   • UPON RECEIPT OF EMAIL
- 602b — ▢   • AT BOOT UP
- 602c — ▢   • UPON USER REQUEST
- 602d — ▢   • AFTER IDLE PERIOD

604 — ⬅   FINISHED — 606

*Fig. 6*



*Fig. 7*



*Fig. 8*

800

START — 802

GET EVENT — 804

APPLY BROWSER INFO ? — 806

YES

NO

BUFFER CONTAINS DATA ? — 820

YES

APPLY BOWSER INFO — 822

CLEAR BUFFER — 824

EMAIL MESSAGE RECEIVED ? — 808

NO

HANDLE NORMAL PROCESSING — 810

YES

812 — OPEN EMAIL

COOPERATIVE BROWSER INFO ? — 814

NO

YES

816 — CONFIGURED TO SHARE ?

NO

YES

818 — BUFFER BROWSER INFO(FORMAT)

## COOPERATIVE BROWSERS USING BROWSER INFORMATION CONTAINED IN AN E-MAIL MESSAGE FOR RE-CONFIGURING

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to the information processing field. More particularly, the invention relates to browser programs.

2. Background of the Related Art

Computer networks were developed to allow multiple computers to communicate with each other. In general, a network can include a combination of hardware and software that cooperate to facilitate the desired communications. One example of a computer network is the Internet, a sophisticated worldwide network of computer system resources.

Networks, such as the Internet, require a network browser to enable navigation between network addresses. A browser is an application program or facility that normally resides on a user's workstation and which is invoked when the user decides to access network addresses. A prior art Internet browser program typically accesses a given network address according to a uniform resource locator (URL), i.e., an addressing format. In addition to forwarding and receiving data to and from the network, the browser also processes each type of data which is presented to it. State-of-the-art browsers provide a complete multimedia experience, including video, pictures, 3-D images, sounds and the like.

In addition, browsers provide useful features which facilitate management of the voluminous information encountered by users while browsing. For example, most commercially available Internet browsers (e.g., Netscape's Navigator and Windows' Explorer) provide a history folder containing recently visited network addresses (e.g., web sites) and a bookmark folder to which a user can store network addresses for future retrieval.

In order to accommodate the particular preferences of multiple users, some aspects of browsers are customizable. For example, browsers often include one or more toolbars, e.g., personal toolbars. Some aspects of such toolbars are configurable by the user. Other configurable features include the colors, fonts, display attributes and the like.

In today's pervasive computer environment it is not uncommon for a user to navigate a network from more than one browser program, each located on a different computer. As a result, the browsers used by a single user may have different configurations, settings and other related browser information. Currently, the only method or system available to remedy this condition is for a user to manually reconfigure each browser. Such a procedure is undesirable because of the time involved and the possibility for errors in attempting to synchronize some or all of the browser settings and related information.

Therefore, there is a need for a method, apparatus and article of manufacture to facilitate the configuration of browsers.

### SUMMARY OF THE INVENTION

The present invention provides a method, apparatus and article of manufacture configured to support sharing of browser information between at least two browser applications. One aspect of the invention provides a method for sharing user-configured browser information between at

least two network browsers configured to communicate the user-configured browser information via a network. The method comprises generating the user-configured browser information during execution of a first network browser on a first computer in response to user-input commands and then transmitting the user-configured browser information via the network to a second computer containing a second network browser, wherein the user-configured browser information is adapted to reconfigure the second network browser. Another aspect provides for a signal-bearing medium containing a program which, when executed by a processor, performs the foregoing method.

Another aspect of the invention provides a method for reconfiguring a first browser located on a first computer. The method comprises parsing user-configured browser information received from a second computer connected to the first computer via a network, wherein the user-configured browser information comprises information generated during execution of a second browser located on the second computer. The method further comprises reconfiguring the first browser according to the user-configured browser information. Still another aspect provides for a signal-bearing medium containing a program which, when executed by a processor, performs the foregoing method.

Yet another aspect of the invention provides an apparatus comprising a first computer comprising a first processor and a first memory containing a first browser program, a second computer comprising a second processor and a second memory containing a second browser program and a network connecting the first and second computer. The network is configured to support transmission of first browser information from the first computer to the second computer. The first browser is configured to generate the first browser information in response to user-input commands and the first computer is configured to send the first browser information to the second computer. The second browser program is then reconfigured according to the received first browser information.

### BRIEF DESCRIPTION OF THE DRAWINGS

The teachings of the present invention can be readily understood by considering the following detailed description in conjunction with the accompanying drawings, in which:

FIG. 1 depicts a simplified block diagram of a network comprising an electronic mail system.

FIG. 2 depicts a simplified block diagram of client computers connected to a network.

FIG. 3 depicts a data input window for designating one or more cooperating browsers.

FIG. 4 depicts a data input window for establishing browser information.

FIG. 5 depicts a data input window for establishing user preferences pertaining to the transmission of browser information.

FIG. 6 depicts a data input window for establishing user preferences pertaining to the application of browser information to reconfigure a browser program.

FIG. 7 depicts a flow diagram for generating and transmitting browser information.

FIG. 8 depicts a flow diagram for handling a received message containing browser information.

To facilitate understanding, identical reference numerals have been used, where possible, to designate identical elements that are common to the figures.

DISH, Ex. 1004 - Page 8 of 15

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention provides a method, apparatus and article of manufacture configured to support sharing of browser information between at least two browser applications. As used herein, browser, browser application, browser program and the like refer to any program(s) (including associated data structures necessary for operation) configured to navigate between addresses (e.g, network addresses) corresponding to locations of data on a computer or system of computers. The invention has particular application to wide area networks (WANs), such as the Internet, in which browser information is communicated between two or more computers connected by the WAN. However, the invention contemplates embodiments in any network environment. Further, in some embodiments, the invention may be implemented on a single computer comprising two or more browser applications.

In one embodiment, electronic mail (e-mail) is used to communicate the browser information between computers. Such an embodiment is described with reference to the Figures below. However, the invention contemplates any method or system (e.g., file transfer protocol (FTP)) adapted to support the information processing described herein.

FIG. 1 depicts a networked e-mail system 100 that benefits from the use of the present invention. The system 100 generally represents any networked system including local area networks (LANs) and wide area networks (WANs). The system 100 comprises an e-mail server 102, a network 104 and a plurality of computers (e.g., client computers) 106₁, 106₂, . . . 106ₙ. Each client computer 106 may be a computer system, an e-mail enabled network appliance, an e-mail enabled wireless device and the like. The client computers 106 are connected to one another through the network 104 and also connected through the network 104 to the e-mail server 102. The network 104 may be any system for connecting the client computers 106 and the e-mail server 102 and allowing information exchange therebetween. Illustratively, the network 104 is the Internet and comprises a plurality of network servers 108 (including, for example, hyper text transfer protocol (http) servers). The servers 108 may be accessed according to unique network addresses. One addressing format that may be used to advantage is the Uniform Resource Locator (URL) format, as is known in the art.

The e-mail server 102 provides e-mail services to all of the user client computers 106 such that e-mail addressed from one terminal to another is routed through the network 104 to the e-mail server 102. For example, the e-mail server 102 may be a mail transfer agent (MTA) supporting simple mail transfer protocol (SMTP). Each user client computer 106, acting as a mail user agent (MUA), may then receive its e-mail from the e-mail server 102. The destination MUA is designated according to an email address, as is known in the art. In another embodiment, the e-mail server 102 may transmit e-mail messages to a post office server (e.g., one of the network servers 108 of the network 104). The destination terminal 106 then uses a post office protocol (POP) to retrieve its messages from the post office server. A system using a post office is advantageous in the event the client computers 106 are not continuously ready to receive e-mail, such as when the client computers 106 are PCs that periodically dial in to an Internet Service Provider (ISP). The system 100 shown in FIG. 1 is merely illustrative; other forms of networks may also benefit from the invention.

FIG. 2 depicts an embodiment of two client computers 106a and 106b, e.g., general purpose computer systems. Each client computer 106 may contain substantially similar components. In general, each client computer 106 includes a Central Processing Unit (CPU) 228 connected via a bus 230 to a memory 232, storage 234, input device 236, and output device 238. The input device 236 can be any device to give input to the client computer 106. For example, a keyboard, keypad, light-pen, touch-screen, track-ball or speech recognition unit could be used. The output device 238 is preferably any conventional display screen and, although shown separately from the input device 236, the output device 238 and input device 236 could be combined. For example, a display screen with an integrated touch-screen, and a display with an integrated keyboard or a speech recognition unit combined with a text speech converter could be used.

Memory 232 is preferably random access memory sufficiently large to hold the necessary programming and data structures of the invention. While memory 232 is shown as a single entity, it should be understood that memory 232 may in fact comprise a plurality of modules, and that memory 232 may exist at multiple levels, from high speed registers and caches to lower speed but larger DRAM chips.

Memory 232 is shown containing a browser program 240, a buffer 242, interfacing software 250, preferences file 244 and e-mail software 246. When executed on CPU 228, the browser program 240 provides support for navigating between the various servers 108 and locating information (e.g., web pages) at one or more of the servers 108. Although only one browser is shown residing on each client computer 106a–b, the invention contemplates computers comprising any number of browsers, which may be other same or varying types. One browser which may be configured to support the present invention is Netscape Navigator®, provided by Netscape Communications of Mountain View, Calif. The information collected by the browser program 240 as well as data related to the operation of the browser program 240 (e.g., user-selected configuration settings) are contained in a browser information data structure 248.

In general, the interfacing software 250 supports communications between otherwise incompatible applications. For example, a browser program 240a residing on a first client computer 106a may be a copy of Netscape Navigator® while a browser program 240 residing on a second client computer 106b may be a copy of Microsoft's Internet Explorer®. In one embodiment, the interfacing software 250 standardizes the format of data input to the buffer 242. Accordingly, browser information transmitted between client computers 106 is applicable to browser programs 240 regardless of the type and version. Although shown residing in memory 232, interfacing software 250 may be any combination of software and hardware which supports interfacing two or more browser programs 240. In addition, the interfacing software 250 may be an integral component of the browser program 240 or may be a separate entity, such as a plug-in.

Buffer 242 is a data structure that can contain browser information. Browser information may be any information related to the browser program 240 and which is to be sent to another client computer 106. In one embodiment, browser information includes information generated during a browsing session, i.e., a period of time when the browser 240 is executing on a client computer 106 and a network connection exists between the client 106 and the network 104 allowing a user to traverse network addresses corresponding to the servers 108. Illustratively, browser information

DISH, Ex. 1004 - Page 9 of 15

includes cache information (e.g., URLs to sites visited, cookies, etc.), keystroke actions, bookmarks, history list information (i.e., a listing of network addresses visited during the browsing session), browser configurations (e.g., font, color, background, screen sizing, display attributes and other user-configurable settings) and the like.

The preferences file 244 is a data structure containing user-selected configuration parameters indicating what portion of the browser information (contained in the buffer 242) will be shared with a cooperating browser (e.g., executing on one of the client computers 106), when the information will be shared and with which entities (e.g., other client computers) the information will be shared. Establishing the user selected preferences is illustrated below with reference to FIGS. 3–6.

E-mail software 246 is a program that supports transmitting the information contained in the buffer 242 from the client computer 106 to another computer (e.g., another client computer 106) via the network 104. In addition, e-mail software 246 supports receiving browser information from another computer.

Storage 234 is preferably a Direct Access Storage Device (DASD), although it is shown as a single unit, it could be a combination of fixed and/or removable storage devices, such as fixed disc drives, floppy disc drives, tape drives, removable memory cards, or optical storage. Memory 232 and storage 234 could be part of one virtual address space spanning multiple primary and secondary storage devices.

As will be described in detail below, one embodiment of the invention is implemented as a program product for use with a computer system such as, for example, the system 100 shown in FIG. 1. The program(s) of the program product defines functions of the preferred embodiment and can be contained on a variety of signal/bearing media, which include, but are not limited to: (i) information permanently stored on non-writable storage media (e.g., read-only memory devices within a computer such as CD-ROM disks readable by a CD-ROM drive); (ii) alterable information stored on writable storage media (e.g., floppy disks within a diskette drive or hard-disk drive); or (iii) information conveyed to a computer by a communications medium, such as through a computer or telephone network, including wireless communications. Such signal-bearing media, when carrying computer-readable instructions that direct the functions of the present invention, represent embodiments of the present invention.

FIGS. 3–6 show a series of data input windows for establishing the preferences contained in the preferences file 244. The data input windows may be supported by a graphical user interface (GUI) displayed on the output device 238 (e.g., a computer monitor). FIG. 3 shows a data input window 300 containing an e-mail address field 302. A user may input to the field 302 an e-mail address for a computer (e.g., a remote client computer 106) to which the browser information contained in the sending computer's buffer 242 will be sent. Although only one e-mail address field 302 is shown, the data input window 300 may include two or more such fields to allow the browser information to be sent to multiple computers. Alternatively, multiple e-mail addresses may be input to a single field 302 in the form of a string. Once the desired e-mail addresses are input to the field 302, a user may advance to the next input window by clicking the "forward" radio button 304.

FIG. 4 shows a data input window 400 containing a plurality of checkboxes 402a–k. Selection of the checkboxes 402a–k determines what browser information will be sent/received between two or more client computers 106.

Although a single window 400 may be used to established both the sending and receiving preferences, in another embodiment the browser information to be sent is established separately from the browser information to be received using two separate windows.

Checkboxes 402b–k each represent an item of browser information. The user may select one or more of the checkboxes 402b–k. Alternatively, the user may select checkbox 402a entitled "all browser information" which will allow transmission of all browser information contained in the buffer 242. In some embodiments, "all browser information" may be limited to the information generated during a particular browsing session. In other embodiments, "all browser information" may include all browsing information associated with a given browser program, irrespective of the session. In the latter case, all the browser information contained on the sending computer will be contained on the receiving computer subsequent to receipt. Duplicate information may then be deleted to increase the available memory of the receiving computer.

It should be understood that some configurable features (i.e., browser information) such as browser configuration information, user preferences and the like, can be made offline, i.e., without a network connection. Nevertheless, such information is browser information as defined herein.

Selection of the checkbox 402b entitled "input data" allows a user to include as browser information data input to a document displayed by the browser program 240. For example, users often input data to an electronic form during an Internet purchase. Such data may include, for example, the user's name, address, telephone number and the like.

Selection of checkbox 402c allows a user to include as browser information cache information and cookies. Cache may include, for example, URLs of websites (or, more generally, addresses for any electronic documents) that were accessed by the browser program 240. Caching facilitates subsequent retrieval of the websites. Selection of checkbox 402c also includes cookies as browser information. Cookies are well-known in the art and allow a Web server to personalize a web page. Although cache and cookies are included together as items of checkbox 402c, in another embodiment each item is separately selectable.

Checkbox 402d is entitled "links taken" and refers to hyperlinks activated by the user. Hyperlinks are active areas (e.g., in the form of text or images) on a web page which are associated with a URL of a web page. When clicked on by the user, the browser program 240 retrieves the web page pointed to by the link. Thus, selection of checkbox 402d includes as browser information links that were activated (clicked on) by the user.

In the embodiment described above, the cache information (checkbox 402c) and the links taken information (checkbox 402d) may be in the form of hyper-text-markup-language (HTML) data representing URLs of various web pages (in the case of web-browsers). Upon receipt of the information by a cooperating browser (described in detail below) the URLs can be stored to appropriate data structures for use by the cooperating browser. However, in other embodiments, the information may be formatted as instructions which, when executed, cause the cooperating browser to retrieve the HTML data from the network 104 and then store the data to appropriate data structures. Other browser information discussed herein that represents information accessible from the network 104 may be similarly acquired by the cooperating browser.

In one embodiment, data input window 400 includes a checkbox 402e entitled "keystrokes." Keystrokes refers to

DISH, Ex. 1004 - Page 10 of 15

user input to a keyboard (e.g., input device **236**). Thus, selection of checkbox **402**e includes as browser information the series of keystrokes provided from the user. The browser information is not limited only to keystrokes and, in other embodiments, may include information from any input device (illustrative input devices **236** are described above with reference to FIG. **2**).

Checkbox **402**f is entitled "history list." History lists are well-known in browser technology and are generally understood to comprise a list of web pages that have recently been accessed. The list of web pages need not be limited to those sites accessed during a single browsing session.

Checkbox **402**g is entitled "customizable preferences of browser." Such preferences include color, sound, finds, display attributes and the like.

Checkbox **402**h is entitled "bookmarks." Bookmarks are well known in the browser technology and typically comprise an HTML file of links. A bookmark file may be established upon installation of the browser program **240** and subsequently populated with links to web pages of interest to the user.

As described above, the browser information written to the buffer **242** may be limited to information collected during a single browsing session. In another embodiment, the browser information may include all information related to the browser program **240**, irrespective of a particular browsing session. Thus, in one embodiment, checkboxes **402**i and **402**j allow a user to include as browser information all bookmarks (**402**i) contained in a bookmark file or only those bookmarks established during a current browsing session (**402**j), respectively. Each of the other checkboxes **402**b–g and **402**k may be similarly configured to further define the browser information to be sent.

Checkbox **402**k is entitled "favorites." A favorites folder is a common browser attribute available with many conventional browsers. The favorites folder comprises one or more Internet shortcuts which, in practice, are similar to bookmarks. A user may select a favorite from a menu, thereby causing the browser program **240** to access the associated URL. Selection of checkbox **402**k includes as browser information the contents of a favorites folder (contained in the browser information file **248**) associated with the browser program **240**.

The selectable browser information identified by the checkboxes **402** is merely illustrative. Other embodiments may include additional browser information.

Upon selection of one or more of the checkboxes **402**, the user may return to the previous data input window by clicking on the radio button **404** or may advance to the next data input window by clicking on the radio button **406**. If the user clicks on radio button **406**, a "sending preferences" window **500** is displayed to the user as shown in FIG. **5**.

The window **500** includes a plurality of checkboxes **502**a–e which allow the user to select when browser information will be transmitted to a remote client computer **106**. A first checkbox **502**a is entitled "upon user request" and, when selected, causes the browser information contained in the buffer **242** to be transmitted immediately in response to a user-request. For example, the browser program **240** may include a "send browser information" feature, e.g., in the form of a radio button or menu option. Upon clicking (or otherwise activating) the radio button or selecting the menu option, the browser information contained in the buffer **242** is transmitted via e-mail to one or more cooperating browsers.

If a second checkbox **502**b, entitled "at shutdown," is selected, the browser information is transmitted when the client computer **106** is shutdown. If a third checkbox **502**c, entitled "at idle period," is selected, the browser information is transmitted when the client computer **106** is idle, e.g., when the computer **106** enters a standby or hibernation mode. A fourth checkbox **502**d allows the user to transmit the browser information periodically. For example, the client computer **106** may be configured to transmit the browser information every 30 minutes. The periodic time interval for transmission may be entered into input field **504**. A fifth checkbox **502**e allows transmission of the browser information to occur at a predetermined action(s), e.g., a keystroke, bookmarking, accessing a web page and the like. The action that causes transmission of the information is designated by the user by selecting one or more of the checkboxes **506**a–c. For simplicity, the actions are generically depicted as "Action 1", "Action 2" and "Action 3." In contrast to the user action described with reference to **502**a, actions relating to **502**e not solely directed to sending the browser information. Instead, the actions relating to **502**e have a primary significance other than to transmission of the browser information. Transmission of the browser information is merely associated with such actions as a convenient way of sending the information with requiring additional steps by a user.

Upon selection of one or more of the checkboxes **502** and **506**, the user may return to the previous data input window by clicking on the radio button **508** or may advance to the next data input window by clicking on the radio button **510**. If the user clicks on radio button **510**, a "receiving preferences" window **500** is displayed to the user as shown in FIG. **6**.

The window **600** includes a plurality of checkboxes **602**a–d which allow the user to select when browser information received from another computer **106** will be applied to reconfigure a local browser program. Selection of a first checkbox **602**a causes the received browser information to be applied upon receipt of an e-mail message containing the information. Selection of checkbox **602**b causes reconfiguration when the receiving client computer **106** boots up. Selection of checkbox **602**c causes immediate reconfiguration in response to an explicit user action. For example, the browser program **240** may include a "reconfigure browser" feature, e.g., in the form of a radio button or menu option. Upon clicking (or otherwise activating) the radio button or selecting the menu option, the received browser information contained in the buffer **242** of the receiving client computer is applied to reconfigure one or more cooperating browsers located on the receiving client computer. Selection of checkbox **602**d causes reconfiguration after an idle period, e.g., such as when the receiving client computer **106** resumes operation after a standby period or hibernation period. Additional or alternative options may also be available to the user. For example, the receiving client computer **106** may be configured to apply the received browser information at periodic time intervals.

FIG. **7** shows a method **700** for operating client computer **106** (referred to herein as the "local client computer" or the "sending client computer") during a browsing session. Method **700** is entered at step **702** and proceeds to step **704** to begin processing an event. At step **706**, the method **700** queries whether the local client computer is configured to share browser information with a remote client computer (also referred to herein as the "receiving client computer"). In one embodiment, the determination at step **706** is made according to whether one or more e-mail addresses were input to the address field **302** in the window **300** (shown in FIG. **3**). If the local client computer is not configured to share browser information, the method **700** proceeds to step

DISH, Ex. 1004 - Page 11 of 15

708 where the event is handled according to normal processing. If the local client computer is configured to share browser information, the method **700** proceeds to step **710** and queries whether the event is a "share event," i.e., an event adapted to initiate transmission of the browser information from the local client computer to the remote client computer. In one embodiment, share events are designated by the user according to selections made in the data input window **500** (shown in FIG. **5**).

If the event is not a "share event" than the method **700** proceeds from step **710** to step **712** and queries whether the event produces browser information. The determination made at step **712** is made according to whether any of the checkboxes **402** are selected in the data input window **400** (shown in FIG. **4**). If the event does not produce browser information, the event is handled as normal processing at step **708**. If the event does produce browser information, the method **700** proceeds to step **714** and queries whether the local client computer is configured to send the browser information in response to the event. If not, the browser information produced by the event is stored to the buffer **242** at step **716**. The method **700** then returns to step **704** to begin processing the next event.

If the local client computer is configured to send the browser information in response to the event, the method **700** proceeds from step **714** to step **718** where the browser information is stored to the buffer **242**. At step **720**, the browser information contained in the buffer **242** is transmitted to the remote client computer via the network **104** and the email server **108** (FIG. **1**). In one embodiment, the browser information is sent as an e-mail message. Transmission of the e-mail message is facilitated by the e-mail software **248**. Illustratively, the browser information may be included in the body of the mail message or may be sent as an attachment to the message. Once the e-mail message has been sent, the buffer **242** is cleared at step **722** and the method **700** returns to step **704**.

If the query at step **710** is answered affirmatively (i.e., the event is a "share event"), then the method **700** proceeds to step **724** and queries whether the buffer **242** contains browser information. During a first iteration of method **700** (i.e., immediately after launching the browser program **240**), the buffer **242** will be empty and the method **700** will return to step **704**. During subsequent iterations, one or more events may produce browser information that will be buffered at step **716**. Following these iterations, step **724** will be answered affirmatively and the method **700** will proceed to step **720** where the information contained in buffer **242** is sent to the remote client computer. The buffer **242** is then cleared at step **722** and the method **700** returns to step **704**.

At some time subsequent to transmission of the e-mail message containing the browser information (step **720**), the message will be received by a remote client computer having the e-mail address designated in the message. The browser information contained in the e-mail message may then be utilized to configure a browser program located on the remote client computer. One embodiment illustrating a method **800** for receiving and applying browser information by a receiving client computer is shown in FIG. **8**.

Method **800** begins at step **802** and proceeds to step **804** to get an event. Method **800** then proceeds to step **806** and queries whether the event comprises instructions to apply browser information received from a sending client computer. In one embodiment, the determination at step **806** is made according to the checkboxes **602** selected in data input window **600** (shown in FIG. **6**). If step **806** is answered negatively, method **800** proceeds to step **808**.

At step **808**, the method **800** queries whether the event is the receipt of an e-mail message. In one embodiment, this determination can be made with information provided by the e-mail software **246** executing on the receiving client computer in response to receiving an e-mail message. If step **808** is answered negatively, method **800** proceeds to step **810** where the event is handled as normal processing. Method **800** then returns to step **804** to begin processing the next event.

If step **808** is answered affirmatively, method **800** proceeds to step **812** where the e-mail message is opened by the e-mail software **246**. At step **814**, method **800** queries whether the received e-mail message contains browser information. In one embodiment, the determination at step **814** is made by processing a control message provided by the sending client computer. The control message may be sent with, or separate from, the e-mail message and contains information recognizable to the CPU of the receiving client computer and indicating that an associated e-mail message contains browser information. In another embodiment, the determination at step **814** can be made with information contained within the e-mail message itself.

If the e-mail message does not contain browser information, method **800** returns to step **804** to retrieve the next event. If the e-mail message contains browser information, method **800** proceeds to step **816** and queries whether the receiving client computer is configured to share the browser information (i.e., reconfigure the browser program **240** located on the receiving client computer). If not, the method **800** returns to step **804**. Otherwise, the method **800** proceeds to step **818** where the browser information is stored to a buffer **242** located on the receiving client computer. The method **800** then returns to step **804**.

Returning now to step **806**, an affirmative determination is made when the event corresponds to a selection made in input window **600** (shown in FIG. **6**). In such an event, method **800** proceeds to step **820** where a query is made to determine whether the buffer **242** contains data (i.e., browser information). Prior to receiving a first e-mail containing browser information (determined at step **814**), step **820** will be answered negatively. If step **820** is answered negatively, method **800** returns to step **804**. If step **820** is answered affirmatively, the browser information contained in the buffer **242** is applied, at step **822**, to reconfigure the browser program **240** located on the receiving client computer. Application of the browser information at step **822** may comprise first parsing the information contained in the buffer. Following reconfiguration of the browser program **240**, the buffer **242** can be cleared at step **824**. The method **800** then returns to step **804**.

Subsequent to step **822**, the browser program **240** located on the receiving client computer will exhibit each browser attribute and configuration setting transmitted by the sending client computer and applied by the receiving client computer. Accordingly, two or more browser programs may share attributes, settings and other browser information. Such a system can facilitate use of browsers to navigate network environments. For example, consider a user reading messages posted on a bulletin board, inputting data into a web page or performing some other task during a browsing session. Prior to completing the task, the user may be required to terminate a browsing session. In such an event, the necessary browser information may be collected and transmitted to a remote computer containing another browser program. The browser information is then used to reconfigure the browser program of the remote computer and restore the user to where he or she left off during the

DISH, Ex. 1004 - Page 12 of 15

terminated browsing session. Thus, in the case of a user reading a message board, the browser displays the message which was being read when the browsing session was terminated. In the case of inputting data to a web page, the web page is rendered with the data that was input prior to the termination of the session contained therein. In effect, the present invention preserves the current status of a browsing session to be resumed at another location.

In addition to preserving input data and the browsing history (i.e., the current page, previous pages, links taken, etc.) the invention also preserves changes made to the configuration and user preferences made to a browser. Thus, in one embodiment, two or more browsers may be periodically synchronized to reflect identical features.

As described above with reference to FIG. **2**, each client computer may contain two or more browsers. Accordingly, some embodiments may include steps to synchronize specific browsers with respect to one another to determine which browsers will be configured with browser information received from predetermined sources.

Further, the invention is not limited to cooperating browsers of the same type, i.e., from the same vendor, or the same version. For example, a first browser may be the Navigator available from Netscape and a second cooperating browser may be the Internet Explorer available from Microsoft. The two browsers may cooperate despite differences in program structures and data structures. In one embodiment, the interfacing software **250** operates to standardize the format of the buffer contents. Thus, steps **716** and **718** may include steps to convert the browser information to a predetermined format recognizable to a receiving client computer irrespective of the sending or receiving browser type. In one embodiment, formatting of the browser information is performed by the interfacing software **250** (shown in FIG. **2**) residing on the sending client computer. The receiving client computer may also include similar interfacing software **250** to process the browser information received from the sending client computer. Illustratively, processing by the receiving client computer may be performed at step **822** (described above with reference to FIG. **8**). It is understood that formatting processes may be performed regardless of compatibility between browser types. Thus, methods **700** and **800** can include formatting steps even where the browser programs residing on the sending client computer and the receiving client computer are of the same type and version (e.g., Netscape Navigator, version 6.1). Interfacing two or more applications is well-known in the art. Accordingly, a detailed discussion of interfacing methods and apparatus is not necessary.

The foregoing embodiments utilize a buffer **242** to store browser information collected during a browsing session. The browsing information may then be transmitted (via e-mail) to another computer executing a different browser program. In other embodiments, the use of a buffer is avoided. Instead, the browser information is transmitted directly from persistent files stored on the sending computer. The receiving computer may then apply the browser information to establish the desired browser configuration.

While the foregoing is directed to the preferred embodiment of the present invention, other and further embodiments of the invention may be devised without departing from the basic scope thereof, and the scope thereof is determined by the claims that follow.

What is claimed is:

1. A method for sharing user-configured browser information between at least two network browsers configured to communicate the user-configured browser information via a network, comprising:

  generating the user-configured browser information during execution of a first network browser on a first computer in response to user-input commands;

  specifying, at the first computer, a second computer containing a second network browser as a recipient of the user-configured browser information from the first computer; and

  transmitting the user-configured browser information, via the network, from the first computer to the second computer,

  wherein:

   the user-configured browser information comprises bookmark information and user-preferences information and is adapted to reconfigure the second network browser,

   the user-preferences information comprises display attributes of the first network browser which cause the second network browser to be reconfigured according to the display attributes, thereby causing the second network browser to resemble first network browser on the second computer with respect to said display attributes, and

   said transmitting the user-configured browser information comprises sending an electronic mail message containing said user-configured browser information.

2. The method of claim **1**, wherein generating comprises generating input device information representing user input to an input device connected to the first computer.

3. The method of claim **1**, wherein generating comprises generating the user-configured browser information during at least one browsing session.

4. The method of claim **1**, wherein generating comprises generating favorites information.

5. The method of claim **1**, wherein generating comprises generating network addresses for electronic documents accessed during at least one browsing session.

6. The method of claim **1**, wherein transmitting comprises sending an electronic mail message containing the user-configured browser information.

7. The method of claim **1**, wherein transmitting occurs automatically in response to a predetermined event.

8. The method of claim **1**, further comprising reconfiguring the second network browser according to the user-configured browser information.

9. The method of claim **1**, further comprising buffering the user-configured browser information prior to the step of transmitting.

10. The method of claim **1**, wherein the user-configured browser information further comprises cookies created during browsing sessions using the first network browser.

11. A method for reconfiguring a first browser located on a first computer, comprising:

  receiving an electronic mail message containing a user-configured browser information;

  parsing said user-configured browser information received from a second computer connected to the first computer via a network, wherein the first computer was specified as a recipient of the user-configured browser information at the second computer, wherein the user-configured browser information comprises information generated during execution of a second browser located on the second computer and including bookmark infor-

DISH, Ex. 1004 - Page 13 of 15

mation and user-preferences information, and wherein the user preferences information comprises display attributes of the second browser which cause the first network browser to be reconfigured according to the display attributes, thereby causing the first network browser to resemble second network browser on the first computer with respect to the display attributes; and reconfiguring the first browser according to the user-configured browser information.

**12**. The method of claim **11**, wherein reconfiguring comprises changing at least one of bookmark information, favorites information, user-preferences information and accessed network addresses information stored on the first computer.

**13**. The method of claim **11**, wherein the user-configured browser information further comprises cookies created during browsing sessions using the second browser.

**14**. A signal-bearing medium containing a browser program which, when executed by a processor, performs a method for sharing user-configured browser information between at least two network browsers configured to communicate the user-configured browser information via a network, the method comprising:

generating the user-configured browser information during execution of a first network browser on a first computer in response to user-input commands;

specifying, at the first computer, a second computer containing a second network browser as a recipient of the user-configured browser information from the first computer; and

transmitting the user-configured browser information, via the network, from the first computer to the second computer,

wherein:

the user-configured browser information comprises bookmark information and user-preferences information and is adapted to reconfigure the second network browser,

the user-preferences information comprises display attributes of the first network browser which cause the second network browser to be reconfigured according to the display attributes, thereby causing the second network browser to resemble first network browser on the second computer with respect to said display attributes, and

said transmitting the user-configured browser information comprises sending an electronic mail message containing said user-configured browser information.

**15**. The signal-bearing medium of claim **14**, wherein generating comprises generating input device information representing user input to an input device connected to the computer.

**16**. The signal-bearing medium of claim **14**, wherein generating comprises generating the user-configured browser information during at least one browsing session.

**17**. The signal-bearing medium of claim **14**, wherein generating comprises generating favorites information.

**18**. The signal-bearing medium of claim **14**, wherein generating comprises generating network addresses for electronic documents accessed during at least one browsing session.

**19**. The signal-bearing medium of claim **14**, wherein transmitting comprises sending an electronic mail message containing the user-configured browser information.

**20**. The signal-bearing medium of claim **14**, wherein transmitting comprises sending an electronic mail message

containing the user-configured browser information and wherein the user-configured browser information further comprises at least one of favorites information and network addresses.

**21**. The signal-bearing medium of claim **14**, further comprising reconfiguring the second network browser according to the user-configured browser information.

**22**. A signal-bearing medium containing a browser program which, when executed by a processor, performs a method for reconfiguring a first browser located on a first computer, comprising

receiving an electronic mail message containing a user-configured browser information;

parsing said user-configured browser information received from a second computer connected to the first computer via a network, wherein the first computer was specified as a recipient of the user-configured browser information at the second computer, wherein the user-configured browser information comprises information generated during execution of a second browser located on the second computer and including bookmark information and user-preferences information, and wherein the user preferences information comprises display attributes of the second browser which cause the first network browser to be reconfigured according to the display attributes, thereby causing the first network browser to resemble second network browser on the first computer with respect to the display attributes; and

reconfiguring the first browser according to the user-configured browser information.

**23**. The signal-bearing medium of claim **22**, wherein reconfiguring comprises changing the contents of data structures of the first browser.

**24**. The signal-bearing medium of claim **22**, wherein reconfiguring comprises changing at least one of bookmark information, favorites information, user-preferences information and accessed network addressed information.

**25**. A system comprising:

a first computer comprising a first processor and a first memory containing a first browser, wherein the first browser generates first browser information in response to user-input commands and wherein the first computer is configured to send the first browser information to the second computer in response to a user designation of the second computer as a recipient of the first browser information, wherein the first browser information includes bookmark information and user-preferences information;

second computer comprising a second processor and second memory containing a second browser, wherein the second browser is reconfigured according to the received first browser information; and

network connecting the first and second computer and configured to support transmission of the first browser information to the second computer, wherein the transmission of the first browser information comprises sending an electronic mail message containing the first browser information, and the user-preferences information comprises display attributes of the first browser which cause the second browser to be reconfigured according to the display attributes, thereby causing the second browser to resemble first browser on the second computer with respect to said display attributes.

**26**. The system of claim **25**, wherein the second memory contains an electronic mail program configured to receive the first browser information.

DISH, Ex. 1004 - Page 14 of 15

**27**. The system of claim **25,** wherein the first browser information comprises at least one of favorites information and accessed network addresses information.

**28**. The system of claim **25,** wherein the second computer is configured to generate second browser information in response to user commands input to the second computer and wherein the second browser information is sent to the

first browser program via the network and is utilized to reconfigure the first browser program.

**29**. The system of claim **28,** wherein the second browser information comprises at least one of favorites information and accessed network addresses information.

\* \* \* \* \*

DISH, Ex. 1004 - Page 15 of 15

**Abstract**

Wireless data promises useful services and great convenience. The many technological and economical obstacles that have been hampering its growth are slowly being overcome. In this article we first explain our vision of what next-generation wireless data services may look like. Then we present the different elements of a base architecture designed to support the common requirements and features. As an example, we describe our initial experience in implementing a wireless data server prototype at Bell Laboratories.

# Next-Generation Wireless Data Services: Architecture and Experience

**MUN CHOON CHAN AND THOMAS Y. C. WOO**

**BELL LABORATORIES**

*T*he growth of mobile telephony has exceeded most expectations, and is particularly accelerated by aggressive pricing plans and subscribers who are already familiar with voice service.

In addition, wireline data is growing by leaps and bounds, largely due to the Internet. It seems natural that the combination of wireless and data should enjoy a high level of success. However, this has proven to be elusive, at best. After many years of promises, mainstream adoption of wireless data has made only limited inroads. For instance, in the United States, with the exception of wireless paging, all other forms of wide-area wireless data services have signed up only a small number of subscribers.

Many factors contribute to the slow adoption of wireless data; some are technological.
- Air interface protocols: The wireless area was once dominated by proprietary and incompatible air interface protocols. The lack of standardization results in high development cost, low-volume production, and scarce customer interest. This situation has improved considerably in the last few years. In the local area, IEEE 802.11 was finally standardized. In the wide area, most analog systems are being replaced with newer digital personal communications services (PCS) systems such as IS-136, IS-95, and Global System for Mobile Communications (GSM), all of which include low-bandwidth data capabilities in the form of short messaging service (SMS) and data calls.
- End-user devices: Until recently, most wireless end-user devices have been designed for specialized vertical markets such as field engineers. The early wireless end devices targeted for consumer uses were bulky, feature-poor, and user-unfriendly. The growth of mobile telephony has significantly changed the landscape. Mobile telephones are rapidly becoming the most popular wireless end-user devices ever introduced. Their design, features, and sophistication are constantly improving. On the data side, new portable devices such as Palm Pilot and Windows CE-based handheld personal computers (HPCs) are gaining momentum. New hybrid devices combining mobile telephony and portable computer features are being introduced (e.g., Nokia 9000 Communicator) and look promising to become the dominant wireless end devices of the future.

- Battery technology: Long-lived batteries reduce maintenance chores (e.g., recharging), and are critical in enhancing the "transparency," and in turn the user experience, of a wireless service. Although significant advances have been made in the area of low-power electronics and protocol design (e.g., sleep mode), battery technology itself has not improved much. This is especially important for data applications since the mean call duration is much higher for data applications than for voice.
- Protocol and software design: With the exception of specialized software utilities such as file synchronization, software designed for wireline use is often used in the wireless setting. A key problem of doing so is that software designed to work in a wireline environment is not optimized for, and hence often do not perform well in, wireless use.

Other factors are economical, such as:
- Infrastructure: Building wireless infrastructure is very expensive, and is especially risky without an established customer demand. On the other hand, without wide coverage, customer demand will remain low. The growth of mobile telephony has helped break this vicious cycle. Specifically, with data capabilities built into the new PCS standards, the same infrastructure built for voice can be reused to provide data services.
- Pricing: On the wireline side, pricing of data services is still a matter of much debate. This is an even more controversial problem for wireless data, because of the scarcity of bandwidth and a strong well-understood demand for wireless voice that is competing for the same bandwidth.

Facilitated by the rapid growth of mobile telephony, progress is being made in addressing each of the above-mentioned factors. Although the progress is not uniform, overall, the impediments presented by these factors are being mitigated. For instance, air interface protocols are rapidly being standardized; wireless end devices are converging to a few platforms; and flat-rate pricing for wireless data has been introduced by a few carriers. We give a brief review of the current state of technology in the next section.

It is our belief, however, that for wireless data to truly take off, two often overlooked issues must first be properly addressed. They are:

1070-9916/99/$10.00 © 1999 IEEE

APPX774

DISH, Ex. 1005 - Page 1 of 14

- The service model: Most wireless data services lack a clear and complete service model. Specifically, unlike their wireline counterparts, the features and performance of a wireless data service depend on the location, access network, and type of end device a subscriber is using. The service "matrix" for different combinations is often either incomplete or undefined. A good service model for a wireless data service should try to match the services rendered to the degree of connectedness of a subscriber. In particular, service variation should be smooth and consistent with the expectation of subscribers.
- Wireline integration: Although wireless is convenient and appealing, it will not totally replace wireline, at least in the foreseeable future. In other words, it is better to view wireless not as a standalone service, but as a complement to wireline, and to provide seamless integration of the two. Like data, this is also true for voice. Mobile telephony is more powerful as a seamless extension of wireline telephony than as a separate independent service.

The importance of these two points can be demonstrated no better than by the *paging* service, which is by far the most successful wireless data service. Paging has an easily understood service model: the primary function of paging is to asynchronously notify a subscriber of an event with an alphanumeric message. It is also tightly integrated with the wireline network to the extent that a page is typically responded to via some wireline service.

To support a complete service model and seamless wireline integration, the main challenge is to develop an underlying system and software architecture that provides some level of transparency from locations, access networks, end devices, and data types; and well-defined interfaces with wireline services.

The contributions of this article are threefold:
- We explain our vision of what next-generation wireless data services may look like. Instead of focusing on individual applications, we focus on identifying their common features and requirements.
- We present the different elements of a base architecture designed to support the common features and requirements.
- We describe our initial experience in implementing a wireless data server prototype at Bell Laboratories.

The focus of this article is not so much on technical details. Rather, our interest is in presenting our vision, innovative service concepts, and an architectural framework for next-generation wireless data services. The scope of this article is restricted to consumer-oriented wide-area wireless data services. We do not consider scientific, specialized vertical, or indoor wireless LAN applications. Similarly, we consider only the use of general-purpose wireless end devices such as mobile phones and personal digital assistants (PDAs), and readily available outdoor wireless link technologies such as cellular/PCS.

The balance of this article is organized as follows. In the next section, we survey the available wireless data networking technologies. We then present our vision of next-generation wireless data services and highlight their key elements. We lay out a general architecture that provides direct support for the key elements of next-generation wireless data services, and then describe Bell Laboratories' Wireless Data Server prototype as a concrete example of a wireless data service. We review related work, and then conclude in the last section.

## A Technology Survey

The available technologies strongly dictate the kind of services that can be practically provided. In the following we briefly survey the available wide-area wireless data network technologies. Our description is not intended to be exhaustive, but rather to put some order on the wide array of available technologies and to point out the important trends.

### Air Interfaces
The available air interfaces can be broadly classified into three categories based on how they are typically deployed.[1]

*Global/National* – The majority of voice infrastructure is converging into one of the three digital PCS standards, namely, IS-136, IS-95, and GSM. All three support similar data capabilities: low-bandwidth SMS over control channels and direct data calls. Packet extensions are currently being defined for each of these standards (e.g., generic packet radio service, GPRS, for GSM).

In the United States a special packet-based system called Cellular Digital Packet Data (CDPD) has been designed and implemented as an overlay on top of traditional cellular infrastructure. The raw bit rate of CDPD is 19.2 kb/s.

There are also an assortment of other specialized systems designed for low-bandwidth data applications such as field support, telemetry, and paging. These include Ardis, RAM, and the Flex/ReFlex family of protocols from Motorola.

Looking into the near future, satellite-based wireless services are becoming more available. Iridium and Teledesic are the two leading providers. Work has also begun on defining the third-generation wireless standards — Universal Mobile Telecommunications Service (UMTS)/International Mobile Telecommunications in the year 2000 (IMT-2000) [1] — which will feature wireless data at a much higher rate (e.g., up to 384 kb/s). A number of proposals are being considered, with wideband CDMA (W-CDMA) [2] as the leading candidate at this point.

*Metropolitan Area* – An example of a metropolitan-area wireless data system is Metricom, which is currently available in a few metropolitan areas including San Francisco, Seattle, and Washington, D.C. An interesting aspect of the Metricom network is its use of packet radio technology. Packets are relayed through poletop-mounted radios a hop at a time to reach the wireline backbone. It is not clear if this technology will become widespread. This, however, can be considered a form of *wireless local loop*, which has attracted a great deal of interest.

*Campus Area* – The U.S. Federal Communications Commission (FCC) recently set aside a new 300 MHz band for use by a new category of unlicensed equipment, called Unlicensed National Information Infrastructure (U-NII) devices. This new band and the new devices are intended to support the creation of high-speed (10–20 Mb/s) digital campus-area wireless networks. Commercial U-NII devices are still rare; we expect more to come soon.

### End Devices
New wireless end devices are being introduced at an unprecedented rate. Significant improvements have been made in the areas of power consumption, portability, features, and user interfaces, although there is clearly still much room for improvement. We mention here a few products that highlight important trends:
- The Nokia 9000 Communicator, which combines a PDA with a mobile phone

---

[1] *Since our main interest is in outdoor wide-area wireless data, we exclude local-area wireless data from our discussion.*

- Motorola's two-way pager, PageWriter, which includes a mini-keyboard and is programmable with third-party software
- The Minstrel CDPD modem for Palm Pilot, which provides wireless IP access to the Palm Pilot
- The Nokia 6100 series mobile phones, with specialized low-power circuitry and record-setting standby/talk time

### Services

The growth of wireless data has been sluggish; service is still its weakest part. Understandably, most service providers are much more heavily promoting their voice services, since the demand and pricing issues are not clear for wireless data.

A few wireless e-mail services are beginning to emerge. AT&T recently introduced an interesting service called PocketNet for providing access to specialized Web content via a variant of Hypertext Markup Language (HTML) called Handheld Device Markup Language (HDML). A number of providers are offering flat-rate service plans for nationwide CDPD access. On the contrary, most wireless two-way messaging services such as Skytel are still following usage-based (e.g., per-message) pricing.

## The Elements of Next-Generation Wireless Data Services

The main appeal of wireless is *mobility*. It offers a user the convenience of conducting business from anywhere at any time. As mentioned before, in the foreseeable future wireless should not be viewed as a replacement of wireline, but as an extension. Specifically, wireless provides an important bridge between two disjoint wireline points.

To explain our vision of the different elements in a next-generation wireless data service, we consider the following scenario.

We begin with a user, Arthur, conducting a multimedia conference in his office. The conferencing application runs on Arthur's desktop and maintains high-definition television (HDTV)-quality video and CD-quality audio connections to all conference participant, together with a shared whiteboard.

After an hour, Arthur is excused from the meeting. Since it is the end of the workday, he decides to leave work for dinner with a friend. However, he wants to make sure that he can be reached in case he is needed. He pulls out and powers on his HPC, waits for it to lock on to the office wireless LAN, then presses a key to transfer the conference states to it.

During dinner, Arthur receives a short message on his cellular phone. The message indicates that an issue arose in the conference discussion that requires his attention. Further details have been sent to him in an e-mail.

Arthur replies to the short message with his cellular phone saying that he will review the issue as soon as he gets back home in about an hour. Then, using his cellular phone, he calls in to check his e-mail. After listening to the e-mail message, Arthur forwards a document to his coworkers, and also faxes a copy of the document to his HPC and his fax printer at home, all in the same call using his cellular phone.

Still feeling the need to clarify a point, Arthur rejoins the conference using his HPC. This time, the HPC connects with the campus-area U-NII operated by the shopping mall where he is having dinner. Participation in the conference is now different:

- Because of display size limitation, Arthur can only see one participant at a time.

- The video quality is lower because of the lower bandwidth on the U-NII wireless link compared to the office wireline connection.
- Although Arthur continues to receive video from other participants, his own uplink video is dropped because the particular HPC he is using does not have a video camera.

After a short discussion, Arthur finishes his dinner and goes home.

Once Arthur gets in his car, his console-embedded PC fires up and quickly finds the digital PCS network. Again, by pressing a single key, Arthur transfers his ongoing conference onto the car PC. With a lower bandwidth available on the PCS network, the video quality further degrades in both frame rate and resolution, and the audio is now FM-quality. The whiteboard is put in receive-only mode since Arthur will not be able to interact on the whiteboard when he drives.

Once in his home office, Arthur points his HPC's infrared port to his home PC's, the conference is now transferred onto the PC, and both video and whiteboard are restored. Everything appears the same as in his office, with the exception of slightly lower video quality due to the lower-speed Internet access using digital subscriber line (xDSL).

On one hand, the above scenario does not represent our whole vision of next-generation wireless data services. On the other hand, some readers may already think that the above scenario sounds too futuristic, and is not practically achievable. In our belief and experimentations, most of the above are already technologically feasible, although the quality of the connections and the overall seamlessness can still use significant improvement. The Bell Laboratories' Wireless Data Server (WDS) prototype, described later, provides concrete testimony to this, although it does not currently support wireless multimedia conferencing.

In any case, the scenario does capture the most important elements we wish to cover in this article. In the following, we make observations about the key elements.

### Ubiquitous Connectivity

The design of a wireless data service is highly dependent on the degree of connectivity assumed. In the future, we argue that a subscriber will be *ubiquitously* connected, that is, almost always connected to some network with some (not necessarily the same) device. In the above scenario, ubiquitous connectivity is demonstrated by the fact that in spite of Arthur's movement, he is capable of keeping in touch using various voice, data, and video services through different networks and devices. In fact, multiple simultaneous connectivities via different access networks are already not uncommon. With most urban areas well-covered by terrestrial infrastructure and the arrival of satellite-based wireless service serving even the most rural areas, achieving relatively continuous connectivity is not unrealistic, and is mostly hampered only by the lack of roaming abilities or arrangements.

We emphasize that connectivity does not equate with bandwidth. In other words, even though a subscriber can communicate with the network, the available bandwidth may vary drastically (e.g., from a few megabits per second to a few bits per second) as a subscriber moves. The types of data services that are practical and of interest are strongly dependent on the available bandwidth.

### Data Accessibility

With ubiquitous connectivity, the issue of data accessibility arises naturally. More precisely, ubiquitous connectivity is most interesting if the same set of data is accessible (perhaps in different formats) to a subscriber no matter how she is cur-

rently connected and what device she is currently using. Such universal data accessibility is impossible with certain combinations since they do not make sense (e.g., video data over a voice connection); thus, the goal is to provide maximal data accessibility consistent with the feasibility and expectation of a subscriber. This is a nontrivial problem. At a minimum, it requires a careful choice in data representation so that the data can easily be transcoded into a form suited for presentation over a particular network/device combination. The newly proposed XML standard [29] looks like a promising starting point.



■ **Figure 1.** *Application transfer paths.*

### The Single-Session Abstraction

In the above scenario, there is a clear separation of *access* and *service*. The method of access to a service may vary over time, while the service remains the same. For example, even though Arthur crosses network (from wireline to different wireless networks, then back to wireline) and device boundaries, the system provides the illusion of a single session to Arthur as well as to other conference participants. Throughout the commute, other conference participants do not see any change except the variation of connection quality from Arthur. At no point was there a need for any conference participant to terminate or restart the application. In addition, notifications for incoming fax, mail, and so on will automatically be forwarded to Arthur's "current device" as specified in Arthur's profile.

The abstraction to a user is that of a single application session that persists across multiple methods of access. A key challenge to realize this abstraction is the ability to deal with network and device handoffs.

### Application Transfer

A *transfer* of application refers to the movement of an application from one device to another. An application transfer is typically, but not necessarily, initiated by a user.

There are many mechanisms to perform application transfer. Invariably, it involves the packaging and shipping of selected state information from one device to another, and the subsequent restart of the application using the packaged state. Typically, the application code is not transferred, because the source and destination hardware architecture could be completely different.

Broadly speaking, there are two ways an application transfer can be carried out, namely, *pull* and *push*. In a pull model, the destination device initiates the transfer; in a push model, the source device initiates the transfer. With both pull and push models, there are two possible transfer paths (Fig. 1).

***Device-Network-Device*** – In this case, the state is forwarded from one device to the other via the network.

The transfer from the office PC to the HPC in the above scenario is an example of this. This is the typical case because it requires no special support from the devices themselves since each device already has a connection to the network.

***Device-Device-Network*** – In this case, the state is transferred directly from one device to the other device, and the network is notified last.

The transfer from the HPC to the home PC in the above scenario is an example of this. A prerequisite for this transfer is that the two devices can communicate peer-to-peer, such as via IR in the above scenario. Apart from the mechanism

issues, another major concern for application transfer is *security*. Clearly, the system must authenticate both the source and destination devices, and ensure that the transfer has been authorized by the user.

***Application Adaptation*** – In order for an application session to persist across network and device handoffs, it is often necessary to adjust the session characteristics so that the application can perform optimally in different operating environments, since each operating environment exhibits a different set of capabilities and constraints. In other words, an application needs to *adapt* to its operating environment.

The first issue of adaptation is the degree of application transparency. On one extreme, an application contains all the intelligence to perform the adaptation itself. On the opposite extreme, the system performs all the adaptation on behalf of the application without the application even being aware of it.

At the application level, adaptation can be carried out along three dimensions: *performance*, *features*, and *format*. Performance adaptation refers to the decrease or increase in the quality of application-level data in response to changes. In the above scenario, an example of performance adaptation is the adjustment of video and audio quality in response to the changes in available bandwidth. Feature adaptation refers to the dropping or adding of an application's capabilities in response to changes. In the above scenario, an example of feature adaptation is the dynamic termination and restart of the video and whiteboard connections as Arthur "moves" through different networks and devices. Format adaptation refers to the transcoding of data from one format to another. In the above scenario, an example of format adaptation is the playing of Arthur's e-mail messages in voice form when he accesses his e-mail with a cellular phone. Format adaptation at the application layer provides basic data accessibility capabilities.

To insulate against the rapidly growing networking and device technologies, the adaptation architecture should be modular and extensible. A particularly flexible way to structure adaptation is the use of dynamically *pluggable* adaptation modules (e.g., Java applets) that are configured by customizable rule sets.

## A General Architecture for Wireless Data Services

In this section we present a high-level architecture for wireless data services. This architecture provides direct support for the various elements of next-generation wireless data ser-

APPX777

DISH, Ex. 1005 - Page 4 of 14



**■ Figure 2.** *System architecture.*

cialized mechanisms optimized for wireless communications. By delegating the complex task of dealing with wireless communications to the wireless middleware layer, individual applications can focus mainly on its own application-specific logic, thus significantly reducing their complexity. As a separate and explicit component, the functions provided by the wireless middleware layer can be reused by a multitude of applications.

We divide the functions of the wireless middleware layer into two planes, namely *data* and *control*. The former refers to data path functions such as data formatting, transfer, and retransmission, while the latter refers to control path functions such as session management.

### Data Plane

**Synchronous and Asynchronous Communication** — Both synchronous and asynchronous data transfer are supported. Synchronous communication is used for two-way interactive flow of data between client and server. In principle, synchronous wireless communication is similar to its wireline counterpart. The key differences are lower bandwidth, higher round-trip delay, and a much higher failure probability for wireless communication. In the scenario presented earlier, the conferencing application and retrieval of e-mail messages require synchronous data transfer.

Asynchronous communication is fundamental to wireless; it is friendly to power consumption and can often lead to sim-

vices discussed in the previous section. At the highest level, the architecture follows a three-tiered organization. The global relationship between the tiers is shown in Fig. 2. At the top, the application logic for a service is embedded in an *end server*, which is responsible for carrying out the actual processing required to provide the service. A later section describes the architecture of such a server. In the middle are a collection of *user agents*, each of which serves as an intermediary between the end server and the actual clients. In abstract terms, a user agent is a logical representation of a subscriber: it hides the network and device mobility of a client, thus relieving the end server of the need to know and deal with the actual characteristics of the client. The degree of transparency provided by a user agent can vary and is dependent on the service being provided. Indeed, depending on the degree of transparency provided by the user agents, the end server may not even be aware of the presence of wireless links. We present the details of a specific user agent architecture in a later section. At the bottom are the actual clients, which manifest themselves as client applications residing on specific devices connected to specific access networks. The client architecture is described next.

### Client Architecture

Compared to a wireline network, a wireless network typically exhibits higher latency, much higher and burstier error rates, and frequent disconnection. Thus, applications designed for wireline use do not perform well in a wireless environment. Instead, applications must be redesigned to take into account the harsher conditions imposed. Figure 3 shows the key architectural components and their relationships in a generic wireless data service client.

We focus the discussion on the *wireless middleware layer*, which encapsulates a set of spe-



**■ Figure 3.** *Client architecture.*

plier application logic. A lot of wireless data applications are asynchronous in nature. Two primary examples are wireless messaging and telemetry. In general, asynchronous notification is often a critical part of many applications, including synchronous ones, to alert a client of an event. Asynchronous communication also provides a graceful way to cope with the problem of intermittent connectivity that is common in wireless. Specifically, asynchronous queuing of data messages allow the decoupling of application processing from network communications. In the scenario, messaging and document forwarding are asynchronous.

**The Transaction Layer** — Many wireless data applications follow a *request-response* paradigm. A typical transaction begins with a client sending a request to a server, which completes the transaction by returning a response. For such applications, it is critical that the client and server stay synchronized and have a consistent view of all ongoing transactions. The unreliable nature of wireless links makes this particularly difficult.

The transaction layer provides explicit support for an application to structure its request-response interactions. These include, among other things, transaction-level message formatting, retransmission of requests and responses, tracking of transaction progress, safe transaction abortion, and security.

**The Adaptation Layer** — The primary goal of adaptation is to allow an application to run efficiently over the resources that are currently available to it. The highly dynamic nature of a wireless environment makes adaptation a necessity.

As mentioned before, adaptation can be used to mitigate the effect of network and/or device handoffs. We divide adaptation functions into two sublayers:
• The upper adaptation layer: This layer provides support for an application to manage its features, performance, and data formatting in response to resource changes. It notifies an application of resource changes and helps set up new data paths upon application requests. Device- or media-specific processing such as transcoding is performed in this layer. In the scenario described, the conference application changes the video and sound quality to adapt to the current device and bandwidth characteristics.
• The lower adaptation layer: This layer works with the network communication layer to provide support for network handoff and other network-specific optimizations (e.g., compression, error encoding). In other words, unlike the upper adaptation layer, the lower adaptation layer provides system-level adaptation that is, for the most part, transparent to applications.

*Control Plane*
**State Management** — In a client/server service model, the application state is distributed between the client and the server. When a client moves from one device to another, the state management module carries out the application transfer functions, which include the following steps:
• Handshake between the source and destination devices
• Packaging of selected state information for transfer
• Transfer of state information from the source to the destination device



■ **Figure 4.** *Server architecture.*

• Transparent restart of application in the destination using the transferred state
• Shutdown of the application in the source device

**Profile Management** — Each application maintains a profile of its *required* and *optional* resources. Similarly, each subscriber has a profile of his/her preferences and customizations; and each device or network has a profile of its capabilities. The profile management module provides an uniform access interface to the different profile information.

**Network Management** — This module tracks the currently accessible networks and their performance, and initiates data path adaptation or network handoff as necessary.

**Device Management** — This module provides a device-independent interface to the management of the device platform. It is responsible for initiating device handoff.

*Server Architecture*
Figure 4 outlines the server architecture. There are three major components: the *interface* component, the processing component and the *data* component.

The interface component contains a set of network interfaces that would allow messages to be sent to and received from various networks (e.g., SMS, CDPD, GPRS, public switched telephone network, and the Internet). Once a message is accepted into the server, it does not matter from where the message is received.

The data component is organized per user and resembles the organization of the client control plane. The per-user data component contains a device profile, a network profile, a state profile, and an object store.

The processing component is the core of the server that implements the service logic. It is made up of three modules: the dispatch module, the service module, and the transcoding module. The *dispatch module* makes three major decisions: which service to invoke, what kind of adaptation to perform, if needed, and to which network to send the message. These three decisions are not orthogonal. For example, the choice of to which network to send the message influences what kind of adaptation should be performed, and vice versa. Factors influencing these decisions are user preference, network availability, and device availability. Once the service, adaptation, and

APPX779

DISH, Ex. 1005 - Page 6 of 14

| Change in | Information displayed to user | Latency perceived by user |
|---|---|---|
| Device display | More information (color, fonts, resolution etc.) can be displayed. | Latency can increase if more information is fetched. |
| Device processing and memory | More information can be displayed if bottleneck is device processing. | Latency can be decreased by trading processing and memory for latency. |
| Network bandwidth | More information can be displayed if bottleneck is bandwidth. | More information can be displayed and latency can be lowered. |

■ **Table 1.** *A summary of adaptation.*

destination are decided, processing is performed by the service module.

The service module plays the important role of providing the notion of a single application. For example, when Web browsing is transferred to a low-bandwidth network, an Internet service gateway can be used to provide an extremely primitive form of browsing over a messaging service. Similarly, two-way messaging service can be used as a substitute for e-mail service. In addition, management of states that are persistent per user, per application, or per session is also performed here. For example, in Web browsing persistent application states such as bookmarks, history, and cookies should be preserved when the user migrates to different devices; cache objects can migrate from server to device or vice versa, depending on the environment. Finally, common service semantics like notification, saving, printing, and transfer of messages is supported in a uniform way across all services.

The service module needs to perform adaptation for a number of reasons, including change in client display, change in client processing or memory characteristics, and change in network bandwidth (Table 1). An important form of adaptation is transcoding. There are two basic transcoding mechanisms: changing information content and changing media format. In the extreme case, a particular data stream can be dropped. For example, in the scenario described earlier, the video stream is dropped when Arthur transfers the conference from an HPC to a cellular phone.

Changes in information content can be triggered by a change in device where a more capable display allows more information to be displayed as the user moves from a mobile phone to a PDA, then to a laptop, or a change in the network bandwidth available where more information can be fetched with reasonable latency. A change in device capabilities — for example, a faster processor or more memory — can also allow more information to be delivered to the client in a timely fashion by trading off processing and memory for bandwidth. Thus, Web browsing can improve from getting text descriptions of stock quotes on a mobile phone to looking at dynamically updated plots of stock prices on a laptop. Changing format is required because of either incompatible media formats (e.g., a Postscript file and a plain text file) or incompatible media types (e.g., text and speech).

Of course, the improvement in service quality does not have to be restricted to data services. When sufficient bandwidth and device capabilities are available, increased information content could mean an increase in the type of media available; for example, video can be added.

An important factor in deciding what kind of transcoding to perform is the minimum service requirement before a service becomes unusable. While a lot of work has gone into understanding this issue for voice and video applications, the requirement for data service is far from clear. A particularly difficult problem with data application is that user expectations are fairly elastic, and vary significantly between different people. In order to make the correct decision, the questions of what is the minimum information required by users and how much latency they are willing to tolerate have to be answered. Furthermore, in a mobile environment changes occur frequently, and the choices for adaptation are often not unique. One user might prefer to have more information over lower latency, or vice versa. Personalization is highly desirable in such an environment.

Generally, there can be one or multiple servers in the network. Commonly used service logic and transcoding functions are replicated on all servers. Some user-specific data, however, may migrate with the user to the closest server for efficiency considerations.

### The User Agent

As described in the previous section, application adaptation is needed to deal with environmental changes (device, network, or media). The particular environmental changes of interest and their corresponding adaptation is often application-specific. Typically, the application decides and registers with the system the particular environmental changes of which it likes to be notified and adapts on its own. Other environmental changes are handled by the system directly on behalf of the application. A modular way to implement such a system-level adaptation is via *user agents*.

Typically, the user agents perform mostly control functions. The actual data path between the end server and the clients may or may not go through them. For low-bandwidth services such as messaging, the data path may go through the user agents if they provide additional value-added functions (see the next section). For high-bandwidth services such as real-time conferencing, the extra latency incurred in having the user agents touch the data may be unacceptable. Thus, they are more suited for session-level management functions.

Depending on the mobility pattern and the amount of signaling traffic, the user agents themselves may migrate as the actual clients move [4].

In our design, a user agent has a fixed part and an extensible part (Fig. 5). The fixed part implements basic messaging functions, a primitive communication service that is always available. Additional basic functions are related to user profile and state management. These functions are generic for all user agents. The extensible part, as the name suggests, can be programmed to perform specific tasks as desired by a user. The extensible part specifies a framework in which additional functions can be added to a user agent in the form of *UA programs*.



■ **Figure 5.** *User agent structure.*

APPX780

DISH, Ex. 1005 - Page 7 of 14



**■ Figure 6.** *The scope of WDS.*

We classify UA programs into two categories: *configuration UA programs* and *programmable UA programs*. A configuration UA program operates only in the data path. Examples include a user-configurable adaptation strategy or a specialized transcoding module uploaded by the user to the data store. Such a transcoding module is required when there are specific user or device requirements that cannot be met by the generic transcoder available. A programmable UA program is a collection of program blocks, each of which contains codes to handle messages of a specific pattern. The framework follows an event-driven model; it contains a kernel that pattern-matches incoming messages and dispatches them to the appropriate program blocks in UA programs. Some examples include maintaining a personal calendar and retrieving specific information from a Web page. Such a model requires an application programming interface (API) that an application can use to precisely specify the types of changes of which it would like to be aware. An example of a user agent implementation is given in a later section.

## An Example: Bell Laboratories' Wireless Data Server

Bell Laboratories' WDS is an application-layer server designed to provide a number of innovative value-added wireless data services to mobile subscribers. WDS is both an application, in that it provides many interesting wireless data services in its own right, and a platform on which new wireless data applications can be built. In particular, many WDS modules can be reused in the implementation of new wireless data services, and many WDS services (e.g., messaging) can themselves be used as basic primitives in constructing new value-added wire-

less data services. The objectives of WDS are to explore the design principles of wireless data applications and to serve as a platform for wireless data service experimentation. Figure 6 shows a high-level pictorial view of the scope of WDS.

The design objectives of WDS call for an architecture that is modular and easily extensible to support new applications intended to operate under a diverse set of constraints imposed by their wireless operating environments. In particular, the architecture allows for protocol and network interfacing elements to be dynamically included or excluded to support networks of different qualities (e.g., bandwidth, delay) and end devices of various sophistication.

WDS has been developed over the course of three years within Bell Laboratories. Its features have been demonstrated with modified versions (to incorporate a *thin client*) of the Lucent IS-136 handset and the Philips Genie GSM handset over IS-136 and GSM air interfaces. A restricted set of WDS features was recently ported to operate over the Omnipoint network with unmodified GSM handsets. The wireless Web browsing feature (see below) of WDS makes use of CDPD networks. WDS was successfully demonstrated at the 1998 GSM World Congress, and is currently being hardened for an upcoming technical trial in an actual service provider's network.

The focus of WDS is on wireless data services for wide-area outdoor use. WDS does not quite support all the features in the scenario described earlier. As a matter of fact, it supports only a fairly modest feature set (see below). We believe it is critical for the growth of wireless data not to distract users with fancy services that cannot be adequately supported by the current air interfaces, but to focus on a core set of value-added services that bring enhanced productivity. As the available bandwidth increases, the WDS architecture scales to support more users as well as more sophisticated services.

In this section we first present the set of services WDS provides, then briefly describe its architecture, and end by illustrating a few WDS design principles. To keep the discussion brief, only selected components of WDS are presented. For a more complete description see [5, 6].

### WDS Services

The services provided by WDS can be divided into three broad classes: two-way messaging, e-mail services, and Web services. We briefly describe each class below.

*Two-Way Messaging* — WDS offers an enhanced form of two-way short messaging. Compared to traditional one-way paging, WDS messaging supports message origination (new messages as well as replies) capability and reliable delivery (i.e., messages are acknowledged). Compared to two-way messaging such as those available under GSM or Skytel [7], WDS offers the following enhanced features:
• Message query, the ability to query and retrieve status about messages sent
• Multicast, the ability to address and deliver a message to multiple recipients with only one uplink message
• Transactions, the ability of the system to actively track and correlate replies to requests
• Heterogeneity, the ability to deliver a message in a variety of media formats (e.g., page, e-mail, phone, fax) as proposed by the sender or specified in the recipient's profile

Apart from the above, WDS two-way messaging is distinguished from other forms of two-way messaging by the kinds

APPX781

DISH, Ex. 1005 - Page 8 of 14

of messages it supports. In most existing two-way messaging services (e.g., Skytel, GSM), only fixed precanned or completely free-form messages can be sent. WDS defines a novel class of messages, called *active messages*, that is specifically designed and optimized for two-way messaging. In simple terms, active messages are message templates containing variable components that can be dynamically customized on demand. It encompasses both fixed precanned and free-form messages, and is expressive for most practical applications, especially server-based ones. In addition to expressiveness, active messages can be encoded in a highly compact way to allow efficient transport over bandwidth-limited wireless links. We describe active messages in greater detail in a later section.

*E-mail Services* — WDS supports two forms of wireless e-mail access. In the first form, a subscriber interacts with WDS in about the same way as desktop mail; the main difference is that all protocol data and user messages are compressed with some specialized encoding before transmission over the wireless link. In the second form, the e-mail service is specifically tailored to be usable by mobile users even with only regular handsets. We describe in greater detail only this second form.

In this limited form, each subscriber is assigned a WDS mailbox in addition to the phone number for his/her voice service. Typical e-mail delivery in this scenario comprises two main steps: *smart notification* and *selective retrieval*. Smart notification refers to the delivery of a notification in the form of a short message to a subscriber upon the arrival of a new e-mail at the subscriber's WDS mailbox.

The "smartness" comes from the fact that the criteria for sending notification, the content of the notification, and the delivery format of the notification are all driven by a set of conditional rules defined by the subscriber and stored as part of the subscriber's profile. Typically, the conditions of the rules are expressed using standard attributes (e.g., sender, subject, time) of e-mail and their actions specify various delivery options (e.g., SMS, voice, fax, e-mail) and content.

The notification is intended to be a description (e.g., sender, subject, time, size, and attachments) of the newly arrived e-mail tailored specifically for the subscriber to let him/her decide on possible actions (e.g., delete, forward, retrieve) on the e-mail. WDS allows a subscriber to retrieve an e-mail in whole or by parts (chunks or attachments), and have the result delivered in any format convertible from the original received format. This is what is referred to as *selective retrieval*.

Selective retrieval is most useful in handling large e-mail volume and/or e-mail with multimedia attachments. It allows a subscriber to receive an e-mail part without the need to process and/or download the whole e-mail, which may consume nontrivial resources. Furthermore, the format



■ **Figure 7.** *The system architecture of WDS.*

APPX782

DISH, Ex. 1005 - Page 9 of 14

| Component | Use | Syntax | Example |
|---|---|---|---|
| Plain text | regular text | text | Care for lunch? |
| Rich text | highlight message parts | \<rich text specifier>{...} | Care for lunch \emphasize{now}? |
| Optional component | include or exclude message parts | \optional{...} | Care for lunch \optional{soon}? |
| User-defined selection | specifies a list of choices | \choice{... | ... | ...} | Care for \choice{lunch | dinner}? |
| Pre-defined variable | system defined selections | specific for each variable | Care for lunch at \time? |
| If conditional | two-way branch | \if{expr} ... \else ... \fi | \if{$r==10$} high \else low \fi |
| Case conditional | pattern branch | \case{expr} ...\or ... \or ... \esac | \case{$c$} OK \or Probably Not \esac |
| Reply component | delineate replies | \reply{...} | \reply{\choice{Yes | No}} |

■ **Table 2.** *Basic building blocks for active messages.*

conversion capability allows a subscriber to receive an e-mail part on whatever limited devices are currently available to her.

*Web Services* – WDS Web services are broken up in a way similar to e-mail services. There is a limited form that allows a subscriber to retrieve selected information from Web pages, and there is another form that resembles standard desktop Web browsing. We describe each of them below.

**Selected Web Information Retrieval** – WDS includes a component called the *Internet service gateway* that interfaces to the Internet on one side and to the subscriber network on the other. To retrieve data from the Web, a subscriber selects and originates a specially coded request for a particular Web page from his/her end device. This request terminates at the Internet service gateway, which translates it into an actual Hypertext Transfer Protocol (HTTP) request and forwards it on to the designated Web server. Upon receiving the response from the Web server, the Internet service gateway filters out the irrelevant materials, formats the desired information for display on the end device, and returns it to the subscriber.

The Internet service gateway serves as both a protocol translator (between the "lightweight" protocol used by the wireless end device and the HTTP used in the Internet) and a data filter/formatter. The Internet service gateway contains a generic filtering engine. The specific filtering steps required for processing a particular Web page are predefined in *filter scripts* written in a specially designed high-level filter specification language.

A key advantage of WDS's gateway approach is that it is transparent to the Web servers. Specifically, the Web servers as well as their information contents need not be modified or reformatted for use by mobile users. Its main limitation is that a separate filter script must be written to access each distinct Web page, although this is somewhat alleviated by the ease of writing filter scripts, and by allowing filter scripts to be installed by individual subscribers in their own user agents. A different approach to the problem is to build a new protocol infrastructure to support mobile users. The Wireless Application Protocol (WAP) Forum is working in this direction with its Wireless Markup Language (WML) proposal [8].

**Wireless Web Browsing** – The bandwidth and device constraints in a wireless environment present great challenges to Web browsing. WDS employs a combination of techniques to provide a reasonably usable wireless Web browsing service over CDPD (with about 10 kb/s effective application bandwidth). These techniques include:

• Client and server proxying: An extra pair of client-server proxies is interposed between the actual client and server to remove some of the inefficiencies of the HTTP exchanges (e.g., cache validation).
• Protocol and application data compression: HTTP protocol messages and Web responses are compressed before transmission over the slow wireless link.
• Asynchronous browsing: Multiple HTTP request/response transactions are allowed and can proceed in an asynchronous fashion.
• Prefetching: Selected Web pages may be fetched ahead of request to reduce the browsing latency.

Due to space limitations, we will highlight only our novel approach to compressing Web responses, called *npact*, in an upcoming section. Other approaches to wireless Web browsing are discussed later.

### WDS Architecture

Figure 7 shows the high-level system architecture of WDS. As shown, the WDS architecture maps almost directly to the generic architecture described in an earlier section. We make a few observations here:
• The subscriber customization module handles all configuration requests, which can come from a subscriber via any network interface. In other words, similar to the data path, a subscriber is able to customize his/her services from any network/device combination.
• Each subscriber has her own user agent, which interacts with various service modules to assist in subscriber-specific processing. User agents can be implemented as a separate process per subscriber (which may have scalability concerns) or in a distributed manner across the service modules.
• A uniform interface exists for all transcoding modules. A particular transcoder is located by consulting a transform matrix which is organized by input and output data types. Each subscriber request is tagged with an input network/device code on entry. The output network/device is dependent on the request and the subscriber profile.

### WDS Design Principles

Many design principles of WDS apply more generally to large classes of wireless data services. In the following, we illustrate two of these principles using WDS concepts.

*Asymmetric Protocol Design* – Wireless end devices are necessarily limited relative to the system; they have relatively less processing power, memory storage and battery capacity. One way to mitigate this mismatch is to have a asymmetric system and protocol design. More precisely, the wireless end device is designed to perform less complex protocol processing, store

APPX783

DISH, Ex. 1005 - Page 10 of 14



■ **Figure 8.** *An overview of* npact *operations.*

less information, and send fewer protocol messages. In other words, the wireless end device should be designed to be a relatively thin client.

**Active Messages** — WDS active messages are essentially message forms where variable components must be filled out by a subscriber before transmission. The basic building blocks of WDS active messages are shown in Table 2; their semantics should be self-explanatory.

The effort required to originate an active message from an end device is highly optimized. In particular, it minimizes the processing power required and the number of bits sent to a message index along with a *modifier*. The message coding process is complex for the receiver (the WDS system), but simple for the sender.

**npact: A Cache–Based Compaction Scheme** — *npact* [9] is an algorithm that nicely ties together compression, caching, and prefetching. It relates compression and caching by providing a way to leverage the cached objects to improve compression.

The *npact* algorithm tries to reduce the size of the transfer by "coding" the requested object in a compact form. The key observation behind our cache-based compaction technique is that instead of coding the requested object on its own, a more compact encoding can be performed by leveraging other objects already available in the client's possession. In particular, if a client already possess "similar" objects in its cache, those objects (called *reference* objects) can be used as an extended "dictionary" based on which the newly requested object may be coded. The more similar the reference objects to the requested object and the more such similar reference objects are available in the client's possession, the smaller the resulting transfer.

Our approach is a compression technique in that it tries to build a dictionary and extract out the recurring patterns. Unlike standard compression techniques such as *gzip*, though, we make use of the set of similar objects, not just the requested object itself, as the compression dictionary.

Our approach can also be viewed as a differential transfer technique in that it compresses out the similar parts, and transfers mainly the differences. However, unlike existing differential transfer techniques, our measure of similarity is not restricted to just objects from earlier versions; our approach can potentially leverage multiple objects in the client's cache.

For prefetching, one can potentially use the idea of compaction to hedge against prefetching the "wrong" objects by prefetching instead a set of objects that are most likely to be similar to the objects that will be needed in the future. This relaxes the selection criteria for prefetching and significantly alleviates the penalty of incorrect prefetching.

Figures 8 and 9 illustrate the flow of npact in the case of using it as a combination of caching, differential transfer, and compression. To be accurate, our cache-based compaction idea represents a general approach rather than a specific algorithm. At a high level, it consists of two key components:

• A selection algorithm for choosing reference objects
• An encoding/decoding algorithm to encode and decode a new object using a collection of reference objects

A specific compaction technique is obtained by providing concrete implementations of the selection and encoding/decoding algorithms.

We have instantiation of the cache-based compaction idea for reducing wireless Web browsing. Specifically, it uses:
• An efficient selection heuristic based on the structure of the URL as the selection algorithm
• A gzip-like dictionary-based compression scheme as the encoding/decoding algorithm

For HTML pages, experimental results have shown that npact works very well for many popular Web sites (by looking at various Web sites) and for most users (by looking at user access traces). Figure 10 shows the performance of npact over 20 representative Web sites when objects from different sets are randomly chosen to be the reference objects.

The technique of compaction can be applied to other domains in addition to Web browsing. For example, we believe it is applicable to many heavily formatted objects, including e-mail and Postscript files, and can potentially be a part of a generic wireless middleware layer. A more detailed description of npact is given in [9].

**User Agents** — User agents are introduced in the design of WDS for two key purposes:
1) To mitigate air interface and end device constraints
2) To enhance personalizability



■ **Figure 9.** *A typical client–server interaction.*



**■ Figure 10.** *A comparison of compression algorithms.*

Regarding 1, a user agent allows reduced uplink bandwidth usage by supporting the transmission of coded messages on the uplink. This accounts for the asymmetric nature of wireless links. The compact coding is made possible by the use of flexible messages (see below). Second, a user agent serves as a repository for the information about its end device (e.g., its on/off and message buffer status), and thus can act as the termination point for wireline signaling protocols. This keeps end device processing and state simple, and reduces the amount of signaling over the air interface. Third, the user agent eases mobility management by maintaining and providing location information to the rest of the system. Fourth, a user agent, being network-resident, is always online, unlike its end device, which can be powered off or go out of range. It allows the system to gracefully handle disconnected users. Finally, by performing intelligent processing in the user agent instead of on the end device, we account for the asymmetric nature of processing power between the network and the end device.

Regarding 2, a user agent can perform customized messaging functions (e.g., selective message forwarding and message screening). It does this by maintaining a profile for the subscriber. WDS user agents are also programmable; that is, a user can potentially install new programs into their own user agents, thus making it a true personal server. This adds another dimension to the functionalities that may be provided.

WDS user agents have a fixed part and an extensible part. The fixed part implements the basic messaging functionalities discussed above. These functionalities are generic for all user agents. For its operation, this part mimics the context of the end device (e.g., the address table, the message table) and keeps information about ongoing message delivery. The extensible part, as the name suggests, can be programmed to perform specific tasks as desired by a subscriber. Some examples include maintaining a personal calendar and retrieving specific information from a Web page.

The operation of the fixed part is straightforward; the extensible part, on the other hand, is much more complex. Strictly speaking, the extensible part specifies only a framework in which additional functions can be added to a user agent in the form of *UA programs*. A UA program is a collection of program blocks, each of which contains codes to handle messages of a specific pattern. The framework follows an event-driven model; it contains a kernel that pattern-matches incoming messages and dispatches them to the appropriate program blocks in UA programs.

A UA program can be used to provide third-party value-added functions to a message flow, or it can serve as the destination endpoint of a message flow itself. An example of the former use is the UA program shown in Fig. 11. This UA program serves a supervisory function in an order placement message interaction between a subscriber and a stock-trading server. Specifically, it ensures that enough funds are available before an order is sent to the stock server (the first *on* block), and that the balance and trade is recorded properly when a confirmation is received (the second *on* block). The general structure of the program is fairly straightforward. An *msg* block defines a message template of interest, and an *on* block defines a handler for the event specified in its guard. An *on* is activated when its guard is enabled. In this example, the guard *"new* PlaceOrder" is enabled when a new `PlaceOrder` message is originated, while the guard *"reply* PlaceOrder" is enabled when a reply to a `PlaceOrder` message is received.

An example of the latter use is message status query, where query messages sent uplink are addressed to and processed by user agents, possibly with the help of other servers in the system. It is in this regard that the extensible part bears special significance in relationship to signaling. Specifically, by addressing a message to the user agent itself, the extensible part could be used to implement direct user agent signaling functions. This turns an end device into a remote control for its user agent, and a user agent into a personal server for a subscriber.

The precise specification of UA program syntax and semantics is beyond the scope of this article (see [5]).

## Related Work

There is a significant amount of research work related to the area of wireless data networking and systems. In this section we highlight some of them.

### Wireless Systems

A wireless PDA, *parctab*, designed for in-building use is described in [10]. This wireless system uses asynchronous

```
msg PlaceOrder {
    %Action[%{"Buy"j"Sell"}e] " " %NumShares[%d]
    " of " %StockSymbol[%s] " at " %Price[%f]
    \reply{%Response[%f"Executed"j"Rejected"}e]
}
msg ErrorOrder {
    "Order not placed — insufficient funds"
} e;
extern float Balance;
on (new PlaceOrder m) {
    if (m.Action == "Buy" && m.NumShares * m.Price>Bal-
ance)
            {send e; drop m; next; }
    forward m;
}
on (reply PlaceOrder m) {
    if (m.Response == "Rejected")
            {forward m; next; }
    if (m.Action == "Buy") /* buy order */
            Balance -= m.Price * m.NumShares;
    else /* sell order */
            Balance += m.Price * m.NumShares;
    forward m;
}
```

**■ Figure 11.** *A sample user agent program.*

communication, includes filtering for multipath duplicates at the agent, and supports reliable remote procedure calls. The *Mowgli* [11] system provides improvements for Internet applications using slow wireless links using a special IP stack called Mowgli Data Channel Protocol and a modified Web protocol (MHTTP). The *Web Express* system described in [12] focuses on optimizing Web transfer. It includes a number of techniques, including file caching and forms differencing. A number of interesting mobile computing systems have been built at Carnegie Mellon University. An overview of this work, covering hardware, networking, and system software and end-user applications, can be found in [13].

### Wireless Middleware

The MOBIWARE toolkit [14] is a software middleware toolkit that provides a set of open programmable interfaces and algorithms for dealing with the complexity of supporting adaptive mobile applications. The *Rover* toolkit [15] implements an asynchronous RPC mechanism which allows remote requests to be queued and data objects to be relocated. There are also proposed specifications from the industries. HDML [16] is a simple user interface definition language for wireless devices, and the Wireless Application Architecture Specification [8] defines a set of APIs and a client software architecture for a wireless system.

### Adaptation

*Application adaptation* attempts to deal with changes in network characteristics at the application level. An adaptation scheme for a network file system (NFS)-type application which resolves file cache inconsistency in a transparent fashion is described in [17]. An approach where configuration and environment variables are used to signal to the service provisioning environment a request for change in service requirements is presented in [18]. In [19] a set of APIs between application and systems is defined to specify adaptation mechanisms for choosing the best possible streaming options. In [20] different proxies are used for different application protocols (HTTP, NFS, etc.). In [21] an optimistic scheme, which can cause inconsistency, is used to reduce Web browsing latency. A good overview of the transcoding work done at the University of California at Berkeley can be found in [22]. *Transport adaptation* attempts to deal with network changes at the transport level. In I-TCP [23], a TCP segment is broken in two, one for wireline and the other for wireless, so a more appropriate control mechanism can be used on the wireless portion of the connection. TCP snooping [24] proposes a scheme that peeks into the TCP packet headers for optimization possibilities.

### Optimization of Wireless Transfer

There exist many techniques for optimizing data transfer over wireless links, and many of the techniques described below are used in different combinations in the various adaptation schemes or wireless middleware. These techniques often trade off one resource for another. For example, compression trades off computation for bandwidth, caching trades off memory for latency (and bandwidth), and prefetching trades off bandwidth for latency. The utilities of these techniques thus depend on the service desired, the device, and the network characteristics. A brief overview of these techniques is given below.

*Compression* can be divided into lossy and lossless. Lossy compression is usually applied to graphical and audio objects, and lossless compression is applied to text and binary objects. *Caching* is frequently used to improve the performance of distributed systems. Traditional caching algorithms search for

*identical objects*. This topic has been studied extensively in the literature [25–28]. *Differencing* compares an earlier version of an object to the current one. This technique is very common in Web browsing applications, where two versions of the same URL are considered for differencing in order to reduce transfer size. *Prefetching* is based on fetching in advance the exact object that will be needed in the future. The utility of prefetching for Web browsing over a relatively slow-speed link (analog phone line) is studied in [29] using a statistical algorithm described in [30]. The utility of prefetching also depends on network pricing; for example, prefetching could be beneficial for browsing over a phone line, which is relatively low-speed, flat-rate, and circuit-based. Finally, [9] describes npact, an algorithm that integrates compression, caching, and differencing into a single framework.

## Conclusion

Most of the technological and economical obstacles against widespread adoption of wireless data are slowly being overcome. Some of the important remaining issues are the need for a precise and complete service model, seamless wireline integration, and a flexible supporting wireless middleware architecture. There is also a general lack of actual experience in deploying large-scale horizontal wireless data services by carriers and Internet service providers. The Wireless Data Server project described in this article is scheduled for a real-world trial later this year, and is a step in this direction. Contrary to the hype, wireless data will grow only slowly. It is our belief that the first form of wireless data services to take off will be simple low-bandwidth text-based services such as wireless e-mail and Web information retrieval. Higher-bandwidth services such as full multimedia e-mail and Web browsing will only follow much later. Not surprisingly, this is similar to the way wireline Internet has evolved. Taking the analogy further, wireless data services will initially be confined to fairly technical subscribers, followed by adoption for business use, and finally used by the general public. In the long run, data and voice will converge. There may be a chance that the full convergence will happen in wireless before wireline, since wireless voice is already transferred in digital bits.

### Acknowledgments

A large number of individuals have contributed to WDS, in the form of guidance, ideas, and implementation. We especially would like to thank Scott Miller, Radhika Ramakrishnan, Salim Virani, and Swapnaganda Hawaldar, who implemented most of the basic WDS infrastructure; Herman Chen, who implemented the e-mail gateway; and John Lin, who implemented the filtering mechanism for the Web gateway. Thomas La Porta and Krishan Sabnani contributed to the formulation of the initial WDS concepts, and have provided much guidance throughout.

### References

[1] Special Issue on IMT-2000: Standards Efforts of the ITU, *IEEE Pers. Commun. Mag.*, vol. 4, no. 4, Aug. 1997.
[2] E. Dahlman et al., "UMTS/IMT-2000 Based on Wideband CDMA," *IEEE Commun. Mag.*, vol. 36, no. 9, Sept. 1998.
[3] World Wide Consortium, "Extensible Markup Language (XML) 1.0," Feb. 10, 1998; http://www.w3c.org
[4] R. Ramjee, T. F. La Porta, and M. Veeraraghavan, "The use of network-based migrating user agents for personal communications services," *IEEE Pers. Commun. Mag.*, vol. 2, no. 6, Dec. 1995.
[5] T. Y. C. Woo, T. F. La Porta, and K. K. Sabnani, "Pigeon: A wireless two-way messaging system," *IEEE JSAC*, vol. 15, no. 8, Oct. 1997, pp. 1391–1405.
[6] K. K. Sabnani, T. Y.C. Woo, and T. F. La Porta, "A system for wireless data services," Savo G. Glisic and Pentti A. Leppanen, Eds., *Wireless Communications: TDMA versus CDMA*, Kluwer, 1997, pp. 205–29.

APPX786

DISH, Ex. 1005 - Page 13 of 14

[7] "Mobile Telecommunication Technologies Corporation," Skytel 2-Way Technology Backgrounder, 1995; http://www.skytel.com/products/st2way.html

[8] WAP Forum, "Wireless Application Protocol Architecture Specification V. 30-Apr-1998," Apr. 30, 1998; http://www.wapforum.com

[9] M. Chan and T. Woo, "Cached-base compaction: A new technique for optimizing Web transfer," Proc. IEEE INFOCOM, to appear, Mar. 1999.

[10] B. N. Schilit et al., "The PARCTAB mobile computing system," Proc. 4th Wksp. Workstation Op. Sys., Napa, CA, Oct. 1993, pp. 34–39.

[11] T. Alanko et al., "Mowgli: Improvements for Internet applications using slow wireless links," IEEE Symp. Pers., Indoor and Mobile Radio Commun., Helsinki, Finland, Sept. 1997, pp. 1038–42.

[12] B. C. Housel and D. B. Lindquist, "WebExpress: A system for optimizing Web browsing in a wireless environment," Proc. ACM Mobicom, Nov. 1996, pp. 108–16.

[13] Special Issue on Mobile Computing at Carnegie Mellon, IEEE Pers. Commun. Mag., vol. 3, no. 1, Feb. 1996.

[14] A. T. Campbell, "The MOBIWARE toolkit," Proc. 4th Int'l. Wksp. High Perf. Protocol Architectures (HIPPARCH '98), June 1998.

[15] A. D. Joseph and M. F. Kaashoek, "Building reliable mobile-aware applications using the Rover toolkit," Proc. ACM Mobicom, Nov. 1996.

[16] Unwired Planet, Inc., "Handheld Device Markup Language (HDML) Specification," v. 2.0, July 1997.

[17] L. B. Mummert, M. R. Ebling, and M. Satyanarayanan, "Exploiting weak connectivity for mobile file access," Proc. 15th ACM Symp. Op. Sys. Principles, Copper Mountain Resort, CO, Dec. 1995.

[18] B. N. Schilit, M. M. Theimer, and B. B. Welch, "Customerizing mobile applications," Proc. USENIX Symp. Mobile and Location-Independent Comp., Aug. 1993.

[19] B. D. Noble, M. Price, and M. Satyanarayanan, "A programming inter-face for application-aware adaptation in mobile computing," Proc. 1995 USENIX Symp. Mobile and Location-Independent Comp., Ann Arbor, MI, Apr. 1995.

[20] B. Zenel and D. Duchamp, "A general purpose proxy filtering mechanism applied to the mobile environment," Proc. ACM Mobicom, Oct. 1997.

[21] G. Banga, F. Douglis, and M. Rabinovich, "Optimistic deltas for WWW latency reduction," USENIX, 1997.

[22] A. Fox et al., "Adapting to network and client variation using infras-tructural proxies: Lessons and perspectives," IEEE Pers. Commun. Mag., Aug. 1998, pp. 10–19.

[23] A. Bakre and B. R. Badrinath, "I-TCP: Indirect TCP for mobile hosts," Proc. Int'l. Conf. Dist. Comp. Sys., Vancouver, Canada, May 1995, pp. 136–43.

[24] H. Balakrishnan et al., "A comparison of mechanisms for improving TCP performance over wireless links," Proc. ACM Sigcomm, Aug. 1996, pp. 256–69.

[25] A. Dingle and T. Partl, "Web cache coherence," Proc. 5th Int'l. World Wide Web Conf., May 1997.

[26] B. M. Duska, D. Marwood, and M. J. Feeley, "The measured access characteristics of World-Wide-Web client proxy caches," USENIX Symp. Internet Tech. and Sys., Dec. 1997.

[27] J. Gwertzman and M. Seltzer, "World-Wide Web cache consistency," Proc. of the USENIX Tech. Conf., 1996.

[28] D. Wessels and K. Claffy, "ICP and the Squid Web cache," IEEE JSAC, vol. 16, no. 3, Apr. 1998, pp. 345–57.

[29] V. N. Padmanabhan and J. C. Mogul, "Using predictive prefetching to improve World Wide Web latency," Comp. Commun. Rev., July 1996.

[30] J. Griggioen and R. Appleton, "The design, implementation, and evalu-ation of a predictive caching file system," Tech. rep. CS-264-96, Dept. of Comp. Sci., Univ. of Kentucky, Lexington, June 1996.

## Biographies

MUN CHOON CHAN [M '97] (munchoon@research.bell-labs.co) received a B.S. degree from Purdue University, West Lafayette, Indiana, in 1990, and M.S. and Ph.D. degrees from Columbia University, New York, in 1993 and 1997, respectively, all in electrical engineering. From 1991 to 1997, he was a member of the COMET reseach group at Columbia, working on ATM con-trol and management. Since 1997 he has been a member of technical staff at Bell Laboratories, Lucent Technologies. His current interests include wire-less systems and network management.

THOMAS Y. C. WOO (woo@research.bell-labs.com) received a B.S. (first-class honors) degree in computer science from the University of Hong Kong in 1986, and M.S. and Ph.D. degrees in computer science from the University of Texas at Austin in 1988 and 1994, respectively. He joined AT&T Bell Lab-oratories in 1994. He is currently a member of technical staff in the Net-working Software Research Department at Bell Laboratories, Lucent Technologies. In the last few years he had worked mostly in the area of Internet protocols, wireless data networking, and network security. His cur-rent research interests include router design and implementation, Internet protocols, security, wireless networking, and Web technologies. He has served as a program committee member for the 1997 IEEE International Conference on Network Protocols, an area technical program chair for IEEE INFOCOM '98, and a program committee member for the 1999 ACM SIG-COMM.

APPX787

DISH, Ex. 1005 - Page 14 of 14


LIBRARY OF CONGRESS
AUG 2 8 2001
COPY
COPYRIGHT OFFICE
II

**Proceedings**

# The Second IEEE Workshop on Internet Applications

# WIAPP 2001

### July 23–24, 2001
### San Jose, California

*Sponsored by*

The IEEE Computer Society

*and*

The IEEE Computer Society's Technical Committee
on the Internet (TCI)



IEEE
COMPUTER
SOCIETY



## Los Alamitos, California

Washington · Brussels · Tokyo

DISH, Ex. 1019 - Page 1 of 14

Copyright © 2000 by The Institute of Electrical and Electronics Engineers, Inc.
All rights reserved

*Copyright and Reprint Permissions*: Abstracting is permitted with credit to the source. Libraries may photocopy beyond the limits of US copyright law, for private use of patrons, those articles in this volume that carry a code at the bottom of the first page, provided that the per-copy fee indicated in the code is paid through the Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923.

Other copying, reprint, or republication requests should be addressed to: IEEE Copyrights Manager, IEEE Service Center, 445 Hoes Lane, P.O. Box 133, Piscataway, NJ 08855-1331.

*The papers in this book comprise the proceedings of the meeting mentioned on the cover and title page. They reflect the authors' opinions and, in the interests of timely dissemination, are published as presented and without change. Their inclusion in this publication does not necessarily constitute endorsement by the editors, the IEEE Computer Society, or the Institute of Electrical and Electronics Engineers, Inc.*

IEEE Computer Society Order Number PR01137
ISBN 0-7695-1137-6
ISBN 0-7695-1138-4 (case)
ISBN 0-7695-1139-2 (microfiche)
ISSN 1530-1354

*Additional copies may be ordered from:*

| IEEE Computer Society | IEEE Service Center | IEEE Computer Society |
|---|---|---|
| Customer Service Center | 445 Hoes Lane | Asia/Pacific Office |
| 10662 Los Vaqueros Circle | P.O. Box 1331 | Watanabe Bldg., 1-4-2 |
| P.O. Box 3014 | Piscataway, NJ 08855-1331 | Minami-Aoyama |
| Los Alamitos, CA 90720-1314 | Tel: + 1 732 981 0060 | Minato-ku, Tokyo 107-0062 |
| Tel: + 1 714 821 8380 | Fax: + 1 732 981 9667 | JAPAN |
| Fax: + 1 714 821 4641 | http://shop.ieee.org/store/ | Tel: + 81 3 3408 3118 |
| http://computer.org/ | customer-service@ieee.org | Fax: + 81 3 3408 3553 |
| csbooks@computer.org | | tokyo.ofc@computer.org |

Editorial production by Frances M. Titsworth

Cover art production by Joseph Daigle/Studio Productions

Printed in the United States of America by The Printing House



IEEE
COMPUTER
SOCIETY

# Table of Contents
## The Second IEEE Workshop on Internet Applications
## WIAPP 2001

Message from the Conference Chair ..................................................................... vii

Conference Organization ................................................................................. viii

## Application Infrastructure

A New TWIST on Mobile Computing: Two-Way Interactive Session Transfer ............................... 2
   *T. Phan, R. Guy, J. Gu, and R. Bagrodia*

Stereoscopic Video Transmission over the Internet ...................................................... 12
   *M. Johanson*

W@nderland: Image-Based Constructable Virtual Space on the WWW ....................................... 20
   *T. Nakao, M. Tsukamoto, T. Ogawa, Y.-H. Loh, M. Miyamae, and S. Nishio*

## Infrastructure

True Anonymity without Mixes ............................................................................ 32
   *C. Molina-Jiménez and L. Marshall*

Monitoring and Controlling Internet Based E-Services .................................................. 41
   *A. Sahai, V. Machiraju, and K. Wurster*

## Caching and Consistency

Using Performance Maps to Understand the Behavior of Web Caching Policies ......................... 50
   *C. Murta and V. Almeida*

BuddyCache: Cache Coherence for Transactional Peer Group Applications ............................. 57
   *M. Bjornsson and L. Shrira*

Exploring the Benefits of a Continuous Consistency Model for Wireless Web Portals ............... 65
   *J. Rajendiran, J. Patwardhan, V. Abhijit, R. Lakhotia, and A. Vahdat*

## Panel session: Ubiquitous Computing and the Internet

The Networked Physical World: An Automated Identification Architecture ............................ 76
   *D. Engels, J. Foley, J. Waldrop, S. Sarma, and D. Brock*

Infrastructure Support for Pervasive and Ubiquitous Computing
   *A. Fox*

Directions in Ubiquitous Computing: A Position Statement ......................................... 78
   *O. Omojokun and P. Dewan*

Scalable and Self-Organizing (Meta) Data Dissemination for
Ubiquitous Computing ................................................................................ 80
   *A Vahdat*

DISH, Ex. 1019 - Page 3 of 14

## Keynote

Eric Brewer
*Associate Professor, University of California at Berkeley*
*Chief Scientist, Inktomi*

## User Interfaces

Click-Once Hypertext: Now You See It, Now You Don't ...................................................84
  *F. Douglis, S. Jain, J. Klensin, and M. Rabinovich*
FlexScope: Support for Browsing Multiple Pages on the Web.......................................94
  *B. Wei, H. Huang, A. Filner, and K. Li*
Web&: An Architecture for Non-interactive Web .........................................................104
  *S. Phatak, V. Esakki, B. Badrinath, and L. Iftode*

## Scalability

Server Switching: Yesterday and Tomorrow .................................................................114
  *J. Chase*
Content Distribution Architecture Using Network Layer Anycast.............................124
  *G. Agarwal, R. Shah, and J. Walrand*
Domain Caching: Building Web Services for Live Events ...........................................133
  *V. Vellanki and A. Chervenak*
Maintaining Replicated Redirection Services in Web-Based Information Systems .................143
  *K. Dasgupta and K. Kalpakis*

## Panel: Security and Privacy

Security analysis of ICQ
  *T. Fitz and A. Stamos*
Digital Rights Management on Open and Semi-Open Networks .............................154
  *M. Välimäki and O. Pitkänen*


Author Index ......................................................................................................................156

DISH, Ex. 1019 - Page 4 of 14

# A New TWIST on Mobile Computing: Two-Way Interactive Session Transfer

Thomas Phan, Richard Guy, Jing Gu, and Rajive Bagrodia

*The University of California at Los Angeles*
*Computer Science Department*
*Los Angeles, CA 90095*
{phantom,rguy,cilla_gu,rajive}@cs.ucla.edu
http://pcl.cs.ucla.edu/projects/imash/

## Abstract

*The ubiquitous use of computer resources for daily productivity is a goal that presently remains unrealised. We believe that the convergence of desktop and mobile applications into a seamless computing experience will provide a strong motivation for future "anytime, anywhere computing." In this paper we describe this convergence as the capability to perform the handoff of application sessions across heterogeneous platforms using the network as a conduit. In addition to discussing the architecture and protocols to facilitate this capability, in this paper we also provide a taxonomy for describing a variety of different session handoff schemes. In particular, we have identified an important Two-Way Interactive Session Transfer (TWIST) behaviour for communication between heterogeneous clients and servers. To demonstrate our concepts, we have implemented the handoff capability with TWIST semantics into a real-world application that serves as a teaching tool for radiology clinicians. From experimental data we will show that the handoff mechanism incurs little delay to transfer large data-laden sessions.*

## 1  Introduction

The integration of mobile computing into ubiquitous everyday use remains an elusive goal. Reaching the ultimate target of "anytime, anywhere computing" will allow users to perform daily needed computer activities on any machine at any time and at any location. However, this vision will continue to be clouded by significant platform heterogeneity issues unless one is satisfied with a least common denominator computing platform impaired by limited CPU power, storage volume, display capability, Internet connectivity, and software interface. We posit that there is an additional difficulty: the lack of convergence of desktop and mobile device software has formed a chasm of noninteroperability that has hitherto been unbridged. The consolidation of applications sessions on these disparate platforms into a seamless, uninterrupted computing experience will motivate the public migration towards a more sophisticated and useful mobile computing behaviour.

This use of mobile computing in the public sector is the general form of the specific application domain we are investigating. As part of the Interactive Mobile Application Support for Heterogeneous Clients [1] (iMASH) research project [1], we have been investigating the complexities related to the convergence of applications running on desktop and mobile platforms connected to wide-area networks such as the Internet. The iMASH project is a multi-year, multi-discipline collaborative effort geared towards the development and deployment of a wireless computing infrastructure to aid physicians and their staff in a new state-of-the-art UCLA clinical

and research hospital being built for this nascent millennium. Our work is intended to enable a new degree of mobile flexibility to augment available wired services. While iMASH has many facets of research, including quality of service provisioning, security, and embedded systems integration, in this paper we focus on the core aspect of application session handoff between platforms.

With the session handoff mechanism, we envision physicians and staff running their typical applications continuously across client platforms which communicate with an Application Server acting as a data repository. The clients may be some set of desktop workstations, laptops, display tablets, handheld pocket computers, or personal digital assistants (PDAs), all of which have their own diverse bandwidth, display, and computation characteristics. Despite this degree of client machine variation, users will be able to seamlessly move an application's session from one machine to another machine running some version of the same application. This session transfer will use the network as a conduit, thereby allowing sessions to be suspended and restored from any network-connected location. The iMASH system shields the user from any complexities and provides near-instantaneous and uninterrupted computing convergence between platforms. To facilitate this functionality, we place a cadre of Middleware Servers as a new layer between the clients and the Application Server.

In this paper we describe the design of the architecture and protocols that enable this session handoff capability. From our research we have identified a taxonomy that allows us to characterise varying session handoff schemes. In particular, we have isolated a general-case behaviour which requires bidirectional interactivity between end clients and application servers that complicate the matter of handoff; we term the handoff in the face of this complexity the Two-Way Interactive Session Transfer (TWIST), which is the crux of this paper. We have further categorised types of operations performed at the clients that are differentiated by the nature of their operations on object data types.

To demonstrate the feasibility of our research, we have implemented the TWIST capability into a real-world Internet application called the Teaching File used as a pedagogical tool for clinical professors. From experiments performed on this system, we have seen that our protocols incur little performance cost; most overhead was due to the communication API we chose to implement our solution. Even when operating on large data sets of up to 100,000 bytes, our handoff functionality typically completes in under 2 seconds.

The rest of this paper is organised in the following manner. In §2 we discuss work that bears semblance to our own and then explain the details of the Two-Way Interactive Session Transfer in §3. We describe our implementation of TWIST for the Teaching File application in §4 and show experimental results in §5. Finally, we summarise our work and suggest future directions in §6.

[1]This work was graciously funded by National Science Foundation award ANI-9986679.

0-7695-1137-6/01 $10.00 © 2001 IEEE

APPX1327

DISH, Ex. 1019 - Page 5 of 14

  

**Figure 1**: A physician is alerted to new clinical information as part of his application session on his PDA.

**Figure 2**: After handoff, the physician's session has moved from his PDA to his desktop.

**Figure 3**: After another handoff, the session is now available on a laptop.

## 2 Related Work

The notion of session transfer among various platforms partially mirrors the well-known concept of process migration [8] [10] found in the context of fault-tolerance and load-balancing. However, process migration requires an *entire* address space to be moved among *homogeneous* clients. Our handoff moves a *subset* of the address space among *heterogeneous* clients.

Our Middleware Servers are capable of performing filtration of data. Such content filtration, or distillation, can occur on a variety of original data objects, such as the reduction in resolution and colour of an image or the reduction of entries in an access log. The use of filtration to reduce the data bulk to aid low-bandwidth devices has been explored in other research such as [11], [4], and [3], but generally these efforts stopped short of considering semantic impacts of distillation.

Finally, the guiding tenet of the iMASH architecture – ubiquitous computing on many devices – parallels the goal of other research groups, but iMASH is unique in its principal of providing a seamless session handoff capability. The Ninja project [7] facilitates wide-area computing services with a distributed computing architecture; this research tackles such issues as scalability and security in their services. The iRoom program [5] provides a rich environment for multi-user interactivity using wireless handheld devices but does not delve into transparent session transfer.

## 3 The Two-Way Interactive Session Transfer

We begin our discussion of the Two-Way Interactive Session Transfer (TWIST) by first describing the mobile computing facility under study, augmenting this facility with a hardware/software architecture that provides session handoff, and then generalising the handoff concept to incorporate two-way transfer semantics.

### 3.1 A Conceptual Mobile Physician

We proceed to describe how we envision a physician, armed with computing platforms enabled with our iMASH technology, can perform daily activities. In Figures 1-3 we illustrate the clinical scenario that has fomented the iMASH research project. In this mockup of our expected operating conditions, a physician requires clinical data access from numerous locations using a variety of machines that exhibit different computation, display, and bandwidth characteristics. In Figure 1 the physician is alerted to and informed

of new clinical data on a small PDA with modest bandwidth and display capabilities. Typical information to be displayed would be the patient symptoms and medical history, available treatment facilities, and perhaps some multimedia data.

The physician decides to investigate the information further on his more powerful desktop workstation and so *transfers his active application session* from his PDA to his desktop, as shown in Figure 2. The state of his data on the PDA, such as rendered images, textual annotations, and user preferences, is automatically sent to a functionally similar application on his workstation. The result of this operation, which we call *Application Session Handoff* (ASH), is that the user experiences little disruption in program usage continuity and is presented with similar if not the same data at both locations. Note that the user has not explicitly saved data to an intermediary destination and then reinstantiated it on the other platform; the physician's sole responsibility is to recognise that his duties would be better served by migrating to another machine, indicating to the iMASH system to make it so (with something as simple as a push of a button), and then continuing his actions on the second machine. The iMASH runtime system provides the mechanism to perform these actions seamlessly and automatically. In Figure 3 we see the physician has decided to move again, this time to a laptop/handheld-PC class of machinery to consult with another physician at another location. The iMASH system has once again provided the capability to move his data accordingly to this new platform.

### 3.2 Application Session Handoff

From this developmental scenario, we can identify the various computing entities involved in our cast. We assume all pre-existing data originates from an **Application Server** (AS) driven by some database management system. We note that such systems are commonly legacy machines whose programming interface must remain inviolate. The users in this system can access the AS from a variety of **Clients** ($C_1$, $C_2$, ... $C_n$) with differing characteristics. In order to allow the applications on these clients to interact with the iMASH environment, we insert small portions of code into these programs, so we require that such applications be open-source. We emphasise here that we are modifying only the Clients and not the Application Servers. The most important hardware portion of our iMASH architecture is the distributed **Middleware Server** (MWS) layer placed between the AS and the clients. The MWS tier will play a variety of roles within iMASH, but in the context of this paper we shall concentrate on a sole Middleware Server and its actions that enable application session handoff.

APPX1328

DISH, Ex. 1019 - Page 6 of 14

We describe the behaviour of an application session handoff by providing the following example. A user begins an iMASH-enabled application on client $C_1$ and wishes to retrieve data from the AS. The client application is iMASH-aware and contacts the MWS that is providing it with service. Upon receiving the data-retrieval request from $C_1$, the MWS contacts the AS to receive this data. The AS returns the data to the MWS, which caches the data object and provides a copy to the requesting client $C_1$. Depending on the characteristics of the client and the connection bandwidth, the data object may be filtered by the MWS to reduce its size. The user then interacts with the data for some period of time. The degree of user interaction on the data will have a significant impact on the behaviour of the system as a whole, which we shall shortly discuss. When the user decides to move his session he activates the handoff mechanism from his client software on $C_1$ to either suspend his session (to be later reinstantiated explicitly from another machine) or to launch the session immediately on a target platform $C_2$. Let us assume for the time being that the user has not performed any modifications to the data object at $C_1$ (a specific case of a more general behaviour we shall soon discuss). The MWS receives the ASH request from the client and proceeds to send the cached original object to $C_2$; in this case, $C_1$ did not need to send its unmodified data back to the MWS. Again, filtering of this cached object may be performed to meet the bandwidth or computational limitations of $C_2$. The application at $C_2$ receives this data and reinstantiates the session, thereby allowing the user to continue work with little to no disruption.

The data object in the preceding scenario is application-dependent. In many cases the application session can be summarised as simply the state of the crucial data structures upon which the application acts. We posit that in no case is the application session the entire address space, thereby differentiating this approach from that of general process migration. The savings in bytes of a strict subset of the address space can be several orders of magnitude. Additionally, handoff of application data is generally OS- and architecture-independent whereas process migration relies heavily on OS and architecture homogeneity.

We categorise varying types of application session handoff as a function of allowable user interactivity with client data. In a *one-way, non-interactive session transfer*, data is initially delivered from the AS to the client with the express understanding that any user modifications to data at the client will not be propagated elsewhere. In this simple system, clients can send data requests but may further act only as data sinks. An ostensibly simple example is the behaviour of data presentation on some current mobile devices. When a user peruses, for example, his stock portfolio kept on Yahoo.com, the information is sent from the Yahoo AS to his mobile client. When he moves to another client and views his stocks again, it appears as if his "session" had been moved from his device to his second client. However, strictly speaking, this is *not* a handoff because he had reinstantiated his information from the originating AS again (the Yahoo website) to have his data delivered to his second client. This widely used form of data mobility incurs extra delay because the AS must be invoked a second time.

A second category of session handoff is *one-way, interactive session transfer*. In this scenario, data again is delivered to the client, but the user can make interactive modifications to other portions of data that originate not from the AS but from the client application and are modifiable in all regards by the user. This secondary data is transferred along with the application session and is reinstantiated at a second client. A particular example is the mechanism we have shown in [12] for implementing session transfer of

the Mozilla web browser. In this case, the data being delivered from the AS is a typical set of webpages. However, at the client, the user is free to make modifications to other important data, such as the bookmark list, user preferences, and URL history, that will be transferred upon session handoff. Note that this modifiable data reaches the second client by going through the MWS as part of the session handoff but never propagates back to the AS.

The third category of session handoff, the *two-way, interactive session transfer*, is the crux of this paper. This type of handoff allows for all data to be modifiable at the client end, including data meant to be saved back to the AS. This capability raises important issues of performance and semantics, which we shall address in the next section.

## 3.3 Handoff with a TWIST

A two-way, interactive session transfer involves the handoff of possibly modified data from one client to another. The transferred data could have originated from the AS, in which case the handoff mechanism semantics become more rigid: if data from the AS is modified at $C_1$, then upon handoff this data is *not* immediately saved back to the AS (in order to be reinstantiated at $C_2$). Instead, this state is delivered to the MWS, which sends it to the second client, thereby shielding the AS from the handoff details. This duty performed by the MWS grants us two important accommodations: (1) we do not have to modify the AS, and since it could very well be a legacy system, altering it to implement a handoff mechanism could be prohibitively difficult; and (2) the AS is allowed to maintain its API and perform its operations without having to deal with any additional complexity of supporting handoff.

With this in mind, it is now clear how a system implementing these semantics is superior. Consider a similar but non-iMASH-enabled system wherein a user saves his session in order to move to another platform. The user has two choices: (1) He can save to an intermediate medium (such as a floppy disk) or, equivalently, send the data explicitly to another storage point (as with FTP). Here the user must make the explicit effort to perform these tedious and most likely slow actions. Another option is that (2) he can save his data back to the AS. Note, however, the implications that come with this latter choice. The user must save his session, in whatever incomplete form it may be, back to a possibly world-accessible data storage point on the AS and in such a way so it will not overwrite the original data object. Once he moves to his second client, he must recall which data object to activate and incur another access to the AS. This scenario is not so much session transfer as it is a simplistic shutdown-and-restart. With a TWIST in place, the semantics are very different. The session being transferred can be in any state of completeness and yet will never be accessible to anyone except the user because it will never be physically returned on the AS until the user explicitly saves back (at which time presumably the user has deemed the data to be fit for storage at the AS). To the best of our knowledge, no research has dealt with the issue of the transfer of modifiable application sessions between heterogeneous clients.

To further expedite our discussion and to lend a quantitative flavouring to this topic, we introduce more notation to characterise the behaviour of our system. As noted before, our system is designed to allow for the filtration, or content adaptation, of data sent from the MWS to the various clients. We can specify the client's characteristics in a device profile that will be made available to the

4

We describe the behaviour of an application session handoff by providing the following example. A user begins an iMASH-enabled application on client $C_1$ and wishes to retrieve data from the AS. The client application is iMASH-aware and contacts the MWS that is providing it with service. Upon receiving the data-retrieval request from $C_1$, the MWS contacts the AS to receive this data. The AS returns the data to the MWS, which caches the data object and provides a copy to the requesting client $C_1$. Depending on the characteristics of the client and the connection bandwidth, the data object may be filtered by the MWS to reduce its size. The user then interacts with the data for some period of time. The degree of user interaction on the data will have a significant impact on the behaviour of the system as a whole, which we shall shortly discuss. When the user decides to move his session he activates the handoff mechanism from his client software on $C_1$ to either suspend his session (to be later reinstantiated explicitly from another machine) or to launch the session immediately on a target platform $C_2$. Let us assume for the time being that the user has not performed any modifications to the data object at $C_1$ (a specific case of a more general behaviour we shall soon discuss). The MWS receives the ASH request from the client and proceeds to send the cached original object to $C_2$; in this case, $C_1$ did not need to send its unmodified data back to the MWS. Again, filtering of this cached object may be performed to meet the bandwidth or computational limitations of $C_2$. The application at $C_2$ receives this data and reinstantiates the session, thereby allowing the user to continue work with little to no disruption.

The data object in the preceding scenario is application-dependent. In many cases the application session can be summarised as simply the state of the crucial data structures upon which the application acts. We posit that in no case is the application session the entire address space, thereby differentiating this approach from that of general process migration. The savings in bytes of a strict subset of the address space can be several orders of magnitude. Additionally, handoff of application data is generally OS- and architecture-independent whereas process migration relies heavily on OS and architecture homogeneity.

We categorise varying types of application session handoff as a function of allowable user interactivity with client data. In a *one-way, non-interactive session transfer*, data is initially delivered from the AS to the client with the express understanding that any user modifications to data at the client will not be propagated elsewhere. In this simple system, clients can send data requests but may further act only as data sinks. An ostensibly simple example is the behaviour of data presentation on some current mobile devices. When a user peruses, for example, his stock portfolio kept on Yahoo.com, the information is sent from the Yahoo AS to his mobile client. When he moves to another client and views his stocks again, it appears as if his "session" had been moved from his device to his second client. However, strictly speaking, this is *not* a handoff because he had reinstantiated his information from the originating AS again (the Yahoo website) to have his data delivered to his second client. This widely used form of data mobility incurs extra delay because the AS must be invoked a second time.

A second category of session handoff is *one-way, interactive session transfer*. In this scenario, data again is delivered to the client, but the user can make interactive modifications to other portions of data that originate not from the AS but from the client application and are modifiable in all regards by the user. This secondary data is transferred along with the application session and is reinstantiated at a second client. A particular example is the mechanism we have shown in [12] for implementing session transfer of

the Mozilla web browser. In this case, the data being delivered from the AS is a typical set of webpages. However, at the client, the user is free to make modifications to other important data, such as the bookmark list, user preferences, and URL history, that will be transferred upon session handoff. Note that this modifiable data reaches the second client by going through the MWS as part of the session handoff but never propagates back to the AS.

The third category of session handoff, the *two-way, interactive session transfer*, is the crux of this paper. This type of handoff allows for all data to be modifiable at the client end, including data meant to be saved back to the AS. This capability raises important issues of performance and semantics, which we shall address in the next section.

## 3.3 Handoff with a TWIST

A two-way, interactive session transfer involves the handoff of possibly modified data from one client to another. The transferred data could have originated from the AS, in which case the handoff mechanism semantics become more rigid: if data from the AS is modified at $C_1$, then upon handoff this data is *not* immediately saved back to the AS (in order to be reinstantiated at $C_2$). Instead, this state is delivered to the MWS, which sends it to the second client, thereby shielding the AS from the handoff details. This duty performed by the MWS grants us two important accommodations: (1) we do not have to modify the AS, and since it could very well be a legacy system, altering it to implement a handoff mechanism could be prohibitively difficult; and (2) the AS is allowed to maintain its API and perform its operations without having to deal with any additional complexity of supporting handoff.

With this in mind, it is now clear how a system implementing these semantics is superior. Consider a similar but non-iMASH-enabled system wherein a user saves his session in order to move to another platform. The user has two choices: (1) He can save to an intermediate medium (such as a floppy disk) or, equivalently, send the data explicitly to another storage point (as with FTP). Here the user must make the explicit effort to perform these tedious and most likely slow actions. Another option is that (2) he can save his data back to the AS. Note, however, the implications that come with this latter choice. The user must save his session, in whatever incomplete form it may be, back to a possibly world-accessible data storage point on the AS and in such a way so it will not overwrite the original data object. Once he moves to his second client, he must recall which data object to activate and incur another access to the AS. This scenario is not so much session transfer as it is a simplistic shutdown-and-restart. With a TWIST in place, the semantics are very different. The session being transferred can be in any state of completeness and yet will never be accessible to anyone except the user because it will never be physically returned on the AS until the user explicitly saves back (at which time presumably the user has deemed the data to be fit for storage at the AS). To the best of our knowledge, no research has dealt with the issue of the transfer of modifiable application sessions between heterogeneous clients.

To further expedite our discussion and to lend a quantitative flavouring to this topic, we introduce more notation to characterise the behaviour of our system. As noted before, our system is designed to allow for the filtration, or content adaptation, of data sent from the MWS to the various clients. We can specify the client's characteristics in a device profile that will be made available to the

4

DISH, Ex. 1019 - Page 7 of 14

MWS. (In some cases the filtration mechanism can be the identity operator.) With this in mind, we define:

$o \equiv$ the original data object

$f_i \equiv$ the filtration mechanism being applied to suit the bandwidth and computation limitations of client $C_i$

$f_i(o) \equiv$ the resultant data object after filtration has occurred. Note that $f_i(o)$ is type-equivalent to $o$.

Once data object $f_i(o)$ is delivered to the client, the application accepting this data may provide the user with a means to modify the data. Such modifications may include basic graphical manipulations, changes to text, or perhaps even wholesale deletion. We thus denote:

$g_i \equiv$ the user modification being performed on data object $f_i(o)$ at $C_i$

$g_i \cdot f_i(o) \equiv$ the resultant data object after user modification has occurred on $f_i(o)$.

The TWIST can be expressed in the aforementioned terms and is shown in Figure 4. As the session begins, (1) the AS returns data object $o$ to the MWS, which is immediately cached. (2) The MWS filters $o$ to suit the limitations of $C_1$ by applying the filter function $f_1$ to $o$; client $C_1$ thus receives $f_1(o)$ from the MWS. (3) The user at $C_1$ proceeds to modify the data by applying an operation $g_1$ to the object, resulting in $g_1 \cdot f_1(o)$. At this point the user wishes to perform application session handoff to another machine. Because this is a *two-way interactive* transfer, the result of the operation $g_1$ at $C_1$ must be made visible to $C_2$ when the session is reinstantiated. The modified form of the data must thus be made available at the MWS so that it can be sent to $C_2$. We note for now that (4) upon handoff, only $g_1$ is sent back to the MWS. (This is an optimisation we shall explain shortly.) (5) The MWS needs $g_1 \cdot f_1(o)$, so it takes the $o$ that was cached, the $f_1$ that was known a priori, and the $g_1$ delivered from $C_1$. (6) The result is passed through $f_2$, the content filter for $C_2$. (7) Finally, $f_2 \cdot g_1 \cdot f_1(o)$ is delivered to $C_2$.

We now make the first of three important observations that will affect performance optimisation and data consistency. First, we note that *the MWS acts as a natural proxy that can act on the behalf of the clients*. We have already stated that the MWS can perform data filtration on data to match the limitations of the clients. Furthermore, the MWS can perform CPU-, IO-, or other resource-intensive processing for the client and pass the result onwards. In such a situation the MWS must be provided the means for doing so (usually in the form of executable object code).

Our second observation involves the critical pathway between the clients and the MWS. For the time being, suppose that $C_2$ expects to receive, after data filtration, $f_2 \cdot g_1 \cdot f_1(o)$. In words, this form represents the filtration for $C_2$ ($f_2$) of the data after modification at $C_1$ ($g_1$) of the data filtration for $C_1$ ($f_1$) of the original object ($o$). (We shall see shortly that this particular pattern need not be the case.) For $C_2$ to receive this, the MWS must have $g_1 \cdot f_1(o)$ in order to perform $f_2$ on that object. However, in order to perform the handoff, $C_1$ need not send the entire $g_1 \cdot f_1(o)$ back to the MWS. It suffices to send back *solely the operation $g_1$ to the MWS*, because the MWS already has both $o$ and $f_1$ available to it: $o$ was cached when it was first fetched from the AS, and $f_1$ was known a priori because $C_1$'s device profile was known. In this



**Figure 4**: Handoff of an application session following strict sequencing.

case, the MWS can reapply $g_1$ to $f_1(o)$, pass the result through $f_2$, and send that object to $C_2$. There are three issues of note here: (1) We assume that the operation $g_1$ can be sent in isolation from $C_1$ back to the MWS. In our research we have seen that many types of operations can be represented in XML [6] and can be thus orders of magnitude smaller than a binary object represented by $g_1 \cdot f_1(o)$. Additionally, (2) we assume that code to apply $g_1$ already exists at the MWS or can be dynamically shipped from $C_1$ to the MWS. Finally, (3) we assume that the reapplication of $g_1$ to $f_1(o)$ takes less time than that for the transmission of $g_1 \cdot f_1(o)$ over the network from $C_1$ to the MWS. This assumption is typically valid because (a) we assume that the computational power of the MWS dwarfs that of the clients and (b) the network bandwidth between clients and the MWS is certainly finite if not very limited.

Our third observation is that when the session is handed off to $C_2$, the following question naturally arises: what exactly is sent to $C_2$? If one follows the principle of least astonishment, one would expect that $C_2$ would receive $f_2 \cdot g_1 \cdot f_1(o)$ as was expressed in the previous paragraph. We shall term this the strict sequencing method since it follows the flow of execution precisely as was shown in Figure 4.

However, another alternative exists, namely $f_2 \cdot g_1(o)$. This series implies that we deem the filtration $f_1$ to be unimportant to the final result being sent to $C_2$ because it is $g_1$ that is the critical modification that must be transferred. Consider the case where the original data object is a 16-bit colour image that results from a full-body nuclear scan of a patient[2]. Suppose the user is working on a client that requires an $f_1$ filtration; for instance the image needs to be reduced down to an 1-bit black-and-white image for his PDA. Upon receiving the image, the physician is able to determine that the patient has a cancerous growth and draws a circle around a particular portion of the image. This graphical annotation is the $g_1$ operation being performed at $C_1$. The doctor then decides to

---

[2] Such scans are typically used to determine if a bodily abnormality is the result of arthritis or a cancer metastasis.

DISH, Ex. 1019 - Page 8 of 14

move his session to another client that requires its own $f_2$ filtration. Does the second client need to receive $f_2 \cdot g_1 \cdot f_1(o)$ or simply $f_2 \cdot g_1(o)$? In this case, *omitting $f_1$ and using $f_2 \cdot g_1(o)$ will suffice because the annotation operation $g_1$ is what is important, not the filtration operation $f_1$*: at $C_2$, the doctor will again be able to see his graphical annotation. Additionally, since a second filtration $f_2$ needs to be applied, a better quality image would result if $f_2$ were applied to an image as close to the original as possible; in this case $f_2 \cdot g_1(o)$ may result in a higher-quality image than $f_2 \cdot g_1 \cdot f_1(o)$. (Performing a filtration of a filtration is like any other lossy operation, such as a photocopy of a photocopy.)

We must note that in this case, the pattern of $f_2 \cdot g_1(o)$ (instead of $f_2 \cdot g_1 \cdot f_1(o)$) is acceptable only due to the nature of the $g_1$ operation that was performed. To further explain this observation, we now make the following categorisation for operations that can be performed at clients An operation $g$ is *syntactically-dependent* if it can be applied validly only to a particular domain of operands. For instance, suppose an operation involves the inversion of bits of an image (so that black becomes white and vice versa). In this case , the operation is valid for 1-bit images but has no clear analogue for colour images. We say that this operation is syntactically dependent upon the characteristics of its operand. An operation $g$ is *syntactically-independent* if it can be applied to an operand regardless of whether a filtration $f$ had been performed on that operand. Image rotation and translation are examples of such functions.

An operation is *semantically-dependent* if its semantic value depends on the filtered image. Consider the case where the original image is a 16-bit colour picture, client machine $C_1$ has an 8-bit colour display, and $C_2$ has a 1-bit black-and-white display. At $C_1$, the user annotates the image with something as simple as the following phrase: "Please make a note of the blue area." At $C_1$ the user is fully capable of determining that the image has shades of blue, but when he transfers his session to $C_2$ with its 1-bit display, he will not be able to see any blue at all! In this case we say the modification is semantically dependent on the filtered image; the change was syntactically valid, but its semantic sense has been lost. Analogously, an operation is *semantically-independent* if its semantic meaning does not change even across different filtrations.

The iMASH system handles the issue of syntactic dependence in the following manner. When a client application is iMASH-enabled, all available user modifications are enumerated and conservatively labelled as being either syntactically dependent or independent. (This task is tractable because we envision either providing our API to developers of new applications or modifying existing applications that perform a focused scope of operations.) The results of syntactically-independent operations performed by the user are visible after handoff to a second client. However, syntactically-dependent operations are not visible after handoff, although the user is free to perform them on the first client. This conclusion is due to the fact that we want to send to $C_2$ the object $f_2 \cdot g_1 \cdot f_1(o)$ instead of $f_2 \cdot g_1 \cdot f_1(o)$ as was previously discussed. In this case, we would warn the user that he is performing a modification that will not be reflected in the session state after handoff.

Dealing with semantic dependence is a more complicated issue. To handle this difficulty, the iMASH system must provide the user with some information pertaining to the nature of the data filtration that occurred at the MWS. For instance, the user may be alerted that the image he is viewing has been reduced in colour and resolution. Once this caveat is available, the user is free to make semantically-dependent modifications at his own discretion. Both semantically-dependent and -independent operations are vis-

ible after handoff.

## 3.4 Leveraging XML

In our architecture we have taken advantage of XML, the eXtensible Markup Language. XML is known for its expressive data description capability and is a de facto standard in industry. By using textual markup tags, a designer can describe any data object to an arbitrary degree of detail. In iMASH we have used XML to allow us to represent client machines, data objects, and the operations being applied to objects. This extensive usage is in contrast to other research such as [14], which uses XML solely as metadata to provide version information of objects.

The following needs motivate our use of XML. In iMASH a client machine's characteristics need to be known to the MWS because the MWS is capable of filtering data based upon the client's available bandwidth, display, and computation capabilities. With XML we can easily express these factors with our own defined set of markup tags that state such items as network interface throughput, available screen resolution and colours, installed runtime libraries, and CPU speed. A client is initially assigned a static XML description of itself, but the user may have the option of dynamically changing it (for instance, he may want to emulate another machine).

Data objects can also be expressed in XML to form an abstract data type. Although the language does not support the inclusion of binary data, we specify a description of data by including a pointer to the data, such as a URL, and metadata that describe the state of the data. For instance, for an image we can describe the data with tags for dimensions, colours, rotation, and annotative text. For text-based data, the data itself can be expressed in XML rather than having simply a pointer. A tremendous advantage of this approach to describing data is that we can pass the XML through filters to do content adaptation. We can take advantage of the eXtensible Stylesheet Language (XSL) [18], a language with which we can provide an arbitrary set of rules for manipulating XML. XSL provides the means to do such actions as filtration, sorting, and alteration. XML and XSL can be used for the $f_i$ filtration functions described earlier.

Finally, XML gives us the flexibility to express user *operations* on data objects. Such operations are the $g_i$ functions mentioned previously. With application-specific tags, we can describe operations such as image cropping, rotating, colouring, or any other arbitrary state change.

## 3.5 Expected Benefits

The architecture we have discussed in this section can be generalised to a variety of applications that exhibit client-server behaviour. We summarise the benefits to be reaped from our iMASH research:

- √ The iMASH architecture provides a handoff capability hitherto unimplemented and unresearched.

- √ The handoff mechanism acts upon a subset of an application's address space, allowing for a much smaller amount of data to be transferred with respect to a brute-force process migration approach. Handoff is also OS- and architecture-independent, whereas process migration is not.

DISH, Ex. 1019 - Page 9 of 14

✓ The handoff capability can be implemented by modifying the source code of only the client applications. The interface to the Application Servers remains inviolate.

✓ We have categorised varieties of handoff bahaviours based upon the level of interaction performed by the user and the directional nature of data between the application server and the clients.

✓ We have identified types of operations performed at the clients that are differentiated by the nature of their operations on object data types.

✓ Our handoff design performs a variety of performance optimisations, such as caching of object data and application of CPU-intensive operations, for the benefit of the clients.

## 4 An Implementation of TWIST

In this section we turn our attention on the implementation of TWIST to enable a real-world application to take advantage of the iMASH environment. We have taken a medical image display application used for pedagogical dissemination of information at UCLA and have augmented it to allow for session handoff from one platform to another. Furthermore, our implementation has resulted in less client-side computation due to a restructuring of this application's software architecture. To the user, the result of our implementation is that he is now able to handoff his session from one platform to another with little to no interruption in his work. Once on the second platform, his session was as he left it. The resulting user interface with this new functionality is shown in Figure 5. We have been able to successfully move sessions across a variety of client machines in our testbed, which includes one desktop machine running Windows NT 4.0 SP5, another running Windows 2000, an Aqcess Technologies QBE personal computer tablet running Windows 98, and a laptop running Windows 2000. Both the desktop machines were connected to the network with 100 Mbps Ethernet while the QBE and laptop were connected with an 11 Mbps 802.11 WaveLAN card.

### 4.1 The Teaching File Application

The Teaching File program is a Java applet developed in-house at UCLA that displays medical images, creates electronic instructional files called "teaching files," retrieves existing teaching files, and enables access to the teaching file database via the Internet. The major goal of the Teaching File program is to provide an advanced and efficient method for improving radiological teaching by clinical professors here at UCLA. It works as a tool for radiologists to gather relevant patient data, rearrange and present this data for students and residents, and report findings to physicians and clinicians. It is intended to be run on high-performance desktop workstations sporting high-resolution displays.

To retrieve a teaching file from the database, the Teaching File applet must cull together two pieces for the user: an original graphical image and the teaching file state when it is saved by the original author (who had used a different tool for preparing the file). This state consists of presentation specifications, such as rotation, zooming, etc., that must be applied to the image. The image itself must also be decoded from its proprietary format called PACS [16] for these manipulations to be applied. The teaching file state also includes simple text annotations provided by the user after an image is presented in the applet. To provide compressed and read-



**Figure 5:** The Teaching File applet with handoff capability.

able data, all teaching file data is encoded in XML. The Teaching File applet performs XML encoding before the teaching file being authored is transmitted to the application server. Likewise, the applet executes XML decoding after retrieving a teaching file from the application server, extracts and restores necessary information, and presents the teaching file to the user.

The original architecture of the Teaching File is shown in Figure 6. This system currently consists of a number of clients running a Java 1.2-capable browser and executing the Teaching File applet downloaded from a webserver. Because the applet is unsigned (and thus unsecured), by definition it can only communicate with its originating webserver, which also happens to be the server which maintains the database of Teaching Files. All communication between the applet and the server is via HTTP. The server executes Java Servlet [13] code in response to client requests.

Upon starting up, the user typically requests a list of available teaching files from the server and selects a particular one to open. The server subsequently returns the graphical image in PACS format, a description of the teaching file state expressed in XML, and a textual annotation, all in separate Java output streams. The Teaching File applet receives this image, converts the PACS data to an object of the standard Java Image class, applies the state to the image, and presents that resultant image along with the textual annotation to the user. At this point the user is free to modify the annotation text as he sees fit before saving his work back to the server. Should that occur, the applet sends back the annotation and a description of the image (all encoded in XML) to the server for storage.

With this application in hand, we looked to augment its design to allow for its participation in the iMASH environment. Its selection as a suitable subject for our research reflects iMASH's goals to provide mobile computing technology for the medical facilities here at UCLA. Our goals for modifying the Teaching File were

APPX1332

DISH, Ex. 1019 - Page 10 of 14



**Figure 6**: Original architecture of the Teaching File.



**Figure 7**: New architecture of the Teaching File. The numbered actions parallel those in Figure 4.

to: (1) enable session handoff with TWIST between different platforms; (2) discover performance bottlenecks and fix them; and (3) condition the Teaching File to better support thinner clients.

### 4.2 Enabling the Teaching File

Our first step was changing the original two-tier architecture (presented in Figure 6) into a three-tier iMASH architecture allowing a Middleware layer to support the handoff. The result of our redesign is shown in Figure 7. The key difference is that the MWS now serves many roles to aid the iMASH environment. In one of our sample testbeds, the Middleware Server is a Sun SPARC workstation and the Application Server is a SPARC server, both running SunOS 5.7.

In our redesign, initially the client applet is downloaded, but this time from the MWS. The original server is now free to be

a true Application Server that focuses on only handling transactions and not the additional duty of delivering the Java applets. The client interacts with the MWS via Remote Method Invocation, Java's version of a remote procedure call, and the MWS communicates with the AS via HTTP as before. Note that we have kept the interface to the AS exactly the same; all communication is through HTTP. We have only modified the client.

The MWS additionally acts as a proxy on behalf of the clients, with the Teaching File applet thus being able to offload most of its computational needs to the MWS. When the user requests a teaching file, the AS, as before, responds via HTTP with the PACS image file and its image-manipulation description but this time to the MWS instead of the client. Here we implement a key performance-enhancement to the system: the MWS performs the image assembly on behalf of the client, including the conversion of the proprietary PACS image to Java Image and the manipulation of that image according to the teaching file state description. The resulting image along with the accompanying textual annotation are shipped to the client over RMI. We chose RMI because we were more familiar with its remote procedure call semantics for our implementation.

Although the performance enhancement is a significant factor, our primary goal was implementing the handoff capability with the TWIST. When the user wishes to perform a session handoff, he must first decide how the handoff shall be conducted with respect to the recipient. If the user selects a "Suspend" operation, his session shall be saved back to the MWS, allowing the application to terminate, and at a later time the session can be reinstantiated by the Teaching File application running on the target machine. This approach is clearly a "pull" mechanism in that the target explicitly retrieves the session state from the MWS. Alternatively, at the first client, the user can select the hostname of the target from a list. When the handoff occurs, the MWS will contact a daemon running on the target machine to immediately launch the Teaching File applet and automatically retrieve the session state. We consider this a "push" mechanism. The applet on the first client terminates when the state is fully reinstantiated on the second client. In our first implementation, we provided static hostnames of the target clients that were running an iMASH session instantiation daemon, but we plan to have leverage a dynamic resource discovery mechanism using a technology such as Jini[17].

We now discuss how our implementation of an iMASH-enabled Teaching File applet mirrors the discussion of the Two-Way Interactive Session Transfer discussed in §3.3.

*MWS as a natural proxy*: As previously mentioned, the MWS acts as an intermediary between the client applet and the AS. This configuration allows the AS to retain its programming interface and lets the MWS perform resource-consuming operations on behalf of the client applet.

*Sending an operation $g_i$ instead of an entire data object from the client to the MWS*: The Teaching File applet allows users to modify the annotation associated with a teaching file. When the user performs a handoff, only the annotation change, encoded as XML, is sent back to the MWS instead of the entire teaching file, thereby reducing network use.

*Disregarding the initial content filtration as an optimisation during handoff*: Unfortunately, there is no content filtration used in the Teaching File applet. We were unable to obtain high-resolution *colour* images of clinical data, and our testbed contained suffi-

8

DISH, Ex. 1019 - Page 11 of 14

ciently similar and powerful client platforms. However, it is clear that we could have incorporated the optimisation to send $f_2 \cdot g_1(o)$ rather than $f_2 \cdot g_1 \cdot f_1(o)$.

*Classification of user operations*: We note that the available client-side operation, namely textual annotation, can be classified as syntactically independent but semantically dependent. Had content filtration occurred, we can see that the annotations can be made regardless of whatever content adaptation was applied. However, because the annotation of course contains semantic meaning, it is semantically dependent on any adaptation.

The modification to the Teaching File client applet code was minor. Our simple approach was merely to replace every HTTP connection to the AS with an RMI connection to the MWS. We term this minor addition to the client code as the Middleware Aware Remote Code, or MARC. This portion of our code essentially acts as a local proxy that connects the client code to the MWS. Additionally, we moved portions of code related to the image assembly (converting the PACS image and applying the teaching file state manipulations) from the client to the MWS as mentioned earlier. The MWS is implemented as a Java RMI server.

## 5  Performance Analysis

In this section we describe a variety of experiments to demonstrate the performance of our iMASH-enabled Teaching File application within our system architecture. We first assert that the principal benefit of the application session handoff mechanism is inherently qualitative in nature: the ability to move an application's session from one machine to another provides the user greater convenience and flexibility, neither of which can be easily measured. Our experiments are designed to identify basic performance behaviour and any newly introduced impacts, including both increased overhead and increased performance.

In our performance trials our Middleware Server was a Sun UltraSPARC-5 workstation running at 270 Mhz with 128 MB of RAM. Our Application Server was a Sun SPARCserver-1000 running at 50 Mhz with 512 MB of RAM. Our test clients were an Intel 450 Mhz Pentium II desktop PC with 128 MB of RAM running Windows NT 4.0 SP5 and an Intel 500 Mhz Celeron laptop with 128 MB of RAM running Windows 2000. The specific platforms in this testbed were chosen due to availability and convenience factors. The desktop was connected to the network with 100 Mbps ethernet, and the laptop was connected with a Lucent 802.11 WaveLAN PCMCIA card. We note that the performance results from the two clients were almost identical, which is not surprising since their CPU and bandwidth characteristics are very similar. For brevity we show the results for only the desktop system. Our client application was the Teaching File Applet running on Internet Explorer with the Sun Java Plug-in. The Teaching File's session included a graphic image and some textual annotations.

In Figure 8 we show the time needed to perform the suspension of the session on a source client. Recall that our implementation allows the user to suspend his session so that he may reinstantiate it at a later time and location. Note that since Java RMI has remote procedure call semantics, the service time at the server is part of the client's time. In all our experiments we controlled the application state size by varying the size of the textual annotation provided by the user. Using the annotation as our control variable is in accordance with our need to vary the size of the user modifi-

cation g, since that is what is shipped from the source client to the MWS as explained in previous sections. Intuitively we expect that as the size of the modification increases, the time to perform the session suspend will increase as well since the data for g must be sent over the network. From Figure 8 we see that this is indeed the case. Even with a modification size of 100,000 bytes, the client-to-MWS latency experienced by the client is under 2 seconds. It may often be the case that the modification data is much smaller than 100,000 bytes; in our application the user modification is the textual annotation itself in XML, but other types of programs may well have modifications much more succinctly expressable.

In Figure 9 we show the time restore a suspended session on a target client. As before, the time to perform the reinstantiation increases as the size of the data increases. Note that the time to restore is up to 1.8 times slower than the time to suspend. Recall that in both activities, a disk access penalty is incurred. We suspect the time to do a suspend, and its accompanying write to disk, is faster due to write buffers at the MWS. Our MWS software is written in Java, and its API does not provide low-level disk control.

We now show the overhead of using our iMASH-enabled Teaching File program with respect to its original version. Both need to interact with the Application Server, so we use the time to do data saves and opens as a metric for the added complexity of iMASH. In Figure 10 we show the time to save data from the client to the AS. This figure shows the total time spent by the iMASH-enabled client, the MWS, and the original client. Recall that in §4.2 we showed that the interaction between the AS and the original client is exactly the same as the interaction between the AS and the MWS in the iMASH environment. This similarity was due to our basic tenets of leaving the AS interface unchanged and allowing the MWS to act as a proxy on behalf of the iMASH-enabled client. In this figure we see that both the unmodified client and the MWS have almost identical performance results while communicating with the AS, which is what was expected. As before, the MWS service time is included in the delay time of the iMASH client, which is surprisingly large for all sizes. This increased delay for the iMASH client is due to two factors: (1) Before passing the data from the AS to the client, the MWS must assemble the data accordingly (by decoding the PACS image and applying image manipulations) as was discussed earlier. This time is *not* counted as part of the delay for the original client. (2) We used Java RMI as our communication protocol between the iMASH client and the MWS. Our choice of RMI was based upon our familiarity with its use, but its performance may be lacking [9].

In Figure 11 we graph the delay incurred from saving data from the client end to the AS. We see the same pattern as before: the time taken by the MWS and the original client are nearly identical, but the iMASH client incurs additional time, most likely due to RMI overhead. This conclusion was borne out when we measured the RMI delay with no server-side activity: the remote method returned on average in 120 ms for 5000 bytes and in 1090 ms for 100,000 bytes. We will try to reduce the delay experienced by the iMASH client by creating a separate thread at the MWS to perform all interaction with the AS, thereby removing almost all MWS service time from the client delay time. We may also use more efficient implementations of RMI or go entirely with a sockets-based programming approach. Note that the time to perform the save to the AS is much less than the time to perform a read from the AS (cf. Figure 10). This difference can be attributed to write buffering at the AS and the need to assemble the teaching files when performing a read.

9

DISH, Ex. 1019 - Page 12 of 14



**Figure 8:** Delay incurred from suspending a session on source client. (iMASH client time includes MWS service time.)



**Figure 9:** Delay incurred from restoring a session on target client. (iMASH client time includes MWS service time.)



**Figure 10:** Latency incurred from retrieving data from Application Server. (iMASH client time includes MWS time.)



**Figure 11:** Latency incurred from saving data to Application Server. (iMASH client time includes MWS service time.)

Finally, we try to quantify the beneficial results of the handoff mechanism. Although we stated at the outset of this section that the convenience and utility of our system is largely qualitative, we can use the preceding performance results to show how our session handoff is better than one semi-reasonable alternative: explicitly saving data from the client back to the Application Server for the express purpose of restoring it later. Note that this approach immediately violates the semantics of session handoff as discussed in §3.3 because the user must invoke the AS twice to perform the "handoff" duty; this activity burdens the server with the need to handle the current data, which may not even be in a state of satisfactory completeness. To quantify this alternative, we simply add together the time for the original Teaching File applet to interact with the AS to perform a data-save and a data-retrieval; the result is the summation of the data for "Original Client" in Figures 11 and 10. Since we expect that most session sizes will be small, we compute that for a size of 5000 bytes, this approach will incur a delay penalty of 500 ms for saving and 3000 ms for retrieving, for a total of 3500 ms. As mentioned before, this value does *not* include the needed time to assemble the data. On the other hand, the time for our handoff mechanism can be computed to be (from Figures 8 and 9 for 5000 bytes) 300 ms for session suspend and 1300 ms for restoration, for a total of 1600 ms. This time of course includes all needed labour to assemble the data. Our value is clearly

less for this given session size, and combined with the seamless and transparent nature of the automated system, results in a distinct advantage. On the other hand, for the large session size of 100,000 bytes, the "Original Client" sum of 3900 ms actually does compare favourably with the iMASH client latency of 5000 ms, since the "Original Client" did not include data assembly cost to be later incurred at the target client during handoff.

## 6 Future Work and Conclusion

Our current research work lends itself nicely to a variety of future extensions. We are planning to incorporate more heterogeneity into our testbed by utilizing a broader range of client platforms, such as Windows CE and Palm palm-sized PDAs. These machines offer an even wider spectrum of display, bandwidth, and computational characteristics. With such devices we shall work with the new necessity of content adaptation on image data to fit on much more limited displays than those found in our current testbed. Additionally, we shall begin look into the ramifications of much more limited bandwidth connections (such as cellular data transmission), fault-tolerance, and extended periods of disconnectivity. Finally, we will explore the issue of the scalability of our ar-

APPX1335

DISH, Ex. 1019 - Page 13 of 14

chitecture through simulation modelling with the GlomoSim [15] network simulation tool.

Using devices of myriad differences for ubiquitous computing is still not available presently. We believe that a large obstacle is the lack of integration between similar applications running on different machines. In this paper we have made our argument for providing a convergence between disparate platforms to create a seamless computing experience. To that end, we have made the following contributions to the field of mobile Internet computing in this paper:

*We have developed an application session handoff capability* that allows for the seamless transfer of application data across multiple OS platforms. Furthermore, we have implemented our design to enable handoff for a real-world application, a teaching tool used by clinical radiologists at the UCLA medical facility.

*We have identified a family of session handoff bahaviours* based upon the level of interaction performed by the user and the directional nature of data between the application server and the clients. In particular, we have pointed out the Two-Way Interactive Session Transfer (TWIST), a general-case behaviour that demands two-way interactivity between the application server its clients. We have categorised types of operations performed at clients that are differentiated by the nature of their operations on object data types.

Finally, *we have implemented our handoff mechanism to perform a variety of performance optimisations*, such as the the caching of not only object data but also *application operations* by utilizing the data description capabilities of XML.

## 7 Acknowledgments

We would like to thank Jinsong Lin, Glenn Glazer, George Zorpas, and Daniel Valentino, Ph.D., for their contributions.

## References

[1] R. Bagrodia, M. Gerla, S. Lu, R. Meyer, D. Valentino, and L. Zhang. "Supporting Nomadic Healers," *UCLA Technical Report 200021*, 2000.

[2] A. Bond, M. Gallagher, and J. Indulska. "An Information Model for Nomadic Environments," *IEEE Proceedings of the Ninth International Workshop on Database and Expert Systems Applications*, 1998.

[3] E. Brewer, R. Katz, E. Amir, H. Balakrishnan, Y. Chawathe, A. Fox, S. Gribble, T. Hodes, G. Nguyen, V. Padmanabhan, M. Stemm, S. Seshan, and T. Henderson. "A Network Architecture for Heterogeneous Mobile Computing," *IEEE Personal Communications*, October 1998. www.cs.berkeley.edu/~brewer/papers.html

[4] A. Fox, S. Gribble, Y. Chawathe, and E. Brewer. "Adapting to Network and Client Variation Using Infrastructural Proxies: Lessons and Prospectives," *IEEE Personal Communications*, August 1998. gunpowder.Stanford.EDU/~fox/pubs.html

[5] A. Fox, B. Johanson, P. Hanrahan, and T. Winograd. "Integrating Information Appliances into an Interactive Workspace," *IEEE Computer Graphics and Applications*, May-June 2000.

[6] C. Goldfarb and P. Prescod. The XML Handbook, Prentice Hall, 2000.

[7] S. Gribble, M. Welsh, R. von Behren, E. Brewer, D. Culler, N. Borisov, S. Czerwinski, R. Gummadi, J. Hill, A. Joseph, R.H. Katz, Z.M. Mao, S. Ross, and B. Zhao. "The Ninja Architecture for Robust Internet-Scale Systems and Service," To appear in a *Special Issue of Computer Networks on Pervasive Computing*. ninja.cs.berkeley.edu/pubs/pubs.html

[8] M. Litzkow, M. Livny, and M. Mutka. "Condor - A Hunter of Idle Workstations," *Proceedings of the 8th International Conference of Distributed Computing Systems*, June 1988. www.cs.wisc.edu/condor/

[9] J. Maassen, R. van Nieuwpoort, R. Veldema, H. E. Bal, and A. Plaat. "An Efficient Implementation of Java's Remote Method Invocation," In *Proceedings of the Seventh ACM SIGPLAN Symposium on Principles and Practice of Parallel Programming*, Atlanta, GA, USA, 1999. www.cs.vu.nl/manta/

[10] D. Milojicic, F. Douglis, F., Y. Paindaveine, R. Wheeler, and S. Zhou. "Process Migration Survey," *ACM Computing Surveys*, June 2000. www.hpl.hp.com/personal/Dejan_Milojicic/

[11] B. Noble, M. Satyanarayanan, D. Narayanan, J. Tilton, J. Flinn, and K. Walker. "Agile Application-Aware Adaptation for Mobility," In *Proceedings of the 16th ACM Symposium on Operating System Principles*, 1997.

[12] T. Phan, K. Xu, R. Guy, and R. Bagrodia. "Handoff of Application Sessions Across Time and Space," To appear in *The IEEE International Conference on Communications (ICC 2001)*, Helsinki, Finland, June 2001. pcl.cs.ucla.edu/papers/

[13] Sun Microsystems, Inc. "JavaServer Pages Technology Webpage." www.javasoft.com/products/servlet/index.html

[14] E. Swierk, E. Kiciman, V. Laviano, and M. Baker. "The Roma Personal Metadata Service," In *Proceedings of the Third IEEE Workshop on Mobile Computing Systems and Applications*, Monterey, CA, USA, December 2000. mosquitonet.stanford.edu/publications.html

[15] M. Takei, J. Martin, and R. Bagrodia. "Runtime Performance for Detailed Wireless Network Simulation," In submission to *ACM Transactions on Modeling and Computer Simulation*.

[16] D. Valentino. "Considerations in Implementing Large-Scale PACS," *Conference on RIS, PACS and Teleradiology: Future-Proof Solutions*, Lubbock, TX, USA, 1998.

[17] J. Waldo. "The Jini Architecture for Network-Centric Computing," *Communications of the ACM*, vol. 42, no. 7, 1999.

[18] "Extensible Stylesheet Language webpage," 2001. www.w3.org/Style/XSL/

# ICC2OOI

## THE IEEE INTERNATIONAL
## CONFERENCE ON COMMUNICATIONS



**Helsinki, Finland**
**June 11 – 14, 2001**



## Conference
## Record Volume 5 of 10





IEEE

IEEE
COMMUNICATIONS
SOCIETY

ICC
GLOBECOM

*Where Minds Meet*

APPX1337

DISH, Ex. 1020 - Page 1 of 12


*Conference record.*

# 2001 IEEE INTERNATIONAL CONFERENCE ON COMMUNICATIONS RECORD

Copyright © 2001 by the Institute of Electrical and Electronics Engineers, Inc.
All rights reserved.

**Copyright and Reprint Permission**

Abstracting is permitted with credit to the source. Libraries are permitted to photocopy beyond the limit of U.S. copyright law for private use of patrons those articles in this volume that carry a code at the bottom of the first page, provided the per-copy fee indicated in the code is paid throught Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923.

For those other copying, reprint or republication permission, write to IEEE Copyrights Manager, IEEE Operations Center, 445 Hoes Lane, P.O. Box 1331, Piscataway, NJ 08855-1331.

| | |
|---|---|
| **IEEE Catalog Number** | 01CH37240 (softbound) |
| | 01CH37240C (CD-ROM) |
| **ISBN** | 0-7803-7097-1 |
| | 0-7803-7098-8 (Microfiche Edition) |
| | 0-7803-7099-6 (CD-ROM) |
| **Library of Congress** | 81-649547 |

LIBRARY OF CONGRESS
JUL 3 1 2001
COPY
COPYRIGHT OFFICE

Additional copies of this publication are available from

IEEE Operations Center
P.O. Box 1331
445 Hoes Lane
Piscataway, NJ 08855-1331 USA

1-800-678-IEEE
1-732-981-1393
1-732-981-9667 (FAX)
email: customer.services@ieee.org
Internet: http://www.ieee.org

**SESSION MI33: MOBILE DATA NETWORK**
Organizer: Kaveh Pahlavan, WPI, CWINS; Jacques Beneat, WPI, CWINS
Chair: Rajamani Ganesh, Verizon Technology Organization

MI33.1   MEASURED PERFORMANCE OF GSM HSCSD AND GPRS.......................................................1330
Jouni Korhonen, Olli Aalto, Andrei Gurtov, Heimo Laamanen, Sonera Corp., Finland

MI33.2   TWO-STAGE DYNAMIC UPLINK CHANNEL ASSIGNMENT FOR GPRS..................................1335
Ying-Dar Lin, Yu-Ching Hsu, Mei-Yan Chiang, National Chiao Tung Univ., Taiwan

MI33.3   MOBILE MULTICAST WITH ROUTING OPTIMIZATION FOR RECIPIENT MOBILITY....................1340
Jiunn-Ru Lai, Wanjiun Liao, Ming-Yu Jiang, Chien-An Ke, National Taiwan Univ., Taiwan

MI33.4   A WIRELESS NETWORK SERVICE PROVIDING WIRELESS CHANNEL INFORMATION
FOR ADAPTIVE MOBILE APPLICATIONS, PART I:PROPOSAL.................................................1345
Byoung-Jo "J" Kim, AT&T Labs - Research, USA

MI33.5   PERMISSIBLE THROUGHPUT NETWORK FEEDBACK FOR ADAPTIVE MULTIMEDIA
IN AODV MANETS....................................................................................................1352
Manthos Kazantzidis, Mario Gerla, UCLA, USA; S J Lee, Hewlett-Packard Laboratories, USA

MI33.6   A SELF-ORGANIZING APPROACH TO DATA FORWARDING IN LARGE-SCALE
SENSOR NETWORKS.................................................................................................1357
Jelena Mirkovic, UCLA, USA; Geetha Priya Venkataramani, UCLA, USA; Songwu Lu, UCLA, USA; Lixia Zhang, UCLA, USA

MI33.7   INTEGRATED RATE AND ERROR CONTROL IN VARIABLE SPREADING GAIN
WCDMA SYSTEMS....................................................................................................1362
Dong Kim, Univ. of Seoul, Korea; Ekram Hossain, Univ. of Manitoba, Canada; Vijay Bhargava, Univ. of Victoria, Canada

MI33.8   HANDOFF OF APPLICATION SESSIONS ACROSS TIME AND SPACE.........................................1367
Thomas Phan, Kaixin Xu, Richard Guy, Rajive Bagrodia, UCLA, USA

MI33.9   SYSTEMS ENGINEERING OF DATA SERVICES IN UMTS W-CDMA SYSTEMS...................1373
Kourosh Parsa, Golden Bridge Tech., USA; Saeed S. Ghassemzadeh, AT&T Labs, USA; Saied Kazeminejad, SBC Tech. Resources, USA

**SESSION G34: RADIO RESOURCE MANAGEMENT**
Organizer: Marco Chiani, University of Bologna, Italy
Chair: Roberto Verdone, CSITE-CNR, University of Bologna, Italy

G34.1   TIME SLOT ASSIGNMENT USING CELL PARTITIONING IN CDMA CELLULAR SYSTEMS................1381
Kohji Takeo, YRP Key Tech Research Laboratories, Japan

G34.2   AUTONOMOUS CALL ADMISSION CONTROL WITH PRIORITIZED HANDOFF IN
CELLULAR NETWORKS..............................................................................................1386
El-Sayed El-Alfy, Yu-Dong Yao, Harry Heffes, Stevens Inst. of Technology, USA

G34.3   AN ADAPTIVE M-QAM MODULATOR FOR FIXED WIRELESS ATM NETWORKS............................1391
Abbas Mohammadi, AmirKabir Univ. (Tehran Polytechnic), Iran; Surinder Kumar, WaveCom Electronics Inc., Canada

G34.4   PERFORMANCE EVALUATION OF PERSISTENT ADMISSION CONTROL IN
FREQUENCY-HOPPED SLOTTED RANDOM ACCESS NETWORKS...........................................1396
Katsumi Sakakibara, Tomohiro Katagiri, Hirokazu Suyama, Jiro Yamakita, Okayama Prefectural Univ., Japan

G34.5   CARRIER ASSIGNMENT ALGORITHMS IN WIRELESS BROADBAND NETWORKS WITH CHANNEL
ADAPTATION............................................................................................................1301
Iordanis Koutsopoulos, Leandros Tassiulas, Univ. of Maryland at College Park, USA

G34.6   RESOURCE ALLOCATION AND SCHEDULING SCHEMES FOR WCDMA DOWNLINKS....................1406
Rath Vannithamby, Elvino Sousa, Univ. of Toronto, Canada

G34.7   PERFORMANCE OF 1XTREME SYSTEM FOR MIXED VOICE AND DATA................................1411
Petteri Luukkanen, Zhigang Rong, Lin Ma, Nokia Research Center, USA

G34.8   THE FPBA ALGORITHM WITH CONTROLLED CAPTURE..............................................1416
Mohamed Hadi Habaebi, Borhanuddin Mohd. Ali, Univ. Putra Malaysia, Malaysia

APPX1339

TUESDAY, JUNE 12, 2001
13:30 - 17:00

**SESSION G35: CDMA RECEIVER ALGORITHMS**
Organizer: Kari-Pekka Estola, Nokia, Finland
Chair: Matti Latva-aho, University of Oulu, Finland

1330    G35.1   LMMSE CHIP EQUALISATION FOR 3GPP WCDMA DOWNLINK RECEIVERS WITH
CHANNEL CODING..................................................................................................1421
1335    Peter Darwood, Paul Alexander, Ian Oppermann, Southern Poro Communications, Australia

G35.2   AN ADAPTIVE RECEIVER FOR DYNAMIC TRAFFIC DS/CDMA PACKET TRANSMISSION.................1426
1340    Zihua GUO, Ben Letaief Khaled, Hong Kong Univ. of Science & Technology, Hong Kong

G35.3   BLIND MULTIUSER DETECTOR FOR DS/CDMA CHANNELS BASED ON THE MODIFIED
STOCHASTIC GRADIENT DESCENT ALGORITHM.......................................................1431
1345    A. Mukherjee, Kah C Teh, E. Gunawan, Nanyang Technological Univ., Singapore

G35.4   JOINT ESTIMATION OF TIME DELAYS AND DOA'S FOR DS-CDMA SYSTEM OVER
MULTIPATH RAYLEIGH FADING CHANNELS.............................................................1436
1352    Kun Wang, New Jersey Inst. of Technology, USA; Hongya Ge, New Jersey Inst. of Technology, USA

G35.5   ADAPTIVE BEAMFORMING AND POWER CONTROL FOR DS-CDMA MOBILE RADIO
COMMUNICATIONS..............................................................................................1441
1357    Ying-Chang Liang, Francois Chin, Centre for Wireless Communications, Singapore; Alex Kot, Nanyang Tech. Univ., Singapore

G35.6   PERFORMANCE ANALYSIS OF FORWARD LINK DS-CDMA SYSTEMS USING
RANDOM AND ORTHOGONAL SPREADING SEQUENCES.............................................1446
1362    Ji-Woong Choi, Seoul National Univ., Korea; Yong-Hwan Lee, Seoul National Univ., Korea; Yong-Ho Kim, Korea Telecom, Korea

G35.7   PULL-IN CAPABILITY OF A MODIFIED CODE TRACKING LOOP FOR DIRECT-SEQUENCE SPREAD-
SPECTRUM COMMUNICATION ON A FREQUENCY-SELECTIVE FADING CHANNEL......................1451
1367    Jia-Chin Lin, National Chi-Nan University, Taiwan

G35.8   INTERFERENCE FREE DECISION FEEDBACK CHANNEL ESTIMATION TECHNIQUE
1373    FOR M-ARY ORTHOGONAL DS/CDMA SYSTEMS.......................................................1456
        Suk-Hyon Yoon, Dae-Ki Hong, Daesik Hong, Chang-Eon Kang, Yonsei Univ., Korea

**SESSION G36: MULTI-CARRIER AND SPREAD-SPECTRUM COMMUNICATIONS**
Organizer: Yumin Lee, National Taiwan University, Taiwan
Chair: Chin-Liang Wang, National Tsing-Hua University, Taiwan

1381    G36.1   A LOW COMPLEXITY ML CHANNEL ESTIMATOR FOR OFDM.......................................1461
        Luc Deneire, Patrick Vandenameele, Liesbet van der Perre, Marc Engels, Bert Gyselinckx, IMEC, Belgium

1386    G36.2   DS-CDMA RECEIVERS BASED ON CANONICAL CHANNEL REPRESENTATION..........................1466
        Jan Erik Håkegård, SINTEF Telecom and Informatics, Norway

1391    G36.3   OWSS MULTIPLE ACCESS SYSTEM FOR 100 MBPS WIRELESS LANS........................................1471
        Vijay Jain, University of South Florida, USA

G36.4   PEAK TO MEAN ENVELOPE POWER RATIO OF OVERSAMPLED OFDM SIGNALS: AN ANALYTICAL
1396    APPROACH.....................................................................................................1476
        Masoud Sharif, Babak H. Khalaj, Sharif Univ. of Technology, Iran

G36.5   AN EFFICIENT EQUALIZATION METHOD TO MINIMIZE DELAY SPREAD IN OFDM/DMT
1301    SYSTEMS........................................................................................................1481
        Romed Schur, Joachim Speidel, Univ. of Stuttgart, Germany

1406    G36.6   IMPLEMENTATION AND FIELD TRIAL RESULTS OF A FAST FREQUENCY HOPPED FSK
TESTBED FOR WIRELESS COMMUNICATIONS........................................................1486
1411    Hanli Zou, UCLA, USA; Sumit Mohan, Qualcomm, USA; Danijela Cabric, Babak Daneshrad, UCLA, USA

G36.7   A "SELF-DECORRELATING" TECHNIQUE TO ENHANCE BLIND SPACE-TIME RAKE RECEIVERS
WITH SINGLE-USER-TYPE DS-CDMA DETECTORS......................................................1491
1416    Kainam Thomas Wong, Guisheng Liao, Shun Keung Cheung, Pak-Chung Ching, Chinese Univ. of Hong Kong, Hong Kong;
        Michael D. Zoltowski, Purdue Univ., USA; Javier Ramos, Carlos III Univ. of Madrid, Spain

G36.8   A PEAK POWER REDUCTION METHOD FOR MULTICARRIER TRANSMISSION..........................1496
        Chan Soo Hwang, Samsung Advanced Inst. of Technology, Korea

G36.9   SUPERIMPOSED TRAINING ON REDUNDANT PRECODING FOR LOW-COMPLEXITY RECOVERY
OF BLOCK TRANSMISSIONS...................................................................................1501
        Shuichi Ohno, Shimane Univ., Japan; Georgios Giannakis, Univ. of Minnesota, USA

APPX1340                              DISH, Ex. 1020 - Page 4 of 12

## SESSION G37: ADVANCED NETWORK SURVEILLANCE AND TRAFFIC MANAGEMENT TECHNIQUES
Organizer: Jose Marcos Nogueira, Federal Univ. of Minas Gerais, Brazil
Chair: Veli Sahin, Marconi Communications, USA; Jose Marcos Nogueira, Federal Univ. of Minas Gerais, Brazil

G37.1   A DYNAMIC TRAFFIC SHARING WITH MINIMAL ADMINISTRATION ON MULTIHOMED
NETWORKS.................................................................................................................1506
Nariyoshi Yamai, Kiyohiko Okayama, Hiroshi Shimamoto, Takuji Okamoto, Okayama Univ., Japan

G37.2   LOCATION MANAGEMENT STRATEGIES FOR WIRELESS NETWORKS - A COMPARISON
STUDY ON SYSTEM UTILIZATION.............................................................................1511
Tracy Tung, Abbas Jamalipour, Univ. of Sydney, Australia

G37.3   VISUALIZATION OF TRAFFIC STRUCTURES......................................................1516
Oliver Niggemann, Benno Stein, Univ. of Paderborn, Germany; Jens Toelle, Univ. of Bonn, Germany

G37.4   UPLINK POWER CONTROL IN UTRA TDD...........................................................1522
Janne Kurjenniemi, Tapani Ristaniemi, Univ. of Jyväskylä, Finland; Seppo O. Hämäläinen, Nokia, Finland

G37.5   A MEASUREMENT-BASED CONGESTION ALARM FOR SELF-SIMILAR TRAFFIC............................1528
Tat-Keung Chan, Wing-Cheong Lau, Univ. of Hong Kong, Hong Kong; Victor Li, HKU, Hong Kong

G37.6   INFERRING LINK CHARACTERISTICS FROM END-TO-END PATH MEASUREMENTS.....................1534
Masato Tsuru, TAO, Japan; Tetsuya Takine, Kyoto Univ., Japan; Yuji Oie, Kyushu Inst. of Technology, Japan

G37.7   MOBILITY ADAPTIVE PROTOCOLS FOR MANAGING LARGE AD HOC NETWORKS.....................1539
Stefano Basagni, Univ. of Texas at Dallas, USA; Damla Turgut, Sajal K. Das, Univ. of Texas at Arlington, USA

G37.8   ACTIVE DISTRIBUTED MONITORING FOR DYNAMIC LARGE-SCALE NETWORKS......................1544
Antonio Liotta, Univ. of Surrey, UK; George Pavlou, Univ. of Surrey, UK; Graham Knight, Univ. College London, UK

G37.9   PREDICTIVE BANDWIDTH CONTROL FOR MPEG VIDEO: A WAVELET APPROACH
FOR SELF-SIMILAR PARAMETERS ESTIMATION.........................................................1551
Yen-Chieh Ouyang Ouyang, National Chung Hsing Univ., Taiwan; Li-Bin Yeh, National Chung Hsing Univ., Taiwan

## SESSION G38a: SPECIAL TOPICS: MPLS, DATA STRUCTURE, TRANSMISSION NETWORK
Organizer: Horst Besier, Deutsche Telekom/T-NOVA, Germany; G.S. Kuo, National Chengchi University, Taiwan
Chair: Nikola Rozic, University of Split, Croatia; Richard Vickers, Nortel Networks, USA

G38a.1   A NEW ARCHITECTURE FOR TRANSMISSION OF MPEG-4 VIDEO ON
MPLS NETWORKS......................................................................................................1556
Geng-Sheng (G.S.) KUO, National Chengchi University, Taiwan; C. T. Lai, National Central University, Taiwan

G38a.2   EFFICIENT CACHE STRUCTURES OF IP ROUTERS TO PROVIDE
POLICY-BASED SERVICES.........................................................................................1561
Shingo Ata, Masayuki Murata, Hideo Miyahara, Osaka University, Japan

G38a.3   RESTORATION METHODS FOR TRAFFIC ENGINEERED NETWORKS WITH LOOP-FREE
ROUTING GUARANTEES.............................................................................................1566
Richard Rabbat, Kai-Yeung (Sunny) Siu, Massachusetts Inst. of Technology, USA

G38a.4   AN ONLINE DISTRIBUTED PROTECTION ALGORITHM IN WDM NETWORKS........................1571
Xun Su, ECE department, UT Austin, USA; Ching-Fong Su, Fujitsu Labs of America, USA

TUESDAY, JUNE 12, 2001
13:30 - 17:00

## SESSION HSN38b: QUALITY OF SERVICE
Organizer: Jürgen Haag, Deutsche Telekom AG Germany
Chair: Manfred Fetter, Deutsche Telekom AG Germany
Sponsor: Communications Switching and Routing

HSN38b.1    A NOVEL EXPLICIT RATE FLOW CONTROL MECHANISM IN ATM NETWORKS........................1576
Xiaolin Zhang, Jieyi Wu, Southeast University, China

HSN38b.2    A QOS ROUTING ALGORITHM BASED ON ANT ALGORITHM..................................................1568
Zhang Subing, Liu Zemin, Beijing Univ. of Posts and Telecommunications, China

HSN38b.3    A HIGH-THROUGHPUT SCHEDULING ALGORITHM FOR A BUFFERED CROSSBAR SWITCH
FABRIC................................................................................................................................1581
Tara Javidi, Univ. of Michigan, USA; Robert Magill, Terry Hrabik, Tellabs Operations, Inc., USA

HSN38b.4    A CAPACITY CORRELATION MODEL FOR WDM NETWORKS WITH CONSTRAINED GROOMING
CAPABILITIES............................................................................................................................1592
Sashisekaran Thiagarajan, Arun Somani, Iowa State University, USA

## SESSION G39a: VIDEO ON DEMAND SYSTEMS
Organizer: Tak Kamae, Labs. of Image Science & Tech, Japan
Chair: Ryoichi Komiya, Multimedia University, Malaysia

G39a.1    TOKEN-TRAY/ WEIGHTED QUEUING-TIME (TT/WQT): AN ADAPTIVE BATCHING POLICY
FOR NEAR VIDEO-ON-DEMAND SYSTEM....................................................................................1597
Wushao Wen, Biswanath Mukherjee, Univ. of California, Davis, USA;
S.-H. Gary Chan, Hong Kong Univ. of Science and Technology, Hong Kong

G39a.2    FAST VIDEO PLACEMENT ALGORITHMS FOR HIERARCHICAL VOD SYSTEMS........................1602
Ren-Hung Hwang, Pin-Hao Chi, CSIE/CCU, Taiwan

G39a.3    PROVIDING SCALABLE ON-DEMAND INTERACTIVE VIDEO SERVICE BY MEANS OF
MULTICASTING AND CLIENT BUFFERING.....................................................................................1607
S.-H. Gary Chan, Hong Kong Univ. of Science and Technology, Hong Kong;
Edward Chang, Univ. of California at Santa Barbara, USA

G39a.4    CHANNEL ALLOCATION FOR LARGE SCALE VIDEO-ON-DEMAND SYSTEMS............................1612
Wing-Fai Poon, Kwok-Tung Lo, Jian Feng, City Univ. of Hong Kong, Hong Kong

## SESSION G39b: INFORMATION INFRASTRUCTURE AND HOT TOPICS
Organizer: Cengiz Akgun, Telcordia, USA
Chair: Barcin Kozbe, Ericsson Inc, USA

G39b.1    A ROLE BASED MODELLING APPROACH FOR THE INFORMATION INFRASTRUCTURE................1617
Jürgen Apfelbeck, University Hagen, Germany

G39b.2    SERVICE SELECTION IN THE ACCESS NETWORK.........................................................................1622
Nick Marly, Dominique Chantrain, Stephane Focant, Koen Handekyn, Koen Daenen,
Claudine Batsleer, Alcatel Corp. Research Center, Belgium

G39b.3    DIAGNOSIS OF SENSOR NETWORKS..............................................................................................1627
Chaiporn Jaikaeo, Chavalit Srisathapornphat, Chien-Chung Shen, Univ. of Delaware, USA

G39b.4    DIFFSERVER: APPLICATION LEVEL DIFFERENTIATED SERVICES FOR WEB SERVERS...............1633
Gautam Rao, Cisco Systems, USA; Byrav Ramamurthy, UNL, USA

# Handoff of Application Sessions Across Time and Space

Thomas Phan, Kaixin Xu, Richard Guy, and Rajive Bagrodia

{phantom,xkx,rguy,rajive}@cs.ucla.edu

Parallel Computing Laboratory
Computer Science Department
The University of California at Los Angeles
Los Angeles, CA 90095
http://pcl.cs.ucla.edu

## Abstract

Personal computing on mobile platforms such as laptops and personal digital assistants, rather than in a traditional desktop environment, is becoming increasingly more common. In this paper we address the issue of application session transfer for uninterrupted data access across this diverse range of platforms. This work is part of the iMASH project, a multi-year, multi-discipline collaborative effort focused on enabling mobile client platforms and incorporating them into existing legacy networked systems for use by medical practitioners. We have developed a tiered architecture that includes a middleware server layer positioned between existing application servers and multiple clients to make session transfer transparent to the user. Any client application executing our Middleware-Aware Remote Code library can save and restore its session by interacting with a middleware server. As a proof of concept, we have implemented the transfer of bookmarks, history, web cache, and user preferences with the Mozilla open source web browser. From this effort we have established baseline performance metrics and have found that the overhead is within reasonable bounds of just a few seconds of latency.

## 1 Introduction

Today, as workforce professionals become more mobile, there is an increasing demand for computing in locations and situations that dramatically diverge from the traditional wired office environment. The popularity of laptop computers and personal digital assistants (PDAs) in conjunction with wireless data service further make nomadic computing a desirable, viable, and increasingly common work style. However, computing mobility opens the door to an influx of myriad technical issues [4] that must be resolved before nomadicity can be considered as a standard rather than as an exceptional behavioural trait for computer users.

The issue we seek to address is one of data access for the mobile user. Previous work has been primarily concerned with providing data for a user on the *same* client across possibly different physical networks. In contrast, our novel contribution to the field of nomadic computing is focused on the architecture and protocols that enable a user to experience uninterrupted and seamless data access across *multiple* devices by performing application session handoff.

We define a system as a tuple of {*platform, location, time*} and a handoff as a transfer of application data from one system to another via the computer network, both wired and wireless. Any change in a given tuple represents a new system, and thus a new representative entity, in our environment. We consider a session to be a strict subset of the process dataspace rather than an entire binary image. The session is defined in the context of a given application but is independent of the architecture and operating system, thus allowing a session to move from one application on one system to another implementation of the same application on another system, so long as the applications handle the session uniformly. Thus, a user participating in our network will be able to move between an office desktop, a PDA, a laptop, and a home desktop with a continuous view of his or her application data. As part of the UCLA Interactive Mobile Application Support for Heterogeneous Clients (iMASH) project [1] providing mobile data access for medical practitioners, we have developed the hardware and software infrastructure that will enable this scenario for nomadic users.

The key component to faciliate this session transfer in the iMASH architecture is an array of middleware servers strategically placed between the application servers and the clients. Requests from clients are addressed to nearby middleware servers, which are the source for all client services. Likewise, these servers become the sole client for application servers, allowing the latter to better perform their role as a data source rather than as a supporter of a large number of heterogeneous clients. In the future the middleware servers will play a larger role in the iMASH architecture than just supporting session handoff, which is the focus of this paper. The middleware layer will provide such essential functionalities as user authentication, information discovery, data caching, presentation conversion, location tracking, and profile management.

We have implemented this handoff capability into the open-source Mozilla web browser as a proof of concept. We posit that the functionality, convenience, and performance of this handoff mechanism in something so commonly used as a browser make a convincing argument for the usefulness of our research effort.

The rest of this paper is organised in the following manner. In §2, we discuss related work in the field of nomadic computing, followed by the system architecture in §3. In §4 we discuss our experimental work on the Mozilla browser along with our results.

## 2 Related Work

Nomadic computing in a wireless environment is discussed in [3] in the context of the BARWAN research project. The authors implemented a system that supports mobility by smoothing client roaming across physical networks with network overlays, hiding wireless TCP losses with a reliable transport layer, and enabling dynamic content transformation with a network-of-workstations middle tier that processes data between the content servers and the clients. Clearly,

iMASH shares similarities with BARWAN, but BARWAN does not support session handoff between clients; specifically, its users are limited to having one mobile client with independent session states, and its middle tier performs only content adaptation.

The researchers in the Odyssey project [10] investigated the usefulness of fast adaptation by modifying a UNIX kernel to alert applications to changes in network conditions. Each application, upon receiving this information, individually adapts its behaviour to suit the available network bandwidth. Such awareness and adaptation requires applications to closely interact with a client-side portion of Odyssey code, similar to our Middleware-Aware Remote Code we shall discuss in 3.3, and like iMASH, the Odyssey architecture contains a middleware-like layer of hardware but is largely limited to content adaptation.

Data transfer between clients similar to our session handoff is explored in [2], which describes an infrastructure that manages application adaptations to changing network QoS using a set of cooperating servers, including a mobility manager and an application migration manager. In [12], researchers developed the Roma system for maintaining data across multiple clients but provide for only the transfer of XML-based metadata that keep file versioning information. In this architecture the actual data transfer must be accomplished by well-known network protocols such as HTTP, FTP, and NFS.

Our work is also related to the well-known concept of process migration in the fields of fault-tolerance and load-balancing. Process migration, surveyed in [8], has primarily focused on application migration among workstations on LANs and generally required all the participating nodes to have homogeneous platforms. In contrast, iMASH explicitly targets a high degree of device and OS heterogeneity. Additionally, the check-pointing and migration activities, implemented in systems such as Condor [6], rely on the brute-force copying of a process' entire binary image. An iMASH application session, on the other hand, is a strict subset of the dataspace and consumes much less memory. The session state at the destination should be adapted to the underlying device characteristics, which may be dramatically different from that on the source node. This additional goal requires the session handoff mechanism to have much more intelligence than a process migration implementation.

In this paper we used a web browser as one possible application that can take advantage of the iMASH environment by implementing a prototype session handoff capability service similarly provided in Netscape Communicator 4.5+ and by such third parties as WebRoamer.com. Although these companies provide facilities that enable the same end result (e.g. a bookmark file transfer), such similarity is only superficial because they rely on simplistic data transfer via LDAP or HTTP to a fixed server. Our implementation performs dynamic service discovery with Sun's Jini service and can execute much more flexible and extensible transactions using Java RMI, all within the context of the larger and more scalable iMASH infrastructure.

# 3   System Architecture

## 3.1   Background

The infrastructure to support the iMASH vision must evolve to allow users seamless access to data from any device on a variety of networks. An important challenge is to develop a middleware infrastructure to: (a) help bridge the gap between application servers and nomadic clients as they migrate active sessions among multiple de-



**Figure 1**: The iMASH architecture

vices; (b) balance application requirements and network conditions; and (c) enhance the scalability of the network.

iMASH, a joint collaboration between the Computer Science Department and the Medical School, is developing such an adaptive middleware infrastructure, initially for healthcare professionals. Its objective is to provide the capability for real-time multimedia communication, such that a physician can access, on the move, patient records and related information. Additionally, users will be able to migrate ongoing application sessions seamlessly to multiple platforms that may range from a high performance diagnostic workstation in the physician's office to hand-held PDAs in the examination room.

## 3.2   Hardware Architecture

The iMASH project will deploy a hardware and software infrastructure adapted to the healthcare domain. The planned hardware architecture is depicted in Figure 1 and consists of:

✓ A set of application servers connected to a high bandwidth wired network. These machines are typically legacy servers that are not well suited to support multiple mobile clients.

✓ A collection of wired client devices that includes office workstations, clinic stations, imaging equipment, etc.

✓ High bandwidth wireless access within the hospital, augmented by one or more lower bandwidth wide area wireless systems, supporting a number of heterogeneous mobile client devices that can vary from laptop to graphical tablet to PDA. These devices have a wide variety of physical characteristics, including CPU power, memory, storage, battery life, weight, and display quality.

✓ A set of strategically deployed, dedicated middleware servers.

The key to the iMASH architecture is the distributed set of middleware servers, which when viewed at the application level, interconnect all applications and clients. Requests from clients are explicitly addressed to nearby middleware servers; these middleware servers are the source for all services for clients, simplifying service discovery, as well as the sole client for application servers.



**Figure 2:** Middleware architecture



**Figure 3:** The MARC architecture

The deployment of middleware servers between the clients and servers provides scalability in several ways. Application servers need not be concerned with a large number of end users but instead can concentrate on collecting and processing data. A client device need not be concerned with contacting potentially large numbers of servers to gather data but instead contacts only the local middleware server for all services. Middleware takes responsibility for getting the data from the right servers, and makes necessary conversion to fit the clients' needs. Middleware can also help scaling by temporary caching, fetching each piece of data only once but serving multiple requests for the same data, for example, as a physician moves locally between a clinic workstation and a graphical tablet.

As shown in Figure 2, middleware servers provide the following functionality:

- ✓ *User authentication and profiling.* Middleware boxes are trusted agents. They authenticate end users on behalf of the application.

- ✓ *Information discovery/data caching.* The middleware server acts as a proxy on behalf of the client to retrieve data from the application server.

- ✓ *Presentation conversion.* Middleware servers fetch data based on user requests (or pre-fetch data based on prediction of user's near-future need) and perform conversion as needed.

The preceding services would be required even in a wired environment. Mobility brings additional requirements to middleware service:

- ✓ *Session handoff.* When a user moves an on-going application session from one device to another, middleware servers act as a "home" for the application state (including active connections, cached data, etc.) to facilitate migration between devices.

- ✓ *Location tracking and network QoS adaptation.* To maintain an active application session as a user moves, the server tracks the user's location, adjusts to local network conditions by pre-allocating bandwidth and other resources along the user's path, and may forward sessions to other middleware servers.

- ✓ *User re-authentication.* When a user changes devices or spawns a new branch of a session to a new device, the middleware server authenticates the user on the new device.

In this paper we focus on the issue of session data transfer while conserving the rest for future work.

### 3.3 Software Architecture

A principal goal of our architecture is to allow the clients and application servers to have the same behaviour as they would without the middleware layer. Inserting the middleware servers simply forces all communication through the middleware servers with no out-of-band data sent directly between application server and client. Therefore, to the servers, the middleware layer must appear to be a client system, and likewise, the middleware layer must appear to be an application server to the clients.

We proceed with the assumption that the application servers are typically legacy systems and are unalterable. However, to enable session handoff we rely on the notion that the client application must be able to execute a segment of our code to communicate with the middleware. Specifically, the client applications must be able to (1) discover middleware data but also protocol messages. The middleware, in complementary fashion, must be able to execute long-running processes that service the clients.

We diagram the interaction between the client, the middleware server, and the application server in Figure 3. As mentioned, the middleware layer behaves as a client for the application servers, which cannot be modified. On the other hand, the client must be altered to perform the session handoff with the middleware layer. The client's source is modified by inserting a small portion of code which we term the *Middleware-Aware Remote Code*, or MARC, that acts as a proxy for the middleware layer within the client. This code facilitates middleware lookup, user authentication, and session saving and restoration, among other things. The MARC can be easily inserted by changing any calls from the client to the application server by calls to the MARC instead.

APPX1345

DISH, Ex. 1020 - Page 9 of 12

# 4 Case Study: The Mozilla Web Browser

In this section we explain and demonstrate the effectiveness of an application tailored for use within the iMASH architecture. Our research has been driven by the need to support current medical applications. The trend in health care is toward information systems that support integrated access to distributed electronic medical records in existing hospital information systems (HIS) and medical picture archiving and communication systems (PACS). Substantial progress has been made in delivery of computer-based information services to health care providers using a highly reliable, *wired* network [13]. This system was designed to acquire, process, and distribute medical records, including images, reports, and related clinical information. Medical data and derived knowledge are permanently archived in distributed multimedia storage systems, and then distributed over high-speed, dedicated switched networks. Such a system, if enabled for use in the iMASH *wireless* environment, would provide physicians with hitherto unexperienced levels of uninterrupted access to clinically important data.

We first wanted to prototype a complex but familiar application to understand and evaluate the feasibility of our approach. Our case study involves Mozilla [9], an open-source web browser based on Netscape Communicator 5.0 that is available from the Free Software Community with the support of Netscape/AOL. We have been working on Mozilla R15 on Windows NT 4.0 SP5. The end result of our implementation is a seamless web-browsing session experienced by the user even after he or she has moved from one machine to another. When the user wishes to migrate to another platform, the browser's session state is accordingly moved as well.

Our goal for this early implementation was not to build a better web browser; rather, this experience provides us with a foundation we can use in the future for medical applications. From this nascent experience with Mozilla, we can: (1) show the viability of our infrastructure and techniques; (2) establish baseline performance metrics and upper-bounds on session state transfer times; and (3) garner insight to generalise our methodology to future complex systems.

## 4.1 Implementation Issues

The MARC and middleware processes can be implemented using a variety of possibilities. Ideally, a good-performance, off-the-shelf software package that provides service lookup and distributed communication would be leveraged. A number of options, such as LDAP [16], Jini [15], and RFC-2165 [14] implementations, can provide service lookup. Likewise, CORBA, Java Remote Method Invocation (RMI), and several message-passing libraries are available for implementing distributed transactions.

In our work we have chosen the Java programming language as software platform of choice. Java includes a bevy of networking classes and APIs that provides a rich set of communication options. For service discovery and distributed communication, we have utilised the Jini software architecture and Java RMI.

For the MARC inside Mozilla, we have implemented our functionality by grafting together Java code with Mozilla's C++ through the use of the Java Native Interface [5] library. The end result is linked with Sun's Java Virtual Machine for Windows NT. The middleware server processes are implemented with long-running Java programs executing RMI to return a proxy object to the clients for them to interact with the middleware.

For Mozilla, we consider a session state to be the bookmark list, the history file, the user preferences, and the cache of web pages. In fact, this state can be used by any number of heterogeneous web browsers so long as they are outfitted with our MARC. A session transfer in our implementation involves the following sequence:

1. The user starts the client application and provides it with a unique user id.

2. The MARC within the application discovers and contacts the middleware server using Jini and begins a new session using the user id. The last saved state, if it exists, is retrieved from the middleware server. This step uses Java RMI to acquire the most recently saved bookmarks, history, and user preferences, all of which are stored on and transported from the middleware as serialised Java Objects.

3. The returned data from the middleware is received by the MARC and then incorporated into the client before the user's current interactive application session begins. Within Mozilla, the data is deserialised by the MARC and then read into Mozilla's bookmark, history, and user preference dataspace. Web pages are retrieved on-demand from the middleware server using a standard proxy protocol communicating with a middleware component executing the Squid [11] webpage proxy cache.

4. As the user changes the current session state, the state is updated at the middleware server at the appropriate times. For example, whenever Mozilla flushes the bookmarks to disk, our MARC will also transmit this data to the middleware via RMI.

5. When the user exits the session, the client updates the state at the middleware. Because Mozilla flushes all data upon exiting, our MARC likewise updates data on the middleware.

## 4.2 Experimental Methodology and Results

In this section we evaluate our system using various criteria. We note that it is inherently difficult to quantitatively ascertain the added value of our system because the end result is not one of performance enhancement but rather of functionality enrichment. The primary benefit of our system is the convenience of having session state seamlessly transferred to a new client device without user intervention.

We do make the following informal observation to try to quantify the added value of our system to a web browser. It is generally difficult for users to remember all the bookmarks that have been saved. Furthermore, we say that among all the URLs saved in a bookmark file, the shortest ones, namely those with only a top-level domain name (e.g. http://www.cs.ucla.edu), are more likely to be remembered by users than longer ones (e.g. increasingly popular dynamically-created URLs like http://football.espn.go.com/nfl/scoreboard?season=2&week=3&year=2000). Using sample Netscape bookmarks from over a dozen users, we calculated that on average, about 25% of the URLs in a bookmark file have only top-level names. It follows then from this very informal argument, whose methodology may be generalised to other applications, that for users who browse the web on multiple client machines, about 75% of the time our automatic session transfer capability is advantageous. We assert that our system is a better solution to this problem than alternative means of finding pages, such as by performing a new websearch or by manual conveyance of the bookmark list (e.g. via floppy disk or FTP) from client to client.

We also looked to measure the overhead induced by our system.

APPX1346

DISH, Ex. 1020 - Page 10 of 12



**Figure 4:** Handoff service time at middleware



**Figure 5:** Latencies of performing handoff at client

In our experiments we timed the latency involved in performing a session handoff for a variety of datasets. Although in our trials we used bookmarks as our session state, these results will be valid in any context of application session data since our implementation transfers data simply as Java Object types. Our experiments involved executing our Mozilla browser on a Windows NT platform running on a 500 Mhz Intel Celeron laptop with 128 MB RAM connected to the network via ethernet. On the server side, our middleware process ran on a 270 MHz Sun Ultra 5 with 256 MB RAM.

Figure 4 shows the service time needed by the middleware process to handle a session transfer as a function of state size; this time includes RMI network transactions and disk access. Obviously, as the size of the state increases, the time need to perform the handoff increases as well, which is shown in the graph.

In Figure 5 we plot the client-side latency of a handoff, which again includes network transactions, disk access, and data processing. Also, due to Java RMI's inherent remote procedure call semantics, the latency seen by the client includes the corresponding execution time of the middleware server as well. As expected, the time to perform a transfer increases because this work is proportional to the size of the state. Note that the results are only in the range of a few seconds for even the largest state size of 1 MB. This result implies that for hardware environments that are similar to our testbed (a likely situation given that our target environment is primarily a high-bandwidth wired and wireless network within a hospital), advanced performance-increasing techniques are not needed unless the state size exceeds a few megabytes. For applications running on platforms and networks with low bandwidth, we can utilize methods such as optimistic prefetching and content adaptation to reduce latency.

It is interesting to note that in Figure 4 the time for the server to perform a session read is longer than for a session write, which is in contrast to the client's behaviour shown in Figure 5. We believe the difference may be due to the fact that the server is running on Sun Solaris, while the client is running on Windows NT.

While both the previous Figures show that the absolute time to perform handoff increases for larger states, in Figure 6 we show that this time actually becomes a smaller portion of the overall time needed by the application to use the state. We graph the overhead in-



**Figure 6:** Overhead of the MARC

curred by the MARC on the client while performing handoff. We calculate the overhead as the percent difference in time to save/restore session between our modified Mozilla and an unmodified Mozilla. Clearly, it can be seen that as the session size increases, the networking cost of the handoff becomes a smaller part of the overall time because the disk access time needed to read and write this state to the client's local storage as well as the cost to incorporate the data into the data space both become larger factors.

We note that our implementation obviously does not provide for the rich set of iMASH features (such as security, content adaptation, scalability, data reconciliation, and multiple middleware servers) that will undoubtedly bring forth future complications, adding to the latency. On the other hand, we will look into faster Java JIT compilation techniques to increase performance over the Sun JVM, which has well-known performance deficiencies [7].

APPX1347

DISH, Ex. 1020 - Page 11 of 12

## 5 Conclusion

Although the iMASH architecture will be an extremely robust system enabling a wide variety of functionality for the mobile physician, we have concentrated our work so far on the session handoff capability so crucial for mobile users. Within the iMASH environment the clients will be able to save and restore their session states to the middleware at different times, locations, and platforms. This particular implementation is but one cog in the overall architecture that will provide continuous access.

As an example of the session handoff transfer, we have created an implementation that allows the Mozilla web browser to save its session state to the middleware layer. It is clear how useful this capability already is for an application as conceptually simple as a web browser: our facility alleviates the need for users to memorize data, use a search engine, or manually transfer files. If the functionality for accessing bookmarks and other data from any location is that favourable, then the resulting reduction of burden for session transfer in medical applications for roaming physicians will be all the more promising.

In the future we will enable medical applications, augment our infrastructure, and explore new research issues as technology progresses during the course of our multi-year project. Our ultimate goal will always be to incorporate our vision with the critically important field of health care.

## 6 Acknowledgments

We would like to thank Yunjung Yi and Jinsong Lin for their help in this work.

## References

[1] R. Bagrodia, M. Gerla, S. Lu, R. Meyer, D. Valentino, and L. Zhang. "Supporting Nomadic Healers," *UCLA Technical Report 200021*, 2000.

[2] A. Bond, M. Gallagher, and J. Indulska. "An Information Model for Nomadic Environments," *IEEE Proceedings of the Ninth International Workshop on Database and Expert Systems Applications*, 1998.

[3] E. Brewer, R. Katz, E. Amir, H. Balakrishnan, Y. Chawathe, A. Fox, S. Gribble, T. Hodes, G. Nguyen, V. Padmanabhan, M. Stemm, S. Seshan, and T. Henderson. "A Network Architecture for Heterogeneous Mobile Computing," *IEEE Personal Communications*, October 1998.
http://www.cs.berkeley.edu/~brewer/papers.html

[4] G. Forman and J. Zahorjan. "The Challenges of Mobile Computing," *IEEE Computer*, vol. 27, no. 4, 1994.

[5] S. Liang. The Java Native Interface, Addison Wesley Longman, 1999.

[6] M. Litzkow, M. Livny, and M. Mutka. "Condor - A Hunter of Idle Workstations," *Proceedings of the 8th International Conference of Distributed Computing Systems*, June 1988.
http://www.cs.wisc.edu/condor/

[7] J. Maassen, R. van Nieuwpoort, R. Veldema, H. E. Bal, and A. Plaat. "An Efficient Implementation of Java's Remote Method Invocation," In *Proceedings of the Seventh ACM SIGPLAN Symposium on Principles and Practice of Parallel Programming*, Atlanta, GA, USA, 1999.
http://www.cs.vu.nl/manta/

[8] D. Milojicic, F. Douglis, F., Y. Paindaveine, R. Wheeler, and S. Zhou. "Process Migration Survey," *ACM Computing Surveys*, June 2000.
http://www.hpl.hp.com/personal/Dejan_Milojicic/

[9] *The Mozilla Homepage*.
http://www.mozilla.org/

[10] B. Noble, M. Satyanarayanan, D. Narayanan, J. Tilton, J. Flinn, and K. Walker. "Agile Application-Aware Adaptation for Mobility," In *Proceedings of the 16th ACM Symposium on Operating System Principles*, 1997.

[11] *The Squid Web Proxy Cache Homepage*.
http://www.squid-cache.org/

[12] E. Swierk, E. Kiciman, V. Laviano, and M. Baker. "The Roma Personal Metadata Service," In *Proceedings of the Third IEEE Workshop on Mobile Computing Systems and Applications*, Monterey, CA, USA, December 2000.
http://mosquitonet.stanford.edu/publications.html

[13] D. Valentino. "Considerations in Implementing Large-Scale PACS," *Conference on RIS, PACS and Teleradiology: Future-Proof Solutions*, Lubbock, TX, USA, 1998.

[14] J. Veizades, E. Guttman, C. Perkins, and S. Kaplan. "Service Location Protocol," *RFC 2165 Document*.
http://www.ietf.org/rfc/rfc2165.txt

[15] J. Waldo. "The Jini Architecture for Network-Centric Computing," *Communications of the ACM*, vol. 42, no. 7, 1999.

[16] W. Yeong, T. Howes, and S. Kille. "Lightweight Directory Access Protocol," *RFC 1777 Document*.
http://www.ietf.org/rfc/rfc1777.txt

1          UNITED STATES PATENT AND TRADEMARK OFFICE

2            BEFORE THE PATENT TRIAL AND APPEAL BOARD

3

4     DISH NETWORK CORPORATION,    )

5     DISH DBS CORPORATION, DISH  )

6     NETWORK L.L.C., ECHOSTAR     )

7     CORPORATION, and ECHOSTAR    )

8     TECHNOLOGIES L.L.C.,         )

9                  Petitioner,     )

10        -vs-                     ) Case No: IPR2015-00627

11    CRFD RESEARCH, INC.,         )  U.S. Patent No.

12               Patent Owner. )  7,191,233 B2

13    _____)

14

15

16          DEPOSITION OF PRASANT MOHAPATRA, Ph.D.

17                 OCTOBER 26, 2015

18

19

20

21

22

23

24    Reported by: ANNE M. TORREANO, RPR, CCRR, CLR, CSR No. 10520

25    JOB NO: 99314

1    address?

2        A.   An IP address?  Yes.

3        Q.   And the IP address would allow the network to

4    know how to move packets between, for example, the

5    first client and the MARC server; correct?

6        A.   There are many other things in addition to the

7    IP address you will need in order to do the transfer.

8        Q.   But you would at least need to know the IP

9    address of the MARC server; correct?

10       A.   Correct.

11       Q.   Similarly, to resume at that second device,

12   the MARC server would need to know the IP address of

13   the second device in order to send the session

14   information from the MARC server to the second device?

15       A.   Yes.

16       Q.   And the MARC server would learn the IP address

17   of the second device when the second device contacted

18   the MARC server to request a resumption of the session?

19       A.   Correct.

20       Q.   And as part of the message saying that it

21   wanted to resume the session, it would include --

22   excuse me.

23           As part of the message that it wished to

24   resume the session, the second device would let the

25   MARC server know what its IP address is?

1          MR. FAHMI:  Objection.  Form.

2          THE WITNESS:  Correct.

3   BY MR. BOWLING:

4       Q.  So in that way, the second device would have

5   identified itself to the MARC server; correct?

6          MR. FAHMI:  Objection.  Form.

7          THE WITNESS:  While pulling the information.

8   BY MR. BOWLING:

9       Q.  And in that way, the MARC -- or excuse me, the

10  second device, to use the language of the claim, would

11  have specified itself to the MARC server?

12         MR. FAHMI:  Objection.  Form.

13         THE WITNESS:  The second device would have

14  specified -- I'm not agreeing to the point that it's

15  conferring to the claim.  So the claim is requiring the

16  second device to be specified before the

17  discontinuation of the session.

18  BY MR. BOWLING:

19      Q.  Why does the claim require that the

20  specification take place before the session is

21  discontinued?

22      A.  Because it's saying you can conduct a session

23  with the first device, then specifying a second device.

24  So you specify the second device before resuming the

25  session in the second device.

1 room 2 when that device specified itself to the server;

2 correct?

3     A.  Correct.

4     Q.  Okay.  So it is possible for a second device

5 to specify itself to a server after the first device

6 has discontinued the session?

7         MR. FAHMI:  Objection.  Form.

8         THE WITNESS:  So the model that Phan, both the

9 papers, San Jose and Helsinki talks about, there's

10 nothing wrong with the model.  I'm not saying that

11 either of them are wrong.  It's just that they are

12 different than what is covered in the claim in the

13 patent.

14 BY MR. BOWLING:

15     Q.  And in particular, it's that the session --

16 excuse me -- the session history is sent before the

17 session is discontinued; correct?

18     A.  Yes.

19     Q.  Okay.  Do you agree, though, that in the Phan

20 model -- the Phan pull model that the second device is

21 specified?

22         MR. FAHMI:  Objection.  Form.

23         THE WITNESS:  Second device is specified at

24 some point in time, yes, in the pull model.

25 BY MR. BOWLING:

1  browsing session as the Bates patent defines the term?

2      A.  No.

3      Q.  Moving to figure 5, in your view, what is

4  meant by the term "at idle period"?

5      A.  Idle period is usually configured in the

6  computer that if you are -- if there is no interaction

7  for, let's say, an hour or half an hour, then it goes

8  to the idle mode.  So basically it's kind of a sleep

9  mode that the computer uses to save resources.

10     Q.  That's a pretty long time.  Would you expect

11  that if a user entered the idle mode, then any browsing

12  session they were engaged in would have necessarily

13  been torn down based on idle time expiring?

14     A.  Yes.

15     Q.  So to go through the series, the client will

16  contact a server, engage in some communication, and

17  then there will be a pause because the user goes away

18  to get a drink or even to sleep, and then the idle

19  period will pass.  And then to the extent that box is

20  checked, that will cause Bates to transmit the browser

21  info?

22          MR. FAHMI:  Objection.  Form.

23          THE WITNESS:  So if we go back to figure 7, in

24  704 it will get the event, which is it's idle.  Then we

25  will follow through the flow chart to transmit the

1  browser info.

2  BY MR. BOWLING:

3      Q.  So the way that will work is at 706, Bates

4  will determine if it is configured for cooperative

5  browsing?

6      A.  Right.

7      Q.  If the answer is yes, then it shall determine

8  if the idle is a share event?

9      A.  Right.

10     Q.  And we'll know that based on whether "idle"

11  was checked in figure 5; correct?

12     A.  Correct.

13     Q.  So if that's true, it will branch to the left,

14  and it will find out does buffer contain data; correct?

15     A.  Correct.

16     Q.  And if we were actively browsing and creating

17  a history and a cache, we would expect that the buffer

18  would in fact contain data; correct?

19     A.  Correct.

20     Q.  So we'll follow the branch "yes," and we shall

21  transmit the browser info?

22     A.  Correct.

23     Q.  When, if ever, will we get to diamond 714?

24     A.  So if you have -- if you don't have a shared

25  event, then does the event produce any browser info?

1     A.  Correct.

2     Q.  So it's possible that the web browser will

3   shut down before the e-mail is sent out?

4     A.  Correct.

5          MR. FAHMI:  Objection.  Form.

6   BY MR. BOWLING:

7     Q.  And in fact, to the extent we're looking at

8   the at shutdown, you would expect that to be the order

9   of events; correct?

10          MR. FAHMI:  Objection.  Form.

11          THE WITNESS:  Can you clarify the question?

12   BY MR. BOWLING:

13     Q.  Especially when we're ending the session in

14   the browser by shutdown --

15     A.  Yes.

16     Q.  -- you would expect the shutdown to take place

17   and the browser to flush its cache to disk before we

18   initiated the sharing of that info by e-mail?

19     A.  By e-mail, yes.

20     Q.  Yes.

21          And e-mail is the prime example given in the

22   Bates patent of how the session information is shared

23   between computers?

24     A.  Correct.

25     Q.  And then at the other end, the second computer

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT AND TRIAL APPEAL BOARD

———————

DISH NETWORK L.L.C., ECHOSTAR CORPORATION
& ECHOSTAR TECHNOLOGIES L.L.C.

Petitioner

v.

CRFD RESEARCH, INC.

Patent Owner

———————

Case IPR2015-00627

Patent 7,191,233 B2

———————

**DECLARATION OF PRASANT MOHAPATRA, PH.D.**

Dish Network et al. v. CRFD
IPR2015-00627   CRFD Ex. 2001

the session is discontinued on the first device, as required by claim 1, but instead transmits some representation of its operations on a data object to the MWS and then *waits* until a session is fully reinstantiated on the second client before terminating its session. *Id*. at 11, rt. col. Accordingly, insofar as *Phan San Jose* describes a "push" mode, *Phan San Jose* does not describe the subject matter recited in claim 1.

32.     The "pull" mode described by *Phan San Jose* is also distinct from the subject matter recited in claims 1 and 23, but for a different reason. As discussed above, when describing the "pull" mode, *Phan San Jose* states:

> When the user wishes to perform a session handoff, he must first decide how the handoff shall be conducted with respect to the recipient. If the user selects a "Suspend" operation, his session shall be saved back to the MWS, allowing the application to terminate, and at a later time the session can be reinstantiated by the Teaching File application running on the target machine. ***This approach is clearly a "pull" mechanism*** in that the target explicitly retrieves the session state from the MWS.

*Ex. 1019* at 11, rt. col. (emphasis added). Thus, the "pull" mode involves the user selecting a "Suspend" operation at the first client device. As illustrated in the above Fig. 5 of *Phan San Jose*, this is effected when a "Handoff" is

Dish Network et al. v. CRFD
IPR2015-00627   CRFD Ex. 2001

selected and the user is presented a dropdown menu. The option to "Suspend" the session corresponds to the "pull" mode. *Id*. When "Suspend" is selected, the user's "session shall be saved back to the MWS, allowing the application to terminate." *Id*. Thus, unlike the "push" mode, in the pull mode no specifying of a target device is taught; if a user wishes to resume the session, some unspecified target device can "pull" the session state from the MWS. *Id*. Thus, the "pull" mode described by *Phan San Jose* fails to teach specifying a second device," as required by claims 1 and 23.

33.   With the above understanding, we can now consider the teachings of *Phan Helsinki*. *Phan Helsinki* pertains to the same system discussed in *Phan San Jose. Ex. 1020* at 7. According to *Phan Helsinki*, "[w]hen a user moves an on-going application session from one device to another, middleware servers act as a 'home' for the application state (including active connections, cached data, etc.) to facilitate migration between devices." *Id.* at 9. Further, a session transfer involves the MARC within a client application contacting the middleware server and beginning a new session. *Id*. at 10. If a previous session state exists, it is retrieved from the middleware server by the MARC and incorporated into the client before the user's current session begins. *Id*. Thus, *Phan Helsinki* describes what was

contemplated in *Phan San Jose* as the "pull" mode in which "the target explicitly retrieves the session state from the MWS." *Ex. 1019* at 11, rt. col.

34.     I am advised that claims may be found unpatentable as anticipated if a single prior art reference discloses each limitation of the claim, either expressly or inherently. I understand a limitation to be inherently disclosed only if it is necessarily present in the reference. It is my opinion that claims 1 and 23 of the '233 Patent are not anticipated by *Phan Helsinki*.

35.     *Phan Helsinki* describes, and *Phan San Jose* explains in greater detail, a "pull" mode. In the "pull" mode, no second device on which a session will be resumed is ***specified***, as required by claims 1 and 23. Instead, in the "pull" mode the user selects a "Suspend" operation at the first client device. When "Suspend" is selected, the user's "session shall be saved back to the MWS, allowing the application to terminate." *Ex. 1019* at 11, rt. col. Later, a second device may obtain the session state from the MWS and begin its session. *Ex. 1020* at 10. Thus, significant differences exist between the pull mode session transfer described by *Phan Helsinki* and the subject matter recited in independent claims 1 and 23 of the '233 patent. Accordingly, *Phan Helsinki* cannot anticipate either of claims 1 or 23.

Dish Network et al. v. CRFD
IPR2015-00627   CRFD Ex. 2001
APPX1829

## VI. Comparison of Phan Helsinki and Claims 4 and 25 of the '233 Patent.

36. I understand that Claims 4 and 25 depend, respectively, from claims 1 and 23 and, therefore, include all of the limitations of their respective parent claims. Accordingly, for the same reasons as expressed above with respect to claims 1 and 23, it is my opinion that claims 4 and 25 are not anticipated by *Phan Helsinki*. Insofar as its "push" mode is concerned, *Phan San Jose* does not teach "transmitting a session history of said first device from said first device to a session transfer module *after said session is discontinued on said first device,*" as required by the claim. Insofar as its "pull" mode is concerned, *Phan San Jose* does not teach "specifying a second device," as required by the claim.

## VII. Comparison of Phan Helsinki and Phan San Jose with Claims 4 and 25 of the '233 Patent.

37. I have been asked to consider whether, to a person of ordinary skill in the art, claims 4 and 25 of the '233 Patent would be obvious in view of the combined teachings of *Phan Helsinki* and *Phan San Jose*. I am advised that even if a claim is not anticipated by a prior art reference, the claim may still

Dish Network et al. v. CRFD
IPR2015-00627   CRFD Ex. 2001
APPX1830

be unpatentable if, at the time of the invention, the claim as a whole would have been obvious to a person of ordinary skill in the art. I understand that considerations of obviousness involve determining the scope and content of the prior art; ascertaining the differences between the prior art and the claims at issue; and resolving the level of ordinary skill in the pertinent art. I further understand that considerations of so-called secondary indicia of non-obviousness can be important to the obviousness inquiry, however, I have not been asked to consider any such secondary indicia of non-obviousness in connection with this declaration.

38.     As I noted above, *Phan Helsinki* pertains to the same system discussed in *Phan San Jose*. *Ex. 1020* at 7. According to *Phan Helsinki*, "[w]hen a user moves an on-going application session from one device to another, middleware servers act as a 'home' for the application state (including active connections, cached data, etc.) to facilitate migration between devices." *Id*. at 9. Further, a session transfer involves the MARC within a client application contacting the middleware server and beginning a new session. *Id*.at 10. If a previous session state exists, it is retrieved from the middleware server by the MARC and incorporated into the client before the user's current session begins. *Id*. Based on this disclosure, a person of

Dish Network et al. v. CRFD
IPR2015-00627   CRFD Ex. 2001

ordinary skill in the art would understand that *Phan Helsinki* is describing what *Phan San Jose* identifies as the "pull" mode.

39.     *Phan San Jose* indicates that it is in the "pull" mode in which "the target explicitly retrieves the session state from the MWS." *Ex. 1019* at 11, rt. col. (emphasis added). This is entirely consistent with *Phan Helsinki's* description of the session initiation process in which the MARC within a client application contacts the middleware server and, if a previous session state exists, retrieves the previous session state from the middleware server and incorporates into the client before a user's current session begins. *Ex. 1020* at 10.

40.     Given that the two references are discussing the same system, a person of ordinary skill in the art would understand that the scope and content of the prior art as represented by *Phan San Jose* and *Phan Helsinki* pertains to that system, and, in particular, what was contemplated in *Phan San Jose* as the "pull" mode. *Phan San Jose* explains that in the "pull" mode the user selects a "Suspend" operation at the first client device. When "Suspend" is selected, the user's "session shall be saved back to the MWS, allowing the application to terminate." *Ex. 1019* at 11, rt. col. Later, if a user

Dish Network et al. v. CRFD
IPR2015-00627   CRFD Ex. 2001

wishes to resume the session, the session state is "pulled" from the MWS as explained in *Phan Helsinki*. *Ex. 1020* at 9-10.

41.    Thus, it is my opinion that the combination of *Phan Helsinki* and *Phan San Jose* does not teach or suggest specifying a target device, as required by claims 1 and 23. Claims 1 and 23 each require, "***specifying a second device***," *Ex. 1001* at 9:33 (emphasis added). However, according to the combination of *Phan Helsinki* and *Phan San Jose,* in the "pull" mode the user "Suspend[s]" the session and the session is saved to the MWS. Later another device can retrieve the session state, as discussed by *Phan Helsinki*. Hence, claims 1 and 23, and their respective dependent claims 4 and 25, are not obvious in view of the combination of the references.

42.    It is also my opinion that a person of ordinary skill in the art would not combine some of the features of the *Phan San Jose* "pull" mode with other features of the "push" mode to arrive at the subject matter of claim 1. I note that no such argument has been advanced by Petitioner, but if such an argument were made, it would not be compelling. In the "push" mode *Phan San Jose* specifies that the session history is transmitted ***before*** the session is discontinued on the first device. *Ex. 1019* at 11, rt. col. This sequence of events is important in a "push" operation because one would want to ensure

that the session handover is complete before discontinuing the session on the first device. Otherwise, session information may be lost and the user would be unable to resume the session in a seamless fashion on the second device. *Phan San Jose* indicates this sort of seamless transfer is a desirable goal, *Ex. 1019* at 5, rt. col., so avoiding a handover operation that has an inherent risk of not meeting this requirement would be a design choice that a person of ordinary skill in the art would be likely to follow.

43.    Thus, in my opinion any combination of *Phan Helsinki* and *Phan San Jose* that incorporate the features of the "push" mode would also ensure that the session history is transmitted **before** the session is discontinued on the first device. Such a requirement is contrary to the requirements of claims 1 and 23 (and, hence, claims 4 and 25).

44.    A further reason why a person of ordinary skill in the art would not incorporate the aspects of "selecting a second device" in a hypothetical "pull" mode is that there is no good reason to do so. A hallmark of a "push" mode is that the user is affirmatively directing the session to a new device that the user wishes to continue the session on. Therefore, to ensure the handover, the user directs the information be sent to that target device by specifying same. *Ex. 1019* at 11, rt. col. In a "pull" mode, however, the user

Dish Network et al. v. CRFD
IPR2015-00627   CRFD Ex. 2001

is about to "Suspend" his or her session. *Id*. Accordingly, the user is concerned with saving the session state to the middleware server. *Id*. There is no reason to specify a second device because the session state is not saved there, it is saved at the middleware server. *Id*.

45.     For at least the above reasons then, it is my opinion that claim 1 is not obvious in view of the combination of *Phan Helsinki* and *Phan San Jose*.

## VII. Comparison of Bates with Claims 1 and 23 of the '233 Patent.

46.     I have been asked to consider whether claims 1 and 23 are anticipated by *Bates*. In my opinion, *Bates* fails to teach "transmitting a session history of said first device from said first device to a session transfer module *after said session is discontinued on said first device*," as recited in claims 1 and 23. Hence, in my opinion, claims 1 and 23 are not anticipated by *Bates*. I explain my reasoning in this regard below.

47.     As noted above, *Bates* describes a process for transferring browser information between two computers *during a browsing session*. *Ex. 1004* at 8:55 et seq. According to that process, if the local computer is configured to share browser information with a remote computer, then, as shown in Fig. 7,

is concerned with *preserving* that current browsing session, *id*. at 11:9-12, and in order to achieve the goal of preserving the current browsing session, *Bates* allows a user to designate when the transfer of the browser information will take place. *Id.* at 7:56 – 8:23. Importantly, none of the specified events (immediately upon user request, at shutdown, when the client computer is idle, periodically, and upon the occurrence of a predetermined action) corresponds to a time *after said session is discontinued on said first device*.

51.     From the standpoint of the person of ordinary skill in the art, it would be clear that steps in a process that takes place *during a browsing session* would not occur *after* that session is discontinued. Even if one ignores *Bates'* explicit statements that the FIG. 7 process taking place during the browsing session, never does *Bates* indicate that any of the described instances for transferring the browser information occur *after* the session is discontinued and nor need they necessarily be so.

52.     For example, a transmission that occurs "immediately upon user request" is not necessarily concurrent with a transmission after a session is discontinued. User requests may occur at any time, and are especially likely to occur during a browsing session as a user comes across interesting

Dish Network et al. v. CRFD
IPR2015-00627   CRFD Ex. 2001

APPX1838

information or performs actions that the user wishes to preserve as browsing history or other session events. Therefore, it is equally, if not more, likely that such a user request will be made (and a corresponding transmission of session state effected) while the user is engaged in a current session.

53.     Likewise, transmissions that occur when an application or a computer is being shutdown need not necessarily occur after a session is discontinued. It is equally likely that the transmission is made as part of the shutdown process – i.e., concurrently with the session being terminated. Indeed, *Bates* shows in Fig. 7 that the transmission of browser information occurs at step 720, and that is said to be a step that takes place "during a browsing session." *Id*. at 8:55-57. It is likely, and a person of ordinary skill in the art would understand that, as part of a shutdown process the method depicted in Fig. 7 would be run to ensure that all browser information stored in the buffer was transferred and, because that method is executed during a browser session, it follows this would occur (including transmission of the browser information) before the shutdown process is completed. Therefore, while the process may occur concurrently with a shutdown, the transmission would still occur before the session is discontinued.

Dish Network et al. v. CRFD
IPR2015-00627   CRFD Ex. 2001

54.     Similarly, transmissions that occur when a computer is idle do not necessarily occur after a session is discontinued. Idle periods can, and often do, occur during a Web browsing session and so transmissions that occur as a result of such an idle period would take place during a session, not after it is discontinued.[1] In fact, nothing in *Bates* suggests otherwise.

55.     Also, periodic transmissions of browser information need not necessarily occur after a session is discontinued. Such time intervals may occur at any time, including before a session is discontinued. In a similar way, transmissions that occur upon the manifestation of an unidentified predetermined action need not necessarily occur after a session is discontinued as such actions may occur at any time and nothing in *Bates* indicates anything to the contrary.

## VII. Comparison of Bates and Chan with Claims 1, 4, 23 and 25 of the '233 Patent.

56.     I have been asked to consider the patentability of claims 1, 4, 23, and 25 under 35 U.S.C. § 103 in view of the combined teachings of *Bates* and *Chan*. In my opinion, these claims are patentable over the combined

---

[1] Id. at __

teachings of *Bates* and *Chan*, and I explain my reasoning in this regard below.

57. I understand that *Chan* is not being relied upon to teach suggest "transmitting a session history of said first device from said first device to a session transfer module after said session is discontinued on said first device," and instead is cited for teachings concerning "a session transfer module." Pet. at 33. Combining the teachings of *Chan* concerning the session transfer module does not alter my conclusions with respect to *Bates* set forth above. That is, in my opinion, even if the person of ordinary skill in the art were to consider the teachings of *Chan* concerning the session transfer module in combination with *Bates'* teachings concerning transfer of sessions, the person of ordinary skill in the art would not find the subject matter of the challenged claims obvious.

58. For example, *Chan* describes a session transfer process in which application state is transferred from a source device to a destination device, the destination device then restarts an application using the transferred session state, and, only after these steps have been completed, does the source device then shut down. *Ex. 1005* at 25. In other words, according to *Chan*, the source device discontinues a session only after the transfer of the

session state to the second device has been completed. Accordingly, a person of ordinary skill in the art considering the combined teachings of *Bates* (which specifies transmissions of browser information **during** a browser session) and *Chan* (which describes a source device discontinuing a session after a transfer of session state to a second device has been completed) would follow the teachings of these references and adopt a method in which the transmission of browser information is completed **before** the session is discontinued. The person of ordinary skill in the art would **not,** based on *Bates* and *Chan,* adopt a process in which a session history of a first device is transmitted from said first device to a session transfer module **after** said session is discontinued on said first device, as recited in claims 1 and 23. Hence, in my opinion, claims 1, 4, 23, and 25 are patentable over the combined teachings of *Bates* and *Chan.*

## VIII. Declaration.

I hereby declare that all statements made of my own knowledge are true and all statements made on information are believed to be true and further that the statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment or both under §

Dish Network et al. v. CRFD
IPR2015-00627  CRFD Ex. 2001
APPX1842

1

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

DISH NETWORK L.L.C., ECHOSTAR
CORPORATION & ECHOSTAR
TECHNOLOGIES L.L.C.,            Case CBM2015-00627

      Petitioner,

   vs.

CRFD RESEARCH, INC.,            Patent 7,191,233

      Patent Owner.
_____/


Deposition of WILLIAM LEO HOARTY, Volume 1, taken

on behalf of the Patent Owner, at Baker Botts LLP,

1001 Page Mill Road, Suite 1-200, Palo Alto,

California 94304, Palo Alto, California, beginning

at 9:10 a.m. and ending at 11:26 a.m. on Friday,

August 7, 2015, before RACHEL FERRIER, Certified

Shorthand Reporter No. 6948.

1  forth in that opening sentence of the summary

2  invention that is disclosed in Bates that you are

3  aware of?

4          MR. BOWLING:  Objection; form.

5          THE WITNESS:  To me, as a technologist

6  and expert, Bates is a -- I read it as a

7  specification of how an invention is novel and how

8  it works.  So, to that extent, I don't know how to

9  apply the word "scope" to what I've read, so if

10 you will allow me to state it, the invention is

11 very clear to me as it is written.

12         BY MR. FAHMI:

13    Q    Well, let's, for example, turn to Figure

14 7.

15    A    Okay.  Pages are stuck.  There we go.

16    Q    Now, as part of your review of the Bates

17 reference, you considered the flow chart shown in

18 Figure 7; right?

19    A    Correct.

20    Q    And referring to column 8, lines 55 to

21 57, you would agree that Figure 7, in Bates,

22 illustrates the operation of a local computer

23 during a browsing session; correct?

24    A    I read -- I read column 8, line 55 to

25 show a method 700 for operating client computer

Dish Network et al. v. CRFD Research
IPR2015-00627  CRFD Ex. 2004

1  106 during a browsing session.

2      Q    So do you understand Figure 7 to show

3  steps performed by the client computer during a

4  browsing session?

5      A    I read Figure 7 to show a method of many

6  that the invention is performing during -- at any

7  rate, this -- correct.  I see it as a method, one

8  of potentially many.

9      Q    Well, this is the one that Bates

10  describes as being performed during a browsing

11  session; is that 11 right?

12      A    It is a method performed during a

13  browsing session, correct.

14      Q    And if we look at some of the steps that

15  are shown in Figure 7, do you see a step labeled

16  "704"?

17      A    I do.

18      Q    What's your understanding of what

19  transpires during that step?

20      A    704 is defined in the specification,

21  referring back to your -- back to the

22  specification.  704 is defined -- give me one

23  moment, please, as to be accurate.

24          The specification teaches that the

25  method 700 is entered into at step 702 and

Dish Network et al. v. CRFD Research
IPR2015-00627  CRFD Ex. 2004

1  proceeds to step 704 to begin processing an event.

2          So as I read it, it is a point of entry

3  where an event is evaluated or begins processing

4  of an event.

5      Q    And a person of ordinary skill in the

6  art, in your opinion, would have the same

7  understanding about what takes place at step 704;

8  is that right?

9          MR. BOWLING:  Objection; form.

10          THE WITNESS:  I would say that any --

11  that the skilled person would read what I just

12  read in the specification and understand it to be

13  an entry point where an event is.  As it reads,

14  it's the beginning of the processing of an event.

15          BY MR. FAHMI:

16      Q    And what would the person of ordinary

17  skill in the art understand that event to be?

18      A    The specification doesn't specifically

19  teach what the event is, other than it is defined

20  in subsequent texts in the specification as

21  something that is -- let me be precise.  Let me

22  just -- to read.

23          The event is not defined as what it is,

24  it's defined -- from my read of the specification,

25  it is defined in how it is evaluated.

Dish Network et al. v. CRFD Research
IPR2015-00627  CRFD Ex. 2004

1      Q      And that evaluation that you are

2   referring to occurs at step 710; is that right?

3           MR. BOWLING:  Objection; form.

4           THE WITNESS:  I read that step 710 is a

5   share event where a determination is made whether

6   or not the event is a share event.  It's column 9,

7   line 10:  If the event is not a share event,

8   method proceeds from 710 to other actions.  If it

9   is a share event, then it -- further processing is

10  performed.

11          BY MR. FAHMI:

12     Q      And prior to that evaluation to

13  determine whether the event is a share event or

14  not, there's a step 706.

15          Do you see that?

16     A      I see 706.

17     Q      What would the person of ordinary skill

18  in the art understand step 706 to be?

19     A      The specification defines step 706 in

20  column -- I believe it's column 8, and step 706 in

21  the specification in column 8, line 63 reads:  "In

22  one embodiment, the determination at step 706 is

23  made according to whether one or more e-mail

24  addresses were" entered -- "were input to the

25  address field 302 in the window 300 (shown in

Dish Network et al. v. CRFD Research
IPR2015-00627  CRFD Ex. 2004

1  Figure 3)."

2      Q    Will the person of ordinary skill in the

3  art have any other understanding of what step 706

4  is?

5      A    I believe that that is -- I believe that

6  defines the scope of step 706.  Entering the e-

7  mail address determines the destination of another

8  -- of another device to which a session might be

9  transferred.

10     Q    Let's go back to step 710.

11     A    Okay.

12     Q    And I believe you indicated that this

13  was a determination as to whether or not the event

14  under consideration is or is not a share event; is

15  that right?

16     A    Correct.  710 diamond indicates whether

17  or not the event is to -- is a share event -- is

18  the point where the determination is made, excuse

19  me.

20     Q    What would the person of ordinary skill

21  in the art understand a share event to be?

22     A    Well, again, referring to the

23  specification, they define share event fairly

24  clearly, and if the type were only larger.  Please

25  excuse my limiting --

Dish Network et al. v. CRFD Research
IPR2015-00627   CRFD Ex. 2004

1       The specification reads, in column 9,

2   starting line 2:  If the local client computer is

3   configured to share browser information, the

4   method proceeds to step 710 and queries whether

5   it's a share event.  We have just found that.

6       And then they further -- it further

7   teaches: "... and queries whether the event is a

8   'share event,' i.e., an event adapted to initiate

9   transmission of the browser information from the

10  local client computer to the remote client

11  computer."

12      Q    So would the person of ordinary skill in

13  the art, then, understand the share event to be an

14  event adapted to initiate transmission of the

15  browser information from the local client computer

16  to the remote client computer?

17      A    That is --

18           MR. BOWLING:  Objection; form.

19           THE WITNESS:  That is how the -- that is

20  what I read as the specification, the words you

21  just stated. It specifies the event -- anyway,

22  yes, what you read is what I read.

23           BY MR. FAHMI:

24      Q    I understand it's what you read, but the

25  question really was whether --

Dish Network et al. v. CRFD Research
IPR2015-00627   CRFD Ex. 2004

1      A      Oh, I'm sorry.

2      Q      -- that would be the understanding of

3  what a share event is from the standard point of

4  the person of ordinary skill in the art?

5      A      The person with ordinary skill -- the

6  skilled person would read a share event and

7  certainly would read more in the specification

8  where a share event -- the share event is defined,

9  and so that is -- there is more to -- the single

10 sentence would not be all that one would read.

11     Q      So what would the person of ordinary

12 skill in the art understand a share event to be?

13     A      I believe the skilled person would read

14 -- would read, of course, throughout the -- would

15 read -- I believe we could start with column 7 of

16 the specification and find, on line 53, that the

17 window 500 defines what -- defines a share event -

18 - or what causes a share event to occur, Figure 5.

19     Q      Well, let's turn to Figure 5.

20            So what would the person of ordinary

21 skill understand to be illustrated in Figure 5?

22     A      The skilled person would read the

23 specification, again, column 7, line 53:  The

24 window 500 of Figure 5 includes a plurality of

25 checkboxes, 502a through e, which allows the user

Dish Network et al. v. CRFD Research
IPR2015-00627  CRFD Ex. 2004

APPX1922

1 to select when browsing information will be

2 transmitted to a remote computer 106.

3      Q      So these instances of when browsing

4 information is transmitted are each potential

5 share events; is that right?

6      A      As I read the specification, the

7 checkboxes determine when browser information is

8 transmitted to a remote computer, so, by

9 definition, I believe that event is being shared.

10      Q      And if we look at Figure 5, there are

11 several of those checkboxes; right?

12      A      I see many checkboxes, yes.

13      Q      One is labeled "502a."

14             Do you see that?

15      A      I see 502a.

16      Q      And that is next to a statement that

17 says "Upon User Request"; is that right?

18      A      I read -- I read "Upon User Request,"

19 yes.

20      Q      And would the person of ordinary skill

21 understand that, if checked, an event is to be

22 coincident with upon receipt of the user request?

23             MR. BOWLING:  Objection; form.

24             THE WITNESS:  The -- excuse me for being

25 -- going a bit -- would you please repeat the

Dish Network et al. v. CRFD Research
IPR2015-00627  CRFD Ex. 2004

1  question.

2          MR. FAHMI:  Sure.

3    Q    The option for sending preference shown

4  in Figure 5, that is upon user request.

5          If that option is selected by checking

6  box 502a, what would that indicate?

7    A    The specification indicates that any of

8  the checkboxes are tests that -- to read -- to be

9  specific, a first checkbox -- and this is 50- --

10 this is column 7, line 56:  "A first checkbox 502a

11 is entitled 'upon user request' and, when

12 selected, causes the browser information contained

13 in the buffer 242 to be transmitted immediately in

14 response to a user-request."

15   Q    So how would that correlate with the

16 process shown in Figure 7?

17   A    From the specification, again, that

18 figure -- the choices of Figure 5 -- sorry,

19 choices of Figure 5 are determined -- I just would

20 like to be precise.  Give me a second.

21         Column 9 defines when that -- the

22 choices of Figure 5 are evaluated, and

23 specifically on line 3, "... the method 700

24 proceeds to step 710 and queries whether the event

25 is a 'share event,'" which means one of those

Dish Network et al. v. CRFD Research
IPR2015-00627   CRFD Ex. 2004

1   boxes were checked.  And if it is, then the event

2   is -- sends the browser information from the local

3   client computer to the remote client computer.

4        Q    So let's consider Figure 7, and in the

5   context of a user having checked box 502a,

6   indicating upon user request -- do you understand

7   these conditions?

8        A    Yes, I understand the conditions.

9        Q    So the process from Figure 7 would begin

10  at step 702; right?

11       A    Yes.

12       Q    And then at step 704, an event is

13  obtained; correct?

14       A    I understand 704 to get to event, yes.

15       Q    Step 706 is a check to see whether the

16  system has been configured for cooperative

17  browsing, as you have previously explained; right?

18       A    Yes.  706 is configured for cooperative

19  browsing.

20       Q    And then step 710, in this example,

21  would be a check to determine whether box 502a has

22  been checked; right?

23            MR. BOWLING:  Objection; form.

24            THE WITNESS:  I don't -- I don't believe

25  that's accurate.  The diamond 710 share event

Dish Network et al. v. CRFD Research
IPR2015-00627   CRFD Ex. 2004

1  checks whether any box in Figure 5 has been

2  checked.

3           BY MR. FAHMI:

4      Q    Okay.  And if box 502a has been checked,

5  what happens next?

6      A    That would -- if 502a is checked, then

7  step 710 19 would evaluate to a "yes" and proceed

8  to 724:  Does buffer contain data? meaning the

9  buffer of the browser system.

10     Q    So that's a determination as to whether

11  there is, in fact, any browser information to be

12  shared; is that right?

13          MR. BOWLING:  Objection; form.

14          THE WITNESS:  It determines whether --

15  as the specification teaches at 724, determines

16  whether -- to be precise.  One moment.

17          Again, in column 9, line 38:  "If the

18  query at step 710 is answered affirmatively (i.e.,

19  the event is a 'share event') then the method 700

20  proceeds to step 724 and queries whether the

21  buffer 242 contains browser information."

22          BY MR. FAHMI:

23     Q    And if there is no browser information,

24  what happens next?

25     A    The specification further teaches,

Dish Network et al. v. CRFD Research
IPR2015-00627  CRFD Ex. 2004

1  again, in column 9, that step -- line 41: "During

2  a first iteration of method 700," in other words,

3  "(immediately after launching the browser program

4  240), the buffer 242 will be empty and the method

5  700 will return to step 704."  I think it --

6  pertinent to that step: "During subsequent

7  iterations, one or more events may produce browser

8  information that will be buffered at step 716."

9  And, further:  "Following these iterations, step

10  724 now will be answered affirmatively and the

11  method 700 will proceed to step 720 where the

12  information contained in buffer 242 is sent to the

13  remote... computer."

14      Q    So if I understand you  --

15      A    "Remote client computer," excuse me.

16      Q    Sorry.

17          If I understand you correctly, if we

18  consider step 724 shown in Figure 7, in the case

19  where there is no information in the buffer, the

20  process simply returns to step 704 to process a

21  next event; right?

22          MR. BOWLING:  Objection; form.

23          THE WITNESS:  As I've read from the

24  specification, it indicates the 724 will branch

25  "no" on an empty buffer and return to the starting

Dish Network et al. v. CRFD Research
IPR2015-00627  CRFD Ex. 2004

1  point.

2        BY MR. FAHMI:

3    Q    And in the case where there is browser

4  information in a buffer and step 724 returns

5  "yes," then that browser information is

6  transmitted at step 720; is that right?

7    A    As I read in the specification 724, upon

8  "true" will branch to step 720.

9    Q    And step 720 is "Transmit Browser

10 Information"; 21 correct?

11   A    I read from the diagram that Figure 7 --

12 that step 720 reads "Transmit Browser Info,"

13 correct.

14   Q    What's your understanding of what that

15 means?

16   A    Browser info is defined fairly well in

17 the specification.  The browser information is

18 contained in -- let me find the column and number

19 so I can be precise.

20        Column 4, line 25 defines:  Memory 232

21 is shown containing a browser program 240, a

22 buffer 242, and interface software 250.

23        The buffer 242 is further defined on

24 line 58 of the same column 4, that "Buffer 242 is

25 a data structure that can contain browser

Dish Network et al. v. CRFD Research
IPR2015-00627  CRFD Ex. 2004

1  corresponds to checkbox 502b in Figure 5.

2        That indicates "At Shutdown"; would you

3  agree?

4    A    I read Figure 5, 502b, to be "At

5  Shutdown," yes.

6    Q    And would you agree the person of

7  ordinary skill would understand that to be the

8  time at which power to the computer is turned off?

9        MR. BOWLING:  Objection; form.

10        THE WITNESS:  I would believe that a

11  skilled person would read 502b to mean at the time

12  a program was closed or terminated, and it could

13  have equal -- either terminate or close program

14  would be a shutdown to the skilled person.

15        BY MR. FAHMI:

16    Q    The next checkbox, 502c, corresponds to

17  "At Idle Period"; is that right?

18    A    I read "At Idle Period," correct.

19    Q    And what would the person of ordinary

20  skill understand the "idle period" to mean?

21    A    I believe the specification states it

22  consistent with a skilled person.  The -- in

23  addition to -- excuse me.

24        "At idle period" selected when browser

25  information -- when client computer is idle, when

Dish Network et al. v. CRFD Research
IPR2015-00627  CRFD Ex. 2004

1  computer enters a standby or hibernation mode.

2      Q    Is there a difference between a standby

3  mode and a hibernation mode?

4      A    There could be.  To -- the skilled

5  person could read they're -- they're equivalent as

6  to the actions of the computer.  They could be --

7  for instance, a standby mode to the skilled person

8  could mean a screen saver has appeared due to a

9  timeout and one merely taps the keyboard to

10  resume.

11          Hibernation would mean, to the person of

12  the ordinary skill, the machine has saved its

13  entire operating information in memory such that,

14  again, tapping the keyboard would cause the

15  machine to recall that information and resume

16  processing.

17          Either way, to the skilled person, the

18  same action occurs:  The computer is unresponsive

19  until awakened from either standby or hibernation

20  where it resumes -- it is expected to resume

21  exactly where it left off.

22      Q    Box 502d in Figure 5 corresponds to

23  "Periodic"; would you agree?

24      A    I agree that the box reads "Periodic,"

25  502d.

Dish Network et al. v. CRFD Research
IPR2015-00627   CRFD Ex. 2004

1    Q    And what would the person of ordinary

2 skill understand the time "Periodic" to be in this

3 context?

4    A    The specification defines accurately

5 what I believe a skilled person would read it.

6         Column 8, line 6:  The client -- "For

7 example, the client computer 106 may be configured

8 to transmit the browser information every 30

9 minutes"; in other words, at a specific time

10 interval.

11    Q    And checkbox 502e in Figure 5

12 corresponds to "At Action"; would you agree?

13    A    I agree that it reads "At Action," 502e.

14    Q    What will the person of ordinary skill

15 understand "At Action" to be in this context?

16    A    The skilled person would read the

17 specification at column 8, line 12:  "The action

18 that causes transmission of the information is

19 designated by the user by selecting one or more of

20 the checkboxes 506a through c.  For simplicity,

21 the actions are" generally -- "generically,"

22 excuse me, "depicted as 'Action 1,' 'Action 2' and

23 'Action 3.'  In contrast to the user action

24 described with reference to 502a, 26 actions

25 relating to 502e... have a primary significance

Dish Network et al. v. CRFD Research
IPR2015-00627   CRFD Ex. 2004

1  other than to" transmit the browser information.

2  The "Transmission of the browser information is

3  merely associated with such actions as a

4  convenient way of sending the information with

5  requiring additional steps by a user."  I would --

6  that's as it reads.

7      Q    So what would the skilled person

8  understand based on that reading?

9      A    The skilled person would read the --

10  that portion of the specification as meaning that

11  this was a definable -- a future definable action

12  that could cause the transfer of information.

13      Q    Let's go back to Figure 7.

14      A    Okay.

15      Q    So we considered the case where the

16  evaluation in step 710 resulted in a "yes" branch;

17  right?

18      A    Correct.

19      Q    Let's consider the case where the

20  evaluation in step 710 results in a "no."

21           In that instance, what happens next?

22      A    Again, I will turn to the specification.

23  The -- step 710, evaluating to "no," is defined in

24  column 9 -- pardon me.  I know it well.  I will be

25  right there.

Dish Network et al. v. CRFD Research
IPR2015-00627   CRFD Ex. 2004

1        In column 9, line 10, the specification

2  reads: "If the event is not a 'share event'" -- in

3  other words, step 710 evaluates "no" -- "than

4  [sic] the method 700 proceeds from... 710 to step

5  712 and queries whether the event produces browser

6  information."

7    Q    And according to Bates, what events

8  produce browser information?

9    A    The specification, at line 12, reads

10  that "The determination made at step 712 is made

11  according to whether any of the checkboxes 402 are

12  selected in the data input window 400 (shown in

13  Figure 4)."

14    Q    So is it correct, then, that Figure 4

15  allows a user to define what events will produce

16  browser information?

17        MR. BOWLING:  Objection; form.

18        THE WITNESS:  The skilled person would

19  read -- would -- upon reading column 9, lines 10

20  on, would read -- would read that -- would refer

21  back earlier in the specification to where a

22  considerable amount of discussion is given to

23  Figure 4, starting in column 5 on line 64.

24        In summary, the opening of that

25  paragraph defines the action as:  "Figure 4 shows

Dish Network et al. v. CRFD Research
IPR2015-00627   CRFD Ex. 2004

32

1  original question, and that was:  Is it correct

2  that the user interface shown in Figure 4 allows

3  the user to specify what browser information to

4  share?

5      A    As I read the specification, the Figure

6  4 defines, as it is titled, what to share, and

7  that is browser information the user intends to

8  share.

9      Q    Let's go back to Figure 7, then.

10         So we have just considered the

11  evaluation that occurs at step 712; right?

12      A    Correct.  We were just discussing Figure

13  712.

14      Q    Or element 712 in Figure 7; right?

15      A    Sorry.  Excuse me.  Thank you.

16      Q    So in the instance where that

17  determination evaluates "yes," what happens next?

18      A    Figure 12, steps -- sorry, Figure 7,

19  step 712 reads:  "Does event produce browser

20  information?"

21         The specification teaches if that

22  evaluates to "yes" -- let me find a more precise -

23  - on column -- on column 9, starting with step

24  [sic] 10:  "If the event is not a 'share event'

25  than [sic] the method 700 proceeds" to step 710 --

Dish Network et al. v. CRFD Research
IPR2015-00627  CRFD Ex. 2004

1  excuse me, "from step 710 to step 712 and queries

2  whether the event produces browser information.

3  The determination made at step 712 is made

4  according to whether any of the checkboxes 402 are

5  selected in the data input window 400 (shown in

6  Figure 4). If the event does not produce browser

7  information, the event is handled as" a -- "as

8  normal processing" in "step 708. If the event does

9  produce browser information, the method 700

10 proceeds to step 714 and queries whether the local

11 client computer is configured to send the browser

12 information in response to the event."

13      Q    So with respect to step 714, what would

14 the person of ordinary skill understand to be

15 taking place?

16      A    Again, to refer back to the

17 specification, it fairly -- it clearly states in

18 column 9 -- I'll start from line 18: "If the

19 event does produce browser 31 information, the

20 method 700 proceeds to step 714 and queries

21 whether the local... computer is" sent to

22 configure -- "is configured to send the browser

23 information in response to the event." "If the

24 local... computer is configured to send the

25 browser information in response to the event, the

Dish Network et al. v. CRFD Research
IPR2015-00627   CRFD Ex. 2004

1  method 700 proceeds from" 718 to step 714 --

2  excuse me, "proceeds from step 714 to step 718

3  where the browser information is stored to the

4  buffer 7242."

5      Q    What would the person of ordinary skill

6  understand that passage of the specification to

7  mean?

8          MR. BOWLING:  Objection; form.

9          THE WITNESS:  The -- I believe it reads

10  literally.  The skilled person would read the

11  method, passing through a test of whether the --

12  whether the system was configured to send browser

13  information in response to the event, and then it

14  would find that it -- an affirmative "yes," it

15  would step to -- it would proceed to step 718 to -

16  - to format and buffer.

17          BY MR. FAHMI:

18      Q    Format and buffer what?

19      A    718 is defined as where the buffer --

20  where the browser information is stored to buffer

21  242.

22      Q    And after formatting and buffering the

23  browser information, the process would proceed to

24  step 720 to transmit that browser information;

25  correct?

Dish Network et al. v. CRFD Research
IPR2015-00627  CRFD Ex. 2004

1      A      I read the specification specifies step

2   720; that the browser information is transmitted

3   to the remote computer.

4      Q      Going back to 714 for a moment, does

5   Bates explain what is evaluated in order to

6   determine whether the system is configured to send

7   browser information in response to the event?

8      A      The specification in column 9 reads:  If

9   the event -- again, I'm sorry, I'm on line 17.

10         "If the event does produce browser

11   information, the method 700 proceeds to step 714

12   and queries whether the local" computer -- "the

13   local client computer is configured to send the

14   browser information in response to the event," and

15   that would require -- that is what I read in the

16   specification.

17      Q      So what is evaluated in order to

18   determine whether the client computer is

19   configured to send browser information in response

20   to the event at step 714?

21         MR. BOWLING:  Objection; form.

22         THE WITNESS:  One would read from -- one

23   would read from the prior -- the previous columns

24   that a combination of actions determines the step

25   714.

Dish Network et al. v. CRFD Research
IPR2015-00627   CRFD Ex. 2004

1  line 34, that returning to step -- I'm sorry. I

2  just stepped out of myself.

3          "Returning... to step 806, an

4  affirmative determination is made when the event

5  corresponds to a selection made in input window

6  600 (shown in Figure 6). In such an event, method

7  800 proceeds to step 820 where a query is made to

8  determine whether the buffer 242 contains data,"

9  in other words, browser information.

10     Q    And if the buffer does contain browser

11  information, what happens next?

12     A    The specification defines, at step 820,

13  on line 42: "If step 820 is answered

14  affirmatively, the browser information contained

15  in the buffer 242 is applied, at step 822, to

16  reconfigure the browser program 240 located on the

17  receiving client computer." I believe the skilled

18  person would read that literally.

19     Q    And is it correct that upon application

20  of that browser information, the receiving

21  computer and the sending computer will have the

22  same attributes, settings, and other information?

23          MR. BOWLING:  Objection to form.

24          THE WITNESS:  I believe the skilled

25  person would refer to the previous discussions of

Dish Network et al. v. CRFD Research
IPR2015-00627  CRFD Ex. 2004

44

1    the -- the sending computer would refer back --

2    they would refer back to Figure 4 to consider that

3    the user had the ability to select what browser

4    information is to be sent and, therefore, received

5    and would consider the selections of choices in

6    Figure 4 as to determine what is in the buffer

7    that is being received.

8            BY MR. FAHMI:

9        Q    And if we refer to column 10, lines 51

10   through 56, when the receiving computer applies

11   the browser information that has been received,

12   the receiving computer and the sending computer

13   would have the same attributes, settings, and

14   other browser information as specified by the

15   user; right?

16           MR. BOWLING:  Objection; form.

17           THE WITNESS:  Please excuse me.  You

18   were reading column 10, 51?

19           MR. FAHMI:  51 through about 56.

20           THE WITNESS:  I read that the --

21   "Subsequent to step 822, the browser program 240

22   located on the receiving computer will exhibit

23   each browser attribute and configuration setting

24   transmitted by the sending" computer -- "by the

25   sending client computer and applied by the receive

Dish Network et al. v. CRFD Research
IPR2015-00627  CRFD Ex. 2004

1  client computer.  Accordingly, two or more browser

2  programs may share attributes, settings and other

3  browser information."

4        BY MR. FAHMI:

5     Q    So the browser information or attributes

6  or settings that the user, at the sending

7  computer, has specified should be transmitted, get

8  received at the receiving computer; correct?

9     A    That is correct.

10    Q    And the receiving computer applies that

11 browser information or setting or attributes as

12 shown in Figure 8; right?

13    A    Correct.

14    Q    And, at that point, insofar as the

15 information that was transmitted and received, the

16 browser at the sending computer and the browser at

17 the receiving computer have the same attributes or

18 settings or other browser information; right?

19    A    I would like to clarify.  I do not agree

20 with the statement.  I believe my previous

21 statement remains correct, that the two browsers,

22 the sending and receiving browser, will be -- will

23 contain the same information to the extent that

24 the user has chosen to share, as defined in Figure

25 4.

Dish Network et al. v. CRFD Research
IPR2015-00627   CRFD Ex. 2004

46

1    Q    And if we refer to column 11, lines 6

2  through 8, Bates indicates that, in effect, then,

3  this process preserves the current status of a

4  browsing session to be resumed at another

5  location; right?

6            MR. BOWLING:  Objection; form.

7            THE WITNESS:  I read, in column 11, that

8  "In effect, the present invention preserves the

9  current status of a browsing session to be resumed

10 at another location."

11            BY MR. FAHMI:

12    Q    So you would agree with what I said?

13            MR. BOWLING:  Objection; form.

14            THE WITNESS:  May I ask you to restate.

15            MR. FAHMI:  Sure.

16    Q    My question was that Bates indicates

17 that, in effect, the process that's been described

18 preserves the current status of a browsing session

19 to be resumed at another location; correct?

20    A    I agree.

21            MR. BOWLING:  Objection; form.

22            THE WITNESS:  Excuse me.  I agree that I

23 read the same and understand it to be the same.

24            BY MR. FAHMI:

25    Q    So I've now handed you what's been

Dish Network et al. v. CRFD Research
IPR2015-00627  CRFD Ex. 2004

47

1  previously marked as Exhibit 1005.

2          Do you recognize this exhibit?

3      A    Yes, I do.

4      Q    What do you recognize it as?

5      A    I recognize it as a document published

6  in the IEEE in the Personal Communications

7  Journal, and it is written by what has been

8  referred to as "Chan," and it's discussion of

9  next-generation data services.

10          Excuse me, let me have some water and

11  clear up here.

12      Q    If I refer to Exhibit 1005 as "Chan,"

13  will you know what I'm talking about?

14      A    Yes, I will.

15      Q    Was Chan one of the references you

16  considered in connection with the preparation of

17  your declaration?

18      A    Yes, Chan was considered in my

19  declaration.

20      Q    When is the last time you had a chance

21  to review Chan?

22      A    I reviewed this document earlier in this

23  week.

24      Q    Let me invite your attention to page 4

25  of the exhibit.  It's page 23 of the article.  And

Dish Network et al. v. CRFD Research
IPR2015-00627  CRFD Ex. 2004

1   on the left-hand column of the page, about halfway

2   down, there's a section entitled "Application

3   Transfer."

4           Do you see that?

5   A    I do see "Application Transfer."

6   Q    And the third paragraph in that section

7   begins: Broadly speaking.

8           Do you see that?

9   A    I see that paragraph.

10  Q    In this paragraph, Chan refers to a pull

11  model and a push model.

12          Do you see that?

13  A    I see pull -- push and pull.

14  Q    Would you agree with the definitions for

15  pull model and push model that Chan gives in this

16  paragraph?

17          MR. BOWLING:   Objection; form.

18          THE WITNESS:   In the context of the

19  discussion of this article, I agree with the

20  definition as provided in this paragraph.

21          BY MR. FAHMI:

22  Q    Let's look at page 6 of the exhibit.

23  It's page 25 of the article.   Towards the bottom

24  of the left-hand column there's a section entitled

25  "Control Plane."

Dish Network et al. v. CRFD Research
IPR2015-00627   CRFD Ex. 2004

1          Do you see that?

2      A    I see the section labeled "Control

3  Plane."

4      Q    And the first subheading under that is

5  entitled "State Management."

6          Do you see that?

7      A    I see the word "State Management" --

8  words.

9      Q    In this section, Chan is describing the

10  steps in an application transfer when a client

11  moves from one device to another; would you agree?

12          MR. BOWLING:  Objection; form.

13          THE WITNESS:  I read those words:  When

14  a client moves from one device to another.

15          BY MR. FAHMI:

16      Q    Would you agree that's what's described

17  here?

18      A    I agree that is what's described here,

19  yes.

20      Q    Now, I've handed you what's been

21  previously marked as Exhibit 1019.

22          Do you recognize this exhibit?

23      A    Yes, I recognize the exhibit.

24      Q    What do you recognize it as?

25      A    I recognize it as a paper presented in

Dish Network et al. v. CRFD Research
IPR2015-00627   CRFD Ex. 2004

1  the pull mechanism; right?

2          MR. BOWLING:  Objection to the form.

3          THE WITNESS:  I see a discussion halfway

4  through where it is labeled "This approach is

5  clearly a pull mechanism."

6          BY MR. FAHMI:

7    Q    And the approach that's being referred

8  to is one where the user selects a suspend

9  operation; is that correct?

10   A    I read, in the third sentence of the

11 paragraph: If the user selects a suspend

12 operation, the session will be saved back to the

13 middleware server, allowing the application to

14 terminate, and, at a later time, the session can

15 be reinstated by the teaching file application

16 running on the target machine.

17   Q    And those activities are what Phan

18 indicates constitute a pull mechanism; correct?

19   A    That is correct.

20   Q    Now, if we look back at Figure 5, we see

21 that suspend is one of the options for target in

22 the teaching file applet interface; correct?

23         MR. BOWLING:  Objection; form.

24         THE WITNESS:  Correct.  I read, in

25 Figure 5,

Dish Network et al. v. CRFD Research
IPR2015-00627  CRFD Ex. 2004

57

1          "Target:  Has a choice of suspend."

2          BY MR. FAHMI:

3     Q     Would the person of ordinary skill in

4   the art understand that the suspend option in the

5   drop-down menu shown in the interface illustrated

6   in Figure 5 is what is being referred to in the

7   paragraph on page 11, indicating that when the

8   user selects the suspend operation, the session is

9   saved back to the MWS?

10          MR. BOWLING:  Objection; form.

11          THE WITNESS:  I read -- I read that if

12  the user selects a suspend operation, his session

13  will be saved back to the MWS, yes.

14          May I ask for 30 seconds?

15          MR. FAHMI:  Of course.

16          (Recess taken from 11:01 to 11:05 a.m.)

17          BY MR. FAHMI:

18     Q     So I handed you a copy of what's

19  previously marked as Exhibit 1020.

20          And do you recognize this exhibit?

21     A     I do.

22     Q     What do you recognize it as?

23     A     I recognize it as another paper

24  presented by the author of the previous, Thomas

25  Phan, presented in Helsinki and at approximately

Dish Network et al. v. CRFD Research
IPR2015-00627  CRFD Ex. 2004

64

1      A      They discuss the use of a Mozilla web

2  browser as part of their system, yes.

3      Q      And that Mozilla web browser has been

4  modified by the addition of the MARC code that we

5  discussed previously; right?

6              MR. BOWLING:  Objection; form.

7              THE WITNESS:  Correct.

8              At the third paragraph reads:  For the

9  MARC inside Mozilla, we have implemented our

10 functionality by grafting together Java code with

11 Mozilla's C++ through the use of a Java native

12 interface, otherwise known as "JNI."

13             So, yes, they are using that for this

14 purpose.

15             BY MR. FAHMI:

16     Q      In the right-hand column on page 10, a

17 sequence of steps involved in a session transfer

18 is outlined; would you agree?

19     A      I see those steps.

20     Q      And the first step has the user starting

21 the client application and providing a user ID; is

22 that right?

23     A      That -- I read the same in step 1, yes.

24     Q      And in the next step, the MARC code

25 within the application discovers and contacts the

Dish Network et al. v. CRFD Research
IPR2015-00627  CRFD Ex. 2004

1  middleware server; right?

2      A    Correct.

3      Q    And the application referred to in that

4  step is the Mozilla web browser; right?

5      A    From the previous paragraphs, I would

6  read that to be the Mozilla web browser as the

7  application.

8      Q    And when the MARC code in the Mozilla

9  web browser contacts the middleware server, the

10  last saved state, if it exists, is retrieved from

11  the middleware server; correct?

12      A    I read that the user -- this step uses

13  Java RMI to acquire the most recently saved

14  bookmarks, history, and user preferences, all of

15  which are stored on and transported from the

16  middleware as serialized Java objects.

17      Q    So the MARC code inside the Mozilla web

18  browser on the client contacts the middleware

19  server, and if the information exists, the MARC

20  code retrieves the saved bookmarks, history, and

21  user preferences from the middleware server; is

22  that correct?

23      A    That is correct.

24      Q    And we are told, in the previous

25  paragraph at the top of the right-hand column of

Dish Network et al. v. CRFD Research
IPR2015-00627   CRFD Ex. 2004

1  page 10, that those objects would constitute a

2  session state; is that right?

3          MR. BOWLING:  Objection; form.

4          THE WITNESS:  It reads:  For Mozilla, we

5  consider a session state to be the bookmark list,

6  the history file, the user preferences, and the

7  cache of web pages.

8          BY MR. FAHMI:

9     Q    So in step 2 of the sequence, the MARC

10  code within the Mozilla web browser contacts the

11  middleware server.  If there is a last session

12  state stored by the middleware server, the MARC

13  code in the Mozilla web browser on the client

14  retrieves that session state; is that right?

15          MR. BOWLING:  Objection; form.

16          THE WITNESS:  I agree that that is the

17  process that is performed.

18          BY MR. FAHMI:

19     Q    And then in step 3, the MARC code

20  incorporates that session state into the client

21  before the user's current interactive application

22  session begins; is that 61 right?

23          MR. BOWLING:  Objection; form.

24          THE WITNESS:  It would -- I believe it

25  would be more accurate to say the data is

Dish Network et al. v. CRFD Research
IPR2015-00627   CRFD Ex. 2004

1  processed by the MARC -- they call it

2  "deserializing" -- and then read into the data

3  space of the Mozilla browser to configure it for

4  first use.

5        BY MR. FAHMI:

6    Q    And that's so the Mozilla browser can

7  then make use of that session state as it begins a

8  new session; right?

9        MR. BOWLING:  Objection; form.

10        THE WITNESS:  That is correct.  Mozilla

11  will begin at the -- from the state as specified

12  by those three data items.

13        BY MR. FAHMI:

14    Q    Does the process that's outlined in

15  those first three steps of the sequence constitute

16  a pull mechanism?

17        MR. BOWLING:  Objection; form.

18        THE WITNESS:  As described -- I would

19  assume you would have to mean as described in the

20  San Jose paper?

21        MR. FAHMI:  Sure.  Let me rephrase it so

22  that that's clear.

23    Q    Considering the push and pull mechanisms

24  described in Phan San Jose, would a person of

25  ordinary skill in the art understand the first

Dish Network et al. v. CRFD Research
IPR2015-00627  CRFD Ex. 2004

1  three steps of the sequence described at page 10

2  of Phan Helsinki to be a pull mechanism?

3      A    I believe that the skilled person would

4  perceive steps 1 through 3 to be a pull mechanism

5  as defined by Phan San Jose.

6          MR. FAHMI:  I don't have any further

7  questions. Thank you.

8          THE WITNESS:  As in breaking for lunch?

9          MR. FAHMI:  I'm done.

10          THE WITNESS:  We are done.  Okay.  Okay.

11  That was too easy.

12          MR. BOWLING:  I have no questions.

13          MR. FAHMI:  Thank you, Mr. Hoarty.

14          THE WITNESS:  I'm sorry.  Excuse me.

15  Thank you.

16          (TIME NOTED:  11:26 A.M.)

17

18

19

20

21

22

23

24

25

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing

paper entitled

## JOINT APPENDIX

was filed with the Clerk of the United States Court of Appeals for the Federal

Circuit via the CM/ECF SYSTEM. Counsel registered with the CM/ECF system

have been served by operation of the Court's CM/ECF SYSTEM per Fed. R. App.

P. 25 and Fed. Cir. R. 25(c) on the 12th day of December, 2016.


Date: December 12, 2016        /s/Tarek N. Fahmi
                               _____
                               Tarek N. Fahmi
                               Attorney for Appellant


Ascenda Law Group, PC
333 W. San Carlos Street, Suite 200
San Jose, CA 95110

Tel: 866-877-4883
Email: tarek.fahmi@ascendalaw.com